IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RENEE M. BUTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-495 (JJF) |
| | ) | |
| LAWNS UNLIMITED LTD., AND, | ) | |
| EDWARD FLEMING | ) | |
| Defendants. | ) | |
| | ) | |

**COMPENDIUM OF UNREPORTED DECISIONS**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Margaret M. DiBianca, Esq.
William W. Bowser, Esquire (Bar I.D. 2239)
Margaret M. DiBianca, Esquire (Bar I.D. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801
Telephone: (302) 571-6601, 571-5008
Facsimile : (302) 576-3282, 576-3476
Email: wbowser@ycst.com; mdibianca@ycst.com

DATED:    January 31, 2007

**CHRISTOPHER J. AROTS, Plaintiff v. SALESIANUM SCHOOL, INC., Defendant.**

**C.A.No. 01-334 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 10171*

**June 17, 2003, Decided**

**DISPOSITION:** [*1] Motion for summary judgment granted. Judgment entered in favor of the defendant.

**COUNSEL:** Christopher J Arots, PLAINTIFF, Pro se, Delhaven, NJ USA.

For Salesianum School, Inc, DEFENDANT: Mark L Reardon, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On May 23, 2001, Christopher J. Arots filed a *pro se* complaint against Salesianum School, Inc. ("Salesianum"), alleging employment discrimination in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et seq.* Presently before the court is the defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (D.I. 7). For the following reasons, the court will grant the motion.

### II. BACKGROUND

Arots worked as a music teacher at Salesianum School for twenty-three years. On January 13, 2000, the school terminated his employment. The plaintiff alleges that his discharge was motivated by discrimination concerning an unnamed disability. Accordingly, Arots filed a charge [*2] with the Equal Employment Opportunity Commission ("EEOC") on August 24, 2000. On December 15, 2000, the EEOC mailed to Arots and to legal counsel for Salesianum a "Dismissal and Notice of Rights" letter stating that any lawsuit arising from the same charge must be filed within ninety days of the receipt of the letter. Salesianum received the letter on December 22, 2000; Arots maintains that he received the letter on February 23, 2001.

Arots filed the present suit on May 23, 2001. Nearly one year later, Arots had yet to provide notice of the lawsuit to Salesianum. Accordingly, on April 30, 2002, the court ordered Arots to show good cause within twenty days as to why the complaint should not be dismissed without prejudice pursuant to *Federal Rule of Civil Procedure 4(m).* On May 14, 2002, Arots mailed the Notice and Request for Waiver of Service and Summons to the defendant, which he then filed on May 23, 2002. The notice was defective, however, in that it provided Salesianum with only five days to respond. Moreover, Arots still had not served the defendant with process. Consequently, the court issued a second order on December 9, 2002 requiring Arots to serve the summons and complaint [*3] upon the defendant within ten days. Eleven days later, on December 20, 2002, Arots served Salesianum with process.

### III. STANDARD OF REVIEW

The defendant moves for dismissal or, in the alternative, summary judgment. Because the court will consider evidence outside the scope of the pleadings, it will treat the present motion as a motion for summary

judgment pursuant to *Federal Rule of Civil Procedure 56. See, e.g., Public Interest Research Group v. Powell Duffryn Terminals, 913 F.2d 64, 71* (converting motion to dismiss to motion for summary judgment when additional evidence was submitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*; *see also Boyle v. County of Allegheny Pa., 139 F.3d 386, 392 (3d. Cir. 1998)*. Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving **[*4]** party. *Boyle, 139 F.3d at 392*. A fact is material if it might affect the outcome of the suit. *Id.* (Citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-74 (3d Cir. 1999)*.

## IV. DISCUSSION

### A. Compliance with the Ninety-Day Statutory Limitations Period

The defendant first moves for summary judgment on the basis that the plaintiff's claim is untimely for failure to file within the prescribed statutory period. For the reasons that follow, the court agrees that the present suit is untimely, and that the plaintiff has not adduced evidence sufficient to warrant tolling of the limitations period.

#### 1. Timeliness of the Plaintiff's Claim

Before bringing a discrimination claim in federal court pursuant to the ADA, the aggrieved party must file a charge of discrimination with **[*5]** the EEOC. If the Commission dismisses the charge, the aggrieved party may sue the employer directly within ninety days of the receipt of the EEOC notification of dismissal. *42 U.S.C. § 2000e-5(f)(1) (2003)*. This notification comprises a letter of determination ("Dismissal and Notice of Rights") informing the party of his or her right to sue and the ninety-day time period in which to file suit. *29 C.F.R. § 1601.19(a) (2003)*. When the receipt date of the right to

sue letter is in dispute, and there is no evidence pertaining to when the letter was actually received, *Rule 6(e) of the Federal Rules of Civil Procedure* will control by invoking the presumption of receipt within three days of mailing. *Seitzinger v. Reading Hosp. and Med. Ctr., 165 F.3d 236, 239 (3d Cir. 1999)*. Furthermore, without evidence regarding the plaintiff's receipt of the right to sue notice, any attempt to file suit even one day after the expiration of the ninety-day time period must result in dismissal. *Mosel v. Hills Department Store, Inc., 789 F.2d 251, 253 (3d Cir. 1986)* (citing cases); *see also Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152, 80 L. Ed. 2d 196, 104 S. Ct. 1723 (1984)* **[*6]** (*per curiam*) ("Procedural requirements established by Congress for gaining access to federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.").

In this case, it is undisputed that the EEOC issued and mailed the Dismissal and Notice of Rights letter on December 15, 2000. The defendant received the letter on December 22, 2000. By contrast, Arots maintains that he received the letter on February 23, 2001. Because he offers no evidence in support of this bare assertion, however, *Rule 6(e)*, presuming receipt after three days from the mailing date, must be applied. Therefore, the presumed date of receipt is December 18, 2000, or three days after the mailing date of December 15, 2000. Because the present suit was filed nearly 180 days after the presumed receipt of the right to sue letter, it is apparent that the action is untimely.

#### 2. Equitable Tolling of the Statutory Period

Although not raised by the *pro se* plaintiff, the court will consider whether equitable tolling of the ninety-day statutory period is appropriate in this case. It is well-established that federal courts should invoke the equitable tolling doctrine 'only sparingly. **[*7]** ' *United States v. Midgley, 142 F.3d 174, 179 (3d Cir. 1999)* (quoting *Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96, 112 L. Ed. 2d 435, 111 S. Ct. 453 (1990))*. In the Third Circuit, equitable tolling may be appropriate in certain limited contexts: (1) if the defendant actively misled the plaintiff; (2) if the plaintiff was prevented, in some extraordinary way, from asserting his rights; (3) if the plaintiff timely asserted his rights mistakenly in the wrong forum; (4) if the claimant received inadequate notice of his right to file a suit; (5) if a motion for appointment of counsel is pending; or (6) if the court

misled the plaintiff into believing that he had done everything required of him. *Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999).* In each of these contexts, the party seeking equitable tolling must have demonstrated reasonable diligence in investigating and filing his claims. *New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1126 (3d Cir. 1997).*

In his answer to the defendant's motion, the plaintiff reports that, after being discharged from his job, he fell into a serious depression and became alcoholic and suicidal. Pl. **[*8]** 's Response to Def.'s Motion for Summary Judgment (D.I. 11) at 1. Arots also explains that he waited to receive his pension check before filing suit. *Id.* at 2. These facts, although unfortunate, do not establish an extraordinary barrier to the plaintiff's ability to assert his rights in a timely manner. In this circuit, "mental incompetence is not *per se* a reason to toll the statute of limitations." *Lake v. Arnold, 232 F.3d 360, 371 (3d Cir. 2000)* (citing *Barren by Barren v. United States, 839 F.2d 987 (3d Cir. 1988)*). Tolling may be warranted if the mental incompetence motivated the injury which the plaintiff seeks to remedy - for example, when a mentally incompetent plaintiff seeks tolling to allow him to sue for his involuntary commitment during the entire limitations period. *Id.* (citing *Eubanks v. Clarke, 434 F. Supp. 1022 (E.D. Pa. 1977)*). From the bare facts asserted by the plaintiff, there appears to be no such relationship between his depression and alcoholism and the injury he seeks to redress, as these hardships occurred after his discharge from Salesianum. In any case, Arot's conclusory and unsupported statements, **[*9]** without more, do not support a finding that equitable tolling is warranted. *See, e.g., Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000)* ("[The plaintiff's] conclusory and vague claim, without a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights, is manifestly insufficient to justify any further inquiry into tolling.").

In his answer, Arots also states that he thought he had filed suit within the statutory time frame. *See, e.g.,* Pl.'s Response to Def.'s Motion at 2 ("I was told how much time I had to file a law suit by federal court, and I met the time line."). If this bare statement may be construed as an assertion that his right to sue notice was insufficient, this argument fails as well. By following *Rule 6(e)*, which is appropriately applied when the date of receipt is in dispute without supporting evidence, Arots is

presumed to have received adequate notice of the time constraint through the right to sue letter. The plaintiff offers no evidence to rebut this presumption.

Likewise, if by his statements Arots intends to suggest that the court misled him into **[*10]** believing that he had done everything required of him, this argument is unsupported. The court has issued no orders or opinions addressing the timeliness of the plaintiff's claims prior to the present memorandum. There is no evidence, or even suggestion, other than the plaintiff's vague assertions, that any employee of the court misled him into believing that he had complied with the statutory deadline. Thus, the court will not found its decision on any such implication.

Finally, the court considers the plaintiff's *pro se* status. Equitable tolling is more appropriate when the litigant is inexperienced and proceeding *pro se. Ricciardi v. Consolidated Rail Corp., 2000 U.S. Dist. LEXIS 14173, 2000 WL 1456736, at *4 (E.D.Pa. 2000)* (citing *Kocian Getty Refining & Marketing Co., 707 F.2d 748, 755 (3d Cir. 1983)*). Nonetheless, a plaintiff's *pro se* status does not, alone, justify the application of equitable principles to excuse the failure to meet procedural requirements. Indeed, "although ... conformity with procedural rules should be viewed liberally when a litigant is acting *pro se,* the rules are not suspended simply because the litigant is unrepresented by counsel. The **[*11]** *pro se* complainant must exercise reasonableness and good faith in prosecution of his claims." *Carter v. Three Unknown Police Officers, 112 F.R.D. 48, 52 (D. Del. 1986); see also McNeil v. United States, 508 U.S. 106, 113, 124 L. Ed. 2d 21, 113 S. Ct. 1980 (1993)* ("We have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."). In this case, there is no evidence that Arots encountered any undue hardship in filing the suit, or that any of the other considerations for equitable tolling are present. Furthermore, as discussed below regarding the plaintiff's extremely untimely service of process upon the defendants, it seems apparent that Arots did not exercise due diligence in pursuing his claims. Therefore, despite the plaintiff's *pro se* status, tolling of the statutory guidelines is not warranted.

## B. Timeliness of Service of the Complaint and Summons

The defendant also moves for summary judgment on

the basis that the complaint was not timely served. Because the court has found that the present action must be dismissed for other reasons, it **[*12]** need not address this alternative argument at length. The court notes, however, that the plaintiff failed to serve the summons and complaint upon the defendant until December 20, 2002, approximately fifteen months after the expiration of the 120-day period, and only after two court orders requiring the plaintiff to show good cause for his failure to timely serve and ordering him to effect service. When considered in light of the plaintiff's failure to timely file suit, the court finds, unequivocally, that the present action must be dismissed. *See, e.g., Fernandez v. I.R.S., 1994 U.S. Dist. LEXIS 10619, 1994 WL 591556 (D.N.J. 1994)* (dismissing *pro se* complaint for failure to serve within 120-day period); *Momah v. Albert Einstein Med. Ctr., 158 F.R.D. 66, 69-70 (E.D. Pa. 1994)* (dismissing complaint served one day after expiration of 120-day period when defendant hospital had conducted business "in the broad light of day" and plaintiff had been employed there); *Parker v. State of Delaware, 2000 U.S. Dist. LEXIS 3112, 2000 WL 291537, at *2 (D. Del. 2000)* (dismissing complaint when plaintiff failed to serve defendants within 120-day period and noting that "extension is particularly inappropriate **[*13]** in the present case because plaintiffs failed to file their complaint within the 90-day 'right to sue' period for Title VII and ADA actions.").

## VI. CONCLUSION

Although he received adequate notice of his right to sue and the associated time constraint, the plaintiff failed to file suit within the prescribed statutory period, and he did not present evidence to warrant equitable tolling of the limitations period. Furthermore, Arots failed to timely serve the summons and complaint upon the defendant. As such, the present action must be dismissed.

THEREFORE, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss or for Summary Judgment (D.I. 7) is GRANTED.

2. Judgment be and is hereby entered in favor of the defendant.

3. The Clerk of the court is directed to close this case.

Dated: June 17, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE



Analysis
As of: Jan 31, 2007

**PAUL G. BREINER; MARSHA L. BREINER; ANGELA SERFAS; WEST PENN
TOWNSHIP ANDREAS NO. 1; ANDREAS VOLUNTEER FIREFIGHTER'S
RELIEF ASSOCIATION; BYRON HESS, Appellants v. SUZANNE LITWHILER;
JAMES TIERNEY; BRIAN JOHNSON; LEROY BREINER; ALAN PARKER;
ERNEST BOERNER; SAMUEL A. SOLEY; WEST PENN FIRE COMPANY # 1;
W PENN TOWNSHIP; PAUL DATTE**

**No. 03-1543**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**98 Fed. Appx. 75; 2004 U.S. App. LEXIS 5400**

**December 2, 2003, Submitted Under Third Circuit Lar 34.1(a)
March 23, 2004, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On appeal from the Memorandum
and Order of the Honorable Thomas I. Vanaskie of the
United States Court for the Middle District of Pennsyl-
vania. (D. C. Civil No. 3: 00-cv-00594). Breiner v. Lit-
whiler, 245 F. Supp. 2d 614, 2003 U.S. Dist. LEXIS
2445 (M.D. Pa., 2003)

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a dispute between a
newly formed volunteer fire department and an existing
volunteer fire department, many of the issues underlying
the claims of appellants, the old department and mem-
bers, had been decided against them in prior litigation in
state court. The United States District Court for the Mid-
dle District of Pennsylvania granted the motion for
summary judgment of appellees, the new department and
members. This appeal followed.

**OVERVIEW:** In a 42 U.S.C.S. § 1983 case, appellants
alleged that appellees violated their rights under the First,
Fourth, and Fourteenth Amendments. The complaint also
invoked the court's supplemental jurisdiction to assert
state law claims for defamation, malicious prosecution,
and civil conspiracy. The district court did not err in
striking appellants' second amended complaint. Not only
did it not comply with the requirements of Fed. R. Civ.
P. 15(a), but the amendment would have been substan-
tially prejudicial. A state court had already rejected ap-
pellants' claims that certain equipment was illegally
transferred to the new fire department. Since those
claims formed the basis of their First, Fourth, and Four-
teenth Amendment claims in the present case, the district
court properly found that appellants were precluded from
relitigating those issues. In regards to those claims not
resolved in the prior state cases, the district court prop-
erly concluded that the evidence did not support those
claims.

**OUTCOME:** The judgment of the district court striking
the second amended complaint and granting summary
judgment dismissing the case was affirmed.

**CORE TERMS:** truck, township, firefighting, prior
adjudication, relitigating, funding, evidentiary support,
state law, correctly, elected, collateral estoppel, summary
judgment, transferred, volunteer, rescue

98 Fed. Appx. 75, *; 2004 U.S. App. LEXIS 5400, **

**COUNSEL:** For PAUL G. BREINER, MARSHA L. BREINER, ANGELA SERFAS, W PENN TWP ANDREAS, ANDREAS VOLUNTEER FIREFIGHTER'S RELIEF ASSOCIATION, BYRON HESS, Appellant: Donald A. Bailey, Harrisburg, PA.

For SUZANNE LITWHILER, JAMES TIERNEY, BRIAN JOHNSON, Appellee: Rolf E. Kroll, Badowski, Banko, Kroll, Kronthal & Baker, Harrisburg, PA. Shaun J. Mumford, Margolis Edelstein, Harrisburg, PA.

For LEROY BREINER, ALAN PARKER, ERNEST BOERNER, SAMUEL A. SOLEY, W PENN FIRE CO # 1, Appellee: Karen S. Coates, Harrisburg, PA.

For W PENN TWP, Appellee: Janine M. Torda, Carmen M. Rinkunas, Eiseman, Myers & Liero, Scranton, PA.

**JUDGES:** Before: SLOVITER, ALITO and FRIEDMAN, * Circuit Judges.

* Daniel M. Friedman, United States Senior Circuit Judge for the Federal Circuit, sitting by designation.

**OPINION:** [*76] OPINION OF THE COURT

FRIEDMAN, [**2] Circuit Judge.

This case involves a dispute between two volunteer firefighting organizations in the same township over their respective roles there. The second organization had been recently formed by dissident members of the first organization, and the first and some of its members sued the former and its members in federal court. The district court held that many of the issues underlying the plaintiffs' claims had been decided against them in prior state court litigation (between the parties); and that collateral estoppel precluded the plaintiffs from relitigating those claims; the court also rejected for lack of supporting evidence the plaintiffs' other claims that had not been so litigated. The district court granted summary judgment for the defendants, dismissing the suit. We affirm.

I

For many years Andres Fire Company No. 1, a volunteer fire fighting organization, had been the recognized fire company of West Penn Township in Pennsylvania. Dissension developed within the organization, and in 1999 several of its members left the organization and formed West Penn No. 1 fire company. The township's

Board of Supervisors officially recognized West Penn No. 1 as the township's [**3] firefighting organization. Two months later, at the scheduled quarterly meeting of the Andreas Volunteer Firefighter's Relief Association ("relief association"), a quorum of the association's members (mostly those who had left Andreas No. 1 to form West Penn No. 1) voted to transfer some of the firefighting equipment, including a rescue truck, to West Penn No. 1. Members of the relief association gained access to the Andreas No. 1 fire hall and removed the equipment and truck.

Litigation in the Pennsylvania state courts soon followed. The first suit, originally an equity action that was converted to one for a declaratory judgment, sought deactivation of West Penn No. 1, re-recognition of Andreas No. 1 and the concomitant funding that it would entail, and a declaration that the removed equipment and truck belonged to Andreas No. 1. The court found that the township's recognition and funding of West Penn No. 1 was valid; the plaintiffs did not appeal that ruling.

The second suit was a replevin action brought by Andreas No. 1 and the relief association seeking the return of the firefighting equipment that had been transferred to West Penn No. 1. West Penn returned the rescue truck [**4] to Andreas No. 1. The trial court then held that although the temporary transfer of the truck for use by West Penn No. 1 was authorized, ownership of the truck had remained with the relief association. A state appellate court upheld the trial court's finding that the transfer was valid, but remanded to the trial court to determine whether Andreas No. 1 or the relief association owned the truck and related equipment. The parties apparently resolved this issue and the state court action was terminated.

While the two state court proceedings were still pending, Andreas No. 1, the relief association, and four of their members filed suit in the United States District Court for the Middle District of Pennsylvania against West Penn No. 1, eight of its members and the township. The amended complaint, filed under 42 U.S.C. § 1983 (2000), alleged that various of the defendants had violated various of the plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments. The complaint also invoked the court's supplemental jurisdiction to assert state law claims for defamation, malicious prosecution and civil conspiracy.

[*77] In a lengthy opinion, the [**5] district court granted summary judgment for the defendants and dismissed the complaint. The court first dismissed the plaintiffs' second amended complaint because they had not complied with the court's requirement for filing such a document. The court held that the doctrines of issue or claim preclusion barred the plaintiffs from litigating

98 Fed. Appx. 75, *; 2004 U.S. App. LEXIS 5400, **

many of their section 1983 claims because the issues underlying those claims had been decided against them in the prior state cases. The court also held that the claim relating to the transfer of the truck and equipment to West Penn No. 1 failed to state a valid claim under section 1983 because it did not involve state action. The court further ruled that with respect to issues not so precluded, the plaintiffs had failed to present adequate evidentiary support for them. The court dismissed the supplemental state law claims without prejudice. Since the plaintiffs do not separately challenge that ruling, we need not address it further.

II

A. Following the completion of discovery, the court gave the plaintiffs until August 31, 2001, "to file a motion for leave to amend the complaint with supporting brief." The plaintiffs did not file such a motion. [**6] Instead, on that date they filed a second amended complaint that added an additional claim and an additional party.

The district court struck the second amended complaint for failure to seek judicial authorization for filing it. The court pointed out that under Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend a complaint without leave of court only once, and that additional amendments may be made "only by leave of court or by written consent of the adverse party." The court further stated that "even if Plaintiffs had sought leave to amend, the filing of a second amended complaint would not have been allowed," because such amendment would have "substantially prejudiced" the defendants.

The district court did not abuse its discretion in striking the second amended complaint.

B. In determining whether the Pennsylvania state court adjudications in the prior cases barred the plaintiffs from relitigating those issues in the district court, we "apply the same preclusion rules as would the courts of that state." Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993). Under Pennsylvania law, [**7]

collateral estoppel applies when the issue decided in the prior adjudication was identical with the one presented in the later action; there was a final judgment on the merits; the party against whom the

plea is asserted was a party or in privity with a party to the prior adjudication; and the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior adjudication.

Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 777 A. 2d 418, 435 (Pa. 2001).

In the prior Pennsylvania cases, the state courts rejected the plaintiffs' claims that the truck and equipment were illegally transferred to West Penn No. 1, and that the township had no authority to recognize and shift funding to West Penn No. 1. Those are the same issues that underlie the plaintiffs' First, Fourth, and Fourteenth Amendment claims. The district court correctly ruled that the plaintiffs were precluded from relitigating those issues in the present district court case. The district court also correctly held that the plaintiffs had not shown that the transfer of the firetruck and equipment to West [*78] Penn No. 1 involved state action; as [**8] a result their section 1983 claim on that issue was fatally flawed.

C. With respect to issues that had not been resolved in the prior state cases, the district court discussed the evidence on those issues at some length and properly concluded that it did not support the plaintiffs' claims. We need not repeat that discussion here. A single example is illustrative.

The plaintiff Angela Serfass contended that the West Penn defendants violated her First Amendment rights by refusing to allow her to serve as Fire Police Captain after she had been elected to that post. She contended the defendants took that action because she was allied with the Andreas No. 1 faction. The defendants responded that she was denied the position because the township required that its holder be at least twenty-one years old (which she concededly was not when she was elected). The district court stated that "after she attained 21 years old, she was approved as Fire Police Captain." The court further stated that "there is absolutely no evidence that she was denied the position because of her affiliation with Andreas No. 1 or the Andreas Relief Association."

The district court did not err in dismissing those [**9] claims for lack of evidentiary support.

CONCLUSION

The judgment of the district court striking the second amended complaint and granting summary judgment dismissing the case is affirmed.

LEXSEE



Analysis
As of: Jan 31, 2007

### KELLY ECONOMOS v. THE SCOTTS COMPANY

### CIVIL ACTION NO. 05-271

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2006 U.S. Dist. LEXIS 84646

### November 20, 2006, Decided
### November 21, 2006, Filed; November 21, 2006, Entered

**PRIOR HISTORY:** Economos v. Scotts Co., 2005 U.S. Dist. LEXIS 29246 (E.D. Pa., Nov. 22, 2005)

**CORE TERMS:** dispatcher, season, busy, overtime, summary judgment, retaliation, male, plant, protected activity, work overtime, deposition, unfair, pregnancy, prima facie case, female, sexual discrimination, discriminatory discharge, prima facie, favorably, resign, spoke, protected class, adverse action, discriminatory, non-moving, proffered, John Rule, treated differently, temporary employee, childcare

**COUNSEL:** [*1] For KELLY ECONOMOS, Plaintiff: OLUGBENGA O. ABIONA, LEAD ATTORNEY, PHILADELPHIA, PA.

For THE SCOTTS COMPANY, Defendant: CHRISTOPHER J. MURPHY, LEAD ATTORNEY, SEAN WALKER SLOAN, SAUL EWING, LLP, PHILADELPHIA, PA.

**JUDGES:** BRUCE W. KAUFFMAN, J.

**OPINION BY:** BRUCE W. KAUFFMAN

**OPINION:**

### MEMORANDUM AND ORDER

**Kauffman, J.**

November 20, 2006

Plaintiff Kelly Economos ("Plaintiff") brings this action against The Scotts Company ("Scotts" or "Defendant") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, et seq. ("PHRA"). Specifically, Plaintiff alleges sexual and pregnancy discrimination in violation of Title VII and the PHRA (Counts I and III, respectively), and retaliation in violation of Title VII and the PHRA (Counts II and IV, respectively). In a Memorandum and Order dated November 22, 2005, this Court dismissed the pregnancy discrimination claims. Now before the Court is Defendant's Motion for Summary Judgment as to Plaintiff's remaining claims. For the reasons that follow, Defendant's Motion will be granted.

[*2] **I. BACKGROUND**

This case arises out of Plaintiff's dismissal from her position as a dispatcher at Scotts' manufacturing and distribution plant in Oxford, Pennsylvania. n1 The Oxford plant engages in the production and distribution of bagged soils. See Ambruso Dec. at P 6. The business is seasonal in nature with the "busy season" typically lasting from mid-March through mid-June, depending on the weather. See Deposition of Joseph Ambruso ("Ambruso Dep.") at 42, attached to Def.'s Mot. at Exhibit B; Deposition of Jim Witter ("Witter Dep.") at 38-39, attached to Def.'s Mot. at Exhibit C; Deposition of Kelly Economos ("Pl.'s Dep.") at 52-53, attached to Def.'s Mot. at Exhibit E. Every year, prior to the busy season, the plant's former manager, Joe Ambruso ("Ambruso"), would hold meetings with the employees to discuss "the demands of the

2006 U.S. Dist. LEXIS 84646, *

impending busy season, as well as the extended hours that would be required of each employee, including the dispatchers." Ambruso Dec. at P 8; see also Deposition of Mary Dawson ("Dawson Dep.") at 17, attached to Def.'s Mot. at Exhibit D.

> n1 The Oxford facility was operated by Hyponex Corporation, a subsidiary of Scotts. See Declaration of Joe Ambruso ("Ambruso Dec.") at P 4, attached to Defendant's Motion for Summary Judgment ("Def.'s Mot.") at Exhibit A. For purposes of this Memorandum, the Court will refer to Plaintiff's employer as Scotts.

[*3]

At all times relevant to this Motion, the Oxford plant had two full-time dispatcher positions, a long-haul dispatcher and a short-haul dispatcher. See Pl.'s Dep. at 90. The dispatchers were responsible for scheduling the delivery of products, finding trucking companies to make the deliveries, and completing all paperwork necessary to ensure that the deliveries were made as scheduled. See Ambruso Dep. at 22. The dispatchers were "essential to arranging and coordinating efficient and timely distribution of [Scotts'] bagged soils to [its] wholesale customers." Ambruso Dec. at P 9. Throughout the relevant period, Scotts did not have a written overtime policy, but the dispatchers were expected to work more than 40 hours per week during the busy season if necessary to complete their work. See id. at P 10; Witter Dep. at 27; Dawson Dep. at 17, 99, 103-104; Deposition of John Rule ("Rule Dep.") at 14-15, 18-19, attached to Def.'s Mot. at Exhibit F.

Plaintiff began working for Scotts at the Oxford plant in February 1997 as a temporary employee, but by September 1997 had been promoted to a permanent position in the customer service department. See Pl.'s Dep. at 77. When [*4] the long-haul dispatcher position became available, Plaintiff applied and was hired in October 2001. See Pl.'s Dep. at 84, 89. At the time, Mary Dawson ("Dawson") held the short-haul dispatcher position. See id. at 90. Throughout her tenure as a dispatcher, Plaintiff was supervised by Ambruso and by Lena Broomell ("Broomell"), Scotts' customer service and dispatch manager at Oxford. See Ambruso Dep. at 73; Pl.'s Dep. at 124.

Plaintiff's first busy season as a dispatcher was in 2002. During the 2003 busy season, she took six weeks of maternity leave starting May 5, 2003. Amy Roberts ("Roberts"), another employee at the Oxford plant, was cross-trained to perform Plaintiff's dispatching duties throughout the 2003 busy season so as to minimize the disruption when Plaintiff took maternity leave. See Ambruso Dep. at 135-37; Pl.'s Dep. at 90-91. In December 2003, Dawson resigned as the short-haul dispatcher. Ron Lambert ("Lambert"), an employee at Scotts' Avondale, Pennsylvania location, temporarily took over her duties until John Rule ("Rule") was hired as her replacement in February or March of 2004. See Ambruso Dep. at 38-39; Rule Dep. at 6.

The 2004 busy season lasted [*5] approximately 14 weeks. See Def.'s Mot. at Exhibit H; Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp.") at Exhibit 29. During that time, Roberts worked an average of 57.8 hours per week, Lambert worked an average of 70.8 hours per week, and Rule worked an average of 63.2 hours per week. n2 See id. Plaintiff worked for only 10 weeks of the 2004 busy season, and during those ten weeks averaged 46.2 hours per week. See id. Other employees at the Oxford plant helped complete the work not performed by Plaintiff as a result of the limited number of hours she was working. See Ambruso Dec. at P 14.

> n2 Rule worked as a dispatcher for only 13 of the 14 weeks in the 2004 busy season.

In early May 2004, Ambruso spoke with Shelly Conway ("Conway") in Scotts' Human Resources Department about the number of hours Plaintiff was working. See id. at P 16. Conway suggested that Ambruso have a meeting with Plaintiff to discuss the need for her to work overtime hours during the [*6] busy season. See id. On May 12, 2004, Ambruso met with Plaintiff and told her that other employees were working more than 40 hours a week and that he would like her to work more hours than she was currently working. See Pl.'s Dep. at 110. Plaintiff replied that she could not do that because of her childcare needs. Ambruso again met with Plaintiff on May 13, 2004 and asked if she had considered the previous day's discussion. See id. at 113. Plaintiff responded that her childcare needs had not changed. Ambruso told her that if she would not commit to working 55 hours per week, he would set a schedule for her. See id.; Def.'s Mot. at Exhibit I, p. 00157.

Ambruso met with Plaintiff for a third time on Friday, May 14, 2004, and gave her a written work schedule setting a 55 hour work week. See Pl.'s Dep. at 116; Ambruso Dec. at P 19. Plaintiff stated that she could not work Ambruso's schedule but that she would volunteer hours when she could. See Pl.'s Dep. at 116, 118. She also asked to speak with Ambruso's supervisor, Jim Witter ("Witter"). See Pl.'s Dep. at 116. Plaintiff thereafter spoke with Witter and told him that she was being "given a schedule and asked [*7] to commit to a schedule as to where [sic] nobody else was. [She] complained that it

was unfair." See Pl.'s Dep. at 120. Witter told Plaintiff that overtime was mandatory and gave her the weekend to find alternative child care. See Pl.'s Dep. at 121.

After Ambruso spoke with Plaintiff on May 14, he contacted Conway again to inform her that pursuant to their prior conversation, he had given Plaintiff a work schedule, but that she had refused to comply. See Ambruso Dec. at P 20. Conway recommended that Ambruso again meet with Plaintiff and provide her with three options: (1) she could begin working the necessary overtime; (2) she could resign from her position as dispatcher; or (3) she could apply to work for Manpower (her former temp agency) and work at the Oxford plant as a temporary employee with no requirement to work overtime. See id.

Ambruso met with Plaintiff for a fourth time on May 17, 2004. Lena Broomell was also present during the meeting. After being informed by Plaintiff that her childcare needs had not changed, Ambruso presented her with the options of (1) working 55 hours a week and committing to the written schedule he provided; (2) becoming a temporary [*8] employee with no mandatory overtime; or (3) resigning. See Pl.'s Dep. at 125; Ambruso Dec. at P 21; Broomell Dec. at P 5; Def.'s Mot. at Exhibit J. Plaintiff told Ambruso that the options were "completely unfair." Pl.'s Dep. at 125.

Following this meeting, Plaintiff called Scotts' Human Resources Department and spoke with Marcia Agnew regarding the three options Ambruso had presented. See Pl.'s Dep. at 133; Declaration of Marcia Agnew ("Agnew Dec.") at P 3, attached to Def.'s Mot. at Exhibit L. Plaintiff told Agnew that she would not work overtime hours because of childcare needs and that she was being forced to resign. See Agnew Dec. at P 3; Pl.'s Dep. at 133. Agnew contacted Ambruso and, following a discussion of the problem, told him that she agreed with Conway's recommendations. See Agnew Dec. at P 4. Agnew contacted Plaintiff to confirm that she was unwilling to work the required hours and then told her that Ambruso would contact her regarding their decision. See id. at P 5; Pl.'s Dep. at 134.

Ambruso and Broomell met with Plaintiff again on May 18, 2004. Plaintiff stated that the options she had been given were "unreasonable," that "they were being unfair, [*9] " and that (1) she would not work the schedule Ambruso had provided, (2) did not want to accept a position as a temporary employee because she would lose her benefits, and (3) would not resign. See Pl.'s Dep. at 128; Def.'s Mot. at Exhibit K. Ambruso told Plaintiff that the company considered her refusal to work the necessary assigned hours to be a resignation. See Pl.'s Dep. at 128; Def.'s Mot. at Exhibit K. Following the meeting, Ambruso and Broomell contacted Conway to

discuss Plaintiff's refusal to work overtime or to accept one of the alternatives she had been offered. See Ambruso Dec. at P 23. They decided to give Plaintiff the option to resign as of June 9, 2004 and Scotts would not contest her unemployment status, or they would suspend her pending a termination decision. See id.

After the conversation with Conway, Ambruso and Broomell met with Plaintiff on May 18, and offered her the choice of resigning or being suspended. See Ambruso Dec. at P 25; Def.'s Mot. at Exhibit K. When Plaintiff declared that she would not resign, Ambruso informed her that she was suspended pending a decision on termination for insubordination. See Ambruso Dec. at P 25; Def. [*10] 's Mot. at Exhibit K; Pl.'s Dep. at 134-35. On May 20, 2004, Ambruso informed Plaintiff that she was terminated. See Ambruso Dec. at P 26.

In June 2004, Plaintiff filed charges of sexual discrimination and retaliation, as well as claims under the Pregnancy Discrimination Act, with the Equal Employment Opportunity Commission ("EEOC") and with the Pennsylvania Human Relations Commission ("PHRC"). On December 2, 2004, the EEOC issued Plaintiff a right to sue notice with respect to her sexual discrimination and retaliation charges, but deemed her pregnancy discrimination charges untimely. Plaintiff filed the instant action on January 20, 2005, alleging sexual discrimination, pregnancy discrimination, and retaliation. n3 On November 23, 2005, this Court dismissed all of Plaintiff's pregnancy discrimination claims for failure to exhaust administrative remedies.

n3 The PHRC also issued a right to sue notice on April 29, 2005, after Plaintiff had filed her Complaint.

## II. LEGAL STANDARD

In deciding a [*11]  motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). However, "there can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). [*12]

The party moving for summary judgment bears the initial burden of showing the basis for its motion. See Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). If the movant meets that burden, the onus then "shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial." Id.

## III. ANALYSIS

### A. Discrimination Claims

Title VII and the PHRA make it illegal for an employer to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment on the basis of sex. See 42 U.S.C. § 2000e-2(a); 43 Pa. Cons. Stat. § 955(a). The two acts are substantially similar, and Pennsylvania courts generally interpret the PHRA consistent with Title VII. See Weston v. Commonwealth of Pennsylvania, 251 F.3d 420, 425 n.3 (3d Cir. 2001) ("The proper analysis under Title VII and the [PHRA] is identical as Pennsylvania courts have construed the two acts interchangeably"). Therefore, the Court will analyze Plaintiff's discriminatory discharge claims under Title VII, and the conclusions [*13] will apply equally to her claims of discrimination under the PHRA.

In order to establish a prima facie case for discrimination under Title VII, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for a position sought or held; (3) she was discharged from or denied the position; and (4) non-members of the protected class were treated more favorably. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). If the plaintiff carries her initial burden of establishing a prima facie case, the burden shifts under the McDonnell Douglas framework to the employer to articulate a legitimate, non-discriminatory reason for the employee's discharge. See id. Once the employer articulates such a reason, the burden shifts back to the plaintiff to show by competent evidence that the articulated reason is pretextual. See id. at 805.

A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by "(1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial

or direct, that discrimination was more [*14] likely than not a motivating or determinative cause of the adverse employment action." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765 (internal quotation and citations omitted); see also, e.g., Igwe v. E.I. DuPont de Nemours & Co., 180 Fed. Appx. 353, 356 (3d Cir. 2006) (quoting Abramson v. William Paterson College of N.J., 260 F.3d 265, 283 (3d Cir. 2001)).

Defendant argues that summary judgment is appropriate on Plaintiff's discriminatory [*15] discharge claims because she has failed to establish a prima facie case of discrimination. For purposes of this motion, Defendant does not dispute that Plaintiff is able to establish the first and third elements of her prima facie case. See Def.'s Mot. at 18 n.4. However, Defendant argues that she is unable to meet her burden of establishing (1) that she was qualified for the job of dispatcher and (2) that an individual outside of her protected class was treated more favorably than she. See id. at 18. The Court will address Defendant's second argument as it is dispositive of Plaintiff's discriminatory discharge claims.

Title VII requires Plaintiff to demonstrate that similarly situated individuals outside of the protected class were treated more favorably than she. See Kimble v. Morgan Props., 2004 U.S. Dist. LEXIS 22843, 2004 WL 2536838, at *3 (E.D. Pa. Nov. 8, 2004). Under Title VII, "to be deemed similarly situated[,] the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." McCann v. City of Philadelphia, 2004 U.S. Dist. LEXIS 18542, 2004 WL 2040410, at *1 (E.D. Pa. Sept. 13, 2004) [*16] (quoting Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (citations omitted)); Atkinson v. Lafayette College, 2003 U.S. Dist. LEXIS 13951, 2003 WL 21956416, *6 (E.D. Pa. 2003) ("Similarly situated employees are ones who have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treat-

ment of them for it"). "Further, the proposed analogues must be similarly situated in all 'material respects.'" Dill v. Runyon, 1997 U.S. Dist. LEXIS 4355, 1997 WL 164275, at *4 (E.D. Pa. April 3, 1997) (citations omitted). Thus, in a case alleging sexual discrimination, "[a] female sexual discrimination plaintiff must show that male employees did not suffer similar adverse employment actions, despite displaying the same problem which provoked and supported the adverse action suffered by the plaintiff." Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 443 (E.D. Pa. 1999) (citing Ludovico v. U.S. Healthcare, Inc., 1997 U.S. Dist. LEXIS 7455, 1997 WL 288592, at *6 (E.D. Pa. May 21, 1997)). [*17]

Plaintiff asserts that she was "treated less favorably by Defendant as to Defendant's conditions of employment [sic]," and that since Scotts had no written overtime policy, its argument that the male dispatcher was working the overtime hours asked of her is a pretext for its discriminatory actions. Pl.'s Opp. at 24-25. Specifically, Plaintiff argues that she was treated less favorably than the male dispatcher, John Rule, because she was given a mandatory fixed minimum overtime schedule and he was not. n4 Plaintiff further argues that it is irrelevant to her discrimination claims that Rule, the only other dispatcher, was working over 55 hours per week, the number of hours Scotts required of Plaintiff during the busy season, since he did so voluntarily. See id.

n4 In her Opposition, Plaintiff also asserts for the first time that she was paid at the rate of $12.12 per hour while Rule was paid $17.50 per hour despite having worked at Scotts for less time. See Pl.'s Opp. at 24. As a general rule, a Title VII plaintiff cannot bring claims in a civil lawsuit that were not first included in an EEOC charge and exhausted at the administrative level. See Burgh v. Borough Council of Montrose, 251 F.3d 465, 469 (3d Cir. 2001). The relevant test to determine whether a plaintiff was required to exhaust her administrative remedies is whether the acts alleged in the subsequent suit are fairly within the scope of the prior administrative charges or the investigation arising therefrom. See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996); Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984). "An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." Rodgers v. Arlington Heights School Dist., 171 F. Supp. 2d 773, 777 (N.D. Ill. 2001) (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992)).

Plaintiff's EEOC and PHRC charges make no allegations regarding wage discrimination, Defendant's position statement does not respond to any claims of wage discrimination, and the EEOC's right to sue notice makes no reference of an investigation of wage discrimination. See Def.'s Mot. at Exhibits P, O; Pl.'s Opp. at Exhibit 46. Plaintiff has not furnished any other evidence to suggest that she exhausted any potential wage discrimination claims. Accordingly, the Court does not have jurisdiction to consider Plaintiff's newly asserted wage discrimination claim. See, e.g., Lawton v. Sunoco, Inc., 2002 U.S. Dist. LEXIS 13039, 2002 WL 1585582, at *4-5 (E.D. Pa. July 17, 2002) (finding that African-American employee failed to exhaust administrative remedies under Title VII with respect to his claims of wage discrimination where his EEOC charge alleged discrimination only on the basis of failure to promote); Mack v. W.R. Grace Co., 578 F. Supp. 626, 632 (N.D. Ga. 1983) ("Discrimination with regard to salary, promotions, and training is not so obviously related to discriminatory discharge, however, that the Court could expect an EEOC investigation of a discharge to extend to such claims"); Sigmon v. Parker Chapin Flattau & Klimpl, 901 F. Supp. 667, 675 (S.D.N.Y. 1995) (finding that the court lacked jurisdiction to hear a female employee's allegations of wage discrimination because they were not "reasonably related" to the discriminatory discharge allegations in her EEOC charge).

[*18]

As a threshold matter, Defendant has established that all Scotts employees were expected, and in fact required, to work overtime during the busy season. Defendant has offered testimony from four current or former Scotts employees, male and female, all of whom confirm that employees were required to work overtime during the busy season, even though the company did not have a written policy regarding overtime. See Ambruso Dec. at P 10 ("During the busy season, dispatchers do not work 40 hours per week. No dispatcher, male or female, has ever been permitted to work such a schedule in the 17 years I have been at Scotts"); Witter Dep. at 27 ("We had a practice of mandatory overtime due to the seasonal nature of our business. Everyone was required to work overtime"); Dawson Dep. at 17 ("We had meetings that would require us to note when shipping season would be coming on and that we would have to work required overtime"); Rule Dep. at 18-19 ("[W]hen I took the position I believed from the interview process that I would be working 60 hours a week in season roughly"). Plaintiff has offered no legal support for her contention that Scotts

must have a written policy in order for the company's [*19] overtime requirement to be valid. Similarly, she has offered no evidence that overtime was voluntary at Scotts. Her general assertions are insufficient to establish a genuine issue of material fact. See Bellamy v. Best Nest, Inc., 2002 U.S. Dist. LEXIS 14115, 2002 WL 32348284, at *3 n.8 (E.D. Pa. July 3, 2002) ("To defeat Defendants' motion, [Plaintiff] must point to specific facts in the record to support her claims, rather than rely on general assertions").

Plaintiff has failed to establish a prima facie case since she has not shown that any male employee at Scotts "did not suffer similar adverse employment actions, despite displaying the same problem which provoked and supported the adverse action suffered by Plaintiff." Pittman, 35 F. Supp. 2d. at 443 (citation omitted) (emphasis added). As discussed above, employees at Scotts are expected to work overtime during the busy season. Defendant has offered evidence that all employees, whether male or female, who assisted with dispatching duties during the 2004 busy season (specifically, John Rule, Ron Lambert, and Amy Roberts) were averaging more than 55 hours of work per work. In fact, Plaintiff was the only employee [*20] performing dispatching duties during the 2004 busy season who averaged fewer than 50 hours per week. Plaintiff has failed to identify any employee, male or female, who was permitted to work the same or less hours during the busy season than she was asked to work. Accordingly, Plaintiff has not established a prima facie discrimination case and summary judgment on her discrimination claims is appropriate. n5

n5 Both the Complaint and Opposition refer to discriminatory remarks Ambruso allegedly made to Plaintiff during her pregnancy. Plaintiff admitted during her deposition that neither Ambruso nor any other Scotts employee made comments regarding her pregnancy or gender that she found to be inappropriate (other than the allegedly discriminatory request that she work overtime) after Plaintiff returned from maternity leave in June 2003. See Pl.'s Dep. at 34.

**B. Retaliation Claims**

Title VII and the PHRA also make it illegal for an employer to discriminate against an employee because she opposed a practice [*21] made unlawful by Title VII or the PHRA, or because she participated in any manner in an investigation or proceeding under either statute. See 42 U.S.C. § 2000e-3(a); 43 P.S. § 955(d). n6 To establish unlawful retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in a protected activity;

(2) her employer took an adverse employment action against her either after or contemporaneous with her protected activity; and (3) there is a causal link between the protected activity and the adverse action. See, e.g., Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); Jones v. School District of Philadelphia, 19 F. Supp. 2d 414, 421 (E.D. Pa. 1998). A general complaint of unfair treatment by an employee does not translate into a charge of illegal discrimination under Title VII, and thus is not a protected activity. See Slagle v. County of Clarion, 435 F.3d 262, 267-268 ("we cannot dispense with the requirement that the plaintiff allege prohibited grounds"); Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 645 (E.D. Pa. 2000) [*22] ("merely complaining about unfair treatment does not constitute a protected activity"); Bartholomew v. St. Luke's Hosp., 2003 U.S. Dist. LEXIS 7695, 2003 WL 21250561, at *6 (E.D. Pa. April 29, 2003).

n6 Retaliation claims asserted under the PHRA are analyzed consistent with similar claims under Title VII. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). Thus, as with Plaintiff's discrimination claims, the Court will limit its analysis of Plaintiff's retaliation claims to the standards for Title VII.

Once the plaintiff establishes a prima facie retaliation case, the analysis follows the McDonnell Douglas framework and the burden shifts to the employer to advance "a legitimate non-retaliatory reason" for its adverse action. See Krouse, 126 F.3d at 500. If the employer satisfies its burden, the plaintiff must convince the fact finder "that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment [*23] action." Id. at 501.

Defendant argues that Plaintiff has failed to set forth a prima facie retaliation case because she has not met her burden of establishing that she engaged in a protected activity. See Def.'s Mot. at 28. Defendant contends that the record demonstrates that Plaintiff only complained generally of being treated differently or unfairly when asked to work overtime, and that despite numerous interactions with her supervisors and Operations and Human Resources Managers, she never communicated to anyone at Scotts that she believed she was being treated differently because of her gender. See id. at 30.

In support of its argument, Defendant points to numerous statements made by Plaintiff at her deposition that she complained only of "unfair" treatment rather than of discriminatory treatment based on her sex. See Pl.'s Dep. at 42, 120, 121, 125, 128, 133, 135, 141-42. When Plaintiff was asked explicitly at her deposition

whether she had told anyone at Scotts that she felt singled out because of her sex or gender, Plaintiff admitted that she had not. See id. at 207. Moreover, Defendant offers declarations from Ambruso, Lena Broomell (office [*24] manager at the plant where Plaintiff worked), and Marcia Agnew (human resources representative) stating that Plaintiff "never complained to [them] that she felt she was being treated differently or unfairly because of her sex and/or gender." See Ambruso Dec. at P 27; Broomell Dec. at P 7; Agnew Dec. at P 7.

Plaintiff's Opposition contains a recital of the dates on which she spoke to Scotts personnel regarding her treatment, and asserts that she complained that she was being treated differently than the male dispatcher. See Pl.'s Opp. at 28. However, the Opposition does not provide a single cite to the record to support these factual assertions, and the Court's examination of the parties' submissions finds no support for Plaintiff's assertion that she complained specifically of sexual discrimination. Facts alleged in a brief or motion without evidentiary support cannot be used to avoid summary judgment. See Vendetta v. Bell Atl. Corp., 1998 U.S. Dist. LEXIS 14014, 1998 WL 575111, at *1 n.1 (E.D. Pa. Sept. 8, 1998). Thus, Plaintiff has not presented any evidence that she engaged in a protected activity since her general complaints regarding "unfair" treatment are not sufficient. Accordingly, [*25] Plaintiff has not established a prima facie retaliation claim and summary judgment will be granted. n7

n7 Defendant's Motion also argues (1) that Plaintiff has no evidence to suggest a causal connection between Defendant's decision to terminate her and her complaints regarding unfair treatment, and (2) that even if she were to establish a prima facie retaliation case, she cannot prove that Defendant's proffered non-discriminatory reason for her termination is merely pretextual. See Def.'s Mot. at 31. Because the Court finds that Plaintiff has not established that she engaged in protected activity, it is unnecessary to reach these arguments.

## IV. CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment will be granted. An appropriate order follows.

### ORDER

**AND NOW**, this 20th day of November, 2006, upon consideration of Defendant's Motion for Summary Judgment (docket no. 19), Plaintiff's Response thereto (docket no. 22), and Defendant's Reply (docket no. [*26] 26), and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Motion is **GRANTED**. Accordingly, the Clerk of the Court shall mark this case **CLOSED**.

**BY THE COURT:**

**/s/ Bruce W. Kauffman, J.**

LEXSEE


Caution
As of: Jan 31, 2007

**JULIA FENNER, Plaintiff, v. FAVORITE BRANDS INTERNATIONAL, INC., a
Delaware Corporation, and AON CONSULTING, INC., a Pennsylvania Corpora-
tion, Defendants.**

**No. 97 C 5906**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**1998 U.S. Dist. LEXIS 7224**

**May 11, 1998, Decided
May 12, 1998, Docketed**

**DISPOSITION:** [*1] Favorite Brands' motion to dis-
miss granted. Counts I and II dismissed without preju-
dice. Counts III, IV, and V dismissed with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee
brought an action against defendant employers alleging
violations of the Comprehensive Omnibus Budget Rec-
onciliation Act (COBRA) of 1985 amendments to the
Employee Retirement Income Security Act, 29 U.S.C.S.
§ 1161 et seq. The employee also alleged promissory
fraud, willful and wanton promissory fraud, and negli-
gent infliction of emotional distress. The employers filed
a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** In the employee's action alleging viola-
tions of COBRA, 29 U.S.C.S. § 1161 et seq., on the part
of the employers, the employers moved to dismiss pursu-
ant to Fed. R. Civ. P. 12(b)(6). The court held that the
employee's allegation did not set forth a claim for viola-
tion of COBRA, 29 U.S.C.S. § 1166. The employee
failed to address whether the employers were acting as
an employer or also the plan administrator. The em-
ployee failed to allege her termination resulted in a loss
of coverage under the employee's health plan. The court
also held that the employee failed to state a claim for
promissory fraud on the ground that the employers mis-
led her into believing her employment was secure. Most
of the alleged statements made by the employers were

not fraudulent but true. The employee failed to allege an
express promise on the part of the employers. Finally, the
court held that the employee failed to state a claim for
negligent infliction of emotional distress. Although the
employee stated that she was the direct victim of the em-
ployers' negligence, she failed to allege that she suffered
a physical impact or injury necessary to sustain the
claim. The employers' motion to dismiss was granted.

**OUTCOME:** The court granted the employers' motion
to dismiss without prejudice the employee's claims
brought under COBRA and to dismiss with prejudice the
employee's claims of promissory fraud and negligent
infliction of emotional distress. The employee was
granted leave to file a second amended complaint consis-
tent with the court's opinion.

**CORE TERMS:** coverage, termination, qualifying,
emotional distress, physical impact, payroll, notice, neg-
ligently, notify, health plan, beneficiary, terminated, in-
fliction of emotional distress, emotional harm, bystander,
marketing, label, plan administrator, promissory fraud,
direct victim, plant, guru, motion to dismiss, contempo-
raneous, administrator, inflicting, contacted, refrain, im-
plied promise, physical injury

**COUNSEL:** For JULIA FENNER, plaintiff: Susan
Renee Bauer, Dennis Ray Favaro, Patricia L. McLauch-
lan Jochum, Thill, Kolodz & Favaro, Palatine, IL.

1998 U.S. Dist. LEXIS 7224, *

For FAVORITE BRANDS INTERNATIONAL, INC., defendant: Alan Michael Kaplan, Nancy E. Sasamoto, Jack N. Bernstein, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL.

For AON CONSULTING, defendant: Carrie A. Durkin, Aon Corporation, Marc D. Fisher, Attorney at Law, Chicago, IL.

**JUDGES:** Robert W. Gettleman, United States District Judge.

**OPINION BY:** Robert W. Gettleman

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Julia Fenner has filed an amended complaint against defendants Favorite Brands International, Inc., ("Favorite Brands") and Aon Consulting, Inc. ("Aon"). Plaintiff alleges violations of the Comprehensive Omnibus Budget Reconciliation Act of 1985 ("COBRA") amendments to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § § 1161 *et seq.*, by Aon (Count I) and Favorite Brands (Count II). She also alleges promissory fraud (Count III), willful and wanton promissory fraud (Count IV), and negligent [*2] infliction of emotional distress (Count V) by Favorite Brands. Favorite Brands has filed a motion to dismiss Counts II, III, IV, and V pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, that motion is granted.

### FACTUAL BACKGROUND

For purposes of a motion to dismiss, the court accepts all well-pleaded allegations in the complaint as true. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996). According to her amended complaint, plaintiff is a former employee of Favorite Brands. Favorite Brands is Delaware corporation, headquartered in Lincolnshire, Illinois.

In June 1996, plaintiff was working as an art director for a family-owned business known as Kidd & Company, located in Ligonier, Indiana. Plaintiff was a member of the family that owned Kidd & Company. Plaintiff had been working for Kidd & Company for over twelve years. For a portion of that time, plaintiff lived in Michigan.

Favorite Brands purchased Kidd & Company on June 17, 1996, and continued to operate it in Ligonier, Indiana. Plaintiff was told that she would remain employed with Favorite Brands [*3] after the purchase. On August 7, 1996, plaintiff wrote Mike Westhusing ("Westhusing"), the Senior Vice President of Marketing for Favorite Brands, and informed him that her husband had lost his job, but had accepted a new position with a company in Elk Grove Village, Illinois and would be starting in August 1996. She stated that she and her husband had put their house in Michigan on the market and that they would be moving to the Northwest suburbs soon. Because space was limited at the Lincolnshire facility, plaintiff suggested that she continue to work for Favorite Brands out of her home after she moved. She stated that she would provide her own equipment if she were permitted to work from home. Plaintiff also stated that she and Favorite Brands could review the situation after a period of time to see if any changes needed to be made.

Near the end of August of 1996, plaintiff received a telephone call from Denise McKinney ("McKinney"), the Director of Marketing for Favorite Brands. McKinney told plaintiff that Favorite Brands wanted her to continue working and that it would be all right to work from home as she had suggested. In August or September, plaintiff asked McKinney whether [*4] she could purchase computer equipment to use at home from Favorite Brands. McKinney said she could not.

On September 7, 1996, plaintiff and her husband moved into a temporary residence in Palatine, Illinois. Plaintiff asserts that they moved to Palatine so that she could be close to Favorite Brands' headquarters in Lincolnshire. Plaintiff claims that they would have moved directly to Naperville, Illinois if she had not been working for Favorite Brands.

On September 9, 1996, plaintiff met with McKinney at the Lincolnshire office. McKinney told plaintiff that she was "officially part of the marketing group at Favorite Brands" and that she was to report directly to her. McKinney also told plaintiff that she would continue to handle the private label packaging and that she would work on other graphic projects with the marketing group. McKinney told plaintiff that she would become the "private label guru of Favorite Brands." Karin Chiapetta ("Chiapetta"), a marketing assistant, then gave plaintiff a tour of the Lincolnshire office. In plaintiff's presence, Chiapetta told the receptionist that plaintiff would be coming in often and that she would not need to sign in because she was now [*5] an employee.

On September 14, 1996, plaintiff purchased computer equipment totaling over $ 18,000 in order to work from her home. During September, October, and November, plaintiff continued to work as an art director. During this time, other employees from Favorite Brands asked plaintiff questions about her job and the contacts she had which enabled her to do her job. Also around this time, Shalini Gupta, the Associate Brand Manager

for Favorite Brands, told plaintiff that the company needed to know everything that plaintiff did and how she did it. On December 1, 1996, plaintiff received a copy of the Favorite Brands employee directory. The directory listed plaintiff with her Palatine address as the Packaging and Collateral coordinator.

Sometime in the early fall of 1996, plaintiff learned that Favorite Brands had also acquired a company known as Sathers. Chiapetta informed plaintiff that Sathers had its own art department and that Favorite Brands was going to have Sathers do art and graphic design work (the type of work that plaintiff did). Although Chiapetta also told plaintiff that she would be working with Sathers' art department, plaintiff never worked there.

Plaintiff was [*6] a beneficiary of a health plan supplied first by Kidd & Company and subsequently by Favorite Brands. In October 1996, plaintiff learned that Favorite Brands was closing the Ligonier plant and that all of the Ligonier employees had been contacted about their future with Favorite Brands or given severance packages and insurance options. Although her insurance benefits had been continuously received through the Ligonier plant, plaintiff was not contacted. Plaintiff, therefore, contacted McKinney and asked what she should do as her payroll and insurance was handled through the Ligonier plant. McKinney told plaintiff to contact Charles Stanley ("Stanley"), the Vice President of Human Resources. Plaintiff telephoned Stanley and left a message for him, but he did not return her call.

Between mid-October and the end of November 1996, plaintiff asked McKinney on at least three occasions about the status of her payroll and insurance. McKinney continually told plaintiff that she had to talk to Stanley. Plaintiff was not contacted by the human resources department or Stanley. On January 6, 1997, after learning that the Ligonier employees who remained with Favorite Brands were switched to the [*7] payroll and insurance at Favorite Brands' plant in Kendallville, Indiana, plaintiff contacted Tom Watson ("Watson"), the Human Resources Manager at the Kendallville plant. Watson told plaintiff that she was on the Kendallville payroll. Plaintiff told Watson that she lived fifteen or twenty miles from the Lincolnshire office. She stated that she worked for the marketing group there and that it would be very inconvenient to be on the payroll and insurance at the Kendallville plant. Watson then said that plaintiff should be on the payroll at Lincolnshire, and told her to expect a telephone call from someone in that office.

Within an hour, Lisa Miller ("Miller"), the Human Resources Assistant at the Lincolnshire office, called plaintiff and told her that she would be on the Lincolnshire payroll and to expect some papers to be delivered

the next day. Plaintiff waited a couple of days, but did not receive any package. She then called Miller. Miller told plaintiff that she would be hearing from Stanley and that she would be on the Kendallville payroll after all. When plaintiff asked about her insurance, Miller told her that Stanley would know.

Over the next two weeks, plaintiff asked about [*8] her insurance and payroll, but received no answers. She continued to work for Favorite Brands although she did not receive a salary or normal pay for her work. On January 27, 1997, plaintiff met with Westhusing and Stanley. They told her that there was "no place in the budget for a graphic artist" and terminated her employment.

Plaintiff did not receive written notice of her right to elect continuing coverage under her health plan until July 10, 1997. The notice -- a copy of which is attached to plaintiff's amended complaint n1 -- states that plaintiff has the option of electing or waiving COBRA coverage. The notice also states that plaintiff's "enrollment form must be postmarked no later than then September 10, 1997; otherwise, [her] coverage will have terminated as of midnight, December 31, 1996."

n1 Documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed. R. Civ. P. 10(c).

## DISCUSSION

## I. STANDARDS ON A MOTION TO DISMISS

In ruling on a motion [*9] to dismiss, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). A claim may be dismissed only if it is beyond doubt that under no set of facts would a plaintiff's allegations entitle it to relief. Travel All Over The World, Inc., 73 F.3d at 1429 (7th Cir. 1996). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

## II. COBRA VIOLATIONS (COUNTS I AND II)

Under 29 U.S.C. § 1161, the plan sponsor of a group health plan must provide "that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan." The term "qualifying event" means any

one of six listed events "which, but for the continuation coverage required . . . would result in the loss of coverage of a qualified beneficiary [*10] . . . ." 29 U.S.C. § 1163. "The termination . . . or reduction of hours, of the covered employee's employment" is one the six events listed in § 1163. Under 29 U.S.C. § 1166(a)(2), the employer of a covered employee must notify the health plan's administrator of a qualifying event, such as termination, within 30 days of the date of that event. n2 Under § 1166(a)(4), the plan administrator must then notify any qualified beneficiary with respect to the qualifying event of that beneficiary's COBRA rights, including the right to elect continuation coverage.

> n2 In certain cases not relevant to this case, the covered employee or qualified beneficiary is responsible for notifying the plan administrator that a qualifying event has occurred. See 29 U.S.C. § 1166(a)(3).

In Count I, plaintiff claims Aon violated COBRA by failing to notify her in a timely fashion, pursuant to § 1166, of her COBRA rights after she was terminated on January 27, 1997. In Count II, plaintiff claims Favorite Brands violated COBRA by failing [*11] to notify her in a timely fashion, pursuant to § 1166, of her COBRA rights after she was terminated on January 27, 1997.

Plaintiff clearly alleges that Favorite Brands was her employer. In Count II, however, plaintiff alleges that Favorite Brands was the COBRA administrator of her health plan. Am. Compl. P 37. This conflicts with her earlier allegation that Aon has been the COBRA administrator for the health plans provided to the employees of Favorite Brands since January 1, 1997. Am. Compl. P 3. As explained above, it is the plan administrator, not the employer, who must notify qualified beneficiaries of their COBRA rights, once the plan has been notified that a qualifying event has occurred. Therefore, if Favorite Brands was merely plaintiff's employer, and not the administrator of her health plan, then her claim that Favorite Brands failed to notify her of her COBRA rights would fail because Favorite Brands, as the employer, had no duty to give such notice. If, on the other hand, Favorite Brands was both plaintiff's employer and the only administrator of her health plan, then plaintiff would have no basis for a claim against Aon. Favorite Brands has not addressed this conflict. [*12] As the allegations stand, the court cannot determine whether plaintiff has stated a claim against Favorite Brands or Aon for violating COBRA.

Plaintiff's COBRA allegations are also deficient in another respect. Although plaintiff claims that she was terminated on January 27, 1997, she does not allege that her termination resulted in a loss of coverage under her health plan. On the contrary, the written notice of her COBRA rights, which she received on July 10, 1997, states that her coverage will terminate (retroactively) as of midnight, December 31, 1996, if her enrollment form is not postmarked by September 10, 1997. This statement indicates that when plaintiff received notice of her COBRA rights, she was still covered by her health plan, months after her alleged termination.

A "qualifying event" is an event "which, but for the continuation coverage required . . . would result in the loss of coverage of a qualified beneficiary . . . ." 29 U.S.C. § 1163 (emphasis added). Because plaintiff has not alleged that her termination resulted in a loss of coverage and because her COBRA notice indicates that she was still covered in July, Favorite Brands argues that plaintiff's termination [*13] cannot constitute a qualifying event. Only a qualifying event triggers the duty to provide notice under § 1166. Favorite Brands therefore asserts that plaintiff has failed to state a claim for a COBRA violation.

Favorite Brands is correct that a termination that does not result in a loss of coverage does not constitute a qualifying event and does not trigger the notice requirements of § 1166. See Chacosky v. Hay Group, 1991 U.S. Dist. LEXIS 1170, No. 89-8083, 1991 WL 12170, at *9 (E.D. Pa. Feb. 1, 1991) (because plaintiffs did not suffer a loss of coverage as a result of their termination, their termination was not a qualifying event and the defendant was not required to give them notices regarding group health care under COBRA). Plaintiff has not alleged that she suffered a loss of coverage. Nor has she alleged sufficient facts from which the court could draw a reasonable inference that she suffered such a loss. Nevertheless, her allegations do not preclude such a loss because a loss of coverage need not occur immediately after the event in question. See id. at *8. The fact that the notice plaintiff received in July 1997 stated that her coverage would be terminated retroactively to December 31, 1996, [*14] would seem to support the possibility that plaintiff lost coverage prior to her termination. At present, plaintiff's allegations on the issue are simply incomplete.

Because of the conflicting allegations described above and the lack of allegations regarding plaintiff's loss of coverage, Counts I and II are dismissed without prejudice, and plaintiff is given leave to file a second amended complaint.

### III. PROMISSORY FRAUD (COUNTS III AND IV)

Plaintiff was an at-will employee. In Count III, however, she claims that employees of Favorite Brands led her to believe that her employment was secure and would

1998 U.S. Dist. LEXIS 7224, *

continue. She claims that employees of Favorite Brands intentionally misled her so that she would stay at the company long enough for them to learn about her business contacts and the duties of her position. Plaintiff claims that she relied on statements by employees of Favorite Brands to her detriment when she: (1) moved to Palatine instead of Naperville; (2) set up an office at home (which involved obtaining a phone line, purchasing over $ 18,000 in equipment, and renting additional office equipment); and (3) gave up the opportunity to seek other employment. In Count IV, [*15] plaintiff reasserts the allegations in Count III and asserts that Favorite Brands' conduct was willful and wanton.

Plaintiff has alleged a number of statements. She claims that: (1) she was told that she would remain employed with Favorite Brands after it purchased Kidd & Company; (2) McKinney told her that Favorite Brands wanted her to continue working and that it would be all right to work from home as she had suggested; (3) McKinney told her that she was "officially part of the marketing group at Favorite Brands" and that she was to report directly to her; (4) McKinney told her that she would continue to handle the private label packaging and would also work on other graphic projects with the Lincolnshire marketing group; (5) McKinney told her that she would become the "private label guru of Favorite Brands;" (6) Chiapetta told the receptionist at the Lincolnshire office, in plaintiff's presence, that she would be coming into the office often and was now an employee; and (7) Favorite Brands listed her in its employee directory.

Most of the alleged statements were not fraudulent, but true. Plaintiff did remain employed with Favorite Brands after it purchased Kidd & Company and [*16] was allowed to work out of her home. She did work with the marketing group at the Lincolnshire office, handling private label packaging and other graphic projects. She simply did not remain employed at Favorite Brands as long as she expected or hoped. The only statement that could reasonably be interpreted as suggesting a longer or more secure employment with Favorite Brands was McKinney's statement that plaintiff would become the "private label guru of Favorite Brands."

Plaintiff claims that this statement constituted a false promise of continued or secure employment. In Illinois, "misrepresentations of intention to perform future conduct, even if made without a present intention to perform, do not generally constitute fraud." HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 545 N.E.2d 672, 682, 137 Ill. Dec. 19 (Ill. 1989). Nevertheless, a promise is actionable when "the false promise or representation of intention of future conduct is alleged to be the scheme employed to accomplish the fraud." Id.

(quoting Steinberg v. Chicago Med. School, 69 Ill. 2d 320, 371 N.E.2d 634, 641, 13 Ill. Dec. 699 (Ill. 1977)).

Plaintiff, however, has failed to allege [*17] an express promise. McKinney did not promise plaintiff -- an at-will employee -- that she would not be fired simply by expressing her opinion that plaintiff would become a guru, that is, that she would succeed n3 at Favorite Brands. Because McKinney was merely expressing an opinion, her statement is not actionable as fraud. See, e.g., Continental Bank, N.A. v. Meyer, 10 F.3d 1293, 1298 (7th Cir. 1993) ("A statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation under Illinois law") (internal quotation marks omitted). Even if McKinney's statement could reasonably be interpreted as an implied promise of continued or secure employment, it would still not be actionable as fraud. See TIC United Corp. v. Lisowski, 1994 U.S. Dist. LEXIS 14765, No. 93 C 6365, 1994 WL 577255, at *4 (N.D. Ill. Oct. 18, 1994) (stating "an implied promise will not suffice to support a claim for promissory fraud"); Dawson v. W & H. Voortman, Ltd., 853 F. Supp. 1038, 1045 (N.D. Ill. 1994) (dismissing fraud claim because implied promise that the plaintiff [*18] would not be terminated was not actionable); Hollymatic Corp. v. Holly Sys., Inc., 620 F. Supp. 1366, 1369 (N.D. Ill. 1985) (stating the court was "aware of no Illinois case in which an alleged or even proven implied promise or representation was found to be a sufficient basis for applying the scheme or device exception" to the rule barring promissory fraud actions). Plaintiff has thus failed to state a claim for promissory fraud, and Counts III and IV are dismissed.

n3 A "guru" has been defined as a "recognized guide or leader." Webster's II New Riverside University Dictionary 555 (Anne H. Soukhanov et al. eds. 1994). Plaintiff has not alleged that "private label guru" is the title of a formal position at Favorite Brands.

## IV. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNT V)

To state a claim for negligent infliction of emotional distress, a plaintiff must first allege the traditional negligence elements: duty, breach, causation, and damages. Corgan v. Muehling, 143 Ill. 2d 296, 574 N.E.2d [*19] 602, 606, 158 Ill. Dec. 489 (Ill. 1991) (citation omitted). The other requirements of Illinois law regarding the tort of negligent infliction of emotional distress have changed

over the years. Prior to the Illinois Supreme Court's decision in Rickey v. Chicago Transit Auth., 98 Ill. 2d 546, 457 N.E.2d 1, 75 Ill. Dec. 211 (1983), Illinois courts applied the "impact rule" to claims for negligent infliction of emotional distress. See Kapoulas v. Williams Ins. Agency, Inc., 11 F.3d 1380, 1381-82 (7th Cir. 1993); Corgan, 574 N.E.2d at 604. Under the impact rule, a direct victim or bystander could recover damages if they suffered: (1) emotional distress and (2) "a contemporaneous physical injury or impact." Corgan, 574 N.E.2d at 605 (quoting Rickey, 457 N.E.2d at 4)). In Rickey, the Illinois Supreme Court adopted the "zone of physical danger" rule. See Kapoulas, 11 F.3d at 1382; Corgan, 574 N.E.2d at 605. Under the zone of physical danger rule, "'a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional [*20] distress.'" Corgan, 574 N.E.2d at 605 (quoting Rickey, 457 N.E.2d at 5)). In Corgan v. Muehling, 143 Ill. 2d 296, 574 N.E.2d 602, 158 Ill. Dec. 489 (Ill. 1991), the Illinois Supreme Court made it clear that Rickey did not define the scope of negligent infliction of emotional distress as it applies to direct victims and that the impact rule still applies to direct victims. Corgan, 574 N.E.2d at 605-06; see also Kapoulas, 11 F.3d at 1382 (interpreting Corgan). The court in Corgan also eliminated the requirement that a victim of negligently inflicted emotional distress allege and prove a physical manifestation of her emotional injury. Corgan, 574 N.E.2d at 607-09. Although the plaintiff in Corgan was a direct victim, Corgan has been interpreted to mean that no victim of a defendant's negligence has to allege physical symptoms to recover damages for emotional distress. See Brogan v. Mitchell Int'l, Inc., 181 Ill. 2d 178, 692 N.E.2d 276, 229 Ill. Dec. 503, 1998 WL 66745, at *3 (Ill. 1998); Pasquale v. Speed Prod. Eng'g, 166 Ill. 2d 337, 654 N.E.2d 1365, 1386, 211 Ill. Dec. 314 (Ill. 1995) (McMorrow, J., dissenting).

In Pasquale v. Speed Prod. [*21] Eng'g, 166 Ill. 2d 337, 654 N.E.2d 1365, 1372, 211 Ill. Dec. 314 (Ill. 1995), the Illinois Supreme Court considered "whether the elimination of the contemporaneous injury or impact requirement for bystander recovery for emotional distress in the area of negligence meaningfully translated into an elimination of the element of physical harm for a bystander's recovery for emotional distress under strict liability theory" (emphasis added). The court determined that it did not. 654 N.E.2d at 1373. In dicta, the court stated that Corgan eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for negligently inflicted emotional distress. Id. at 1371 and 1372. The Pasquale court's characterization of the holding in Corgan is inaccurate. The court in Corgan did not eliminate the need for a direct victim to allege and

prove a contemporaneous injury or impact. See Corgan, 574 N.E.2d at 605-06; Kapoulas, 11 F.3d at 1382 (interpreting Corgan). When the Corgan court decided that a plaintiff need not allege that she suffered a "physical injury or illness as a result of her emotional distress," it was referring to the requirement [*22] that a plaintiff allege a "physical manifestation" of her emotional distress, not the requirement that she suffer a physical impact or injury in the first place. See Corgan, 574 N.E.2d at 607-09; see also Brogan, 1998 WL 66745 at *3 (the "second issue in Corgan was whether a plaintiff must plead physical manifestations of the emotional distress in order to state a claim for negligent infliction of emotional distress").

Although a bystander need not suffer a physical impact or injury, her ability to recover is still based on the fact that she was in danger of experiencing such an impact or injury. See Corgan, 574 N.E.2d at 606 (a bystander may recover "'when she is sufficiently close to [a negligently caused] accident such that she is subjected to a high risk of physical impact emanating from the accident itself'") (quoting Lewis v. Westinghouse Elec. Corp., 139 Ill. App. 3d 634, 487 N.E.2d 1071, 1075, 94 Ill. Dec. 194 (Ill. App. 1985) (Linn, J., dissenting)); Rickey v. Chicago Transit Auth., 98 Ill. 2d 546, 457 N.E.2d 1, 5, 75 Ill. Dec. 211 (1983) (the zone of physical danger rule "does not require that the bystander suffer a physical impact or injury at [*23] the time of the negligent act, but it does require that she must have been in such proximity to the accident . . . that there was a high risk to [her] of physical impact").

Thus, the scope of a defendant's duty is defined by the accident that he negligently causes and the zone of danger that "encircles" it. See Corgan, 574 N.E.2d at 606. In other words, a plaintiff must suffer some physical impact or injury in order to be a direct victim in the context of this tort. See Leonard v. Kurtz, 234 Ill. App. 3d 553, 600 N.E.2d 896, 898-99, 175 Ill. Dec. 653 (Ill. App. 1992) (finding that a widow who alleged the wrongful cremation of her husband's remains was not a direct victim under Corgan because "there [was] no contemporaneous physical injury to [her]" and "no direct contact between the plaintiff and defendants"). If the impact rule did not apply to direct victims, the scope of recovery for negligent infliction of emotional distress would be coterminous with recovery for negligence itself. The Illinois Supreme Court clearly did not intend to create that situation. See Brogan v. Mitchell Int'l, Inc., 181 Ill. 2d 178, 692 N.E.2d 276, 229 Ill. Dec. 503, 1998 WL 66745 (Ill. [*24] 1998) (stating that "there exists no broad duty to avoid [negligent] misrepresentations that cause only emotional harm"); Doe v. Roe, 289 Ill. App. 3d 116, 681 N.E.2d 640, 648, 224 Ill. Dec. 325 (Ill. App. 1997) ("We do not read Corgan so broadly as to support the notion

that by breaching a contract, even under circumstances evincing culpable negligence, one necessarily becomes liable in tort merely because the non-breaching party suffers some emotional distress as a consequence of the breach").

In this case, plaintiff claims that Favorite Brands had a duty under COBRA either to notify the plan administrator of her termination or, as the plan administrator, to notify her directly of her right to continued coverage under her health plan. She claims that Favorite Brands breached this duty by failing to notify the plan administrator, or her, in a timely and reasonable fashion. Finally, she claims that she suffered, and continues to suffer, severe and extreme emotional distress as a result of Favorite Brands' breach. Thus, plaintiff alleges that she was a direct victim of Favorite Brands' negligence, but fails to allege that she suffered a physical impact or injury. She therefore [*25] fails to state a claim. For the reasons discussed above, the court finds that the fact that Favorite Brands has a duty to notify under COBRA does not mean that it has a duty to refrain from negligently inflicting emotional harm on plaintiff.

A case may present itself where a defendant's special relationship with the plaintiff, or other unique circumstances, will justify imposing on the defendant a duty to refrain from negligently inflicting emotional harm on the plaintiff, even in the absence of a physical impact or injury, or the danger thereof. This case, however, is not that case. As the court in Krieger v. Adler, Kaplan & Begy, 1996 U.S. Dist. LEXIS 113, No. 94 C 7809, 1996 WL 6540, at *14 (N.D. Ill. Jan. 5, 1996), recognized, "the employer-employee relationship does not compare with the psychologist-patient relationship that the court found so vulnerable to exploitation in Corgan." n4 Because of the nature of the employer-employee relationship, the Krieger court declined to impose a duty to refrain from negligently inflicting emotional harm on the defendant, a law firm which had terminated the plaintiff. Id. Moreover, Congress provided for COBRA's civil enforcement and the imposition of [*26] civil penalties in the event of violations. See 29 U.S.C. § 1132. The existence of these remedies also suggests that no duty to

refrain from negligently inflicting emotional harm should be imposed on Favorite Brands in this case. Cf. Smith v. SRDS, Inc., 1997 U.S. Dist. LEXIS 95, No. 96 C 858, 1997 WL 11014, at *3 (N.D. Ill. Jan. 7, 1997) (finding that plaintiff had failed to establish that her employers had a duty to guard against negligently imposed emotional harm, in part, because she already had a claim for breach of contract against them). Plaintiff has presented no authority recognizing the failure to provide notice under COBRA as a common law tort. Accordingly, Count V is dismissed.

n4 The court in Corgan found that the defendant had a duty to refrain from negligently inflicting emotional harm on the plaintiff, in part, because the defendant was a psychologist and the plaintiff was a patient in his care. Corgan, 574 N.E.2d at 606-07. Nevertheless, the plaintiff still alleged that she suffered a physical impact or injury, as she claimed that the defendant repeatedly engaged in sexual intercourse with her "under the guise of therapy." Id. at 603.

[*27]

**CONCLUSION**

Favorite Brands' motion to dismiss is granted. Counts I and II are dismissed without prejudice. Counts III, IV, and V are dismissed with prejudice. Plaintiff is given leave to file a second amended complaint consistent with this opinion on or before June 1, 1998. Defendants shall respond thereto on or before June 22, 1998. This matter is set for a report on status on June 23, 1998, at 9:00 a.m., at which time the parties are directed to present a final discovery plan.

**ENTER:**

**May 11, 1998**

**Robert W. Gettleman**

**United States District Judge**

LEXSEE



Cited
As of: Jan 28, 2007

**Deborah R. Fernandez, et al v. U.S.A., Internal Revenue Service, et al**

**Civil Action No. 93-5378 (NHP)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**1994 U.S. Dist. LEXIS 10619**

**July 20, 1994, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**COUNSEL:** For Plaintiff: Mr. Edward Fernandez, Pro Se, Kearny, NJ.

For Defendant: Susan C. Cassell, Assistant United States Attorney, FAITH HOCHBERG, UNITED STATES ATTORNEY, Newark, NJ. Richard L. Gilman, Esq., Tax Division, U.S. Department of Justice, Washington, DC.

**JUDGES:** POLITAN

**OPINION BY:** NICHOLAS H. POLITAN

**OPINION:**

LETTER OPINION

Dear Litigants:

This matter comes before the Court on the motion of defendant United States of America, on behalf of the Internal Revenue Service ("IRS"), to dismiss plaintiffs' Complaint as against the IRS pursuant to Federal Rules of Civil Procedure 12(b)(5) and 4(m). For the reasons expressed herein, defendant's motion is hereby GRANTED.

The Court notes that this motion was originally returnable on May 23, 1994. Prior to the return date, the Court notified the parties that the motion would be

decided pursuant to Rule 78 of the Federal Rules of Civil Procedure. In a Letter Opinion dated June 13, 1994, the Court indicated that the Certificate of Service attached to defendant's Notice of Motion revealed that the motion papers were forwarded to an incorrect address. Thus, the Court Ordered defendant to re-serve the motion papers on plaintiff at the proper address. [*2] See Letter Order dated June 13, 1994. By letter dated June 20, 1994, defendant forwarded the motion papers to plaintiffs at the correct address. n1 Pursuant to this Court's June 13, 1994 Letter Order, plaintiffs were provided until July 8, 1994 to submit opposition papers to the Court. The Court's prior Letter Order further informed the parties that any reply papers would be due by July 15, 1994 and that thereafter, the Court would decide the matter without oral argument. As of the present date, July 20, 1994, no further submissions have been received by the Court from any of the parties. Accordingly, the Court will treat defendant's motion as unopposed.

> n1 A courtesy copy of the transmittal letter and supporting documentation was received by the Court on June 24, 1994.

Pro se plaintiffs filed the instant Complaint on December 2, 1993. Therein plaintiffs alleged, inter alia, that defendant Internal Revenue Service illegally taxed plaintiff Edward Fernandez's wages and denied him his rights under the tax [*3] laws. See Plaintiff's Complaint.

Plaintiffs also named as defendant National Freight Inc. asserting similar allegations. National Freight, Inc. is not a party to the instant motion.

Plaintiffs' Certificate of Service filed on March 16, 1994 indicates that plaintiff served a Summons on defendants Internal Revenue Service and National Freight, Inc. The Certificate of Service does not indicate if a copy of the Complaint was also served with the Summons. Furthermore, there is no proof in the file that plaintiffs served a copy of the Summons and Complaint on the United States attorney or his representative as required by Fed.R.Civ.P. 4(i)(1)(A) and (i)(2). Nor is there any proof that a copy of the Summons and Complaint was served on the Attorney General of the United States at Washington, D.C. as required by Fed.R.Civ.P. 4(i)(1)(B) and (i)(2). n2

n2 Rule 4(i)(1) applies to service upon the United States. Rule 4(i)(2) applies to service upon an officer, agency or corporation of the United States. Rule 4(i)(2) requires a plaintiff who brings an action against an agency of the United States to satisfy the service requirements of 4(i)(1) in addition to serving the agency itself.

[*4]

Fed.R.Civ.P. 4(m) requires a plaintiff to serve the summons and complaint upon named defendants within 120 days after the filing of the complaint. Failure to comply with the 120 day service requirement results in the dismissal of the Complaint without prejudice. Rule 4(m) further provides that if the plaintiff shows good cause for failure to satisfy the 120 day requirement "the court shall extend the time for service for an appropriate period."

In response to the instant motion plaintiffs have not offered any proof of service on the United States attorney or the Attorney General. Furthermore, plaintiffs have not offered any explanation for their failure to satisfy the service requirements. In fact, plaintiffs have submitted no opposition to the instant motion.

Accordingly, because plaintiffs have failed to satisfy the service requirements of Rule 4(i)(1) and (2) and because more than 120 days have passed since the filing of the Complaint, defendant IRS's motion to dismiss is GRANTED.

An appropriate form of Order accompanies this Opinion.

NICHOLAS H. POLITAN, U.S.D.J.

ORDER

This matter having come before the Court on defendant Internal Revenue Service's ("IRS") motion to dismiss [*5] plaintiffs' Complaint, and the Court having fully reviewed the submissions of the parties, and for the reasons more fully explained in the accompanying Letter Opinion, and for good cause shown,

IT IS on this 20th day of July, 1994,

ORDERED that defendant's motion is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE as against defendant IRS.

NICHOLAS H. POLITAN, U.S.D.J.

LEXSEE

**JANET FRANCIS, Plaintiff, v. JOINT FORCE HEADQUARTERS, et al., Defendants.**

**Civil No. 05-4484 (RBK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2006 U.S. Dist. LEXIS 72738*

**October 4, 2006, Decided
April 10, 2006, Filed**

**NOTICE: [*1]** NOT FOR PUBLICATION

**PRIOR HISTORY:** *Francis v. Joint Force Headquarters Nat'l Guard, 2006 U.S. Dist. LEXIS 70917 (D.N.J., Sept. 19, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a pro se former federal military technician, alleged harassment, discrimination, and retaliation. She also claimed that defendant union failed to represent her or investigate her complaints. The union moved to dismiss and to substitute the Secretary of the Army as a defendant. Individual defendants and federal defendants, federal employers, also moved to dismiss. The technician moved to amend and to strike, inter alia.

**OVERVIEW:** The union alleged that the court lacked jurisdiction over the technician's claim against it. In particular, the union claimed that federal employees had no private cause of action against a union for breach of its duty of fair representation. Contrary to the technician's argument, nothing in *29 C.F.R. § 458.2* could establish a private cause of action against a union for breaching its duty of fair representation or otherwise endowed the court with jurisdiction over the technician's claim against the union. It was well established that a regulation alone could create a cause of action. Just as the court lacked jurisdiction to hear a federal employee's suit against her union for breach of the duty of fair representation, the court could not serve as a forum for the same suit directed against the union's agents or officers. As to the individual defendants, mailing the summons and complaint to a defendant's workplace was insufficient, particularly where, no evidence indicated that the individuals received the mail. Finally, the technician's complaint constituted a claim under Title VII. As such, the technician's claims were cognizable only against her employer.

**OUTCOME:** The union's motion to dismiss was granted. The federal employers' motion to dismiss was granted. The technician was ordered to properly effectuate service upon the Secretary of the Army and the Attorney General of the United States. The technician's motion to amend her complaint was denied. The technician's motions for entry of default and to strike defendants' motion for summary judgment were denied.

**COUNSEL:** JANET FRANCIS, Plaintiff, Pro se, WESTAMPTON, NJ.

For JOINT FORCE HEADQUARTERS, HRO, HRO-EO, JAG, IG and management offices, NATIONAL GUARD BUREAUNGB-EO, DONALD BALLARD, MS. EVELSIZER, LTC GIUARENO, COL STEPHEN HINES, LTC INGRAO, COL KEYES, LTC MAHON, KATHEY MCCREADY, COL MILLIKEN, MR PHELAN, MG GLEN REITH, LTC SCHEPENS, JOHN SORI, MAJOR JAMAL BEALE, GENERAL FRANK CARLINI, Defendants: DOROTHY J. DONNELLY, UNITED STATES ATTORNEY'S OFFICE, TRENTON, NJ.

For AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES c/o AFL-CIO, Defendant: JAMES KATZ, SPEAR, WILDERMAN, BORISH, ENDY, SPEAR &

RUNCKEL, PC, CHERRY HILL, NJ.

**JUDGES:** Robert B. Kugler, United States District Judge.

**OPINION BY:** Robert B. Kugler

**OPINION: KUGLER,** United States District Judge:

This matter comes before the Court upon a motion to dismiss the Complaint of Plaintiff pro se Janet Francis ("Plaintiff") by Defendant American Federation of Government Employees ("AFGE"), a motion to dismiss and to substitute the Secretary of the Army as a Defendant by Donald Ballard, Evelsizer, n1 Giuareno, Stephen Hines, Ingrao, Keyes, Mahon, Kathey McCready, Milliken, Phelan, Glen Reith, Schepens, John Sori (collectively, **[*2]** "Individual Defendants"), Joint Force Headquarters and National Guard Bureau-NGB-EO (collectively, "Federal Defendants"), and motions by Plaintiff to amend her Complaint, to strike the Federal Defendants' motion to dismiss, for entry of default and to amend her motion for entry of default. For the reasons set forth below, Defendants' motions will be granted and Plaintiff's motions will be denied.

> n1 The Complaint lists several Defendants by their surnames alone. As the first names of these Defendants do not appear in the Caption or anywhere else in the record, this Court will refer to these Defendants by last name in this Opinion and accompanying Order.

## I. Background

Plaintiff, formerly a federal military technician with the New Jersey Army National Guard, filed suit on September 13, 2005, against a number of defendants including Joint Force Headquarters, the National Guard Bureau-NGB-EO, and AFGE. Although Plaintiff's specific allegations are unclear, she appears to claim harassment, discrimination, **[*3]** and retaliation for a complaint filed with the Equal Employment Opportunity Commission in November or December of 2003. She also claims that her union, AFGE, failed to represent her or investigate her complaints.

Plaintiff amended her Complaint on September 15, 2005, adding several individually named defendants. Without seeking leave of Court, Plaintiff filed a Second Amended Complaint on September 23, 2005, adding General Frank Carlini and Major Jamal Beale as individual defendants and requesting a jury. Plaintiff moved to file a Third Amended Complaint on November 3, 2005.

The AFGE filed a motion to dismiss for lack of subject matter jurisdiction on October 10, 2005, and the Federal Defendants made a limited appearance to file a motion to dismiss on January 25, 2006. Plaintiff filed a motion for entry of default on January 27, 2006, a motion to strike the brief in support of Defendants' motion to dismiss on February 6, 2006, n2 and an amended motion for entry of default and for default judgment on February 9, 2006.

> n2 Plaintiff's motion to strike is more appropriately characterized as a brief in opposition to Defendants' motion to dismiss. Accordingly, Plaintiff's motion to strike will be denied and will be considered as an opposition.

**[*4]**

## II. American Federation of Government Employers' Motion to Dismiss

### A. Duty of Representation

AFGE moves to dismiss Plaintiff's claim that AFGE failed to represent her against her employer for lack of jurisdiction. In particular, AFGE contends that federal employees have no private cause of action against a union for breach of its duty of fair representation and that such claims are within the exclusive jurisdiction of the Federal Labor Relations Authority ("FLRA").

AFGE's argument is supported by the Supreme Court's decision in *Karahalios v. National Fed'n of Fed. Employees, Local 1263, 489 U.S. 527, 109 S. Ct. 1282, 103 L. Ed. 2d 539 (1989)*, the seminal case in which the Court held that federal employees have no "private cause of action against a breach by a union representing federal employees of its statutory duty of fair representation." *Id. at 529*; see also *Abbott v. United States, 144 F.3d 1, 4 (1st Cir. 1998)* (reiterating the Court's holding in

Karahalios). The Court reasoned that Congress intended to leave the enforcement of union duties, including representation, to the FLRA and its General Counsel. The Court concluded that a breach [*5] of the duty of fair representation constitutes an "unfair labor practice" under *5 U.S.C. § 7116(b)(8)*. Allegations of a breach must therefore be addressed administratively by the FLRA pursuant to *§ 7118*, which provides for the investigation and adjudication of complaints of unfair labor practices by a union. n3 *Karahalios, 489 U.S. at 536-37.*

> n3 The Court further explained:
>
> > There is no express suggestion in Title VII that Congress intended to furnish a parallel remedy in a federal district court to enforce the duty of fair representation. The Title provides recourse to the courts in only three instances: with specified exceptions, persons aggrieved by a final FLRA order may seek review in the appropriate court of appeals, *§ 7123(a)*; the FLRA may seek judicial enforcement of its orders, *§ 7123(b)*; and temporary injunctive relief is available to the FLRA to assist it in the discharge of its duties, *§ 7123(d).*
>
> *Karahalios, 489 U.S. at 536-37.*

Plaintiff [*6] filed briefs in opposition on November 3, 2005, and November 23, 2005. n4 In particular, she argues:

> It is unequivocally established by decisions *29 CFR 458.2(a)(4)* and *(5)* as the private cause of action against the Union for breach of its statutory duty of fair representation, any such claims must be filed administratively as a violation of the plaintiff's constitutional and civil rights and are within the exclusive jurisdiction of the United States District Court.

(Pl. Opp'n filed Nov. 3, 2005.)

n4 Plaintiff's briefs in opposition were not filed prior to the October 21, 2005, deadline established by *Local Civil Rule 7.1*. Nevertheless, the Court need not hold pro se litigants "to strict accountability of compliance with the rules of procedure," *Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997)*, and will therefore consider Plaintiff's untimely oppositions.

However, neither *29 C.F.R. § 458.2(a)(4)*, prohibiting labor unions from [*7] limiting members' right to sue, nor *§ 458.2(a)(5)*, addressing "safeguards against improper disciplinary actions" by unions, authorizes a federal employee to sue her union in district court for an unfair labor practice. Moreover, it is well established that a regulation alone cannot create a cause of action, particularly where Congress has demonstrated a deliberate intent to preclude judicial recourse in the district court. See *Alexander v. Sandoval, 532 U.S. 275, 286, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)* ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.") (citing *Touche Ross & Co. v. Redington, 442 U.S. 560, 578, 99 S. Ct. 2479, 61 L. Ed. 2d 82 (1979))*. Accordingly, nothing in *29 C.F.R. 458.2* could establish a private cause of action against a union for breaching its duty of fair representation or otherwise endow this Court with jurisdiction over Plaintiff's claim against AFGE.

**B. Defendants John Siri and Michael Phelan**

AFGE also moves for dismissal of the claims against union officers John Siri ("Siri"), improperly captioned as "John Sori," and Michael Phelan ("Phelan"), added as individual Defendants in Plaintiff's [*8] Amended Complaint of September 15, 2005. n5 In response, Plaintiff argues that:

> John Siri removed himself from my case and wouldn't provide anyone else to represent me which violated the plaintiff's Civil and Constitutional rights. When plaintiff asked Michael Phelan to represent her, he stated he didn't know enough about the case to represent her. I'd informed Mr. Phelan that he could inform the appropriate individuals that he is going to represent me and to request for an extension to review the case. Mr. Phelan

refused which violated the plaintiff's Civil and Constitutional Rights.

(Pl. Opp'n filed Nov. 23, 2005, at 4-5.)

n5 AFGE argues for dismissal of Siri and Phelan in its "Reply Memorandum" of October 31, 2005. Not only was AFGE's brief in reply filed prior to Plaintiff's brief in opposition, AFGE offered no justification for omitting these arguments from its original motion to dismiss, filed October 10, 2005. Nevertheless, the docket indicates that AFGE was likely not on notice of Plaintiff's claims against Siri and Phelan until after it filed its motion, as Plaintiff improperly served them by certified mail sent to their workplaces on October 7, 2005. (See Docket No. 9.) As Plaintiff did address AFGE's arguments for dismissal of Siri and Phelan in a second opposition brief filed November 23, 2005, and has, therefore, been accorded an opportunity to respond, the Court will proceed to rule on AFGE's arguments. See also 5A C. Wright and A. Miller, Federal Practice and Procedure (2d ed. 1990), § 1357 ("court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair."); *Bryson v. Brand Insul., Inc., 621 F.2d 556, 559 (3d Cir. 1980)* (noting availability of sua sponte dismissal for failure to state a claim); *Thomas v. Ford Motor Co., 70 F. Supp. 2d 521, 532 (D.N.J. 1999)* (dismissing sua sponte).

[*9]

However, Plaintiffs may not bypass the Court's ruling in *Karahalios* by suing the lawyers or union officials where such the suit would not be permitted against the union. *Montplaisir v. Leighton, 875 F.2d 1, 4, 7 (1st Cir. 1989)* (holding suits against union lawyers precluded due to "the anomaly which would result from denying members the right to sue the union for deficient representation, but allowing them to sue union agents for precisely the same conduct"); see also *LaFauci v. St. John's Riverside Hosp., 381 F. Supp. 2d 329, 334 (S.D.N.Y. 2005)* (dismissing union agents from suit because of "shield of immunity for individual union members in suits for breach of the duty of fair representation"). Thus, just as this Court lacks

jurisdiction to hear a federal employee's suit against her union for breach of the duty of fair representation, this Court cannot serve as a forum for the same suit directed against the union's agents or officers.

In any event, union agents are not personally liable for acts performed on the union's behalf, including acts or omissions amounting to a breach of the duty of fair representation. See *Atkinson v. Sinclair Refining Co., 370 U.S. 238, 247-49, 82 S. Ct. 1318, 8 L. Ed. 2d 462 (1962)* [*10] (holding that policy that the union should "'be the sole source of recovery for injury inflicted by it' . . . cannot be evaded or truncated by the simple device of suing union agents or members.").

Accordingly, because Plaintiff has alleged no claims against Siri and Phelan other than those against the Union, this Court will grant AFGE's motion to dismiss.

### III. Federal Defendants' Motion to Dismiss

Also before the court is a motion by the Federal Defendants to dismiss the Individual Defendants under *Rule 12(b)(5)* for insufficient service of process and failure to state a claim, and to substitute the Secretary of the Department of the Army for Joint Force Headquarters and the National Guard Bureau, leaving the Secretary of the Army as the sole remaining Defendant.

### A. Insufficient Service of Process

*Rule 4(m)* instructs courts to dismiss suits where "service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint" unless "the plaintiff shows good cause for the failure." *Fed. R. Civ. P. 4(m)*; *Abdel-Latif v. Wells Fargo Guard Svc., Inc., 122 F.R.D. 169, 171 (D.N.J. 1988)*. [*11] Despite the relaxed treatment accorded pro se complaints, the Court has no power to adjudicate a suit over defendants who have not been properly served. *Jones v. Frank, 973 F.2d 872 (10th Cir. 1992)* (upholding dismissal of pro se suit for insufficient service of process); *Townsel v. Contra Costa County, 820 F.2d 319 (9th Cir. 1987)* (same).

Plaintiff filed her Complaint against Joint Force Headquarters and the National Guard Bureau on September 13, 2005, adding the Individual Defendants to the Complaint on September 15, and September 23, 2005. n6 Plaintiff served the United States Attorney on November 29, 2005, but has not served the United States

Attorney General, nor has she served the Individual Defendants. Plaintiff maintains that she adequately served each Defendant by sending a copy of the Complaint and summons by certified mail to the Defendant's workplace. However, there is no indication that the Individual Defendants even received the mail, and the return receipt cards provided by Plaintiff are unsigned or signed by individuals other than the Defendants. n7

> n6 Plaintiff filed her Second Amended Complaint on September 23, 2005, adding General Frank Carlini and Major Jamal Beale as individual defendants. Because Plaintiff has already amended her Complaint on September 15, 2005, Plaintiff was obligated to obtain leave of court for all further amendments. *Fed. R. Civ. P. 15(a)* ("A party may amend the party's pleading once as a matter of course."). Because the Second Amended Complaint was improperly filed, it shall be stricken, rendering the First Amended Complaint filed September 15, 2005, the active Complaint.

**[*12]**

> n7 Plaintiff also argues that the Court "served the US Attorney's Office and the US Attorney General's Office electronically prior to my delivery of the complaint." (Opp'n filed Feb. 6, 2006, at 11.) However, the electronic notice does not amount to service of the Complaint under the Rules.

*Rule 4(e)* establishes the sole avenues for effecting service upon individual defendants. Individuals may be served by delivering the summons "to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode." *Fed. R. Civ. P. 4(e)*. Mailing the summons and Complaint to a defendant's workplace is insufficient, particularly where, as here, no evidence indicates that the defendant received the mail. n8 Accordingly, the Individual Defendants have not been served for the purposes of *Rule 4*. Because the above captioned suit was filed September 13, 2005, the 120 day period provided by *Rule 4(m)* has long since expired.

> n8 Plaintiff argues that *Rule 4* authorizes service by handing "the document to be served to the individual, partner, officer, or agent; leaving it at his or her office with a person in charge thereof." (Opp'n, filed Feb. 6, 2006, at 14.) However, Plaintiff is quoting *Rule 4(h)*, which addresses "Service Upon Corporations and Associations" and therefore has no bearing on the service of an individual.

**[*13]**

Before dismissing a suit for insufficient service of process, however, the court should first "determine whether good cause exists for an extension of time." *Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1305-06 (3d Cir. 1995)*. Good cause requires "a demonstration of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified in the rules." *MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1097 (3d Cir. 1995)* (holding that "good cause" is the same standard as "excusable neglect" under *Rule 6(b)(2)*) (citing *Petrucelli, 46 F.3d at 1312*). "The burden of establishing excusable neglect is upon the appellant, even one proceeding pro se." *Kersh v. Derozier, 851 F.2d 1509, 1512 (5th Cir. 1988)* (quoting *Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981)* (citations omitted)).

A pro se litigant's unfamiliarity with the rules does not constitute good cause sufficient to excuse a failure to timely serve process. *Kersh, 851 F.2d at 1512* ("To hold that a pro se litigant's ignorance of [the Rules] excuses his **[*14]** compliance with the [Rules] would automatically excuse his failure to serve his defendants timely."); *Townsel, 820 F.2d at 320* ("To hold that complete ignorance of *Rule 4* . . . constitutes good cause for untimely service would allow the good cause exception to swallow the Rule."). Consequently, Plaintiff's misreading of the Rules does not amount to good cause for her failure to serve Defendants.

Nevertheless, the Court may still exercise its discretion to provide Plaintiff with an extension of time, even in the absence of good cause. In weighing whether to exercise this discretion, courts look to (1) whether the plaintiff's Complaint is frivolous, (2) the plaintiff's motivation in "pursuing its claim (both in the factual and legal components of the case)," (3) objective unreasonableness, and (4) the need to "advance

considerations of compensation and deterrence." *Ritter v. Cooper, 2003 U.S. Dist. LEXIS 23544, 2003 WL 23112306, *3 (D. Del. 2003)* (citing *E.I. du Pont de Nemours & Co. v. New Press, Inc., 1998 U.S. Dist. LEXIS 9496, 1998 WL 355522, *4 (E.D. Pa. 1998)*); see also *Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986)*.

Because nothing in Plaintiff's **[*15]** Complaint states a claim against the Individual Defendants, the factors weigh in favor of disallowing any additional time to effectuate service on these Defendants. Rather, as allegations of employment discrimination by a federal employer, Plaintiff's Complaint constitutes a claim under Title VII. *Wilson v. Potter, 159 Fed. Appx. 415, 417 (3d Cir. 2005)* ("Title VII is the exclusive remedy for claims of discrimination arising out of federal employment.") (citing *Brown v. General Services Admin., 425 U.S. 820, 835, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976)*). As such, Plaintiff's claims are cognizable only against her employer, since "Title VII does not permit the imposition of liability upon individuals unless they meet . . . [the] definition of 'employer.'" *Manns v. Leather Shop Inc., 960 F. Supp. 925, 928, 36 V.I. 214 (D.V.I. 1997)* (citing *Grant v. Lone Star Co., B.L., 21 F.3d 649, 652 (5th Cir. 1994)*); *Tomka v. Seiler Corp., 66 F.3d 1295 (2nd Cir. 1995)*; see also *Dici v. Pennsylvania, 91 F.3d 542, 552 (3rd Cir. 1996)* (holding that individual employees cannot be held liable under Title VII).

Accordingly, because Plaintiff's complaint **[*16]** does not state a claim against the Individual Defendants, and because, as provided below, Plaintiff will retain an opportunity for recourse against her employer, this Court will not exercise its discretion to allow Plaintiff additional time to effectuate service on these Defendants, and Plaintiff's claims against the Individual Defendants will be dismissed without prejudice.

## B. Substitution of Secretary of the Department of the Army as a Defendant and Leave to Effectuate Service

The Federal Defendants argue that Plaintiff was an employee of a federal department and therefore must bring her Title VII suit against the head of the agency in his official capacity, in this case the Secretary of the Department of the Army. In support of this assertion, Defendants provide a Notification of Personnel Action, verifying Plaintiff's former position as a Federal military technician pursuant to the National Guard Technicians

Act, *32 U.S.C. § 709*. (Donnely Decl. filed Jan. 25, 2006)

As an employee of the Department of the Army, Plaintiff was a federal employee, *Reiser v. New Jersey Air Nat'l Guard, 152 Fed. Appx. 235 (3d Cir. 2005)*, and therefore **[*17]** should have brought her employment discrimination suit against the Secretary of the Department of the Army, pursuant to *42 U.S.C. § 2000e-16(c)*. See *Grier v. Headquarters, U.S. Army Forces Command, Ft. McPherson, Ga., 574 F. Supp. 183, 184 (D.C. Ga. 1983)* (ordering plaintiff to amend complaint adding the Secretary of the Army as an the proper defendant); *Varma v. Gutierrez, 421 F. Supp. 2d 110, 2006 WL 708203 (D.D.C. 2006)* (granting defendant's motion to substitute agency head as proper defendant under *§ 2000e-16(c)* over plaintiff's objection).

When suing a federal officer, such as the Secretary of the Army, in his official capacity, the plaintiff must also serve both the United States Attorney and the Attorney General of the United States, pursuant to *Rule 4(i)*. *Sanchez-Mariani v. Ellingwood, 691 F.2d 592 (1st Cir. 1982)*; *Jones v. Frank, 973 F.2d 872 (10th Cir. 1992)*. n9 Plaintiff has not yet served the Attorney General of the United States.

> n9 Plaintiff argues that she is not required to serve the United States Attorney General because she was "an Excepted Service employee." The classification as "excepted service" is intended to distinguish positions such as Plaintiff's from civil service positions in the competitive service, *5 U.S.C. § 2103 (a)*, and has no bearing on *Rule 4(i)* or Plaintiff's obligation to serve the Attorney General of the United States.

**[*18]**

Instead of requesting dismissal, the Federal Defendants ask this Court to substitute the Secretary of the Army for Defendants National Guard Bureau and Joint Force Headquarters. Defendants also request this Court to allow Plaintiff additional time to properly serve the United States and the Secretary of the Army.

In order to provide Plaintiff an opportunity to litigate the merits of her claims, Defendants' motion will be granted. The Secretary of the Army will be substituted as a Defendant and Plaintiff will be Ordered to properly effectuate service on the Secretary of the Army and the

Attorney General of the United States.

## IV. Plaintiff's Motions

### A. Plaintiff's Motion to File a Third Amended Complaint

Plaintiff moves to amend her Complaint, "adding AFGE violated plaintiff's Civil Rights Act, Constitutional rights and conspiracy, wrongful termination, by Joint Force Headquarters, additional grounds for relief and additional claims pertaining to the statute's impact on the discrimination strength of AFGE's not providing plaintiff equal protection." (Pl. Mot. Amend Compl.)

Where a plaintiff has already amended his complaint or defendants have filed a responsive **[*19]** pleading, the plaintiff may further amend the complaint only with leave of the court. *Fed. R. Civ. P. 15(a)*; *Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000)*. Under *Rule 15(a)*, such leave should be "freely given when justice so requires." *Fed. R. Civ. P. 15(a)*; *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)* (instructing courts to permit amendments freely to afford plaintiffs the opportunity to test claims on the merits). Courts are to accord even greater latitude to amend where the plaintiff is pro se. See e.g., *Frasier v. General Elec. Co., 930 F.2d 1004, 1008 (2d Cir. 1991)*.

District courts nevertheless retain substantial discretion to deny amendments in the event of bad faith, undue prejudice to opposing parties, futility of the amendment, or "repeated failure to cure deficiencies by amendments previously allowed." *Davis, 371 U.S. 182*; *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)* ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, **[*20]** prejudice, and futility.").

As discussed previously, this Court lacks jurisdiction over Plaintiff's allegations that AFGE failed to fairly represent her, rendering futile any amendment of this claim. Plaintiff's wrongful termination claim is already included in original Complaint, obviating any need for an amendment, and, moreover, Plaintiff has failed to "attach to the motion a copy of the proposed pleading or amendments" as required by *Local Civil Rule 7.1(f)*.

Accordingly, Plaintiff's motion to amend her Complaint will be denied for futility and noncompliance with the Local Civil Rules.

### B. Motions for Default

Plaintiff filed motions for entry of default against the Federal Defendants on January 27, 2006, and on February 9, 2006, on the grounds that Defendants had failed to appear despite having been adequately served with process.

Plaintiff asserts correctly that *Rule 55(a)* provides for entry of default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." *Fed R. Civ. P. 55(a)*. However, the Federal Defendants made a limited appearance to move **[*21]** to dismiss on January 25, 2006, and therefore have indeed appeared in the action for the purposes of the Federal Rules. See, e.g., *Hudson v. North Carolina, 158 F.R.D. 78 (E.D.N.C. 1994)* ("The filing of a Motion to Dismiss constitutes defending an action within the meaning of *Rule 55(a)*.") (citing *Wickstrom v. Ebert, 101 F.R.D. 26, 33 (E.D. Wis. 1984)*). Moreover, as established above, Plaintiff had not effected service of any of the Federal Defendants as of January 27, 2006. Accordingly, Plaintiff's motions for an entry of default will be denied.

The accompanying Order shall issue today.

Dated: 4-10-06

S/Robert B. Kugler

United States District Judge

### ORDER

THIS MATTER having come before the Court upon a motion to dismiss the Complaint of Plaintiff pro se Janet Francis ("Plaintiff") by Defendant American Federation of Government Employees ("AFGE"), a motion to dismiss and to substitute the Secretary of the Army as a Defendant by Donald Ballard, Evelsizer, Giuareno, Stephen Hines, Ingrao, Keyes, Mahon, Kathey McCready, Milliken, Phelan, Glen Reith, Schepens, John Sori (collectively, "Individual Defendants"), Joint Force Headquarters **[*22]** and the National Guard Bureau-NGB-EO (collectively, "Federal Defendants"), and motions by Plaintiff to amend her Complaint, to strike the Federal Defendants' motion to dismiss, for default judgment, and to amend her motion for default judgment; and the Court having considered the moving

papers, and the Oppositions thereto; and for the reasons expressed in the Opinion issued this date;

IT IS hereby **ORDERED** that AFGE's motion to dismiss [Docket No. 8] is **GRANTED** and Defendants AFGE, John Siri, improperly captioned as "John Sori," and Michael Phelan are hereby **dismissed;**

IT IS further **ORDERED** that the Federal Defendants' motion to dismiss [Docket No. 23] is **GRANTED,** and the Secretary of the Department of the Army is hereby substituted as Defendant for Joint Force Headquarters and National Guard Bureau-NGB-EO, and the Individual Defendants are dismissed, leaving the Secretary of the Department of the Army as the sole Defendant;

IT IS further **ORDERED** that Plaintiff shall properly effectuate service upon the Secretary of the Army and the Attorney General of the United States on or before **May 1, 2006;**

IT IS further **ORDERED** that Plaintiff's **[*23]** motion to Amend the Complaint [Docket No. 15] is **DENIED,** that Plaintiff's Second Amended Complaint [Docket No. 6] filed September 23, 2005, is hereby **stricken,** and that the Active Complaint is Plaintiff's First Amended Complaint, filed September 15, 2005;

IT IS further **ORDERED** that Plaintiff's motions for entry of default [Docket Nos. 24, 27] are **DENIED;**

IT IS further **ORDERED** that Plaintiff's motion to strike Defendants' motion for summary judgment [Docket Nos. 29] is **DENIED.**

Dated: 4-10-06

S/ Robert B. Kugler

United States District Judge

LEXSEE


Caution
As of: Jan 31, 2007

**LISA GUILES, Plaintiff, v. METROPOLITAN LIFE INSURANCE CO, Defendants.**

**CIVIL ACTION NO. 00-5029**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2002 U.S. Dist. LEXIS 2393; 27 Employee Benefits Cas. (BNA) 2131**

**February 13, 2002, Decided**

**PRIOR HISTORY:** [*1] Guiles v. Metro. Life Ins. Co, 2001 U.S. Dist. LEXIS 18559 (E.D. Pa., Nov. 9, 2001)

**DISPOSITION:** Defendant's motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff plan participant sued defendant plan administrator, seeking payments of the benefits claimed to be owed under an ERISA qualified long-term disability plan. The plan administrator moved for summary judgment.

**OVERVIEW:** The plan administrator argued that it was not a proper party in the plan participant's action. The court determined that the plan administrator was entitled to summary judgment because, under 29 U.S.C.S. § § 1132(a)(1)(B) and 1132(d), the plan was the only entity against whom claims for benefits under the plan could be brought. The plan participant sought to hold an entity other than the plan liable for the payment of benefits. The plan participant's proposition that a plan administrator who breaches its fiduciary duty may be sued under the theory of equitable estoppel or for breach of fiduciary duty was not applicable.

**OUTCOME:** The plan administrator's summary judgment motion was granted.

**CORE TERMS:** plan administrator, summary judgment, fiduciary, entity, breach of fiduciary duty, equita-

ble estoppel, proper party, equitable relief, misrepresentations, enforceable, statutory authority, administrator

**COUNSEL:** For LISA S. GUILES, PLAINTIFF: NINA B. SHAPIRO, LANCASTER, PA USA.

For METROPOLITAN LIFE INSURANCE COMPANY, DEFENDANT: E. THOMAS HENEFER, STEVENS AND LEE, READING, PA USA. KIRK L. WOLGEMUTH, READING, PA USA.

For WARNER-LAMBERT COMPANY, WARNER-LAMBERT INVESTMENT COMMITTEE, WARNER-LAMBERT COMPAMT SHORT TERM DISABILITY BENEFITS PLAN, WARNER-LAMBERT COMPANY LONG TERM DISABILITY BENEFITS PLAN, DEFENDANTS: KIRK L. WOLGEMUTH, READING, PA USA. CAROLINE AUSTIN, WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP, PHILADELPHIA, PA USA.

**JUDGES:** EDUARDO C. ROBRENO, J.

**OPINION BY:** EDUARDO C. ROBRENO

**OPINION:**

    **Memorandum and Order**

    AND NOW, this 13th day of February, 2002, upon consideration of defendant's motion for summary judgment (doc no. 31) and plaintiff's response in opposition to motion for summary judgment (doc. no. 33), it is

hereby ORDERED that the defendant's motion for summary judgment (doc. no. 31) is GRANTED. The court's order is based on the following reasoning: [*2]

Plaintiff is a participant in an ERISA qualified long-term disability plan. Metropolitan Life Insurance Company (hereinafter "MetLife"), as the plan administrator, denied plaintiff benefits under the plan. Plaintiff has brought this action seeking payments of the benefits claimed to be owed under the plan. MetLife claims that it is not a proper part in this action because only the plan may be sued to recover payments of benefits. Before the court is MetLife's motion for summary judgment.

ERISA provides the statutory authority for a participant to bring an action to recover benefits under a benefits plan:

(a) A civil action may be brought (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B). ERISA also provides, in relevant part:

Any money judgment under this title against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such [*3] person is established in his individual capacity under this title.

29 U.S.C. § 1132(d)(2).

In construing a statute, the task of the court is to determine whether the language of the Congressional enactment has a "plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808, 813 (1997). If so, the court must give the language full effect and "enforce it according to its terms," unless doing so would produce an absurd result. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S. Ct. 1942, 1947, 147 L. Ed. 2d 1, 7 (2000).

The language of § § 1132(a)(1)(B) and 1132(d), read together, clearly and unambiguously provides that the plan is the only entity against whom claims for benefits under the plan may be brought. See Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324-25 (9th Cir. 1985). Since in this case, plaintiff seeks to hold an entity other than the plan liable for the payment of benefits, the defendant's motion for summary judgment should be granted. n1

n1 . Although the statutory authority seems clear, courts have split in their analysis of whether a plan administrator may be liable for benefits under § 1132(a)(1)(B). Compare Neuma Inc. v. AMP, Inc., 259 F.3d 864, 872 n.4 (7th Cir. 2001) ("ERISA permits suits to recover benefits only against the Plan as an entity"); Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993) (citing Gelardi); Constantine v. American Airlines Pension Benefit Plan, 162 F. Supp. 2d 552, 559 n.5 (N.D. Texas 2001) (noting that the Fifth Circuit has not addressed this issue and citing district courts in the circuit finding "that the plan is the only proper party in a suit to recover benefits under § 1132(a)(1)(B)") with Hamilton v. Allen-Bradley Co., Inc., 244 F.3d 819, 824 (11th Cir. 2001) (noting that § 1132(a)(1)(B) "confers a right to sue the plan administrator for recovery of benefits"); Hall v. LHACO, Inc., 140 F.3d 1190, 1196 (8th Cir. 1998) (determining plan administrator is a proper party); Taft v. Equitable Financial Co., 9 F.3d 1469, 1471 (9th Cir. 1993) (same); Daniel v. Eaton Corp., 839 F.2d 263, 266 (6th Cir. 1988) (noting that the proper party in an ERISA action is the party that "is shown to control the administration of the plan")

[*4]

Plaintiff cites the Third Circuit's decision in Curcio v. John Hancock Mut. Life Ins., Co., 33 F.3d 226 (3d Cir. 1994), for the proposition that under Third Circuit law, a fiduciary to a plan may be required to pay benefits to a plan participant. Curcio involved a suit against the plan administrator to collect benefits under an ERISA plan. 33 F.3d at 229. In that case, the plaintiff claimed that the plan administrator had made misrepresentations to the plaintiff (and other plan participants) concerning certain benefits under the plan. See id.

The Third Circuit found that since the plan administrator exercised discretion over the administration of the plan and managed its assets, the administrator of the plan, under the facts of that case, satisfied the statutory definition of a fiduciary. See id. at 234. As a fiduciary, therefore, the plan administrator could be held liable under ERISA for making affirmative misrepresentations.

See id. at 235. The court concluded that under § 1132(a)(3)(B), the section of ERISA which authorizes claims to pursue equitable relief against a fiduciary of a plan, plaintiff [*5] was entitled to proceed against the plan administrator for an action under the theory of equitable estoppel. See id. at 238. n2

n2 . The plaintiff also argued that the plan administrator was liable under a breach of fiduciary duty theory under 29 U.S.C. § 1109. See id. at 238. The court concluded that this "alternative argument provides additional support for our conclusion that [the plan administrator] is liable to [the plaintiff]." Id. at 238-39.

Curcio is distinguishable. One, Curcio involved a claim against a plan administrator for equitable relief pursuant to theories of equitable estoppel under 29 U.S.C. § 1132(a)(3)(B) and breach of fiduciary duty under 29 U.S.C. § 1109. The instant case involves a claim for monetary damages under § 1132(a)(1)(B). Two, Curcio, involved allegations that the plan administrator was a fiduciary and had breached its duty. The instant [*6] claim does not allege any breaches of duty on the part of the plan administrator. Therefore, Curcio stands for the proposition, not applicable here, that a plan administrator who breaches its fiduciary duty may be sued under § 1132(a)(3)(B) under the theory of equitable estoppel or under § 1109 for breach of fiduciary duty. n3

n3 . Nevertheless, several district courts in the Eastern District of Pennsylvania have held that a plan administrator may be liable for a recovery of benefits under § 1132(a)(1)(B). See Cimino v. Reliance Standard Life Ins. Co., 2001 U.S. Dist. LEXIS 2643, at *8 n.2, Civ. A. No. 00-2088 (E.D. Pa. March 12, 2001); Moore v. Hewlett-Packard Co., 2000 U.S. Dist. LEXIS 4437, at *13-14, Civ. A. No. 99-2928 (E.D. Pa. April 6, 2000); Vaughn v. Metropolitan Life Ins. Co., 87 F. Supp. 2d 421, 425 (E.D. Pa. 2000); Parelli v. Bell Atlantic-Pennsylvania, 1999 U.S. Dist. LEXIS 17868, at *12, Civ. A. No. 98-3392 (E.D. Pa. Nov. 19, 1999); Welch v. Corestates Financial Corp., 1999 U.S. Dist. LEXIS 8406, at *11-12, Civ. A. No. 98-3533 (E.D. Pa. June 1, 1999). This view is not unanimous, though, and several courts have held that, based on the plain language of the statute, plan administrators are not proper parties to actions for a recovery of benefits under § 1132(a)(1)(B). See Smith v. Prudential Health Care Plan, 1997 U.S. Dist. LEXIS 14216, at *9, Civ. A. No. 97-891 (E.D. Pa. Sept. 9, 1997); Reinert v. Giorgio Foods, Inc., 1997 U.S. Dist LEXIS 9090, at *11-13 (E.D. Pa. June 25, 1997); Blahuta-Glover v. Cyanamid LTD Plan, 1996 U.S. Dist. LEXIS 5786, at *9, Civ. A. No. 95-7068 (E.D. Pa. April 29, 1996).

[*7]

Since the statutory mandate is clear, and Curcio does not apply, summary judgment is appropriate for the defendant. Thus, defendant's motion for **summary judgment is granted.**

**AND IT IS SO ORDERED.**

**EDUARDO C. ROBRENO, J.**

ORDER

**AND NOW**, this **13th** day of **February, 2002**, pursuant to a Memorandum and Order dated February 13, 2002, it is hereby **ORDERED** that **JUDGEMENT** is **ENTERED** in favor of defendant Metropolitan Life Insurance Company and against the plaintiff.

**AND IT IS SO ORDERED.**

**EDUARDO C. ROBRENO, J.**

LEXSEE

**NICHOLE S. HALL, Plaintiff, v. GLENN O. HAWBAKER, INC., et al., Defendants.**

**No.: 4:06-CV-1101**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**2006 U.S. Dist. LEXIS 81760; 39 Employee Benefits Cas. (BNA) 1417**

**November 8, 2006, Decided**
**November 8, 2006, Filed**

**CORE TERMS:** qualifying, notice, coverage, premium, beneficiary, health insurance, divorce, failure to state a claim, legal separation, divorce decree, terminated, notification, misrepresentation, entitle, aforementioned, administrator, fiduciary, equitable relief, plan administrator, employee benefit plan, detrimental reliance, termination, cancelled, deadline, notify, elect, required to provide, motion to dismiss, reinstatement, trigger

**COUNSEL:** [*1] For Nicole S. Hall, Plaintiff: Bernard F. Cantorna, Bryant & Cantorna, P.C., State College, PA.

For Glenn O. Hawbaker, Inc., Glenn O. Hawbaker, Inc. Employee Benefit Plan, Defendants: Thomas G. Collins, Stephen Moniak, Buchanan Ingersoll & Rooney PC, Harrisburg, PA.

For Capital Blue Cross, t/d/b/a NCAS Pennsylvania, Defendant: David R. Fine, Amy L. Groff, Kirkpatrick & Lockhart Nicholson Graham LLP, Harrisburg, PA.

**JUDGES:** John E. Jones III, United States District Judge.

**OPINION BY:** John E. Jones III

**OPINION:**

    **ORDER**

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

    Pending before the Court are the Motion of Capital Administrative Services, Inc., to Dismiss Counts I, II, and IV of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss Counts I, II, and IV") (doc. 50), filed on September 29, 2006, and the Motion of Glenn O. Hawbaker,

Inc., and the Glenn O. Hawbaker, Inc., Employee Benefit Plan to Dismiss Counts II, IV, and V of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss Counts II, IV, and V") (doc. [*2] 56), filed on October 9, 2006. For the reasons that follow, the Motions will be granted in part and denied in part.

**PROCEDURAL HISTORY:**

    On May 31, 2006, Plaintiff Nichole S. Hall ("Plaintiff" or "Ms. Hall") filed a Complaint arising under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., in the United States District Court for the Middle District of Pennsylvania, with Glenn O. Hawbaker, Inc., and Capital Blue Cross t/d/b/a NCAS Pennsylvania as named Defendants. (Rec. Doc. 1-1). Prior to the filing of any Answer(s) or Motion(s) by Defendants, on June 22, 2006, Plaintiff filed an Amended Complaint, also arising under the provisions of ERISA, 29 U.S.C. § 1001 et seq., and naming Glenn O. Hawbaker, Inc., and Capital Blue Cross t/d/b/a NCAS Pennsylvania as Defendants. (Rec. Doc. 5-1). On June 23, 2006, Plaintiff filed a Motion for Preliminary Injunction requesting reinstatement of her health insurance. (Rec. Doc. 6).

    Both Defendants then filed Motions to Dismiss portions of the Amended Complaint (docs. 16, 25), prompting Plaintiff, on September 21, 2006, to file a Motion [*3] to Amend Pleadings (doc. 41-1). By Order dated September 21, 2006 (doc. 43), this Court granted Plaintiff's Motion to Amend, and on same date, Plaintiff filed her Second Amended Complaint (doc. 42). The Second Amended Complaint also arises under the provisions of ERISA, 29 U.S.C. § 1001 et seq. However, it names as Defendants Glenn O. Hawbaker, Inc., Capital Administrative Services, Inc., t/d/b/a NCAS Pennsylvania, and the Glenn O. Hawbaker, Inc., Employee Benefit Plan.

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

On September 29, 2006, Capital Administrative Services, Inc. ("NCAS"), filed a Motion to Dismiss Counts I, II, and IV of the Second Amended Complaint (doc. 50), and on October 9, 2006, Glenn O. Hawbaker, Inc. ("GOH"), and the Glenn O. Hawbaker, Inc., Employee Benefit Plan ("Plan") filed a Motion to Dismiss Counts II, IV, and V of the Second Amended Complaint (doc. 56). Both of the instant Motions to Dismiss have been briefed by the parties. The Motions to Dismiss are therefore ripe for disposition.

**FACTUAL BACKGROUND:**

In her Second Amended Complaint, Plaintiff seeks various forms of relief. (Rec. Doc. 42). However, the principal forms of relief sought are a declaratory judgment [*4] that the divorce decree entered on or about September 9, 2005 was the qualifying event entitling her to elect "COBRA" coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act, the reinstatement of her dependent health insurance coverage through GOH until September 9, 2005, the opportunity to make any and all insurance payments required were Plaintiff entitled to elect COBRA coverage after September 9, 2005, and Defendants' payment of any and all medical bills that Plaintiff incurred from June 15, 2005 to the present. The aforementioned health insurance, available as part of the Plan, is a self-funded employee benefit plan for employees and beneficiaries of GOH. (Rec. Doc. 42, P 4).

Plaintiff alleges that NCAS was a named fiduciary and the claims administrator for the Plan. (Rec. Doc. 42, P 8). Plaintiff alleges that GOH was the sponsor of the Plan, the plan administrator, and a named fiduciary. (Rec. Doc. 42, P 7). However, Plaintiff alleges that GOH is also the "defacto [sic] decision maker on granting or denying continued health insurance coverage" to Plaintiff. (Rec. Doc. 42, P 9).

On November 7, 1993, Plaintiff and Michael Hall ("Mr. Hall") married. (Rec. Doc. [*5] 42, P 10). At all times relevant to the instant dispute, Mr. Hall was employed by GOH. (Rec. Doc. 42, P 6). As an employee of GOH, Mr. Hall was entitled to employee benefits, including health insurance, from the Plan. (Rec. Doc. 42, P 6). Although Plaintiff does not specifically aver when she first obtained health insurance under the Plan, Plaintiff had health insurance through GOH for some period of time prior to the events leading to this dispute. (Rec. Doc. 42, P 14).

While Plaintiff was insured under the Plan, she was the victim of recurrent thyroid cancer. (Rec. Doc. 42, P 14). During her coverage under the Plan, Ms. Hall had two surgeries and multiple tests related to her cancer, allegedly costing the Plan tens of thousands of dollars. (Rec. Doc. 42, P 15).

In 2004, Mr. Hall filed for divorce from Plaintiff in New York. (Rec. Doc. 42, P 11). On January 6, 2005, Mr. Hall and Plaintiff signed a Separation Agreement relating to equitable distribution of their marital property. (Rec. Doc. 44-1, Ex. B). The Separation Agreement n1 provided that the parties would "agree to remain separated . . . for a period of six (6) months after the execution of the Agreement, or June 1, 2005, so [*6] that the Wife can continue to obtain medical insurance for that period of time from the [H]usband." (Rec. Doc. 44-1 at 15).

> n1 As NCAS accurately noted, because Plaintiff attached the Separation Agreement as an Exhibit to her Second Amended Complaint, the Court may consider its contents in resolving the instant Motions. See Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004). Indeed, in its disposition of the instant Motions, the Court may consider the contents of all Exhibits that Plaintiff attached to her Second Amended Complaint.

On or about June 15, 2005, Mr. Hall completed an NCAS Termination Notification Form in which he described his marital status as "Single" and indicated that health insurance coverage for his "Ex Wife" should be terminated because of "Divorce or Legal Separation." (Rec. Doc. 44-2, Ex. C). Mr. Hall also denoted June 15, 2005 as the date of the qualifying event and the date on which coverage should terminate. (Rec. Doc. 44-2, Ex. C).

As a result of Mr. Hall's [*7] completion of the NCAS Termination Notification Form, on or about June 21, 2005, NCAS sent the required COBRA Qualifying Event Notification ("Notification") to Ms. Hall. (Rec. Doc. 44-2, Ex. D). The Notification indicated that Ms. Hall's coverage under the Plan terminated June 15, 2005. (Rec. Doc. 44-2, Ex. D at 1).

Plaintiff alleges that the Notification informed her that she had forty-five (45) days in which to elect to continue health insurance benefits or have them terminated. (Rec. Doc. 42, P 25). However, the Notification actually says that "[t]o continue coverage, you must complete and submit the application that is enclosed with this letter to NCAS within 60 days from either the date of this letter or your coverage term date (whichever is later)." (Rec. Doc. 44-2, Ex. D at 1). The Notification then itemized the premiums for the types of coverage available, including a total of $ 350.22 for individual medical and dental coverage, and further advised: "[y]our completed application should include a premium payment in order to

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

activate coverage that terminated on the termination date listed above." (Rec. Doc. 44-2, Ex. D at 1).

Plaintiff alleges that she then contacted NCAS, [*8] which advised her to send a monthly premium of $ 350.22. (Rec. Doc. 42, P 26). Accordingly, on or about July 29, 2005, NCAS received a Continued Group Health Coverage Application ("COBRA Application"), selecting continued individual medical and dental insurance, and containing a $ 350.22 COBRA payment, from Ms. Hall. (Rec. Doc. 44-2, Ex. E). On her COBRA Application, Ms. Hall designated her marital status as "Sep[a]rated." (Rec. Doc. 44-2, Ex. E).

On August 16, 2005, Plaintiff received notice that she had to pay $ 537.01 by next month's closing date to bring her account current. On or about September 7, 2005, NCAS received the $ 537.01 payment requested. (Rec. Doc. 42, PP 29-30). If the qualifying event occurred on June 15, 2005, the $ 537.01 payment brought Plaintiff's account current through August 31, 2005. (Rec. Doc. 42, P 30).

However, Plaintiff alleges that the qualifying event did not take place until September of 2005. On September 7, 2005, a decree of divorce was issued in New York, which incorporated the Separation Agreement signed in January and filed in September. (Rec. Doc. 44-1, Ex. A). The divorce decree was entered on September 9, 2005. (Rec. Doc. 42, P 19).

Plaintiff [*9] alleges that on or about early September of 2005, Plaintiff's fiance, Paul Morris ("Mr. Morris"), had a telephone conversation with NCAS about the status of Ms. Hall's payments. (Rec. Doc. 42, P 58). Plaintiff alleges that NCAS advised Mr. Morris that Ms. Hall's payments were current. (Rec. Doc. 42, P 58). Indeed, Plaintiff alleges that NCAS failed to inform Mr. Morris that Ms. Hall's September payment had been due on August 15, 2005, and that Defendants considered her September payment in arrears. (Rec. Doc. 42, P 58). Further, Plaintiff alleges that "the defendant" n2 knew that Plaintiff's account was in arrears and that Plaintiff did not know it when "the defendant" failed to disclose that information to Mr. Morris in early September. (Rec. Doc. 42, PP 68-69).

n2 Count I names NCAS and GOH as Defendants. However, in her allegations within Count I, Plaintiff fails to specify which Defendant to which the singular, "the defendant," allegations refer. Given Plaintiff's allegation that Mr. Morris called NCAS (doc. 42, P 67), this Court assumes that any reference to "the defendant" within Count I refers to NCAS.

[*10]

However, on September 15, 2005, NCAS sent Plaintiff written notice that her premiums were in arrears as of August 29, 2005, in the amount of $ 350.22. (Rec. Doc. 42, P 59). The September 15, 2005 notice also allegedly advised Plaintiff that her "continuation of coverage may be cancelled as of next month's closing date if this balance is not paid," thus indicating to Plaintiff that if payment was not received by October's closing date, insurance may be cancelled. (Rec. Doc. 42, PP 59, 62).

Plaintiff also alleges that, contrary to the Plan's COBRA Administration Service Rider, the September 15, 2005 notice failed to indicate that if payment was not made by October 1, 2005, NCAS intended to cancel her COBRA insurance retroactive to August 31, 2005, the last date through which payments were timely. (Rec. Doc. 42, PP 60-61). Plaintiff alleges that the Plan documents contain a COBRA Administration Service Rider, which provides that if a participant is late with payment, "NCAS shall notify the COBRA continuant in writing. If NCAS does not receive a full premium payment within thirty days from the date of the notice, NCAS shall cancel the COBRA continuant retroactive to the first day of [*11] the period for which timely payment has not been made . . . ." (Rec. Doc. 42, P 61).

Plaintiff alleges that Mr. Morris mailed her September payment, in the amount of $ 350.22, on or about September 26, 2005. (Rec. Doc. 42, P 33). Plaintiff also alleges that Mr. Morris mailed the payment for October, also in the amount of $ 350.22, on or about October 1, 2005. (Rec. Doc. 42, P 34).

However, on or about October 12, 2005, Plaintiff received a Certificate of Health Insurance Creditable Coverage for the period of June 15, 2005 through August 31, 2005. (Rec. Doc. 42, P 35). Further, on October 12, 2005, Plaintiff also received notice that her insurance was being cancelled for non-payment and was notified that she could contact the NCAS COBRA department via telephone in regards to the termination. (Rec. Doc. 42, P 36). Plaintiff also alleges that on October 13, 2005, she received a second, written notification from NCAS about the termination. (Rec. Doc. 42, P 37).

Plaintiff avers that she made repeated telephone calls to NCAS about her termination, and that she was advised that GOH would determine whether to reinstate her insurance. (Rec. Doc. 42, P 38). However, Plaintiff alleges that [*12] when she contacted GOH, she was informed that NCAS would determine whether to reinstate her insurance. (Rec. Doc. 42, P 40). Plaintiff also alleges that an attorney working on her behalf left messages with NCAS's customer service department, but received no return calls as of October 27, 2005. (Rec. Doc. 42, P 40).

Thus, on or about October 27, 2005, Plaintiff, through her attorney, advised NCAS that she had made the September and October premium payments via checks dated September 26, 2005, and October 1, 2005, respectively. (Rec. Doc. 42, P 41). Plaintiff also alleges that her attorney advised NCAS that Plaintiff had not received "any notice that the September payment was in arrears" n3 and requested that her benefits be reinstated. (Rec. Doc. 42, P 41).

n3 The Court notes that Plaintiff's allegation that she had no notice (doc. 42, PP 41-42, 68 ("no notice of this premium due was sent to the plaintiff")) may be contradicted by Plaintiff's allegation that on September 15, 2005, NCAS sent notice that the September premium was in arrears (doc. 42, PP 59-60). The allegations would not conflict if Plaintiff had also alleged that she never received the September 15, 2005 notice, but Plaintiff made no clear allegation of such. The allegation most nearly suggesting that Plaintiff never received such notice is contained in P 49, where Plaintiff refers to "copies of notifications of late payments *allegedly* sent to Ms. Hall on or about August 16, 2005 and September 15, 2005." (Rec. Doc. 42, P 49 (emphasis added)). However, several of Plaintiff's other allegations tend to suggest that she received it. (See Rec. Doc. 42, PP 60, 91-95).

Regardless of whether Plaintiff alleges that she received the September 15, 2005 notice or not, in P 59, Plaintiff appears to concede that NCAS sent such notice. (Rec. Doc. 42, P 59).

[*13]

Although Plaintiff fails to allege when her thyroid cancer recurred, Plaintiff is currently fighting cancer. (Rec. Doc. 42, P 16). "[S]ignificant testing and expense is necessary for her further treatment." (Rec. Doc. 42, P 16).

Accordingly, Plaintiff's efforts to have her insurance reinstated continued. (See Rec. Doc. 44-2, Exs. H-J). On or about February 6, 2006, Plaintiff again contacted NCAS, through her attorney, to advise NCAS that Plaintiff had sent the September and October premiums, was continuing to send monthly premiums, had not received notice that she was in arrears, and requested reinstatement of her insurance benefits. (Rec. Doc. 42, P 42). The February 6, 2006 letter also requested a written explanation as to the continued denial of Plaintiff's insurance coverage and copies of all documents relating to the denial. (Rec. Doc. 42, P 43). A similar letter was sent on February 16, 2006. (Rec. Doc. 42, P 45). The February

16, 2006 letter also advised NCAS that the qualifying event had not occurred in June of 2005, but rather when the parties were divorced on September 9, 2005, and argued that Plaintiff should have been covered by Mr. Hall's insurance until that date. [*14] (Rec. Doc. 44-2, Ex. J).

On or about February 27, 2006, NCAS advised Plaintiff that her written appeal had been forwarded to GOH and that a detailed response would be forthcoming from the group's broker of record. (Rec. Doc. 42, P 46). On or about March 8, 2006, a memorandum from GOH was received by Plaintiff, indicating the qualifying event for termination as divorce or legal separation, listing a chronology of events regarding Plaintiff's claim, and providing some supporting documents. (Rec. Doc. 42, PP 47, 48). However, no summary plan, insurance policy, or file was included with the memorandum. (Rec. Doc. 42, P 47).

As a result, on March 21, 2006, Plaintiff's attorney requested "copies of notifications of late payments allegedly sent to Ms. Hall on or about August 15, 2005 and September 15, 2005." (Rec. Doc. 42, P 49). Plaintiff's attorney also requested a formal response to her appeal letter, the reasons her insurance continued to be denied, and notice of any further administrative appellate right Plaintiff might have. (Rec. Doc. 42, P 50). Plaintiff alleges that as of September 21, 2006, no formal response from NCAS has been received, and thus, any further administrative appeal [*15] would be fruitless. (Rec. Doc. 42, P 51).

Plaintiff also alleges that NCAS's records indicate receipt, by NCAS, of two premium payments from Plaintiff on October 13, 2005, "said payment bringing Ms. Hall's account status from being in arrears to being paid under the defendant's billing system." (Rec. Doc. 42, P 63). Further, Plaintiff alleges that pursuant to both the terms of the Agreement for Third Party Administration Services between GOH and NCAS, and the September 15, 2005 notice, she had thirty (30) days from the September 15, 2005 notice to bring her account current. (Rec. Doc. 42, P 64). Thus, Plaintiff alleges that Defendants untimely rejected any payment(s) received on or about October 13, 2005, two days prior to the alleged October 15, 2005 deadline, and cancelled Plaintiff's insurance prematurely. (Rec. Doc. 42, P 65).

This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this is an action to recover benefits under a medical expense benefit plan covered by ERISA and arises under the laws of the United States.

## STANDARD OF REVIEW:

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

In considering a motion [*16] to dismiss, a court must accept the veracity of a plaintiff's allegations. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); see also White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990). In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that in considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); see also District Council 47 v. Bradley, 795 F.2d 310 (3d Cir. 1986).

**DISCUSSION:**

In its Motion, NCAS seeks dismissal of Counts I, II, and IV of the Second Amended Complaint for failure to state a claim upon which relief can be granted. (Rec. Doc. 50 at 1). NCAS asserts that Count I of the Second Amended Complaint should [*17] be dismissed for failure to state a claim because Plaintiff "does not and could not allege that Ms. Hall 'reasonably relied' on any misstatement by NCAS," and that Count II should be dismissed for failure to state a claim because NCAS is not a proper defendant to Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim and because NCAS gave proper COBRA notice at the proper time. Further, NCAS argues that Count IV should be dismissed for failure to state a claim because it "essentially reiterates the incorrect theory . . ." underlying Count II. (Rec. Doc. 51 at 5).

GOH and the Plan's Motion seeks dismissal of Counts II, IV, and V of the Second Amended Complaint for failure to state a claim upon which relief can be granted. (Rec. Doc. 56 at 1). GOH argues that Count II should be dismissed for failure to state a claim because GOH is not a proper defendant relative to Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim and because GOH had no duty to investigate Mr. Hall's notice of a qualifying event. GOH and the Plan also assert that Counts IV and V, respectively, should also be dismissed for failure to state a claim because they "essentially reiterate[] [*18] the incorrect theory underlying Count II . . . ." n4 (Rec. Doc. 57 at 23).

n4 The Court has noted the Plan's wish to join GOH's Motion to Dismiss Counts II and IV to the extent that Plaintiff asserted any claim(s) against it in the aforementioned Counts. (Rec. Doc. 57 at 26 n.10). Because this Court finds that

the only named Defendants to Counts II and IV are NCAS and GOH (doc. 42 at 13, 15), this Court sees no need for the Plan to join in said Motion as to the aforementioned Counts.

For the sake of clarity and in the interest of being concise, this Court will consider the Motions to Dismiss by Count.

**A. NCAS's Motion to Dismiss Count I**

In Count I, Plaintiff alleges a breach of fiduciary duty, naming NCAS and GOH as Defendants. n5 (Rec. Doc. 42 at 12). NCAS has moved that Count I be dismissed for failure to state a claim because of Plaintiff's failure to allege detrimental reliance.

n5 Despite naming NCAS and GOH as Defendants in Count I, within said Count, Plaintiff only explicitly avers involvement of NCAS, and, in fact, the majority of averments in the Count reference only "the defendant." Nevertheless, only NCAS has moved the Court to dismiss Count I.

[*19]

NCAS aptly notes that the Third Circuit has held that, to make out a claim under ERISA, 29 U.S.C. § 1001, et seq., for breach of fiduciary duty, a plaintiff must plead and prove:

(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation.

Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found., 334 F.3d 365, 384 (3d Cir. 2003). n6 In fact, recently the Third Circuit reiterated the need for ERISA plaintiffs to plead and prove reliance to sustain a claim for breach of fiduciary duty. See Hooven v. Exxon Mobil Corp., No. 05-1610, 2006 U.S. App. LEXIS 26011 at *11 (3d Cir. Oct. 20, 2006) ("[d]etrimental reliance on a material misrepresentation made by the defendant is a necessary element of an ERISA breach of fiduciary duty claim.").

n6 The Court recognizes that NCAS does not concede that it was acting as a fiduciary with re-

Case 1:05-cv-00495-JJF    Document 45-2    Filed 01/31/2007    Page 41 of 120

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

spect to the alleged conversation with Mr. Morris. (See Rec. Doc. 51 at n.5).

[*20]

In Count I, as NCAS indicated, Plaintiff alleges several dates as the potential final date by which her September premium had to be received in order for her COBRA coverage to continue. Paragraph 32 suggests the September premium was due by the end of September, paragraph 60 suggests that it was due by October 1, 2005, and paragraph 64 suggests that it was due by October 15, 2005. n7 (Rec. Doc. 42, PP 32, 60, 64). As NCAS astutely notes, all of the dates suggested are *after* Mr. Morris's alleged September 26, 2006 payment. Thus, NCAS argues that Plaintiff has not, indeed could not, plead detrimental reliance.

> n7 NCAS (see doc. 62 at 6) and GOH (see doc. 63 at 13) argue that Plaintiff's allegations and argument (docs. 42, PP 59-62; 61 at 11) that "Plan documents provide a thirty day period in which to make payment from the late notice" (doc. 61 at 15) should fail because the documents cited are not actually plan documents. Given Plaintiff's multiple allegations as to the final date by which her September premium had to be received in order for her COBRA coverage to continue, and that at least one of those allegations references "Plan documents" (doc. 42, P 61), this Court will reserve ruling on the question of the final deadline until after the upcoming hearing on Plaintiff's Motion for Preliminary Injunction. (Rec. Doc. 6). The Court emphasizes that in its disposition of a motion to dismiss, it must consider whether Plaintiff could show *any* facts in support of her allegations that would entitle her to relief.

[*21]

However, when disposing of NCAS's Motion to Dismiss Count I, this Court must consider whether Plaintiff could prove any set of facts that would entitle her to relief. In Count I, Plaintiff alleges that "plaintiff inquired of NCAS in early September 2005 as to the amount of health insurance premium owed. Plaintiff was informed that the premiums were paid." (Rec. Doc. 42, P 67). Plaintiff also alleges that on September 26, 2005, and October 1, 2005, her fiance, Mr. Morris, mailed Plaintiff's $ 350.22 premium payments for September and October. (Rec. Doc. 42, PP 33-34). Further, Plaintiff alleges that NCAS received the aforementioned payments on October 13, 2005, and that these payments brought "Ms. Hall's account status from being in arrears

to being paid under the defendant's billing system." (Rec. Doc. 42, P 63). Finally, as indicated above, two of Plaintiff's allegations suggest that her September premium had to be received prior to October 13, 2005: Paragraph 32 suggests the September premium was due by the end of September and paragraph 60 suggests that it was due by October 1, 2005. (Rec. Doc. 42, PP 32, 60).

> n8 In light of the conflicting final due dates alleged by Plaintiff and Plaintiff's allegation that her premium for September was mailed on September 26, 2005, this Court is not unsympathetic to NCAS's argument that detrimental reliance has not been pleaded. However, given the standard of review that this Court must apply to motions to dismiss, for each Count, the Court considers whether Plaintiff could prevail if she proved the deadline most favorable to that Count.

[*22]

Given Plaintiff's conflicting allegations, it is entirely unclear to this Court what was the final date by which NCAS had to receive Plaintiff's September payment in order to prevent the termination of her COBRA coverage. Such a fact-specific inquiry is not the proper subject of a motion to dismiss, and as such, the Court cannot grant NCAS's Motion to Dismiss. However, the Court is confident that those factual circumstances will be more fully developed at the upcoming hearing on Plaintiff's Motion for Preliminary Injunction. n9 (Rec. Doc. 6).

> n9 If, as NCAS suggests (see doc. 62 at 4 n.4), the hearing reveals that Plaintiff's September payment was due August 15, 2005, and that Plaintiff had a thirty (30) day grace period running from the first day of the covered month (September), then Plaintiff's grace period lasted through the end of September.

At the upcoming hearing, Plaintiff will have the opportunity to prove a set of facts to support her claims that she is entitled to relief. The key facts in such [*23] a determination will be when Plaintiff's September premium was received by NCAS n10 and the last date by which it had to be received by NCAS in order for Plaintiff's COBRA coverage to continue. n11 If Plaintiff shows that her September premium was received by NCAS on October 13, 2005; that, according to Plan documents, the final date on which it could be received in order for her COBRA coverage to continue was any date prior to that; and that Plaintiff's mailing of her September premium, and thus NCAS's receipt, was delayed

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

by any NCAS misrepresentations of her account status, Plaintiff may have a claim for detrimental reliance.

> n10 Given that Plaintiff alleges misrepresentations by NCAS, NCAS's argument that Plaintiff's alleged mailing of her September 26, 2006 premium would have resulted in their receipt of such payment prior to the final deadline may be inapposite. Consideration of NCAS's argument necessarily involves a credibility determination that cannot be made at this juncture.

> n11 Depending on this Court's findings as to when Plaintiff's September premium was received by NCAS and what was the last date by which it had to be received by NCAS in order for Plaintiff's COBRA coverage to continue, any alleged misrepresentations by NCAS may then become determinative as well.

[*24]

Accordingly, NCAS's Motion to Dismiss Count I is denied. Count I is not dismissed for failure to state a cause of action because a dispute exists as to the last date by which payment could be received in order to maintain Plaintiff's COBRA coverage n12 and a dispute exists as when Plaintiff's premium was sent and received. Depending on which facts Plaintiff proves, Plaintiff could show that she detrimentally relied on NCAS's alleged misrepresentation in early September 2005 that her account was up to date.

> n12 Plaintiff alleges that several different deadlines are referenced in relevant documents. (See Rec. Doc. 42, PP 32, 60, 64).

**B. NCAS and GOH's Motions to Dismiss Count II**

**1. Plaintiff's Claims under 29 U.S.C. § 1132(a)(1)(B)**

First, we will consider NCAS and GOH's arguments that they are not proper defendants for a claim under 29 U.S.C. § 1132(a)(1)(B). n13 As Defendants submit, ERISA sets forth the persons entitled to bring a claim for relief, [*25] as well as the specific claims that are authorized. Specifically, ERISA's Civil Enforcement section states, in pertinent part, as follows:

> (a) Persons empowered to bring a civil action. A civil action may be brought-

> (1) by a participant or beneficiary . . .

> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . .

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan . . . .

29 U.S.C. § 1132(a). ERISA also provides, in relevant part:

> Any money judgment under this title against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this title.

29 U.S.C. § 1132(d)(2) [*26] .

> n13 The Court is cognizant that NCAS and GOH's Motions to Dismiss Count II on the grounds that they were improper defendants (docs. 51 at 14; 62 at 5; 63 at 4) sought dismissal of only those claims within Count II brought pursuant to 29 U.S.C. § 1132(a)(1)(B). However, because Count II contains both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) claims, in the interest of completeness and clarity, the Court contrasts its treatment of 29 U.S.C. § 1132(a)(1)(B) claims with that of 29 U.S.C. § 1132(a)(3) claims.

In Count II of her Second Amended Complaint, Plaintiff alleges that Defendants' incorrect determination that a qualifying event, namely legal separation or divorce, terminated Plaintiff's insurance on June 15, 2005, resulted in Plaintiff's receipt of a COBRA notice months before it should have been issued. (Rec. Doc. 42, PP 73-75). Because the Halls' divorce decree was entered September 9, 2005, Plaintiff [*27] alleges that she was entitled to elect COBRA coverage for at least sixty (60) days

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

after same date, until at least November 9, 2005. In fact, Plaintiff alleges that because Defendants' notice of termination was legally insufficient and factually incorrect, Plaintiff was entitled to benefits under her husband's insurance on October 13, 2005, the date on which her COBRA coverage was terminated. Accordingly, in Count II, Plaintiff seeks:

> a) declaratory judgment; b) attorney's fees c) finding that the qualifying event was the divorce decree entered on or about September 9, 2005; d) reinstating the health insurance coverage provided by Glenn O. Hawbaker, Inc., to the plaintiff Nichole Hall as of June 15, 2005; e) that Ms. Hall be allowed to make any and all insurance premium payments that would be required under the insurance contract as of the order of the court; and f) that the defendants be responsible for any and all medical bills incurred by Nichole Sue Hall from June 15, 2005 to the present pursuant to 29 U.S.C. § 1132(a)(3) and 1132(a)(1).

(Rec. Doc. 42 at 14-15).

As the District Court for the Eastern District of Pennsylvania [*28] recently stated, the language of 29 U.S.C. § 1132(a)(1)(B) and 1132(d), read together, clearly and unambiguously provides that the plan is the only entity against whom claims for benefits under the plan may be brought. Guiles v. Metropolitan Life Ins. Co., 2002 U.S. Dist. LEXIS 2393 *3 (E.D. Pa. 2002); see also Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324-25 (9th Cir. 1985). Moreover, a participant or beneficiary cannot bring an action under § 1132(a)(3) for "other appropriate equitable relief" when all they seek is past due benefits. See Blahuta-Glover v. Cyanamid Long Term Disability, 1996 U.S. Dist. LEXIS 5786, 1996 WL 220977 *5 (E.D. Pa. 1996) ("Because § 112(a)(1)(B) provides an adequate remedy, a claim for equitable relief for an alleged simple wrongful denial of benefits cannot be maintained under § 1132(a)(3).").

Count II of the Second Amended Complaint reveals that Plaintiff is seeking equitable relief, pursuant to 29 U.S.C. § 1132(a)(3), as against Defendants NCAS and GOH. See Reinert v. Giorgio Foods, Inc., 1997 U.S. Dist. LEXIS 9090 *15-16 (E.D. Pa. [*29] 1997); see also Spain v. AETNA Life Ins. Co., 13 F.3d 310, 312 (9th Cir. 1993) (stating that ERISA allows equitable relief against fiduciaries and nonfiduciaries). Because Plaintiff is not alleging a "simple wrongful denial of

benefits," see Blahuta-Glover, 1996 U.S. Dist. LEXIS 5786, 1996 WL 220977 *5 (E.D. Pa. 1996), but rather that multiple alleged errors by Defendants require injunctive relief in order for Plaintiff to be made whole, Plaintiff's allegations explain her attempt to seek equitable relief.

Nevertheless, Plaintiff's claims under 29 U.S.C. § § 1132(a)(1)(B) are dismissed because the Plan is the only appropriate defendant to these claims. Guiles, 2002 U.S. Dist. LEXIS 2393; see also Gelardi, 761 F.2d at 1324-25. Given this Court's finding that neither NCAS nor GOH are proper Defendants to Plaintiff's claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B), this Court need not consider Plaintiff's argument that under 29 U.S.C. § 1132(a)(1)(B), Plan documents can, and do, provide Plaintiff protection beyond that provided by ERISA. (See Rec. Doc. 60 at 12).

Thus, [*30] after a thorough review of the plain language of the Second Amended Complaint and applicable case law, the Court will grant NCAS and GOH's Motions to Dismiss those claims in Count II brought pursuant to 29 U.S.C. § 1132(a)(1)(B). Guiles, 2002 U.S. Dist. LEXIS 2393; see also Gelardi, 761 F.2d at 1324-25.

### 2. Plaintiff's Claims under 29 U.S.C. § 1132(a)(3)

With regard to Plaintiff's 29 U.S.C. § 1132(a)(3) claims in Count II, we will now consider NCAS and GOH's arguments that Plaintiff cannot prevail on them as a matter of law because NCAS provided Ms. Hall proper COBRA notice at the proper time. Defendants argue that they had no duty to research the accuracy of Mr. Hall's representation on the NCAS Termination Notification Form that a qualifying event, namely a divorce or legal separation, had taken place on June 15, 2005. Further, Defendants argue that, in fact, the qualifying event occurred on June 15, 2005 because that is the date that Mr. Hall told Defendants that it occurred. NCAS also argues in the alternative that, even if a qualifying event occurred in September 2005, [*31] NCAS was not required to provide Ms. Hall COBRA notice at that time because neither she nor Mr. Hall gave notice of a qualifying event.

Plaintiff counters with three arguments that she claims entitle her to "her husband's dependent health insurance coverage until the date of the divorce decree, or September 9, 2005." (Rec. Doc. 60 at 18). Accordingly, Plaintiff asserts that when her COBRA coverage was terminated on October 12, 2005, "she was still within the election period to elect continuing coverage, had elected continuing coverage, and had prepaid two and one-half months of insurance premiums." (Rec. Doc. 60 at 18). First, Plaintiff argues that on June 15, 2005, Plaintiff was entitled to dependent coverage under Mr.

2006 U.S. Dist. LEXIS 81760, *; 39 Employee Benefits Cas. (BNA) 1417

Hall's health insurance, pursuant to the terms of the Plan and ERISA, because no qualifying event, i.e. divorce or legal separation, occurred on said date. Second, Plaintiff argues that her COBRA Application provided NCAS and GOH notice that the Halls' were separated and, thus, that no qualifying event had occurred on June 15, 2005. Third, Plaintiff argues that she provided NCAS adequate notice of the entry of the September 9, 2005 divorce decree, the alleged true [*32] qualifying event, in February 2006.

We will first consider Plaintiff's theory that the qualifying event occurred on June 15, 2005. As NCAS and GOH submit, under ERISA, both the employee or the qualified beneficiary and the plan administrator bear responsibility for providing notice to one another of important dates. 29 U.S.C. § 1166(a)(3) outlines the notice that employees and beneficiaries are required to provide. It states: "each covered employee or qualified beneficiary is responsible for notifying the administrator of the occurrence of any qualifying event . . . within 60 days after the date of the qualifying event." 29 U.S.C. § 1166(a)(3). A "qualifying event" is defined as "any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary: . . . (3) [t]he divorce or legal separation of the covered employee from the employee's spouse." 29 U.S.C. § 1163.

After the employee or beneficiary has provided the required notice of a qualifying event, 29 U.S.C. § 1166(a)(4) indicates that the plan [*33] administrator "shall notify . . . (B) in the case of a qualifying event described in paragraph (3) or (5) of section 603 where the covered employee notifies the administrator under paragraph (3), any qualified beneficiary with respect to such event, of such beneficiary's rights under this subsection . . . ." 29 U.S.C. § 1166(a)(4). Thus, Defendants argue that the employee or qualified beneficiary's notice triggers the plan administrator's obligation to provide the impacted beneficiary with the required COBRA notice outlining their rights and obligations. (See Rec. Docs. 51 at 16; 57 at 16).

Because there is no case law on point from the Court of Appeals for the Third Circuit, we look to our Sister Circuits for guidance in interpreting the aforementioned ERISA provisions. Both NCAS and GOH argue that this Court should follow the Second Circuit's holding that "[i]t is the act of the employee telling his employer that the qualifying event has occurred-not the actual occurrence of the qualifying event itself-that triggers the employer's notice obligations under COBRA." Philips v. Saratoga Harness Racing, Inc., 240 F.3d 174, 178 (2d Cir. 2001). [*34]

In Philips, the Second Circuit's reasoning included consideration of the text of the aforementioned ERISA provisions, precedent, and public policy. See Phillips, 240 F.3d at 178-179. When considering the issue of whether an invalid divorce is actually a qualifying event, the Second Circuit surveyed the applicable case law, including a case from the Eighth Circuit, see Lincoln Gen. Hosp. v. Blue Cross/Blue Shield of Nebraska, 963 F.2d 1136 (8th Cir. 1992) ("under COBRA, if the notice of the divorce is given to the employer by the covered employee, the plan administrator is required to provide the qualified beneficiary with notice of her rights to continue coverage."). The Second Circuit then concluded that "[t]he unifying thread running through the cited cases is the notion that notice of a qualifying event is the dispositive factor in determining whether an employer's COBRA obligations have attached." 240 F.3d at 178.

The Second Circuit also indicated that "a cursory examination of § 1163 reveals that whether or not a 'qualifying event' has occurred (such as a 'divorce or legal separation') . . . often requires a legal determination. [*35] " Id. at 179. Citing the Supreme Court's ruling that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available," Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575, 102 S. Ct. 3245, 73 L. Ed. 2d 973 (1982), the Second Circuit concluded that "public policy is best served by relieving health plan administrators of the responsibility for making legal judgments." 240 F.3d at 179.

Finally, the Second Circuit also considered the remedial purpose of COBRA, which "was enacted as a legislative response to the growing number of Americans without health insurance and the reluctance of hospitals to treat the uninsured." Id. (citations omitted). The Second Circuit reasoned that "[i]f an employer can avoid COBRA's notice requirements simply by challenging the legal predicate for a qualifying event of which it was notified, the Congressional purpose of keeping affordable health insurance available will be thwarted." Id.

The only other Court of Appeals' decision on this issue is that cited by Plaintiff in her Briefs in Opposition to Defendants' Motions to Dismiss, [*36] Simpson v. T.D. Williamson, Inc., 414 F.3d 1203 (10th Cir. 2005). Plaintiff argues that Simpson holds that "a divorce or 'legal separation' is the qualifying event that terminates health insurance and gives a beneficiary the right to continuation of COBRA insurance under ERISA." (Rec. Doc. 60 at 15). Further, Plaintiff indicated that Simpson concluded that "'legal separation' is uniformly understood to mean a formal 'judicial alteration of the marital relationship' and that a separation of the husband and wife was not a triggering event for the cancellation of family

health insurance or COBRA notice requirements." (Rec. Doc. 60 at 15).

However, as NCAS and GOH aptly note, Simpson is factually distinguishable from the instant dispute in several important respects. First, in Simpson, the plan administrator unilaterally determined that a "qualifying event" had occurred based on three interlocutory protective orders entered by the divorce court and a letter from the wife requesting that her "estranged husband" be given no information about the medical services that she received. Simpson, 414 F.3d at 1204. Second, upon receipt of her COBRA [*37] notice, the wife in Simpson elected coverage, but also objected to the plan administrator's provision of COBRA notice on grounds that no "qualifying event" had occurred. Id. Third, after the final divorce decree had been entered, the wife gave proper notice of a "qualifying event." Id.

In fact, in Simpson, the Tenth Circuit shared the same policy concerns as those the Second Circuit expressed in Philips. Indeed, the Tenth Circuit cited Philips for the proposition that "COBRA's purpose to ensure beneficiaries continuing affordable health care coverage during transitional periods is best served by relieving, to the extent possible, all interested parties from the responsibility of making legal judgments." Simpson, 414 F.3d at 1206 (citation omitted). The Tenth Circuit also noted that "§ 1166(a)(3) places the initial burden on the 'covered employee or qualified beneficiary' to notify the plan administrator of a 'qualifying event' as defined in § 1163(3)." Id.

It seems fairly clear to this Court that, in Simpson, the plan administrator's *unilateral* determination that a "qualifying event" had occurred, as well as the same policy concerns [*38] outlined in Philips, led the Tenth Circuit to its holding. Thus, this Court finds the holdings in Simpson and Philips, although they appear at odds at first glance, can be reconciled when viewed in light of the policy concerns underlying them. The factual distinctions between the two cases, rather than the law or policy underlying them, account for the divergent outcomes. Additionally, this Court finds that although Philips is not binding, the Second Circuit's reasoning is sound and persuasive, and, thus, this Court will follow Philips here.

In light of the text of the aforementioned ERISA provisions and applicable precedent, particularly Philips' persuasive holding that "[i]t is the act of the employee telling his employer that the qualifying event has occurred--not the actual occurrence of the qualifying event itself-that triggers the employer's notice obligations under COBRA," 240 F.3d at 178, this Court holds that neither NCAS nor GOH had a duty to investigate Mr. Hall's representations on his Termination Notification Form. This Court also holds that a qualifying event occurred on

June 15, 2005 because that is the date on which Mr. Hall represented [*39] that a qualifying event occurred.

Given Mr. Hall's representation that a qualifying event, namely a divorce or legal separation, occurred on June 15, 2005, on June 21, 2005, NCAS properly sent Ms. Hall the COBRA notice that it was obligated to pursuant to 29 U.S.C. § 1166(a)(4). When Plaintiff returned her COBRA Application, electing coverage and indicating her marital status as "Sep[a]rated," she failed to sufficiently object to either Mr. Hall's representation that a "qualifying event," i.e. divorce or legal separation, had occurred, or the issuance of the COBRA notice. Ms. Hall's acquiescence, as well as the Second and Tenth Circuit's concerns that plans not be required to make legal determinations, lead this Court to the opinion that neither NCAS nor GOH had reason to second-guess NCAS's issuance of the June 21, 2005 COBRA notice to Ms. Hall.

Even if, as Plaintiff argues, the qualifying event took place upon entry of the divorce decree on September 9, 2005, Plaintiff's argument that she was entitled to COBRA notice and election as a result of that qualifying event fails. Plaintiff's argument fails because neither Mr. Hall nor Ms. Hall provided the notice [*40] required under 29 U.S.C. § 1166(a)(3) within sixty (60) days of September 9, 2005. Plaintiff did not inform NCAS of the divorce until February 2006, long after the sixty (60) window had closed.

Further, Plaintiff's argument that her delayed notice was excused because of the Plan's failure to furnish her the documents required under 29 U.S.C. § 1166(a)(1) to inform employees and beneficiaries of their rights and obligations under COBRA, is unavailing. As NCAS indicated, this Court found no legal authority for the proposition that Ms. Hall's duty under § 1166(a)(3) is contingent on the Plan's satisfaction of § 1166(a)(1). Even if Ms. Hall's duty under § 1166(a)(3) were contingent on the Plan's satisfaction of § 1166(a)(1), the June 21, 2005 COBRA notice she received provided at least some information about her COBRA rights and obligations, including that her coverage was terminated because of the occurrence of a "qualifying event." n14

n14 The Court notes that the June 21, 2005 COBRA notice also provided specific information about second qualifying events that could have raised certain inferences about all qualifying events: divorce is a second qualifying event and qualified beneficiaries must notify the Plan within sixty (60) days of a second qualifying event in order to continue COBRA coverage. At the very least, this language undercuts Plaintiff's assertion that "[i]t is unreasonable to think that a

participant would know that she was required to provide notice of a qualifying event, when her dependent insurance had already been terminated." (Rec. Doc. 61 at 12).

Further, the Court considers persuasive GOH's argument that given the Separation Agreement that the Halls signed in January of 2005, any suggestion that Plaintiff "was somehow in the dark as to why her coverage was being terminated" in June of 2005 (see doc. 61 at 12 ("notice provided by NCAS to the plaintiff failed to identify what the qualifying event was that terminated her insurance")) is "disingenuous at best." (Rec. Doc. 63 at 10).

[*41]

Thus, this Court expressly holds that for the purposes of this Memorandum and all subsequent matters in this dispute, the qualifying event occurred on June 15, 2005. Notwithstanding our finding as to the date of the qualifying event, and for the reasons aforestated, there may be an alternate argument and supporting facts that would entitle Plaintiff to relief. If Plaintiff shows that NCAS receipt of her September COBRA premium by October 15, 2005 would entitle her to continued COBRA coverage (see doc. 42, P 61) and that NCAS received her September premium on October 13, 2005 (see doc. 42, P 63), she may be entitled to relief for wrongful denial of benefits. Accordingly, the claims that Plaintiff makes in Count II pursuant to 29 U.S.C. § 1132(a)(3) are not dismissed for failure to state a claim.

**C. NCAS and GOH's Motion to Dismiss Count IV**

In Count IV, Plaintiff alleges:

[t]he COBRA notice sent to the [P]laintiff on or about June 21, 2005 was invalid because no qualifying event occurred to trigger such notice . . . [and] Plaintiff is entitled to notice and election of COBRA benefits pursuant to the September 9, 2005 divorce decree; [*42] to recover from the defendants, any out-of-pocked medical expenses incurred; and the reinstatement of her insurance.

(Rec. Doc. 42, PP 81, 85). In terms of relief requested, Count IV requests one form of relief in addition to those requested in Count II: "that the [D]efendants pay $ 100.00/day for the failure to comply with the notice re-

quirements after being advised of the date of the divorce." (Rec. Doc. 42 at 17).

The only potentially significant difference between Counts II and IV, the form of relief requested, is not sufficient to sustain Count IV because, as Defendants have argued, Count IV is based on the same erroneous theory underlying Count II: "the 'qualifying event' occurred on September 9, 2005." (Rec. Doc. 57 at 26). Given this Court's holdings that the qualifying event occurred on June 15, 2005 and that the Halls' failure to provide notice of the divorce decree excused Defendants from providing a COBRA notice following the September 9, 2005 divorce decree entry, Plaintiff cannot obtain a penalty for Defendants' failure to issue a COBRA notice, for reasons described more fully above. Accordingly, NCAS and GOH's Motions to Dismiss Count IV are granted.

[*43] **D. The Plan's Motion to Dismiss Count V**

Count V alleges that Ms. Hall's "monthly COBRA payments were made timely pursuant to the explicit terms of the Plan and the notices regarding payment sent to Ms. Hall" and that "Ms. Hall's dependent insurance was cancelled contrary to the terms of the Plan and ERISA." (Rec. Doc. 42, PP 87-88). As the Plan notes, the claim in Count V rests partially on the same premise that the claim in Count II did: "the 'qualifying event' occurred on September 9, 2005." (Rec. Doc. 57 at 26). As this Court has held that the qualifying event occurred on June 15, 2005, this argument fails.

However, as outlined above, Plaintiff may be able to show a set of facts entitling her to relief. If Plaintiff shows that NCAS receipt of her September premium by October 15, 2005 would entitle her to continued COBRA coverage (see doc. 42, P 61) and that NCAS received her September premium on October 13, 2005 (see doc. 42, P 63), she may be entitled to relief for wrongful denial of benefits. Accordingly, the claims presented by Plaintiff in Count V are not dismissed for failure to state a claim. GOH's motion to do so is, therefore, denied.

**NOW, THEREFORE,** [*44]    **IT IS ORDERED THAT:**

1. NCAS's Motion to Dismiss Counts I, II, and IV of the Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (doc. 50) is **GRANTED** in part and **DENIED** in part:

a. NCAS's Motion is **GRANTED** to the extent that Plaintiff's claims in

Count II pursuant to 29 U.S.C. § 1132(a)(1)(B) are dismissed and that Count IV is dismissed.

b. NCAS's Motion is **DENIED** in all other respects.

2. GOH's Motion to Dismiss Counts II, IV, and V of the Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (doc. 56) is **GRANTED** in part and **DENIED** in part:

a. GOH's Motion is **GRANTED** to the extent that Plaintiff's claims in Count II pursuant to 29 U.S.C. § 1132(a)(1)(B) are dismissed and that Count IV is dismissed.

b. GOH's Motion is **DENIED** in all other respects.

s/ John E. Jones III

United States District Judge

LEXSEE



Cited
As of: Jan 31, 2007

**L. H. DOANE ASSOCIATES, INC., Defendant-Appellant, v. A. BARRY SEYMOUR, Plaintiff-Appellee.**

**No. 172, 1984**

**SUPREME COURT OF DELAWARE**

**1985 Del. LEXIS 589**

**December 18, 1984, Submitted**
**April 23, 1985, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:**

AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant former employer sought review of a judgment by the Superior Court (Delaware) in favor of appellee former employee in the employee's action for unpaid wages.

**OVERVIEW:** The employee brought suit for unpaid accrued "overtime" and unused "comp" time after leaving his employment. The court affirmed the judgment in favor of the employee. The court held that the parties' original agreement that the employee would receive a fixed salary was modified by an implied agreement based on the parties' conduct regarding the issues of overtime, vacation time, and separation pay. The court also found that the trial court did not abuse its discretion in denying the employer's motion to amend its answer to allege a statute of limitations defense pursuant to 10 Del. Code § 8111 because the motion was made on the eve of trial and because the statute of limitations had not run. The employee was entitled to attorney's fees because the action was properly brought under the Delaware Wage Payment and Collection Act, 19 Del. Code, ch. 11. The court finally held that the employer's argument was made too late, which asserted that the employee's claims were preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.S. § 1001 et seq. The court noted that the employee's claims fell with the exclusions from ERISA under 29 C.F.R. § 2510.3-1(b)(1).

**OUTCOME:** The court affirmed the judgment in favor of the employee in his action to recover unpaid accrued "overtime" and unused "comp" time.

**CORE TERMS:** overtime, unpaid, matter of law, fixed term, modified, contractual, misreads, booklet, cross-appeal, unilateral, flowing

**JUDGES:** Before HORSEY, MOORE and CHRISTIE, Justices.

**OPINION BY:** BY THE COURT; HENRY R. HORSEY

**OPINION:**

ORDER

This 23rd day of April, 1985, upon consideration of the briefs and the contentions of the parties at oral argument, it appears to the Court that:

(1) This is a wage dispute (hotly contested) between L. H. Doane Associates, Inc., a Subchapter "S" engineering firm doing business as a partnership (hereafter "Doane" or "employer"), and A. Barry Seymour, a former associate and partner (hereafter "Seymour" or "employee"), whose employment by the firm ended with his

resignation in June, 1979. In 1980, Seymour filed a claim for unpaid wages in the Court of Common Pleas, New Castle County; and following a non-jury trial in January, 1983, Seymour was awarded a judgment of something less than $ 3,000 for unpaid accrued "overtime" in lieu of vacation pay, with interest and attorney's fees.

(2) Doane took an appeal on the record to Superior Court; and that Court affirmed under Levitt v. Bouvier, Del.Supr., 287 A.2d 671 (1972). The Court found [*2] substantial evidence to support the Trial Court's findings of fact, no error of law, and no abuse of discretion.

(3) The Trial Court had found plaintiff Seymour to be entitled to cash payment for unused "comp" time for overtime credited to his payroll record, notwithstanding the parties' original agreement that he receive a fixed salary regardless of number of hours worked. In a bench ruling, the Court stated, "that the establishment of the vacation journal confirms Mr. Seymour's testimony, that at some point that [original] policy was changed . . . [and] the corporation . . . whether unwittingly or knowingly, committed itself to pay [Seymour his overtime over 40 hours a week] either by giving him the overtime, letting him take days off, or alternatively at his termination, the obligation to pay him in cash or some other acceptable equivalent."

(4) Doane's appeal to this Court is stated to be motivated by concern for the stability of the law and not the money involved. Appellant states, "the decision below must be reversed under Heideck v. Kent General Hospital . . . because it enforces as a matter of law an unwritten employer 'policy' [unilaterally] created by the [*3] company bookkeeper." According to appellant, the finding appealed "violates the express holding" of Heideck v. Kent General Hosp., Inc., Del.Supr., 446 A.2d 1095 (1982): that "even a written employer policy in a personnel manual does not create strict contractual obligations." However, appellant misreads Heideck and its application to this case.

(5) Heideck involved a suit for wrongful termination of employment that turned on whether the employee was employed at will or for a fixed term. This Court affirmed the Trial Court's grant of summary judgment for the employer on the overwhelming evidence that plaintiff was an employee at will. Plaintiff relied in part on the contents of her "Employee Information Booklet" as supporting her claim to employment for a fixed term rather than "at will" status. Rather than rejecting consideration of the booklet (as some jurisdictions have done on the reasoning that such material should be "deemed to be merely a unilateral statement of company policies"), we examined the booklet's contents and found them not to support plaintiff's fixed term claim. Thus, appellant misreads Heideck as holding as a matter of law that employer-

employee [*4] contractual relations may not be altered by a company's unilateral policy statements.

(6) Appellant Doane also misconstrues the Court's bench ruling quoted above in paragraph (3). Doane states that the Trial Court committed legal error by ruling that a change in "policy" was enforceable as a matter of law, in violation of this Court's "express holding" in Heideck. We think a fair construction of the bench ruling is that reached by Superior Court, i.e., that the parties' original contract "was modified by an implied agreement consisting of the conduct of parties involving the very issue of overtime, vacation time and separation pay (citations omitted) . . . The facts in the instant case are clearly distinguishable from those in Heideck where here [sic] Seymour relied on the continuous practice as reflected in testimony and documentary evidence that an arrangement regarding overtime compensation was a matter of accepted practice. [Thus,] notwithstanding the controverted evidence in this case, sufficient evidence exists from which the Court could properly draw the conclusion reached." Clearly, a course of conduct of parties can modify the parties' express undertaking. [*5] Collins & Aikman Corporation v. Compo Industries, Inc., Del.Supr., No. 233, 1983, McNeilly, J. (May 1, 1984) (ORDER).

(7) The Trial Court did not abuse its discretion in denying Doane's motion to amend its answer to raise a statute of limitations' defense under 10 Del. C. § 8111. The motion was not filed until the eve of trial and after the case had been pending at issue for over a year and a half in the Court of Common Pleas; and, in any event, the suit was filed within one year of Doane's rejection of Seymour's request for compensation for overtime work. See H & H Poultry Co., Inc. v. Whaley, Del.Supr., 408 A.2d 289 (1979); Mergenthaler, Inc. v. Jefferson, Del.Supr., 332 A.2d 396 (1975); and Plant v. Catalytic Construction Co., Del.Super., 287 A.2d 682 (1972).

(8) Seymour's action was properly brought under the Delaware Wage Payment and Collection Act, 19 Del. C., ch. 11, thereby permitting the Trial Court to assess Seymour's reasonable attorney's fees and other costs against Doane. 19 Del. C. § 1113. Chapter 11's definition of the terms "employer" and "employee" subject to the Act are broadly stated so as to include a Subchapter "S" corporation [*6] as well as a shareholder-employee within the Act's coverage. Seymour's claim was for wages, not a share of the net profits of the corporation. See also Fairfield Builders V. Vattiliana, Del.Supr., 304 A.2d 58 (1973).

(9) Doane's eleventh-hour assertion before Superior Court that federal statute law known as "ERISA", the Employee Retirement Income Security Act of 1974, 29 U.S.C. § § 1001, et seq., preempts Seymour's claim for

unpaid wages either at common law or under 19 Del. C., ch. 11 comes too late to be considered. The record in this case was made before the Court of Common Pleas. In any event, Seymour's claims are for unpaid wages in the form of overtime pay and not for the recovery of benefits under a welfare plan. Hence, they appear to fall within the exclusions of 29 C.F.R. § 2510.3-1(b)(1).

NOW, THEREFORE, IT IS ORDERED that the judgment of Superior Court be and it hereby is

AFFIRMED.

BY THE COURT:

Henry R. Horsey, Justice

EXHIBIT

ORDER

This 1st day of May, 1984, it appears to the Court that:

1. The appeal and cross-appeal here involved have resulted from the denial of injunctive and other relief sought in the Court of Chancery by Collins & Aikman [*7] Corporation (C&A) pursuant to an exclusive license agreement under patent rights and know-how in-processes and compositions relating to tufted carpet having a synthetic resin backing.

2. The agreement specifically provides it "shall be construed, interpreted and enforced in accordance with and under the laws of the State of New York" where it was executed.

3. The Chancellor wrote two exhaustive opinions dated July 6, 1982 and October 12, 1982 dealing with the issues raised by the parties and further set forth in detail the consequences flowing therefrom by Order dated June 24, 1983.

4. The findings of fact upon which the Chancellor found the license agreement to be modified under existing New York law permitting modification of contracts by conduct of the parties are clearly supported by the record.

5. The consequences flowing from the contract as modified enunciated in the Chancellor's Order of June 24, 1983 are clearly the product of an orderly and deductive process.

6. We find no reasons to reach collateral issues raised in the appeal and cross-appeal although that is not to say we have not considered them.

NOW, THEREFORE, for the reasons stated in the Chancellor's Opinions [*8] dated July 6, 1982 and October 12, 1982, and the Order of June 24, 1983, the judgment of the Court of Chancery be and it is hereby

AFFIRMED.

BY THE COURT:

John J. McNeilly, Justice

10 of 33 DOCUMENTS

**KEITH LLOYD, Plaintiff, v. THE NEW YORK BOTANICAL GARDEN AND GREGORY LONG, Defendants,**

**03 Civ. 7557 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 21961*

**August 10, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Lloyd v. N.Y. Botanical Garden, 2004 U.S. Dist. LEXIS 18749 (S.D.N.Y., Sept. 15, 2004)*

**DISPOSITION:** **[*1]** Defendants' motion to dismiss granted in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee brought an action asserting racial, age, and disability discrimination, violations of the Consolidated Omnibus Budget Reconciliation Act (COBRA), *29 U.S.C.S. § 1161* et seq., and the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1140*, and unlawful retaliation. Pursuant to *Fed. R. Civ. P. 12(b)(6)*, defendants, a former employer and the employer's president, moved to dismiss portions of the complaint.

**OVERVIEW:** Defendants sought to dismiss all claims against the president as well as eight of the causes of action against the employer. The employee voluntarily withdrew the eight causes of action. The employee's remaining cause of action against the president sought damages for failure to provide him with the required notification of the cancellation of his medical insurance in violation of COBRA. It was well established law that an aggrieved employee could not have recovered monetary damages against an individual under ERISA or COBRA. In fact, the only remedy against persons in their individual capacity was injunctive relief, not monetary damages to the beneficiary. The court found that the employee's complaint sought solely monetary damages

against the president. As the recovery of such damages from an individual was not possible under ERISA or COBRA, the employee failed to state a claim under which relief can be granted.

**OUTCOME:** Defendants' motion to dismiss was granted.

**COUNSEL:** For Keith Lloyd, Plaintiff: Ian F. Wallace, Michael Shen & Associates, New York, NY.

For New York Botanical Garden, Defendant: George Felix Brenlla, Clifton, Budd & DeMaria, L.L.P., New York, NY.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION:**

 **Order**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

 On September 24, 2003, Plaintiff Keith Lloyd brought this action against Defendants The New York Botanical Garden ("the Garden") and Gregory Long ("Long"), president of the Garden, asserting racial discrimination, age discrimination, disability discrimination, violations of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), *29 U.S.C. §*

Case 1:05-cv-00495-JJF    Document 45-2    Filed 01/31/2007    Page 52 of 120

Page 2
2004 U.S. Dist. LEXIS 21961, *1

*1161 et seq.,* and the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1140,* and unlawful retaliation. Plaintiff seeks monetary damages for each cause of action, including liquidated damages and punitive damages.

Pursuant to *Fed. R. Civ. P. 12(b)(6),* Defendants **[*2]** bring this motion to dismiss portions of the complaint for failure to state a claim upon which relief can be granted. Specifically, Defendants seek to dismiss all claims against Long as well as the Second, Third, Fourth, Sixth, Eighth, Ninth, Eleventh and Twelfth causes of action against the Garden.

As Plaintiff has informed the Court that he will voluntarily withdraw the Second, Third, Fifth, Sixth, Eighth, Ninth, Eleventh and Twelfth causes of action, these counts are dismissed. Furthermore, as the Court finds that Defendant Long cannot be held individually liable for the Tenth cause of action, Defendants' motion to dismiss this count is granted.

### FACTS

All facts are as asserted by Plaintiff, unless otherwise noted.

Plaintiff is a 62-year-old black male, who formerly worked for Defendants until his unlawful termination in September 2001. During Plaintiff's employment, he experienced discriminatory treatment and endured harassment and a hostile work environment because of his race and age. While on disability leave for a work-related injury, Defendant terminated Plaintiff because of his disability, prevented him from obtaining medical benefits in violation of *Section 510 of ERISA* **[*3]** , and failed to provide him with required notification of the cancellation of his medical insurance in violation of COBRA.

### DISCUSSION

### I. MOTION TO DISMISS STANDARD

Under *Fed. R. Civ. P. 12(b)(6),* a court may "dismiss a claim on the basis of a dispositive issue of law," *Neitzke v. Williams, 490 U.S. 319, 326, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989),* by examining the legal sufficiency of the claim as opposed to the evidence underlying the factual issues. *De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996).* However, "a complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Paulemon v. Tobin, 30 F.3d 307, 309 (2d Cir. 1994)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* Hence, on a motion to dismiss, this Court must accept the plaintiff's allegations as true and construe those allegations in the light most favorable to the plaintiff. (See *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).*

### II. WITHDRAWN CLAIMS

Plaintiff has informed the Court that he will voluntarily **[*4]** withdraw the Second, Third, Fifth, Sixth, Eighth, Ninth, Eleventh and Twelfth causes of action by filing an amended complaint. n1 (See Pl.'s Mem. Opp. to Defs.' Mot. to Dismiss at 2). Accordingly, these claims are hereby dismissed.

> n1 Plaintiff concedes that the legal arguments set forth in Defendants' brief are meritorious. (See Pl.'s Mem. Opp. to Defs.' Mot. to Dismiss at 5). The Court has examined Defendants' arguments, and also agrees that the Second, Third, Fifth, Sixth, Eighth, Ninth, Eleventh and Twelfth causes of action should be dismissed on the grounds suggested by Defendants.

### III. TENTH CAUSE OF ACTION AGAINST LONG

Plaintiff's Tenth cause of action seeks damages for failure to provide him with the required notification of the cancellation of his medical insurance in violation of COBRA. (See Compl. at PP145-47).

It is well established law that an aggrieved employee may not recover monetary damages against an individual under ERISA or COBRA. *29 U.S.C. § 1132 (d)(2)* **[*5]** ("Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.") In fact, as Defendants correctly contend, the only remedy against persons in their individual capacity is injunctive relief, not monetary damages to the

beneficiary. *Greater Blouse, Skirt & Undergarment Assoc. v. Morris, 1996 U.S. Dist. LEXIS 8099, 1996 WL 325595 at *4 (S.D.N.Y. Jun. 12, 1996)* ("An administrator is liable under *§ 1132* for certain proscribed conduct . . . The remedy [is] injunctive relief [or] money damages owed to the plan, not the beneficiary."); see also *Ratner v. Local 29 RWDSU Health & Welfare Fund, 2001 U.S. Dist. LEXIS 17, 2001 WL 11072 at *2 (S.D.N.Y. Jan. 4, 2001)* (holding that plaintiff could not amend complaint to include punitive damages against a plan administrator because *§ 1132* provided the exclusive remedy to an aggrieved plan participant). In this case, the complaint seeks solely monetary damages against Defendant Long. As the recovery of such damages from an individual is not possible under ERISA or COBRA, Plaintiff **[*6]** fails to state a claim under which relief can be granted. n2 Therefore, Defendants' motion to dismiss this claim against Long is granted.

n2 Furthermore, Plaintiff brings suit against Long in his individual capacity as "the Garden's President," (see Compl. at P11). However, directors of a corporate plan cannot be held liable under COBRA or ERISA unless they qualify as an administrator. See *Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir. 1989)* ("Only the plan administrators and trustees of the plan in their capacity as such may be held liable" under COBRA and ERISA); (*Ratner v. Local 29 R.W.D.S.U. Health & Welfare Fund, 2001 U.S. Dist. LEXIS 17, 2001 WL 11072 at *2 (S.D.N.Y. Jan. 4, 2001)* (holding that several trustees and the president of the corporate administrator could not be held personally liable under ERISA); *Beyland v. Rome Cable Corp., 1998 U.S. Dist. LEXIS 15593, 1998 WL 690926 at *4 (N.D.N.Y. Sept. 30, 1998)* (holding that neither individual officers nor directors can be individually liable in a recovery of benefits claim under ERISA). Therefore, as the Garden's President, Long cannot be held liable for violations of COBRA.

While Plaintiff cites *Crocco v. Xerox Corporation, 137 F.3d 105, 107-108 (2d Cir. 1998)*, for the proposition that whether or not a defendant is a plan administrator is an issue of fact not ripe for summary dismissal, Crocco is not applicable to this case. The Crocco Court held that "because it is clear from the Plan documents that [defendant] was neither the designated Plan administrator nor a Plan trustee . . . it cannot be held liable for benefits due to [plaintiff] under the plan". However, this holding was based on a factual dispute about whether the corporate defendant was the plan administrator. In this case, Plaintiff has failed to even allege that Long was a plan administrator or sponsor. Thus, on the face of the complaint, he is not liable to Plaintiff for a violation of COBRA.

**[*7]**

### CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss all claims against Long as well as the Second, Third, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh and Twelfth causes of action against the Garden is granted. Consequently, Long is no longer a party to the action. The only claims remaining against the Garden are racial discrimination, disability discrimination and unlawful retaliation.

The Clerk of the Court is directed to enter judgment for Defendants accordingly.

SO ORDERED:

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: New York, New York

August 10, 2004

LEXSEE

**Timothy J. Lloyd, Sr., Ronald L. Kelly, Sr., James L. Peterson, William H. Horner, II and Glenn F. Mabry v. Wilmington Savings Fund Society**

**Civil Action No. 84C-FE-68**

**Superior Court of Delaware**

**1985 Del. Super. LEXIS 1194**

**February 28, 1985, Submitted**
**May 28, 1985, Decided**

**PRIOR HISTORY:**  [*1]

Wilmington Savings Fund Society's Motion for Summary Judgment - Denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant bank filed a motion for summary judgment in plaintiff employees' action for employee benefits, including severance pay, vacation pay, sick pay, and pension benefits, plus costs and attorney's fees.

**OVERVIEW:** A company contracted to provide data processing services to the bank and offered to employ all of the bank's employees. The employees accepted employment with the company. The employees asserted that they were voluntarily terminated from their employment with the bank and were entitled to employee benefits pursuant to the Delaware Wage Payment and Collection Act, Del. Code Ann. tit. 19, § 1109. The court determined that the employees were entitled to severance pay under the policy that the bank had with its employees. The court held that the employees were involuntarily terminated by the bank. The court explained that by offering the employees either employment with the company or unemployment benefits, but not the option of continued employment with the bank, the bank effectively terminated its relationship with the employees. The court noted that employees went to work for the company under a different employment agreement than they had with the bank. The court concluded that not only did that preclude the bank's continued fulfillment of its part of the relationship, but under the terms of the bank's severance pay policy the action entitled the employees to severance pay.

**OUTCOME:** The court denied the bank's motion for summary judgment. The court concluded that upon proper application to the court, summary judgment would have been granted to the employees on the issue of severance pay, the amount to be decided either by agreement of the parties or by a trial limited to the issue of damages.

**CORE TERMS:** severance pay, terminated, sick, pension benefits, vacation pay, summary judgment, data processing, termination, involuntarily, unemployment, coverage, eligible, Collection Act, agreement to pay, entitles, unused, employment agreement, pension plan, vacation, offering, salary

**COUNSEL:**

Lawrence M. Sullivan, Esquire, 1112 King Street, Wilmington, Delaware 19801

Thomas Reed Hunt, Jr., Esquire, Donald E. Reid, Esquire, Morris, Nichols, Arsht and Tunnell, Twelfth and Market Streets, P.O. Box 1347, Wilmington, Delaware 19899

**OPINION BY:**

POPPITI

**OPINION:**

VINCENT J. POPPITI, *JUDGE*

UNREPORTED OPINION

Letter Opinion

The matter before the Court is a Motion for Summary Judgment filed by Wilmington Savings Fund Society ("WSFS" or "the bank") in an action by former employees ("plaintiffs") of WSFS for employee benefits, including severance pay, vacation pay, sick pay, and pension benefits, plus costs and attorney's fees. This is the Court's opinion and order on the Motion after consideration of the parties' respective arguments and submittals.

The undisputed facts are that the plaintiffs were all employees of WSFS who worked in the bank's data processing unit prior to February 15, 1983. On that date WSFS entered into an agreement with E.D. Systems Corp. ("EDS") by which EDS contracted to provide data processing services to WSFS for a period of six years. Pursuant to the agreement EDS agreed [*2] to offer employment to all of the WSFS employees in the data processing unit, and the employees were told that they would be eligible for unemployment benefits if they decided not to accept employment with EDS. They were not given the choice of remaining with WSFS. All of the plaintiffs accepted employment with EDS, with no break in their employment, in the same jobs they held prior to February 15, 1983, at the same location and with the same equipment they used prior to the transfer.

Plaintiffs assert that they were involuntarily terminated from their employment with WSFS and therefore are entitled to employee benefits pursuant to 19 Del.C. § 1109 * of the Delaware Wage Payment and Collection Act, under which 19 Del.C. § 1113 entitles them to bring the instant action. At the time of the transfer of employment to EDS, WSFS had a written severance pay policy in effect which provided that:

All employees are eligible for severance pay under the following conditions:

(1) In the event an employee is involuntarily terminated for reasons other than poor performance or insubordination or dishonesty, they will receive one week's pay for each year of service at the time of [*3] termination.

(2) If an employee in good standing submits a proper resignation, the Bank, at its discretion, may grant two week's severance pay in lieu of the two weeks notice and allow the employee to leave immediately.

(3) Any exception to this policy requires the approval of the president and chief executive officer.
WSFS also had a written policy by which employees were entitled to vacation pay only if the employees voluntarily terminated their employment. The bank had no sick pay policy upon termination and had never paid employees for unused sick pay if they were terminated. Finally, pension benefits upon termination were payable

only to those employees who had ten or more years of vested service and had reached their early or normal retirement dates, criteria which none of the plaintiffs had fulfilled.

* 19 Del.C. § 1109 provides:

(a) Any employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made; provided, however, that this section shall not apply to employers subject to Part I of the Interstate Commerce Act [49 U.S.C.A. § 1 et. seq.].

(b) As used herein, "benefits or wage supplements" means compensation for employment other than wages, including, but not limited to, reimbursement for expenses, health, welfare or retirement benefits, and vacation, separation or holiday pay, but not including disputed amounts of such compensation subject to handling under dispute procedures established by collective bargaining agreements.

[*4]

The employment contract that the plaintiffs had with EDS provided that they retained their existing vacation eligibility, the right to obtain mortgage and consumer loans at the discount rates available to WSFS employees, their work time service credits for vesting purposes under the WSFS pension plan, and checking and WSFS Plan Card privileges. The EDS contract, however, differed from the arrangement with WSFS in the medical insurance plan, the life insurance coverage, dental insurance coverage, disability coverage, salary, stock purchase plan, and the offering of an EDS pension plan. *

* The Court notes only features of the employment agreement with EDS which were the same as or different from that with WSFS; while the parties dispute whether the differing features were better under one employer or the other, these disputes are not material to the issue before the Court.

The instant Motion for Summary Judgment may be granted only if the facts, when viewed in the light most favorable to the plaintiffs, lead this Court to the conclusion that there are no material issues of fact and WSFS is entitled to judgment as a matter of law. Moore v. Sizemore, Del.Supr., 405 A.2d [*5] 679 (1979); Bradford, Inc. v. Travelers Indemnity Co., Del.Super., 301 A.2d 519 (1972).

The Court is satisfied that the plaintiffs' cause of action is properly brought under the Delaware Wage Payment and Collection Act ("the Act"), 19 Del.C. ch. 11. Section 1109 of the Act provides for the payment of benefits or wage supplements and includes severance pay, vacation pay, sick pay, and pension benefits within its coverage. See § 1109, quoted supra. Moreover, this Court has previously held that the civil action remedy made available to employees in § 1113 of the Act encompasses § 1109 as well. Department of Labor ex rel. Commons v. Green Giant, Del.Super., 394 A.2d 753, 758 (1978).

The Court is further satisfied that the plaintiffs are entitled to severance pay under the policy that WSFS had with its employees at the time the instant cause of action arose, and holds that the plaintiffs were involuntarily terminated by WSFS. By offering the plaintiffs either employment with EDS or unemployment benefits, but not the option of continued employment with WSFS, the bank effectively terminated its employer-employee relationship with the plaintiffs. Further, the [*6] plaintiffs went to work for EDS under a different employment agreement than they had with WSFS. Not only did this preclude WSFS' continued fulfillment of its part of the employment relationship, but under the terms of WSFS' severance pay policy this action entitled the plaintiffs to severance pay. See Chapin v. Fairchild Camera & Instrument Corp., Cal. Ct. App., 109 Cal. Rptr. 111 (1973); Mace v. Conde Nast Publications, Inc., Conn.Supr., 237 A.2d 360 (1967). See also Livernois v. Warner-Lambert Co., 723 F.2d 1148, 1152 (4th Cir. 1983), where the court, applying South Carolina law, held that "the operative language to describe the event triggering a right to severance pay is termination of employment either as a result of job elimination or by reason of Company convenience." The court in Livernois held that the employees transferred when a division of a company was sold to another company, despite having substantially the same jobs in that their salary and other benefits were at least equal to their pre-sale status, were nevertheless entitled to severance pay.

Under the Court's rationale as discussed herein, unemployment is not a prerequisite to the [*7] right to severance pay, see Chapin, supra at 115; Adams v. Jersey Central Power & Light Co., N.J.Super. L., 114 A.2d 776 (1955), aff'd, 120 A.2d 737 (1956), nor is the Court's decision affected by the fact that the EDS-WSFS contract stated that upon termination of the agreement WSFS "may offer employment" (emphasis added) to the employees providing WSFS' data processing services on its premises. Finally, the Court finds no evidence of record to suggest that the plaintiffs waived their right to severance pay by accepting the transfer to EDS.

With regard to the plaintiffs' claims for vacation pay, sick pay, and pension benefits, the Court finds no evidence of record to support an award of these benefits. Plaintiffs assert that 19 Del.C. § 1109 entitles them to collect all of the above-listed damages. Section 1109, however, provides that such benefits or wage supplements shall be paid by "[a]ny employer who is party to an agreement to pay or provide" them. The record before the Court reveals that WSFS agreed to vacation pay only for those employees who voluntarily terminated their employment, it did not award unused sick pay, and none of the plaintiffs [*8] was eligible for pension benefits upon termination.

The plaintiffs' final claim is for costs and attorney's fees, amounts to which they are entitled under the clear language of 19 Del.C. § 1113(c).

Based upon the foregoing, WSFS' Motion for Summary Judgment is hereby denied. Upon proper application to the Court, summary judgment will be granted to the plaintiffs on the issue of severance pay, the amount to be decided either by agreement of the parties or by a trial limited to the issue of damages. Said application with an appropriate form of order, approved as to form only unless also agreed to as to substance, shall be filed not later than ten (10) days from this date.

IT IS SO ORDERED.

17 of 49 DOCUMENTS

**ROBIN MCINTYRE, Plaintiff, v. CITY OF WILMINGTON, Defendant.**

**C.A. No. 01-396 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 14569*

**July 9, 2002, Decided**
**July 9, 2002, Filed**

**SUBSEQUENT HISTORY:** *Affirmed by McIntyre v. City of Wilmington, 2003 U.S. App. LEXIS 13680* (3d Cir. Del., June 27, 2003)

**DISPOSITION:** **[*1]** Defendant's motion to dismiss granted.

**COUNSEL:** ROBIN R. MCINTYRE, plaintiff, Pro se, Wilmington, DE.

For CITY OF WILMINGTON, defendant: Rosamaria Tassone, City of Wilmington Law Department, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On June 12, 2001, Robin McIntyre ("McIntyre"), a *pro se* plaintiff, filed a complaint alleging that his employer, the City of Wilmington, wrongfully dismissed him from his job as a Code Enforcement Officer with the Department of Licenses and Inspections ("DLI") and unfairly reassigned him to a lower level position as a water meter reader for the Department of Finance, Water Division ("DFWD"). Prior to filing his complaint with the court, McIntyre properly exhausted his state and federal administrative remedies by filing claims with both

the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC"). After his claims were dismissed by both agencies, McIntyre timely filed his complaint within ninety days of receipt of the EEOC's right to sue letter. *See 29 C.F.R. § 1601.19(a)* **[*2]** .

Presently before the court is the City of Wilmington's motion to dismiss the plaintiff's complaint pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*. McIntyre's complaint and its attachments are sufficient to constitute a basis for subject matter jurisdiction. Therefore, the City of Wilmington's motion to dismiss pursuant to Rule 12(b)(1) will be denied. McIntyre cannot, however, prove any set of facts consistent with the allegations in the complaint which would entitle him to relief. As a result, the City of Wilmington's motion to dismiss pursuant to Rule 12(b)(6) will be granted.

**II. FACTS**

Prior to September 14, 1998, McIntyre was employed by the DFWD. On September 14, 1998, McIntyre was promoted to a job with the DLI. Within the first three months of McIntyre's employment with the DLI, the department received several complaints regarding McIntyre's lack of professionalism. Shortly thereafter, the DLI Commissioner was replaced by a new Commissioner, James Mosely. While the outgoing commissioner had looked past the complaints regarding McIntyre, Commissioner Mosely took them more seriously. As a result, McIntyre was placed on extended probation.

During **[*3]** this extended probation, while inspecting an apartment building, McIntyre "had words"

with a resident of the building in the presence of a DLI Senior Inspector. The resident with whom McIntyre argued turned out to be the future son-in-law of City of Wilmington Councilman Demetrio Ortega. Coincidentally, Councilman Ortega is chairman of the DLI. On March 1, 1999, McIntyre was dismissed from the DLI for inappropriate behavior and reassigned to his old job with the DFWD.

On October 29, 1999, McIntyre, an African American, filed a claim with the DDOL alleging racial discrimination in connection with his dismissal from the DLI. The completed DDOL claim form is attached to McIntyre's complaint. In the claim, McIntyre complains of the DLI's failure to terminate a Caucasian employee whose conduct was allegedly more egregious than his own. The claim states, "I was discharged from that dept. [sic] because of words with councilman's future son in law, after being on extended probation since then. A caucasion [sic] was not discharged after, allegedly kicking a door in (in uniform) put back on probation, while during he was allegedly (1) impersonating a police officer, (2) drunk and disorderly, [*4] (3) racial slurs, etc." On June 30, 2000, the DDOL dismissed McIntyre's charge, finding no reasonable basis to conclude that the DLI had discriminated against McIntyre. Soon thereafter, McIntyre filed a claim with the EEOC. Subsequent to the filing of the EEOC claim, the Caucasian employee McIntyre mentioned in his DDOL claim was also terminated. After adopting the factual findings of the DDOL, the EEOC also dismissed the claim. A right-to-sue letter was issued on June 4, 2001.

McIntyre filed a timely complaint with the court on June 12, 2001. Upon filing his complaint, McIntyre completed and signed a JS-44 civil cover sheet which lists the City of Wilmington as the only captioned defendant. The form further designates the basis of jurisdiction as a federal question, the nature of the suit as Civil Rights-Employment, and the cause of action as "employment discrimination."

The complaint itself outlines the above-mentioned chain of events leading to his dismissal. It further states that Councilman Ortega's daughter was hired by the DLI shortly after he was fired. McIntyre also alleges in his complaint that he has been "harassed since returning to work [at the DFWD]." To support this [*5] assertion, McIntyre provides a list of two instances in which he believes he was harassed. The first reads, "I was

suspended for 2 days for misreading 1 water meter." The second reads, "I was suspended for 2 weeks for misreading about 7 meters, allegedly." He ends his complaint by stating, "Somewhere in here, there has to be some wrong doings on the part of the city, and I need someone to help me find it, because I want to sue the city for a couple of reasons, harrassment [sic], favoritism, etc."

## III. STANDARDS OF REVIEW n1

> n1 Since the plaintiff is a *pro se* litigant, the court has a special obligation to construe his complaint liberally. *Zilich v. Lucht, 981 F.2d 694, 694 (3d Cir. 1992)* (citing *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972))*.

### A. Rule 12(b)(1) Standard

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of a plaintiff's complaint. A motion to dismiss under Rule [*6] 12(b)(1) for lack of subject matter jurisdiction can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack). *Mortensen v. First Federal Savings and Loan, 549 F.2d 884, 891 (3d Cir. 1977)*. When reviewing a facial attack the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id. See also Barrister v. Wendy's Int'l, Inc., 1993 U.S. Dist. LEXIS 10422, 1993 WL 293896, *3 (E.D. Pa. July 30, 1993)*.

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy as to the existence of its power to hear the case. *Mortensen, 549 F.2d at 891*. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* The plaintiff bears the burden to prove that jurisdiction does in fact exist. *Id.* However, the plaintiff's burden is relatively [*7] light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed

by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Kulick v. Pocono Downs Racing Ass'n, 816 F.2d 895, 899 (3d Cir. 1987) (quoting Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666, 39 L. Ed. 2d 73, 94 S. Ct. 772 (1974)).*

### B. Rule 12(b)(6) Standard

In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1997); Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).* Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969); Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).* A court should dismiss a complaint "only if it is clear that no relief **[*8]** could be granted under any set of facts that could be proved consistent with the allegations." *See Graves, 117 F.3d at 726; Nami, 82 F.3d at 65* (both citing *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).*

## IV. DISCUSSION

### A. Rule 12(b)(1) Motion to Dismiss

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In Re Corestates Trust Fee Litigation, 837 F. Supp. 104, 105 (E.D. Pa. 1993), aff'd 39 F.3d 61 (3d Cir. 1994).* Therefore, the court will first turn its attention to the 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

In its motion, the City of Wilmington attacks McIntyre's complaint on both facial and factual grounds. First, the City attacks McIntyre's complaint on its face, noting that it fails to aver any basis for jurisdiction. While this is true, since McIntyre is a *pro se* plaintiff, the court must construe his complaint liberally. **[*9]** *Zilich, 981 F.2d 694.* Although McIntyre's handwritten complaint does not itself state any specific basis for the court's jurisdiction, it does convey that McIntyre believes he was unfairly discharged and harassed by his employer. Additionally, the JS-44 civil cover sheet which McIntyre completed, signed and filed with the Clerk of Court upon

filing his complaint designates the basis of jurisdiction as a federal question, the nature of the suit as Civil Rights-Employment, and the cause of action as "employment discrimination." Furthermore, the claim form that McIntyre filed with the DDOL alleges racial discrimination. n2 The pleading standard under the Federal Rules is generally liberal, and even more so for *pro se* plaintiffs. The court thus finds that it is not unreasonable to conclude that McIntyre is attempting to assert a racial discrimination claim against his employer pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2*(a)(1). Since Title VII is a federal statute, the court has federal question jurisdiction over the dispute. Therefore, the defendant's facial attack fails.

n2 Since the DDOL claim form was attached to the complaint, it may be considered by the court in the determination of this motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)* (stating that when deciding a motion to dismiss, courts can generally consider the complaint, exhibits attached to the complaint, and matters of public record).

**[*10]**

The defendant also argues that the facts of the case do not give rise to federal jurisdiction. The court cannot accept this assertion. Although McIntyre has the burden of proving that jurisdiction exists, this burden is light. *Id.* Basically, McIntyre need only demonstrate that his claim is not wholly insubstantial, frivolous, devoid of merit, or made for the purpose of obtaining jurisdiction." *Bell v. Hood, 327 U.S. 678, 682, 90 L. Ed. 939, 66 S. Ct. 773 (1946); Kulick, 816 F.2d at 899.* McIntyre's DDOL claim alleges racial discrimination by his employer. It states that a Caucasian employee whose conduct on the job provided grounds for dismissal was not fired while he, an African-American, was fired for less egregious infractions. A racial discrimination claim is unquestionably within the purview of Title VII. McIntyre's claim, although perhaps weak, is substantially asserted so as to establish a basis for subject matter jurisdiction. Any other conclusion would overstep the bounds of a jurisdictional inquiry and lead into an evaluation of the merits of McIntyre's case. This would be an improper inquiry for a district court to make when reviewing **[*11]** a Rule 12(b)(1) motion. *See Growth*

*Horizons, Inc v. Delaware County, 983 F.2d 1277, 1281 (3d Cir. 1993)*. Therefore, the defendant's factual attack on subject matter jurisdiction also fails.

For these reasons, the court concludes that the defendant's factual and facial attacks on the court's subject matter jurisdiction are without merit. The court will, therefore, decline to dismiss the complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

### B. Rule 12(b)(6) Motion to Dismiss

The standard governing a Rule 12(b)(6) motion to dismiss for failure to state a claim is not as constrained as the standard for a Rule 12(b)(1) motion. *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*. A federal claim being reviewed under Rule 12(b)(6) does not have to be "wholly insubstantial" to be dismissed. *Id.* Rather, a court should dismiss a complaint "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." *See Graves, 117 F.3d at 726*. Although McIntyre's complaint cannot be dismissed for lack of subject matter jurisdiction, **[*12]** it fails the 12(b)(6) test.

A racial discrimination case under Title VII can be made in one of two ways. First, under the *Price Waterhouse* analysis, *see Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*, a plaintiff must produce direct evidence that race was a motivating factor in the employment decision. *See Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994)*. "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Nixon v. Runyon, 856 F. Supp. 977, 983 (E.D. Pa. 1994)*.

McIntyre's claim fails under the *Price Waterhouse* analysis. McIntyre's complaint contains broad allegations of harassment and favoritism, but absolutely no references to any specific facts that constitute direct proof of racial animus. In fact, McIntyre's complaint makes no mention of race at all. There are no references to racial jokes, epithets, gestures or any other racially tinged activity that could constitute direct evidence of a racial motivation the part of the DLI. Thus, there is no direct evidence that race was a motivating factor in the DLI's decision to fire **[*13]** McIntyre.

A Title VII plaintiff can also prevail under the *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* framework. In the

*McDonnell Douglas* analysis, the plaintiff can attempt to demonstrate, through indirect evidence, that the defendant's actions were racially motivated. Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case by demonstrating that he is a member of a protected class. The plaintiff must then establish that he or she was qualified for an employment position, but was not hired or was fired from the position "under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3d Cir. 1995)*. When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons were pretextual-that is, that they are false and that **[*14]** the real reason for the employment decision was discriminatory. *Id.*

McIntyre's claim also fails under the burden-shifting regimen of *McDonnell Douglas*. First, McIntyre cannot establish a prima facie case of race discrimination. Although McIntyre is a member of a protected class, the circumstances surrounding his dismissal do not give rise to an inference of unlawful discrimination. The only allegation McIntyre has made which could possibly give rise to an inference of racial discrimination is his assertion that he was fired for less egregious infractions than those committed by a Caucasian employee. Subsequent to McIntyre's filing of the DDOL claim, however, this employee was also fired. The fact that both African American and Caucasian employees were discharged extinguishes any inference of unlawful discrimination.

Even if McIntyre could make a prima facie case, the court can easily determine, based solely on the complaint and its attached exhibits, that the City of Wilmington had several legitimate, non-discriminatory reasons for dismissing McIntyre from his position with the DLI. First, McIntyre states in his complaint that the commissioner of the DLI received complaints **[*15]** regarding McIntyre, and therefore, placed him on "extended probation." Secondly, McIntyre states that, while on probation, he "had words" with the Councilman Ortega's future son-in-law in the presence of a DLI Senior Inspector. The court ventures no opinion, but it might not be unreasonable to infer that McIntyre was

dismissed from his job at the DLI because of the incident with the councilman's future son-in-law. In other words, the events surrounding McIntyre's dismissal might support the conclusion that he was fired for "stepping on the wrong toes," not because he is African-American. While this is unfortunate for McIntyre, there is absolutely no evidence which could support the assertion that McIntyre's dismissal was racially motivated.

Since the City of Wilmington has several legitimate, non-discriminatory reasons for dismissing McIntyre from the DLI, the burden shifts to McIntyre to prove that these reasons are pretextual. *See Waldron, 56 F.3d at 494.* McIntyre has not met this burden. The only evidence which could support the assertion that the City of Wilmington's reasons for dismissing McIntyre were pretextual is the allegation that a Caucasian employee who **[\*16]** had engaged in more egregious conduct than McIntyre was not fired. However, as previously noted, the fact that this co-worker was fired soon after McIntyre's DDOL claim was filed vitiates any argument that the reasons for McIntyre's termination were pretextual.

McIntyre has not demonstrated that his termination was either the direct or indirect result of racial animus. Consequently, he cannot prevail on his Title VII claim under either the *McDonnell Douglas* or *Price Waterhouse* standard. Thus, the court concludes that McIntyre's complaint fails to state a claim.

The conclusion that McIntyre's complaint does not state a claim upon which relief may be granted does not end the court's inquiry, however. The court must decide whether to grant leave to amend the complaint. The Supreme court has granted discretion to the District Courts in determining whether to grant or deny leave to amend. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).* However, refusal to grant leave to amend without any justifying reason is an abuse of that discretion and is inconsistent with the spirit of the Federal Rules of Civil Procedure. *Id.* Furthermore, **[\*17]** *pro se* plaintiffs should be given the opportunity to amend their complaints unless it clearly appears that the deficiency cannot be overcome by amendment. *Weaver v. Wilcox, 650 F.2d 22, 27 (3d Cir. 1981).* "Among the grounds that could justify the denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice and futility." *In Re Burlington Coat Factory Sec. Litig., 114 F.3d*

*1410, 1434 (3d Cir. 1997).*

In McIntyre's case, any amendment would be futile. Futility, in this context, means that the complaint, as amended, would fail to state a claim upon which relief may be granted. *Id.* In assessing futility, the district court should use the same standard of legal sufficiency that applies under Rule 12(b)(6). *Id.* The court is convinced that were McIntyre granted leave to amend, he would nevertheless be unable to state a claim upon which relief might be granted. In his DDOL claim, McIntyre failed to produce any facts or allegations which could convince the DDOL that he had a legitimate racial discrimination claim. Similarly, upon filing a claim with the EEOC, McIntyre failed to produce any evidence of racial discrimination. Finally, **[\*18]** in the present lawsuit, McIntyre has failed to adduce facts which support a claim upon which relief could be granted. Thus, although McIntyre has had three opportunities to present facts supporting his claim, he has failed to do so on each occasion. Consequently, the court concludes that permitting McIntyre to amend his complaint will not result in the production of any new facts to support his claim. Therefore, leave to amend will not be granted.

## V. CONCLUSION

McIntyre's complaint, when considered together with its attachments and the JS-44 civil cover sheet, is sufficient to establish subject matter jurisdiction. Therefore, the court will not dismiss the complaint pursuant to Rule 12(b)(1). Nevertheless, McIntyre has not and cannot prove any set of facts that might demonstrate that his dismissal from the DLI was racially motivated. Therefore, the court will grant the defendant's motion to dismiss pursuant to Rule 12(b)(6).

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The City of Wilmington's motion to dismiss (D.I. # 9) is GRANTED.

2. The Clerk shall close the case.

Dated: July 9, 2002

　　Gregory M. Sleet

　　UNITED STATES DISTRICT JUDGE

LEXSEE



Cited
As of: Jan 31, 2007

## LISA MERSHON v. WOODBOURNE FAMILY PRACTICE, LLC

### CIVIL ACTION NO. 06-00253

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2006 U.S. Dist. LEXIS 49577

### July 19, 2006, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff terminated employee filed an action against defendant former employer alleging pregnancy discrimination claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. § 951 et seq., and violations of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C.S. § 1161 et seq. The employer moved to dismiss the complaint.

**OVERVIEW:** The employee alleged that the employer discriminated against her due to her pregnancy and that it violated its duties under COBRA by failing to adequately notify her about the availability of continued medical coverage. The employer filed a Fed. R. Civ. P. 12(b)(6) dismissal motion, arguing that the employee failed to assert any actionable claims. The court agreed that the employee failed to state actionable pregnancy discrimination claims, but held that she had presented sufficient evidence to support her COBRA violation claim. The Pregnancy Discrimination Act of 1978 (PDA), 42 U.S.C.S. § 2000e(k), did not require the employer to give the employee a pregnancy-related leave of absence. The employee did not qualify for an unpaid leave under the employer's employment policies because she had not worked for the employer for at least a year. She was fired because of her excessive absenteeism, not because of her pregnancy. The employee sufficiently alleged a breach of fiduciary duty claim under the Employee Retirement Income Security Act of 1974 arising out of the em-

ployer's premature termination of her medical coverage, in violation of 29 U.S.C.S. § § 1161, 1165.

**OUTCOME:** The court granted the employer's dismissal motion in part and denied it in part. It granted the motion as to the employee's Title VII and PHRA pregnancy discrimination claims. It denied the motion as to the employee's COBRA violation claim. The court granted the employer's motion for leave to file a reply brief and accepted an exhibit as filed. The employer was directed to file an answer within 20 days.

**CORE TERMS:** pregnancy, notice, coverage, election, qualifying, continuation, disability, beneficiary, unpaid, elect, terminated, pregnant, failed to state, childbirth, illness, animus, sex, health insurance, Pregnancy Discrimination Act, plan administrator, prima facie case, leave of absence, summary judgment, facts sufficient, maximum period, manual, identification, non-pregnant, promulgated, contributed

**COUNSEL:**  [*1]  For LISA MERSHON, Plaintiff: GERARD K. SCHROM, SCHROM AND SHAFFER, MEDIA, PA; NEIL EVAN BOTEL, LAW OFFICES OF SCHROM & SHAFFER, MEDIA, PA.

For WOODBOURNE FAMILY PRACTICE, LLC, PATRICIA COLLINS, ANTHEIL MASLOW & MACMINN LLP, DOYLESTOWN, PA.

**JUDGES:** Juan R. Sanchez, J.

**OPINION BY:** Juan R. Sanchez

OPINION:

### MEMORANDUM AND ORDER

**Juan R. Sanchez, J.**

Woodbourne Family Practice, LLC asks this Court to dismiss a former employee's complaint that it engaged in discrimination based on pregnancy and provided inadequate notice of the availability of continued medical coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. § 1161 et seq. Because I find Lisa Mershon failed to state a claim of pregnancy discrimination, I will dismiss Counts I and II; because I find Woodbourne's COBRA notice inadequate, I will deny Woodbourne's Motion to Dismiss Count III of the Amended Complaint.

### FACTS

Woodbourne hired Mershon on March 23, 2003, as a medical assistant. After becoming pregnant in July or August, Mershon asked for limited duty in September because she experienced complications in the pregnancy including bleeding. On October 9, 2003 Woodbourne [*2] gave Mershon a desk job. On October 21, Mershon began bleeding profusely and was sent to the hospital by her treating physician, who also faxed a note to Woodbourne saying Mershon's last day of medically approved work was that day, October 21. Mershon's supervisor, Jane Egbert, was not there on October 21, so Mershon gave the note to one of Woodbourne's doctors, Michael Taptikoff, M.D., who told Mershon to follow her doctor's orders for bed rest. Mershon was hospitalized from October 22 to November 3, 2003. The October 21 fax listed her date of return to work as "unknown, being monitored by ultrasound[;] if condition unchanged, return to work app[roximately] 6 weeks post-partum." Def.'s Brf., Ex. D.

On November 3, 2003 Woodbourne decided Mershon had abandoned her job and prepared a notice purporting to advise her of a rights under COBRA. Woodbourne's COBRA form reads in its entirety (handwritten additions in italics):

Cobra Notice

Date: *11-4-03*

Employee: *Lisa Mershon*

This letter acknowledges that I have been offered continuation of my health insurance. If I choose to accept Cobra benefits, I understand that the payment is due be-

fore the 20th, so [*3] my coverage is still in effect for the first of next month. *Present coverage expires 11-30-03*

I do want Cobra Benefits

I do not want Cobra Benefits

Employee Signature

The price of this coverate at presnt time is *287.70*

*L: you will receive a check on 11-14-03*

*Jane*

Woodbourne mailed the notice certified on November 6, 2003 and received it back as unclaimed sometime after November 22. Two days after hearing from a co-worker she had been terminated, Mershon went to Woodbourne's office on December 20, 2003, where she received a copy of the "Cobra Notice" and learned Woodbourne had cancelled her health insurance on November 30, 2003.

In her Amended Complaint, Mershon alleges discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the basis of disparate treatment for her pregnancy, Count I; discrimination under the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 et seq., Count II; and, breach of fiduciary duty under COBRA, Count III.

### DISCUSSION

When considering a Motion to [*4] Dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court is required to accept all allegations in, and reasonable inferences from, the Complaint as true and view them in the light most favorable to Mershon. *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir. 1989). A Rule 12(b)(6) motion may only be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *D.P. Enter. Inc. v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir. 1984).

Pregnancy discrimination under 42 U.S.C. § 2000e-2(a)(1) n1 is a form of gender discrimination and is subject to the familiar *McDonnell-Douglas* n2 burden-shiftinganalysis. To establish a *prima facie* case, Mershon must show (1) she is a member of a protected class; (2) she was qualified for the job in question; (3) she suffered an adverse employment decision; and (4) circumstances surrounding the adverse decision support an in-

ference of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 796 (3d Cir. 1990).* [*5]  Although each of these elements must be demonstrated to withstand a motion for summary judgment, the standard is less stringent at the point of a motion to dismiss. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (noting the *McDonnell Douglas* test "is an evidentiary standard, not a pleading requirement."). Instead, Mershon must only present the "short and plain statement of the claim showing that the pleader is entitled to relief" established by F.R. Civ. P. 8(a)(2). *Swierkiewicz,* 534 U.S. at 512. Mershon must set forth facts sufficient to support an inference Woodbourne terminated her as the result of discriminatory animus. n3

> n1 § 2000e
>
> 4%(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . .

**§ 2000e-2. Unlawful employment practices(a) Employer practices**

> It shall be an unlawful employment practice for an employer--
>
> > **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin; or

> > **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[*6]

> n2 *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

> n3 Because Woodbourne's Motion contained "matters outside the pleading," it will be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(b). In this case, Mershon failed to state a claim for pregnancy discrimination under either the lenient Rule 12(b)(6) standard or the more stringent standard of Rule 56.

The Pregnancy Discrimination Act of 1978 (PDA), 42 U.S.C. § 2000e(k), does not require an employer to excuse a pregnant employee's absences, if it would not excuse those of a non-pregnant employee. "'The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but . . . not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees . . . in which event it would not be ignoring pregnancy after all.'" *Rhett v. Carnegie Ctr. Assocs.(In re Carnegie Ctr. Assocs.),* 129 F.3d 290, 296 (3d Cir. 1997), quoting *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 738 (7th Cir. 1994).* [*7]  Mershon must show Woodbourne treated her differently than it would have treated an employee on leave for a temporary disability other than pregnancy. *Id.*

at 299. The PDA does not require an employer to grant maternity leave or to reinstate an employee after a maternity leave. *Id.* "The PDA is a shield against discrimination, not a sword in the hands of a pregnant employee." *Id.* The PDA "does not force employers to pretend that absent employees are present whenever their absences are caused by pregnancy." *Crnokrak v. Evangelical Health Sys. Corp.*, 819 F. Supp. 737, 743 (N.D. Ill. 1993).

To prevail on her claim of pregnancy discrimination, Mershon must show Woodbourne treated her differently than it treated non-pregnant employees. *Carnegie Center Associates*, 129 F.3d at 297. Woodbourne's employee handbook emphasizes attendance, making ill employees responsible for finding their own replacements and warning of "possible termination" on the fourth unexcused absence or lateness. The handbook also limits unpaid leaves of absence to those who have been employed by Woodbourne for more than year. The Manual states "[t]o be eligible for a leave [*8] of absence for any reasons[sic], an employee must have completed one year of employment with Woodbourne." Def.'s Reply Brf., Ex. A. at 11.

Mershon had worked at Woodbourne for seven months when she left work on October 21, 2003 and was not terminated until she had missed nine more work days on November 3, 2003. Prior to October 21, Mershon had used eight sick days, seven vacation days and a personal day, exceeding Woodbourne's allowances for new employees. Woodbourne terminated Mershon for excessive absenteeism, not because she was pregnant. Mershon was not an employee qualified for an unpaid leave of absence because she had not worked for Woodbourne for more than a year. Merson cannot meet the second prong of the *McDonnell-Douglas* test that she was an otherwise qualified employee. *McDonnell Douglas*, 411 U.S. at 802. If any prong fails, Mershon has failed to state a claim upon which relief can be granted. *Swierkiewicz*, 534 U.S. at 511. Nor has she stated facts sufficient to raise an inference of an animus toward pregnancy compared to any other illness. *Carnegie Center Associates*, 129 F.3d at 296.

Mershon claims the employee manual [*9] is evidence of an animus against pregnancy because it does not treat pregnancy as a catastrophic illness, allowing only two weeks unpaid leave for a pregnancy-related illness and four weeks for other illnesses; therefore, Mershon says she has presented a *prima facie* case of pregnancy discrimination because the regulations promulgated under Title VII require pregnancy to be treated the same as any other disability. 29 C.F.R. § 1604.10(b); n4 Standing to sue requires the plaintiff to allege she has suffered "a distinct and palpable injury" as a result of defendant's action. *McConnell v. Federal Election Com'n*, 540 U.S. 93, 225-26, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003) (reiterating the "bedrock case-or-controversy requirement" of Article III); *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1281 (3d Cir. 1993) (same). Because Mershon was not eligible for unpaid leave, she does not have standing to challenge Woodbourne's policy.

n4 Regulations promulgated under Title VII provide:

> Disabilities caused or contributed to by pregnancy, childbirth, or related medical conditions, for all job related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions. . . . Written or unwritten employment policies and practices involving matters such as the commencement and duration of leave . . . [and] reinstatement . . . shall be applied to disability due to pregnancy . . . on the same terms and conditions as they are applied to other disabilities.

29 C.F.R. § 1604.10(b).

[*10]

Mershon's second claim, that her COBRA notice was inadequate, fares better under a Rule 12(b)(6) challenge. Woodbourne argues its COBRA notice was sufficient, focusing on the presumption that Mershon received the notice sent by certified mail. Woodbourne produced a registered mail envelope to prove it had sent a timely COBRA notice to Mershon. The law presumes that a letter properly addressed, stamped, and mailed was received by the person to whom it was addressed. *Hagner v. United States*, 285 U.S. 427, 430, 52 S. Ct. 417, 76 L. Ed. 861 (1932).

Of more importance is the statutory requirement an employee have sixty days in which to make a COBRA decision. The plain language of the statute requires a COBRA election period of at least 60 days, n5 measured from the later of either the date of the qualifying event or the date on which the beneficiary receives notice of his COBRA options. 29 U.S.C. § 1165. n6

n5 29 U.S.C. § 1165. **Election**

(a) In general

For purposes of this part--

(1) Election period

The term "election period" means the period which--

(A) begins not later than the date on which coverage terminates under the plan by reason of a qualifying event,

(B) is of at least 60 days' duration, and

(C) ends not earlier than 60 days after the later of--

(i) the date described in subparagraph (A), or

(ii) in the case of any qualified beneficiary who receives notice under section 1166(4) [FN1] of this title, the date of such notice.

[*11]

n6 The Fifth Circuit has held the statute's language does not limit the election period to 60 days and allowed an election at any time during the COBRA's maximum length of time an employer must provide continuation coverage to employees unless the benefit plan limits the election period. *Lifecare Hospitals, Inc. v. Health Plus of Louisiana, Inc., 418 F.3d 436, 441-42 (5th Cir. 2005).*

The sixty days Woodbourne was required to give Mershon in which to elect her COBRA benefits had not expired on December 20, 2003 when she learned of her dismissal. Whether the qualifying event was her failure to return to work on November 3 or Woodbourne's decision to terminate her on November 6, 2003, Mershon had at least until January 2, 2004 to elect COBRA benefits. 29 U.S.C. § 1165. The statute requires a continuation of coverage from the date of the qualifying event through the election period. 29 U.S.C. § 1161. n7 Woodbourne cancelled Mershon's health insurance prematurely on November 30, 2003, resulting in uninsured medical expenses and the [*12] cost of state-supported medical insurance for Mershon. *Branch v. G. Bernd Co., 955 F.2d 1574, 1582 (5th Cir. 1992)* (holding employer liable for employee's medical expenses). n8 I will deny Woodbourne's motion to Dismiss as to Count III, alleging a violation of fiduciary duty under ERISA. An appropriate order follows.

n7 29 U.S.C. § 1161. **Plans must provide continuation coverage to certain individuals**

(a) In general

The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

n8 Because Mershon was denied sixty days of continued coverage in which to maker her election, the adequacy of Woodbourne's "Cobra Notice" is unimportant. At the time the notice may have met the requirements of COBRA. *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1301 (3d Cir. 1993).* In November 2004, the U.S. Department of Labor promulgated regulations which require the name and address of the plan administrator, an identification of the qualifying event, identification of the beneficiary, explanation of procedures, consequences of failing to elect, description of the continuation coverage, the maximum period for which it runs, how to extend the maximum period, the effect of a second qualify-

ing event, the cost of the continuation, the due dates for payments and a reminder to keep the plan administrator informed of changes. 29 C.F.R. § 2590.606-4. The Appendix to section 2590.606-4 includes a model COBRA notice which includes all the requirements on a single page.

[*13]

**ORDER**

And now this 19th day of July, 2006, Defendant's Motion to Dismiss ( Document 10) is GRANTED as to Counts I and II of the Amended Complaint (Document 7) and DENIED as to Count III of the Amended Complaint. It is further ORDERED Defendant's Motion for Leave to File a Reply Brief (Document 13) is GRANTED and Exhibit A to Document 13 is accepted as filed. Defendant is directed to file an Answer within 20 days. A Rule 16 Conference shall be held September 5, 2006 at 4:00 p.m. in Courtroom 5D.

BY THE COURT:

Juan R. Sanchez, J.

LEXSEE

BRIAN MILLER, et al., Plaintiffs, v. COMPUTER SCIENCES CORP., Defendant.

Civil Action No. 05-10-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 48746

July 14, 2006, Decided

**CORE TERMS:** fiscal year, statute of limitations, bonus, summary judgment, guaranteed, issues of material fact, cause of action, genuine, bonuses, annual, prorated, notice, personal services, received notice, failure to pay, began to run, freely, cause of action accrued, deposition testimony, reasons discussed, period of time, year to year, outsourcing, one-year, expired, salary, accrue, amend

**COUNSEL:** [*1] Timothy James Wilson, Esquire, of MARGOLIS EDELSTEIN, Wilmington, Delaware, Attorney for Plaintiffs.

Erica N. Finnegan, Esquire, of CROSS & SIMON, LLC, Wilmington, Delaware. David Ellis Moore, Esquire, and Sarah Elizabeth DiLuzio, Esquire, of POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware. Of Counsel: Larry R. Seegull, Esquire, and Linda M. Boyd, Esquire, of DLA PIPER RUDNICK GRAY CARY US LLP, Baltimore, Maryland. Of Counsel: Tyler Brian Raimo, Esquire, of COMPUTER SCIENCES CORP., Falls Church, Virginia, Attorneys for Defendant.

**JUDGES:** Joseph J. Farnan, Jr., District Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

### MEMORANDUM OPINION

**Joseph J. Farnan Jr., District Judge.**

Pending before the Court are Defendant's Motion For Summary Judgment (D.I. 97) and Defendant's Motion For Leave To File An Amended Answer (D.I. 105). For the reasons discussed, both motions will be denied.

## I. BACKGROUND

Defendant, an information technology services company, has an incentive program, known as the Annual Management Incentive Program ("AMIP"), whereby participants receive a percentage of their base salary if they meet certain objectives for the fiscal year. n1 AMIP's original [*2] purpose was to create incentives for upper-level management; however, more employees became involved as the company accumulated new employees from clients in connection with outsourcing transactions. Plaintiffs became Defendant's employees through an outsourcing transaction with DuPont. Following the changeover and until April 2003, Plaintiffs participated in AMIP and received annual bonuses. Plaintiffs contend that the AMIP bonus was a substantial portion of their annual salaries and was used to entice them to work for Defendant.

> n1 Defendant's fiscal year runs from April 1 through May 31 of each year. Fiscal year 2004 ran from April 1, 2003 through May 31, 2004.

According to Defendant, fiscal year 2003 was difficult, and the company was forced to decrease the number of AMIP participants. Plaintiffs were notified in September 2003 that they would no longer be participants. Plaintiffs filed their Complaint on December 13, 2004 in the Superior Court for the State of Delaware in and for New Castle County. Plaintiffs' [*3] Complaint alleges that Defendant violated the Delaware Wage Payment and Collection Act ("DWPCA") by withholding "the earned AMIP bonus of each of the Plaintiffs for the period of time from April 1, 2003 through and including the time of CSC's notice to each Plaintiff in September 2003." (D.I. 1, Ex. A). On January 10, 2005, the action was removed to this Court.

## II. PARTIES' CONTENTIONS

By its motions, Defendant contends that it should be permitted to amend its Answer to state that Plaintiffs' claims are barred by the one-year statute of limitations on claims for wages. Defendant further contends that Plaintiffs are not entitled to an AMIP bonus for fiscal year 2004 because they were never eligible to participate and did not know the criteria on which the bonus would be based.

In response, Plaintiffs contend that Defendant should not be given leave to amend because an amendment would unduly prejudice Plaintiffs. Alternatively, Plaintiffs contend that the statute of limitations has not expired because their cause of action did not accrue until after the close of the 2004 fiscal year. Finally, Plaintiffs contend that there are genuine issues of material fact as to their DWCPA [*4] claim, and therefore, summary judgment is not warranted.

## III. DISCUSSION

A. Whether The Court Should Grant Defendant Leave To Amend Its Answer

Rule 15(a) of the Federal Rules of Civil Procedure provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The grant or denial of a motion to amend is within the discretion of the Court. Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971). However, the United States Supreme Court has cautioned that leave should be freely granted unless there is an apparent reason for denying a request such as: undue delay, bad faith, dilatory motive, undue prejudice, or futility of the claims. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); Adams v. Gould, Inc., 739 F.2d 858 (3d Cir. 1984).

The Court will not grant Defendant leave to amend its Answer because Defendant's statute of limitations defense is futile. The DWCPA provides that "[a] civil action to recover unpaid wages and liquidated damages [*5] may be maintained in any court of competent jurisdiction." 19 Del. C. 1113. Bonuses, particularly "year-end bonus[es] based upon. . . performance," fall within the DWCPA's definition of "wages." Seitz v. Siegfried Group, 2001 Del. Super. LEXIS 364, *; 19 Del. C. § 1101(a)(2). Under Delaware law, a plaintiff's claim for wages is subject to Section 8111 of the Delaware Code, which provides:

No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or from any other benefits arising from such work, labor or personal services performed or in connection with any such action, shall be brought after the expiration of one year from the accruing of the cause of action on which such action is based.

10 Del. C. § 8111; Compass v. Am. Mirrex Corp., 72 F. Supp. 2d 462, 467 (D. Del. 1999).

Plaintiffs' sole claim is for a prorated amount of their AMIP bonuses [*6] under the DWCPA "for the period of time from April 1, 2003 through and including the time of CSC's notice to each Plaintiff in September of 2003." (D.I. 1 at Ex. A). Because Plaintiffs' claim is a claim for wages, the one-year statute of limitations applies, and the Court must determine when Plaintiffs' cause of action accrued.

In Delaware, the statute of limitations begins to run "when proper parties are in existence capable of suing and being sued, and a cause of action exists capable of being sued on forthwith." Plant v. Catalytic Constr. Co., 287 A.2d 682, 684 (Del. Super. 1972). Defendants contend that the statute of limitations began to run when Plaintiffs received notice that they were no longer AMIP participants in September 2003. However, Plaintiffs' claim is one for wages, and a cause of action for wages cannot accrue until the employer fails to pay the wages. See e.g. Roos v. Delaware Valley Radiology, P.A., 1989 U.S. Dist. LEXIS 4023, at *17-18 (D. Del. April 3, 1989) (cause of action accrued when defendant failed to pay plaintiff); Martinez v. Gastroenterology Assocs., 2005 Del. Super. LEXIS 233, at *5 (Del. Super. [*7] July 5, 2005) ("claim must be raised within one year of the employer's failure to pay"). Plaintiffs filed their Complaint in December 2004. Accepting March 31, 2004, the end of the 2004 fiscal year, as the earliest date on which the statute of limitations on Plaintiffs' claim began to run, the Court concludes that Plaintiffs filed before the statute of limitations had expired. Accordingly, the Court will deny Defendant's Motion For Leave To File An Amended Answer (D.I. 105).

B. Whether The Court Should Grant Defendant's Motion For Summary Judgment On Plaintiffs' Claim Under The DWCPA

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light [*8] most favorable to the non-moving party. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).

The Court concludes that genuine issues of material fact exist, and therefore, summary judgment is inappropriate. Defendant contends that Plaintiffs were not entitled to participate in AMIP because participation was never guaranteed and Plaintiffs never received the AMIP criteria. To demonstrate that participation was never guaranteed, Defendant has adduced evidence from the Employee Total Rewards Guide, which states that participation is reviewed each year and not guaranteed (D.I. 98 at A344, A346), and deposition testimony in which Plaintiffs acknowledge that participation is not guaranteed (D.I. 98 at A66-67, A128-29, A250, A282). Defendant has also put forth evidence that Plaintiffs never received the AMIP criteria. (See e.g. D.I. 98 at A6-7, A67, A133). Defendant argues that in order to be eligible for AMIP for fiscal year 2004, Plaintiffs would need to receive and act in conformity with the criteria.

In response, Plaintiffs contend that, while participation was not guaranteed, Defendant failed to adhere to its policy of annual review and that employees [*9] were in the program unless they were given notice of removal within weeks of the beginning of a new fiscal year. (D.I. 101 at B542-43, D.I. 102 at B993, B1045-46, B1103). Plaintiffs further contend that receipt of the criteria was not a prerequisite to participation in AMIP. In support of this contention, Plaintiffs have put forth evidence that as a rule, employees, even those considered participants,

were not informed of the AMIP criteria until sometime during the fall of the fiscal year. (See e.g. D.I. 100 at B231, B318). Plaintiffs' deposition testimony shows that the criteria changed very little from year to year, and therefore, Plaintiffs generally knew what was required to earn a bonus until they received the specifics later in the fiscal year. (D.I. 101 at B409, B547, B839). Finally, there is evidence that certain employees who have lost or lose their status as AMIP participants have received or can receive prorated portions of their AMIP bonuses. (D.I. 101 at B485-87, D.I. 98 at A344). n2

n2 The Employee Total Rewards Guide does state that participation may vary from year to year. (D.I. 98 at A344, A346). It also lists certain circumstances in which an employee may be given a prorated amount. (D.I. 98 at 344). It does not specifically state how a situation like Plaintiffs' is handled, however.

[*10]

As the evidence adduced by Plaintiffs and Defendant demonstrates, there are genuine issues of material fact relating to whether Plaintiffs are entitled to AMIP payments for April 1, 2003 to the time they received notice that they were no longer participating in the program. Accordingly, the Court will deny Defendant's Motion For Summary Judgment (D.I. 97).

**IV. CONCLUSION**

For the reasons discussed, Defendant's Motions will be denied. An appropriate Order will be entered.

LEXSEE



Caution
As of: Jan 28, 2007

**JOYCE PARKER and WILLIE PARKER, Plaintiffs, v. STATE OF DELAWARE, SECRETARY THOMAS EICHLER, Individually and as Agent for the State of Delaware, JANET KRAMER, Individually and as Agent for the State of Delaware, and DIANE GADOW, Individually and as Agent for the State of Delaware, Defendants.**

**C.A. No. 98-445-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 3112**

**March 13, 2000, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**SUBSEQUENT HISTORY:** Motion granted by Parker v. State, 2003 Del. Super. LEXIS 349 (Del. Super. Ct., Oct. 14, 2003)

**PRIOR HISTORY:** Parker v. State, 1997 Del. Super. LEXIS 390 (Del. Super. Ct., Aug. 26, 1997)

**DISPOSITION:** Defendants' motions to dismiss for lack of personal jurisdiction granted.

**COUNSEL:** Caroline Patricia Ayers, Esquire, Wilmington, Delaware, for Plaintiffs.

Michael F. Foster, Esquire and Keith R. Brady, Esquire, Deputy Attorneys General, Delaware Department of Justice, Wilmington, Delaware, for State of Delaware, Thomas Eichler, and Diane Gadow.

David H. Williams, Esquire, Morris, James, Hitchens & Williams, Wilmington, Delaware, for Janet Kramer.

Michael J. Ossip, Esquire and Robert C. Farley, Jr., Esquire, Of counsel, Morgan, Lewis & Bockius LLP,

Philadelphia, Pennsylvania, for Janet Kramer.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: March 13, 2000
Wilmington, Delaware

Sue L. Robinson
**District Judge**

**I. INTRODUCTION**

Currently before the court are motions to dismiss filed by defendants the State of Delaware, Secretary Thomas Eichler, Janet Kramer, and Diane Gadow. (D.I. 7, 14) Defendants seek dismissal of plaintiffs Joyce and Willie Parker's complaint for, inter alia, lack of personal jurisdiction. Plaintiffs allege violations of Title VII, 42 U.S.C. § 2000e [*2] et seq., 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and a variety of state law claims including

Page 1

Willie Parker's loss of consortium arising out of the allegedly unlawful termination of his wife's employment. Because plaintiffs failed to serve defendants within the appropriate time period, the court lacks personal jurisdiction over defendants and it shall dismiss the complaint.

## II. BACKGROUND

Prior to the termination of her employment, Joyce Parker worked as a Registered Nurse for the Delaware Division of Youth and Family Services at the Ferris School. During her employment, she allegedly was harassed and discriminated against on the basis of her race, sex, and disability. On July 31, 1996, defendant Eichler fired her for allegedly committing fraud. Plaintiff waited until May 30, 1997 to lodge a complaint with the Equal Employment Opportunity Commission ("EEOC"). Because of her delay, the EEOC dismissed her complaint in a December 18, 1997 notice of dismissal. That notice specifically warned plaintiff that it was "the only notice of dismissal and of your right to sue that [*3] we will send you." It further indicated that she had 90 days from receipt of the notice to file a federal lawsuit based on Title VII and/or the ADA. The notice was copied to plaintiffs' attorney. ( D.I. 15 Ex. 2)

Nonetheless, plaintiffs waited well beyond this 90-day time limit and filed the present complaint on July 30, 1998. Based on this filing date, the 120-day period for service of process expired on October 27, 1998. See Fed. R. Civ. P. 4(m). The docket reveals, however, that summonses were not issued for any defendant until December 28, 1998 -- nearly five months after the filing of the complaint. Plaintiffs did not serve Janet Kramer until May 6, 1999. (D.I. 4) According to the docket, plaintiffs have not yet served any other defendant with a summons and a copy of the complaint. n1

> n1 Defendants concede that plaintiffs served the Attorney General on March 15, 1999 and Diane Gadow on August 16, 1999 (D.I. 15 at 6, 7), but the docket does not indicate any return of service. Moreover, this service was well beyond Rule 4(m)'s 120-day deadline.

[*4]

On May 5, 1999, the court issued an order to show cause why plaintiffs' case should not be dismissed for want of service and failure to prosecute. (D.I. 3) Plaintiffs responded through their counsel that they filed suit "within the statute of limitations time period" to "preserve [their] rights to pursue this matter at a later date." (D.I. 6 at 1) Apparently, plaintiffs sought state administrative relief following the filing of the present complaint. When this relief proved unsuccessful, plaintiffs caused summonses to be issued for defendants but, according to plaintiffs' counsel, service was not effected because defendants either refused service or were not present to accept service. (D.I. 6 at 1-2)

Shortly after plaintiffs' response to the court's "show cause" order, defendants filed the instant motions to dismiss. The court delayed action on its order to show cause pending resolution of these motions. Although defendants raise several grounds for dismissal of plaintiffs' complaint, the court shall confine its analysis to plaintiffs' failure to properly serve defendants with summons and a copy of the complaint under Fed. R. Civ. P. 4(m).

## III. STANDARD FOR DISMISSAL UNDER [*5] FED. R. CIV. P. 4(m)

Rule 4(m) of the Federal Rules of Civil Procedure provides:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period. . . .

The Third Circuit has enunciated a two-pronged inquiry for determining whether to excuse a plaintiff's improper service and extend the time for effecting service. See McCurdy v. American Bd. of Plastic Surgery, 157 F.3d 191, 196 (3d Cir. 1998). First, the court must determine whether good cause exists for the failure to effect service in a timely manner. See id. If good cause exists, the court must grant an extension for service of process. See id. If not, the court may either dismiss the action or grant an

extension in "the sound exercise of its discretion." See id.

## IV. DISCUSSION

Turning [*6] to the first prong of the test, plaintiffs have not shown good cause for their flagrant noncompliance with Rule 4(m)'s service deadline. Summonses were not issued until five months after plaintiffs filed their complaint and service was not effected until (at the earliest) May 6, 1999 -- nearly seven months after the 120-day service deadline expired. Furthermore, the State of Delaware has yet to receive service of process. Plaintiffs argue that the delay was justified because they were attempting to exhaust their state administrative remedies. (D.I. 9 at 12) No court has recognized this excuse as good cause for failure to effect timely service. Indeed, nothing prevented plaintiffs from pursuing such administrative remedies while also complying with the service requirements of the Federal Rules of Civil Procedure. Because good cause does not exist for the delay, the court now must determine whether dismissal of the entire action is appropriate.

If plaintiffs had missed the service deadline by a mere matter of days, the court would be inclined to extend the service deadline. Here, however, plaintiffs did not even bother to cause summonses to be issued until five months after they filed [*7] their complaint. Thus, they missed the service deadline not by a matter of days, but by several months (and, in one case, they did not serve the defendant at all). Where a plaintiff conducts service of process in such a half-hearted manner, the Third Circuit has not hesitated to affirm dismissal of the underlying action for failure to comply with Rule 4(m). See, e.g., McCurdy, 157 F.3d at 196; Lovelace v. Acme Markets, Inc., 820 F.2d 81, 84 (3d Cir. 1987). Although plaintiffs argue that dismissal would be unjust because of "possible statute of limitations problems," the Third Circuit also has explained that the running of the limitations period does not compel the court to grant an extension of the service deadline. See Petrucelli v. Bohringer & Ratzinger, GMBH, 46 F.3d 1298, 1306 (3d Cir. 1995). Extension is particularly inappropriate in the present case because plaintiffs failed to file their complaint within the 90-day "right to sue" period for Title VII and ADA actions. Thus, it is likely that much of the complaint would be dismissed anyway.

Accordingly, the court shall dismiss the complaint for lack of personal jurisdiction over [*8] defendants.

## V. CONCLUSION

The court shall grant defendants' motions to dismiss for lack of personal jurisdiction. An appropriate order shall issue.

10 of 11 DOCUMENTS

**BARRY W. POWELL, Plaintiff, v. BOB DOWNES CHRYSLER-PLYMOUTH, INC., and GROUP HEALTH PLAN, INC., Defendants.**

**No. 90-226 C (2)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 22540*

**July 20, 1992, Decided**
**July 20, 1992, FILED**

**DISPOSITION:** **[*1]** Plaintiff's motion to withdraw the amendment to Count I of the second amended complaint GRANTED. Plaintiff's motion to set case for trial during the August 3, 1992, docket DENIED. Plaintiff's motion to set the case for nonjury trial only DENIED without prejudice. Defendant GHP's motion for summary judgment is GRANTED with respect to Counts II and X of the second amended complaint and DENIED without prejudice with respect to Count VI of the second amended complaint. Plaintiff's motion to amend Count VI of the second amended complaint DENIED without prejudice. Plaintiff's motion to amend the second amended complaint so as to add Count XII GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed three separate motions to amend his second amended complaint, the former employee also filed a motion to withdraw the amendment to his religious discrimination claim and to set the case for trial. Defendant health plan filed a motion for summary judgment in an action brought by the former employee against defendant former employer and health plan.

**OVERVIEW:** The former employee brought an action against his former employer and health plan alleging improper termination, failure to properly advice the former employee of his right to continue health insurance coverage, and failure to comply with the terms of the relevant health insurance plan or policy. The former employer filed three separate motions seeking to amend his second amended complaint, a motion to withdraw an amendment to the count alleging religious discrimination in the termination and set the case for trial. The health plan filed a motion for summary judgment. The court granted the motion to withdraw and denied the former employee's motion to retain the trial date for the case. The court granted the health plan's motion for summary judgment on the claim alleging violation of the Consolidated Omnibus Budget Reconciliation Act (COBRA), *29 U.S.C.S. § 1161* et seq., where the former employee alleged that defendants failed to give him notice of the option of continuing group health plan coverage, as required by COBRA. The court also granted the health plan's motion for summary judgment on the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1104*.

**OUTCOME:** The court granted the former employee's motion to withdraw the amendment to his Title VII of the Civil Rights Act of 1964 claim, and denied his motion to set the case for nonjury trial. The court also granted the health plan's motion for summary judgment with respect to the COBRA and ERISA claims of the second amended complaint and it denied the motion with respect to the breach of contract claim.

**COUNSEL:** James N. Foster, John B. Ranick, McMahon and Berger, Attys for Bob Downes Chrysler, St. Louis, MO.

No attys for Group Health Plan.

Dempster K. Holland, Attys for Barry W. Powell, St. Louis, MO.

**JUDGES:** Edward L. Filippine, UNITED STATES DISTRICT JUDGE

**OPINION BY:** Edward L. Filippine

**OPINION:**

### MEMORANDUM AND ORDER

This matter is before the Court on three separate motions to amend the second amended complaint filed by plaintiff, on a motion to withdraw amendment to Count I and set case for trial filed by plaintiff, and on a motion for **[*2]** summary judgment filed by defendant Group Health Plan, Inc. ("GHP").

This action arises out of the allegedly improper termination of plaintiff's employment as a car salesman for defendant Bob Downes Chrysler-Plymouth, Inc. ("Bob Downes"); defendants' alleged failure properly to advise plaintiff of his right to continue health insurance coverage with GHP; and defendants' alleged failure to comply with the terms of the relevant health insurance plan or policy. Plaintiff filed his original seven count petition in the Circuit Court of St. Louis County, Missouri, and Bob Downes removed the case to this Court. Now before this Court is plaintiff's second amended complaint consisting of Counts I, II, V, VI and X. The claims in Counts II, VI and X of the second amended complaint are asserted against both defendants, while the claims in Counts I and V are asserted against defendant Bob Downes only. The case is set for jury and nonjury trial on the docket commencing on Monday, August 3, 1992.

By the pending complaint, plaintiff seeks monetary relief for an alleged violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *42 U.S.C. § 2000e* et seq., through religious **[*3]** discrimination in the termination of plaintiff's employment with Bob Downes (Count I of the second amended complaint); for an alleged violation of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), *29 U.S.C. § 1161* et seq., (Count II of the second amended complaint) and of § 404 of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1104,* (Count V of the second amended complaint) n1 through the failure to give plaintiff proper notice of the right to continue health insurance coverage; for an alleged breach of contract in violation of Missouri common law principles through a failure to comply with certain terms of the group health

insurance policy or plan (Count VI of the second amended complaint) n2; and for an alleged breach of fiduciary duties in violation of § 404 of ERISA, *29 U.S.C. § 1104,* through a failure to provide proper written notice of plaintiff's right to continued health insurance coverage (Count X of the second amended complaint). In addition to the requests for actual damages, attorneys' fees and costs that are part of each count of the second amended complaint, plaintiff seeks in Count VI of that complaint statutory damages for defendants' **[*4]** allegedly vexatious refusal to pay under the terms of the health insurance policy or plan. n3

n1 In Count V of the first amended complaint, plaintiff had set forth a negligent misrepresentation claim under Missouri common law principles similar to the negligent misrepresentation claim set forth in Count V of the second amended complaint. By an April 8, 1991, order, the Court noted that the claim in Count V of the first amended complaint may remain "not as a separate cause of action, but on the ground that the claim is under ERISA. **See Board of Trustees of Cedar Rapids Pediatric Clinic, P.A., Pension Plan v. Continental Assur[].** *Co., 690 F. Supp. 792 (W.D. Ark. 1988)."* The Court characterized the claim as a breach of fiduciary duty claim by a plan beneficiary under *29 U.S.C. § 1104,* rather than as a state law negligent misrepresentation claim. This characterization also applies to the similar claim now set forth in Count V of the second amended complaint and, therefore, that count will be construed as presenting an ERISA claim rather than a state law claim.

n2 It is not clear whether the parties consider the claim in Count VI of the second amended complaint as preempted by ERISA and thus as an ERISA claim rather than a state law breach of contract claim. A similar breach of contract claim was asserted in the original complaint, filed in this Court on August 7, 1990 (as Count IV of that complaint) and in the first amended complaint, filed October 9, 1990 (as Count VI of that complaint). While Bob Downes raised preemption as an affirmative defense to these breach of contract claims in the original and first amended

complaints, no motion has been filed to address whether or not any such claim is preempted by ERISA. See Bob Downes' motion for partial summary judgment or, in the alternative, motion to dismiss for failure to state a claim upon which relief can be granted, filed April 24, 1990, which raised issues concerning only Counts I and V of the original complaint and Bob Downes' motion for partial summary judgment, filed November 2, 1990, which raised issues concerning only Counts III, IV, V, VII and IX of the first amended complaint. Additionally, the notice of removal based removal on the federal claims under Title VII and the COBRA as set forth in Counts I and II of the original complaint, and did not mention the preemption by ERISA of any state law claims pursued in the original complaint.

In the April 8, 1991, order, which addressed Bob Downes' motion for partial summary judgment directed to the first amended complaint, the Court noted that "plaintiff agrees that state causes of action are preempted by ERISA. *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987)*." Neither that order nor the motion it addressed, however, expressly discussed the breach of contract claim in Count VI of the first amended complaint. Notably, the claim in Count VI of the second amended complaint, which was filed after the April 8, 1991, order, still appears to be pursued as a state law claim rather than as a claim under ERISA.

It appears that the allegations supporting the breach of contract claim in Count VI of the pending complaint focus on the allegedly improper processing of a claim or claims for benefits under an insured employee benefit plan. In *Pilot Life Ins. Co., supra,* the Supreme Court specifically found such state law claims are preempted by ERISA. For purposes of this order, the Court will not further address this issue, and will assume that Count VI of the second amended complaint presents only a state law breach of contract claim. The Court will, however, direct the parties to file materials addressing ERISA preemption issues with respect to Count VI of the second amended complaint.

[*5]

n3 If the claim in Count VI is deemed preempted by ERISA, **see** footnote 2 **supra,** then the claim for statutory damages for defendants' allegedly vexatious refusal to pay would no longer be before the Court.

Plaintiff moves to withdraw his motion to amend Count I of the second amended complaint and to set the case for nonjury trial the week of August 3, 1992. The Court will grant the motion to withdraw and will not further address the motion to amend Count I of the second amended complaint. In light of other pending motions addressed by this order and ERISA preemption issues that remain before the Court, the Court will deny plaintiff's motion to retain the present August 3, 1992, trial date for this case. Additionally, the Court will deny without prejudice plaintiff's request to set this case on a nonjury trial docket only. Such a request may be reasserted once each of the parties has consented of record to the waiver of the jury trial provided for in the Missouri state court from which this case was removed. **See** Mo. R. Civ. P. 69.01; *Fed. R. Civ. P. 81(c)* and *38(d)*. **[*6]** Thus, at this time the case will be set on another docket for jury and nonjury trial.

Pursuant to *Federal Rule of Civil Procedure 56,* defendant GHP moves for entry of summary judgment in its favor with respect to Counts II, VI and X of the second amended complaint on the grounds there are no genuine issues of material fact and movant is entitled to judgment as a matter of law. In support of this motion, movant argues only that it owed no duty to plaintiff under the notice requirements of COBRA since it was neither the administrator nor the sponsor of the relevant health insurance plan, citing *29 U.S.C. §§ 1002*(16) and 1166(a), as well as *Davis v. Liberty Mut. Ins. Co., 276 U.S. App. D.C. 394, 871 F.2d 1134, 1138 (D.C. Cir. 1989)* (finding defendant group health insurer is not an administrator within the meaning of ERISA unless either it is designated as such in the relevant instrument or it qualifies as a plan sponsor under the statute).

Plaintiff opposes the summary judgment motion. As for Count II of the second amended complaint, plaintiff concedes that COBRA "requires only that the Plan Administrator . . . give the continuation coverage notice" and that movant is not **[*7]** such an administrator, but contends movant "became part of the notification process

when it entered the business of operating employee health plans." With respect to Count VI of the second amended complaint, plaintiff responds that the motion does not properly address the state law breach of contract claim set forth in that count and therefore must be denied with respect to that count. To counter movant's argument with respect to Count X of the second amended complaint, plaintiff urges movant may be a fiduciary as defined broadly under ERISA because the payment of benefits owed under the health insurance policy or plan was GHP's obligation and not the obligation of Bob Downes. Plaintiff further urges that there exist issues of material fact as to whether, "as a fiduciary, Defendant GHP had the duty to provide Defendant [Bob] Downes with the proper forms to advise terminated employees of their continuation rights."

Additionally, should the Court find that GHP is not governed by the COBRA and ERISA statutes with respect to the claims set forth in Counts II and X of the second amended complaint, then, plaintiff contends the state common law remedies against GHP are not preempted and **[*8]** it is proper to permit the amendment of the second amended complaint. In particular, plaintiff seeks to add a Count XII consisting of a negligence claim against defendant GHP for its failure to provide defendant Bob Downes with the proper continuation coverage notification forms and to amend Count VI to include allegations specifying that (a) defendant Bob Downes is liable only for certain damages as limited by COBRA and (b) as a non-fiduciary defendant GHP is liable for additional damages for its alleged breach of provisions of the group health insurance plan, see paragraphs 40a, 41, and 41a, as well as the prayer for relief in the proposed amended Count VI. In support of these requests, plaintiff cites *Sparks v. Mo-Kan Iron Workers Pension Fund, 765 F. Supp. 566 (W.D. Mo. 1990)* (ERISA does not pre-empt state law claims against a party acting solely in a non-fiduciary capacity).

Bob Downes has not filed a brief in opposition to either of these requests to amend.

GHP opposes the motion to amend the second amended complaint to add Count XII but does not expressly oppose the motion to amend Count VI of the second amended complaint. GHP urges ERISA preempts the state law **[*9]** claim(s) and remedies plaintiff seeks to pursue in the proposed amendment(s) to the second amended complaint.

Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56; Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983).* When presented with such a motion, this Court must determine whether there "are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "Factual disputes that are irrelevant or unnecessary" will not preclude a summary judgment. *Id. at 248.* When evaluating a motion for summary judgment, the Court must view the facts in the light most favorable to the party against whom the motion is directed, giving such party the benefit of all reasonable inferences to be drawn from the facts. *Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982).* However, the party opposing the summary judgment motion "may not rest upon mere allegations or denials **[*10]** of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson, 477 U.S. at 248* (quoting *First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)*).

After careful consideration, the Court deems it appropriate to grant the motion for summary judgment to the extent the motion is directed to Count II of the second amended complaint. By that count, plaintiff specifically alleges in relevant part that, upon plaintiff's termination, "Defendants failed to give Powell notice of the option of continuing group health plan coverage, as required by the Federal [COBRA]"; and that, as a result of the COBRA violation, plaintiff "has been damaged by being required to pay the cost of medical treatment, which would have been covered by his continued group health plan coverage," and by having to incur substantial legal fees.

The notice provisions of COBRA require the group health plan to provide to each covered employee "at the time of commencement of coverage under the plan" written notice of the possibility of continuing coverage upon the occurrence of certain events. *29 U.S.C. § 1166(a)(1).* **[*11]** Additionally, the plan administrator is required to notify any qualified beneficiary subject to any of certain specified events (including termination) of the beneficiary's rights upon the occurrence of such event(s), including the possibility of continuing plan coverage. *29 U.S.C. § 1166(a)(4).* An "administrator" is defined as "the person specifically so designated by the terms of the

instrument under which the plan is operated" or "if an administrator is not so designated, the plan sponsor." *29 U.S.C. §§ 1002*(16)(A)(i) and 1002(16)(A)(ii). Furthermore, the term "plan sponsor" statutorily refers to "the employer in the case of an employee benefit plan established or maintained by a single employer." *29 U.S.C. § 1002*(16)(B)(i).

Here, there is no dispute that, (1) upon commencement of plaintiff's employment with defendant Bob Downes, defendant GHP provided plaintiff with the required written continuation notice, see Part XII(O) of the "Group Medical and Hospital Service Certificate"; and (2) only defendant Bob Downes is the "administrator" for purposes of *29 U.S.C. § 1166*(a)(4) because (a) no "administrator" was specifically designated in the relevant plan and (b) Bob Downes **[*12]** was the single employer establishing or maintaining the relevant plan. n4 Thus, defendant GHP had no obligation under *29 U.S.C. § 1166*(a)(4) to provide plaintiff, as a qualified beneficiary, with notice of the right to continued coverage upon the termination of his employment with defendant Bob Downes. Furthermore, in light of the specificity of ERISA in defining both the plan administrator and the plan sponsor, plaintiff's argument regarding movant's participation in the notification process is not persuasive enough to render movant liable for allegedly failing to provide plaintiff with notice of right to continue coverage upon plaintiff's termination from employment. **See** *Moran v. Aetna Life Ins. Co., 872 F.2d 296, 299-300 (9th Cir. 1989)* (Congress' specific definition of "plan administrator" in *29 U.S.C. § 1002*(16) precludes the Court from extending liability under *29 U.S.C. § 1132*(c) to an insurer for its alleged failure to provide a beneficiary with ERISA plan documents); *Davis,* 871 F.2d at 1137-38 and 1138 n.5 (same). Accordingly, movant is entitled, as a matter of law, to entry of summary judgment in its favor with respect to Count II of the second amended **[*13]** complaint.

> n4 Based upon the determination that GHP is not an "administrator," this Court finds inapposite the decision in *Lincoln Gen. Hosp. v. Blue Cross/Blue Shield,* No. 91-1777 NE, 963 F.2d 1136, 1992 U.S. App. LEXIS 10299, slip op. 4-8 (8th Cir. May 12, 1992), regarding the insurer's provision of COBRA notice.

The motion for summary judgment will, however, be denied to the extent it is directed to any breach of contract claim set forth in Count VI of the second amended complaint. **But see** footnote 2 at page 3 **supra.** As part of that claim plaintiff contends defendants

> breached the provisions of the plan by failing to pay the amount due and by failing to ensure that reasonable procedures were established to promote the orderly administration of the plan, including an assurance that [Bob] Downes would properly notify [plaintiff] of his rights under the COBRA statute;

and the

> refusal of GHP to pay the amount due under the plan and to properly provide the **[*14]** orderly administration of the plan as aforesaid was and is vexatious and without reasonable cause or excuse and [plaintiff] is entitled, on account of said vexatious refusal to pay, to additional damages and attorneys['] fees as provided by Missouri law to wit: [§ ] 375.420 RSMo, 1986.

Notably, this state law claim focuses on defendants' alleged failure to comply with payment or procedural provisions of the relevant insurance policy or plan, rather than on GHP's alleged failure to comply with any COBRA notice requirements. Thus, movant's arguments regarding its duty to provide plaintiff with the notice required by COBRA is not dispositive of plaintiff's breach of contract claim against GHP in Count VI of the second amended complaint. Moreover, to the extent such a state law claim for breach of contract is properly before this Court, the available record reflects the existence of genuine issues of material fact regarding the occurrence and/or materiality of any alleged breach of the terms and provisions of the health insurance policy or plan so as to preclude entry of summary judgment in favor of defendant GHP on that count.

To the extent the motion is directed to Count **[*15]** X of the second amended complaint, the Court finds the motion well taken. The fact that GHP is not the plan administrator or plan sponsor does not prohibit a determination that GHP is a fiduciary for purposes of ERISA. *Coleman v. Nationwide Life Ins. Co., 748 F.*

*Supp. 429, 431 (E.D. Va. 1990).* Additionally, the failure of the plan explicitly to name a person or entity as a fiduciary is not dispositive of one's fiduciary status. *Coleman, 748 F. Supp. at 432.* For "the term fiduciary is to be broadly construed and a person's title does not necessarily determine if one is a fiduciary." *Consolidated Beef Indus., Inc. v. New York Life Ins. Co., 949 F.2d 960, 964 (8th Cir. 1991),* **cert. denied,** *503 U.S. 985, 112 S. Ct. 1670, 118 L. Ed. 2d 390 (1992);* **accord** *Blatt v. Marshall & Lassman, 812 F.2d 810, 812-13 (2d Cir. 1987)* ("Whether or not an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held."). Therefore, movant's reliance on its lack of status as a plan administrator or plan sponsor does not necessarily preclude it from liability under ERISA as a fiduciary and **[\*16]** the Court must ascertain whether movant may be liable under ERISA as a fiduciary with respect to the conduct challenged in Count X of the second amended complaint.

ERISA defines a plan fiduciary as a person who

> (i) . . . exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) . . . renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) . . . has any discretionary authority or discretionary responsibility in the administration of such plan.

*29 U.S.C. § 1002*(21)(A). Courts have found that one who has discretion in deciding whether claims are to be paid or establishes the policies and procedures followed in evaluating claims is a fiduciary under the ERISA, whereas one who performs only ministerial or actuarial services is not a fiduciary. *Baxter v. C. A. Muer Corp., 941 F.2d 451, 454-56 (6th Cir. 1991)* (per curiam); *Baker v. Big Star Div. of Grand Union Co., 893 F.2d 288, 290* **[\*17]** *(11th Cir. 1989); McManus v. Travelers Health Network, 742 F. Supp. 377, 382 (W.D. Tex. 1990); Eaton v. D'Amato, 581 F. Supp. 743, 746-47 (D.D.C. 1980);*

see *American Fed'n of Unions, Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y, 841 F.2d 658, 664-65 (5th Cir. 1988)* (finding the insurer was not a fiduciary in part because it had no discretion to grant or deny claims); *Anderson v. Alpha Portland Indus., Inc., 647 F. Supp. 1109, 1128 (E.D. Mo. 1986)* (finding the insurer was not a fiduciary in part because it had no discretion to pay or decline a claim), **aff'd on other grounds,** *836 F.2d 1512 (8th Cir. 1988),* **cert. denied,** *489 U.S. 1051, 103 L. Ed. 2d 579, 109 S. Ct. 1310 (1989); McLaughlin v. Connecticut Gen. Life Ins. Co., 565 F. Supp. 434, 441-42 (N.D. Cal. 1983)* (finding the insurer was a fiduciary because it had the authority to grant or deny claims). Furthermore, an insurer may be deemed a fiduciary when it has the authority to grant or deny a beneficiary's request to convert a group policy to an individual policy. *Vogel v. Independence Fed. Sav. Bank, 728 F. Supp. 1210, 1229-30 (D. Md. 1990).*

Under ERISA a fiduciary **[\*18]** has an obligation to discharge its duties with respect to the plan

> solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and . . . (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*29 U.S.C. § 1104*(1). Such an obligation may support an ERISA claim only to the extent that fiduciary duties, rather than nonfiduciary duties or ministerial tasks, are being challenged. **See** *Schulist v. Blue Cross of Iowa, 717 F.2d 1127, 1132 (7th Cir. 1983)* (finding insurer was not liable as a fiduciary under ERISA with respect to challenged conduct not relating to the processing of claims for benefits under the plan); **cf.** *Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co., 713 F.2d 254, 259 (7th Cir. 1983)* (fiduciary status only imposes fiduciary obligations with respect to actions taken in regard to that status and not with respect to other actions). **[\*19]**

Here, as plaintiff contends, movant is a fiduciary

with respect to the payment or nonpayment of claims for benefits made by beneficiaries or employees covered by the plan. In relevant part the "Group Medical and Hospital Service Certificate" ("Certificate") provided to plaintiff sets forth provisions for the types of services and benefits covered by and excluded from the plan, see e.g. parts II and V of the Certificate; for the termination of the plan, part IV of the Certificate; for the continuation of the plan's coverage, parts XI and XII(O); and for the pursuit of grievances when GHP's decisions are challenged, Attachment C to the certificate. Any challenges to conduct by GHP falling within these aspects of the plan might be encompassed by ERISA's provisions pertaining to plan fiduciaries.

Such conduct, however, is not the focus of Count X of the second amended complaint. That count instead focuses on GHP's conduct in allegedly failing to provide defendant Bob Downes with proper written notice of a terminated employee's right to continue coverage. Plaintiff has not pointed to any legal or factual basis upon which to find that, as a fiduciary, GHP had a duty under ERISA to [*20] provide Bob Downes with such notice or forms. Indeed, a fiduciary may not be liable for failing to provide notice of conversion rights where such information is set forth in the plan documents available to the plan beneficiary. *Castello v. Gamache, 593 F.2d 358 (8th Cir. 1979)* (per curiam). As noted earlier, there is no basis upon which to find that any entity other than Bob Downes had an obligation to provide plaintiff with proper termination notice of continuation privileges; and there is no indication that any entity owed Bob Downes an obligation under ERISA, or even under COBRA, to provide proper written notice of such privileges. Even assuming arguendo GHP had a ministerial duty to provide Bob Downes with such notice, plaintiff has not pointed to any evidentiary material of record that would support a determination that genuine factual issues exist regarding GHP's lack of compliance with any such duty. Thus, the Court finds that movant is entitled, as a matter of law, to entry of summary judgment in its favor on Count X of the second amended complaint.

Having found GHP is not subject to ERISA or COBRA duties with respect to Counts II and X of the second amended complaint, [*21] the Court must now consider plaintiff's requests to amend the second amended complaint. Until ERISA preemption issues are resolved, the Court finds it inappropriate at this stage of the proceedings to consider any amendment of the state

law claim(s) set forth in Count VI of the second amended complaint. Accordingly, plaintiff's motion to amend that count will be denied without prejudice.

To give the parties an adequate opportunity properly to address all ERISA preemption issues pertaining to this case, the Court will grant plaintiff's request to amend the second amended complaint so as to add the proposed Count XII previously submitted by plaintiff and will give defendants eleven days within which to file any motion(s) directed to ERISA preemption issues pertaining to that count. By this amendment ruling, the Court is in no manner addressing or determining whether or not ERISA preempts the claim(s) now set forth in the new Count XII.

The Court notes, however, that the United States Court of Appeals for the Eighth Circuit has stated "Congress intended pre-emption to apply even where no ERISA fiduciary remedy existed." *Consolidated Beef Indus., Inc., 949 F.2d at 964.* This [*22] Court therefore questions plaintiff's reliance on the **Sparks** decision to support his arguments that the state law claim in Count XII and any state law claim in Count VII are not preempted by ERISA.

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that plaintiff's motion to withdraw the amendment to Count I of the second amended complaint is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff's motion to set case for trial during the August 3, 1992, docket is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's motion to set the case for nonjury trial only is **DENIED without prejudice.**

**IT IS FURTHER ORDERED** that defendant GHP's motion for summary judgment is **GRANTED** with respect to Counts II and X of the second amended complaint and is **DENIED** without prejudice with respect to Count VI of the second amended complaint.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend Count VI of the second amended complaint is **DENIED** without prejudice.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend the second amended complaint so as to add Count XII is **GRANTED.**

1992 U.S. Dist. LEXIS 22540, *22

**IT IS FURTHER ORDERED** that, **[*23]** within eleven days of the date of this order, defendants shall file a motion or motions addressing whether ERISA preempts the state law claim(s) set forth in Counts VI and XII of the second amended complaint. Plaintiff shall file his response to any such motion within five days thereafter; and defendants may file their reply brief(s) in the time allowed by Local Rule 7.

   **IT IS FURTHER ORDERED** that this case is removed from the August 3, 1992, docket; to be reset for jury and/or nonjury trial on the earliest available docket as soon as preemption issues are determined.

   An appropriate judgment will accompany this memorandum and order.

   Dated this 20th day of July, 1992.

   Edward L. Filippine

   UNITED STATES DISTRICT JUDGE

**JUDGMENT**

   In accordance with the memorandum and order filed this date and incorporated herein,

   **IT IS HEREBY ORDERED and ADJUDGED** that, with respect to Counts II and X of the second amended complaint, judgment is entered in favor of defendant Group Health Plan, Inc., and against plaintiff Barry W. Powell; and plaintiff Barry W. Powell's claims and causes of action as set forth in Counts II and X of the second amended complaint against defendant **[*24]** Group Health Plan, Inc., only are **DISMISSED** with prejudice.

   Dated this 20th day of July, 1992.

   Edward L. Filippine

   UNITED STATES DISTRICT JUDGE

LEXSEE



Cited
As of: Jan 31, 2007

**PAUL C. SEITZ, Plaintiff, v. THE SIEGFRIED GROUP, LLP, SIEGFRIED & SCHIEFFER, LLP, SIEGFRIED CONSULTING, LLP, and SIEGFRIED RESOURCES, LLP, Defendants.**

**C.A. No. 99C-12-025-CHT**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

**2001 Del. Super. LEXIS 364**

**March 15, 2001, Submitted**
**October 2, 2001, Decided**

**DISPOSITION:** [*1]

Motion for Partial Summary Judgment on the Complaint and Motion for Summary Judgment on the Partnerships' Counterclaim denied. Partnerships' Motion for Summary Judgment on Their Counterclaim granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant accounting partnerships moved for partial summary judgment on plaintiff former employee's complaint seeking to recover allegedly unpaid incentive bonuses and other amounts pursuant to Del. Code Ann. tit. 19, § 1101(a)(2). They also moved for summary judgment on their counterclaim that the employee breached his employment agreement.

**OVERVIEW:** Several agreements executed by an accountant and the partnerships he worked for established a system under which the employee could earn incentive bonuses. Amounts earned in excess of an annual ceiling became amounts owed under a deferred compensation note. The agreements also prohibited him from soliciting or serving clients of the partnerships after he terminated his employment. Several years after he resigned, the employee learned that his deferred compensation payments were not going to be as expected, so he sued under the Delaware Wage Payment and Collection Act, Del. Code Ann. tit. 19, § 1101(a)(2). The court held that his incentive bonuses were wages under that statute, and that his action was not time-barred because it did not accrue until

he realized there was a dispute. The partnerships' counterclaim for solicitation of clients was not proven at least as to those admitted former clients that the employee admitted having solicited.

**OUTCOME:** The court denied the partnerships' motion as to the employee's complaint, but granted it on their counterclaim only as to solicitation of certain clients of the partnerships, but not others.

**CORE TERMS:** partnership, employment agreement, solicitation, deferred, summary judgment, termination, entity, cause of action, matter of law, bonus, aforementioned, counterclaim, calculation, terminated, calculate, Collection Act, solicited, repayment, limitations period, year-end, clarify, submitted to arbitration, partial, soliciting, scoring, solicit, entitled to judgment, material fact, begin to run, presently

**COUNSEL:** David H. Williams, Esquire and Elizabeth A. Brown, Esquire, MORRIS JAMES, HITCHENS & WILLIAMS LLP, Wilmington, DE, Attorneys for the Plaintiff.

Jeffrey M. Weiner, Esquire, Wilmington, DE, Attorney for the Defendants.

**JUDGES:** TOLIVER, JUDGE.

**OPINION BY:** TOLIVER

OPINION:

OPINION AND ORDER

On the Defendants' Motions

for Partial Summary Judgment

and

On the Plaintiff's Motion

for Partial Summary Judgment.

TOLIVER, JUDGE

FACTS

The Plaintiff, Paul C. Seitz, is an accountant and the Defendants n1 are providers of accounting services to various persons and/or entities. On July 1, 1993, the parties entered into an agreement ("Employment Agreement") whereby Seitz would be employed to act as an accountant on behalf of present and future clients of the Partnerships. He was to receive compensation based upon those efforts as defined in that agreement. It was also contemplated that clients previously served by Seitz or whose interests he would subsequently [*2] be retained to represent would become part of the clientele of Partnerships.

n1 The Siegfried Group, Siegfried & Schieffer, Siegfried Consulting and Siegfried Resources were, at all times relevant to this action, limited liability partnerships registered in the State of Delaware. They shall hereinafter be referred to as the "Partnerships".

On January 4, 1996, Seitz and the Partnerships entered into a series of contracts which altered the manner in which Seitz was to receive compensation for his efforts on behalf of the Partnerships. Also affected were the terms and conditions relating to any termination of the relationship between Seitz and the Partnerships as well as the nature and the consequences of any professional contact between Seitz and clients of the Partnerships following a termination.

Of primary consequence among the aforementioned agreements were the Incentive Compensation Agreement ("ICA") and the Tactical Component Agreement ("TCA"). The ICA provided Seitz with the opportunity to earn compensation [*3] by attaining certain short-term goals and objectives deemed mutually beneficial to both parties as opposed to longer-term business objectives. The TCA, specifically Paragraph 4, defined the mechanism by which the computation of Seitz' compensation would be achieved. It also set out the criteria to be used

in evaluating his performance. They included sales, client service and a scoring component, including, but not limited to, new business development, corporate citizenship and other factors as determined by the Partnerships.

There was a limitation, however, on the amount of incentive compensation that Seitz could receive or be paid, as opposed to earn, in any one year. The TCA also defined the maximum amount payable and what became of the amount of incentive compensation earned in excess of that amount. The agreement stated that any monies owed to Seitz, including incentive compensation, but not yet payable, would be deferred and added to the tactical component in future years during which Seitz would be subject to the TCA. n2 In the event that the professional relationship between the parties was terminated, the excess so earned but not paid would be added to a promissory note (the [*4] "Seitz Note") and repaid according to the terms and conditions stated therein. n3

n2 TCA at P4(f).

n3 The Seitz Note was created as a result of an amendment to the Employment Agreement that was entered into by the parties on January 4, 1996. The relevant terms and conditions of the Seitz Note are provided for in P6 of that agreement.

For reasons that are not altogether clear, Seitz tendered his resignation from the Partnerships in a letter dated August 7, 1997. According to Seitz, the final date of their association was to be mutually determined later. On August 8, the resignation was accepted by Robert L. Siegfried, President of the Partnerships, who nominated September 7 as the date when the separation would be effective. However, during the interim, the Partnerships terminated Seitz's employment as of August 11, 1997. n4

n4 Letter from Siegfried to Seitz of August 11, 1997; see Defs.' Answer and Countercl. at Ex. N.

[*5]

At least during the month of August, 1997, the record reflects that the parties were attempting to calculate the incentive compensation due Seitz for the Partnerships' fiscal year 1996. n5 Although the final amount due for that period remains in dispute, it appears that Seitz had earned an amount in excess of that to which he could be paid under the TCA. n6 In any event, no further action

on this issue was taken prior to the termination of the relationship between the parties.

> n5 The reference to the Partnership fiscal years shall hereinafter be designated "FY ___ ".

> n6 On August 5, 1997, a draft of a document purportedly from Robert Siegfried was directed to Seitz and calculated total incentive compensation for FY 1996 at $ 461, 461. If that were the case, pursuant to the TCA, the maximum incentive compensation payable would be $ 206,250. The balance, or $ 255,211, would have to be deferred and placed into the Seitz Note. However, while the Partnerships deny that this was the final figure for that year, it does not appear that they dispute that some incentive compensation was to be deferred and added to the Seitz note.

[*6]

On November 19, 1997, Seitz directed correspondence to the Partnerships demanding payment of the Seitz Note. The payments of principal and interest were to begin on May 19, 1999. n7 Nothing else of note transpired until April 9, 1998. On that date, Seitz requested that the Partnerships calculate his incentive compensation for the portion of FY 1997 up to the effective date of his termination. On December 7, 1998, the Partnerships informed Seitz that his incentive compensation FY 1997 prior to his termination was a negative $ 12,758. It was also at that time that Seitz was informed that he was due a total of $ 199,788 as opposed to the $ 461,461 figure referred to in the August 5, 1997 memo, which had not been given final approval. n8

> n7 According to P3(b) of the Seitz Note:

>> The first such installment (of the Seitz Note) shall be due and payable: . . . (ii) eighteen (18) months after the date on which Borrower receives Lender's demand for repayment, where Lender (x) is less than 52 years of age at the time Lender demands repayment hereunder, and Lender has voluntarily terminated his employment, or (y) is less than 52 years of age at the time Lender demands repayment hereunder, and Borrower has terminated Lender's employment for cause. . . .

See compl. at Ex. F.

[*7]

> n8 Letter from Partnerships' counsel to counsel for Seitz of December 7, 1998; see compl. at Ex. G.

No payments were made on the indebtedness due under the Seitz Note following the November 19, 1997 demand for payment. It appears that compensation related to various aspects of his employment relationship with the Partnerships had been advanced to Seitz prior to his termination. The amount of that compensation was unilaterally determined by the Partnerships who began to deduct it monthly following Seitz' termination and the subsequent demand for repayment of the note by Seitz. Although there was no agreement concerning the Partnerships' calculation of this "negative compensation", Seitz did not dispute the right of the Partnerships to off-set whatever that amount was determined to be against the deferred incentive compensation.

On December 27, 1999, the Partnerships informed Seitz that they had made what was later determined to be a contribution of $ 9,747.34 to Seitz' 401(k) plan as of September 12, 1997. The contribution was not authorized by Seitz and was credited against the deferred [*8] incentive compensation for 1997. n9

> n9 It is not completely clear from the correspondence between the parties that the deduction and subsequent contribution was for FY 1997. However, it is apparent that Seitz did not affirmatively authorize the contribution at the time it was made. In addition, Seitz alleges that the contribution was subject to a forty percent (40%) forfeiture rate and therefore a loss to Seitz of $ 3,898.94. The basis for this claim is not set out in the pleadings but is presumably a reference to 26 U.S. c. § 401 of the Internal Revenue Code.

Seitz instituted this litigation on December 3, 1999. His complaint, as it presently exists, n10 generally alleges that the monies the Partnerships refused to pay him as outlined above constituted "wages" within the meaning of the Delaware Wage Payment and Collection Act, specifically 19 Del. C. § 1101(a)(2). The refusal, he contends violates that law, making the Partnerships liable for damages, including the deferred [*9] incentive compensation, interest, penalties, costs and attorney's fees. Seitz

also seeks the return of the "negative compensation" that was incorrectly charged against his incentive compensation for FY 1997 as well as the monies which he forfeited because of what he claims was the unauthorized 401(k) contribution.

> n10 The complaint was amended on January 27, 2000, prior to the filing of answer by the Partnerships pursuant to Superior Court Civil Rule 15(a).

The Partnerships have denied the allegations made by Seitz. In addition, they have raised certain affirmative defenses, which, they allege will bar Seitz from any relief to which he might be entitled even if they acted improperly. Lastly, the Partnerships have filed certain counterclaims alleging that Seitz is in fact liable to them for breaches of the agreements executed by the parties during the course of their professional relationship.

On December 20, 2000, the Partnerships filed two motions seeking the entry of partial summary judgment on their behalf [*10] pursuant to Superior Court Civil Rule 56. The first sought a determination that Seitz was not entitled to any relief under the Delaware Wage Payment and Collection Act and that he failed to state a claim for relief as to the amount of incentive compensation claimed or insofar as the 401(k) contribution was concerned. The second motion requests a ruling from the Court on their counterclaim which sought damages based on the alleged solicitation and/or performance of professional services by Seitz for clients of the Partnerships.

Seitz has opposed those motions and seeks entry of judgment in his favor, also pursuant to Rule 56, as to Counts II thru IV and VI of the Partnerships' counterclaim and the damage claim arising out of the solicitation of two entities claimed as clients of the Partnerships. Specifically, Seitz claims that the aforementioned counts must be submitted to arbitration pursuant to one of the agreements ("Partners' Agreement") entered into by the parties at the start of their relationship. As to the two entities allegedly solicited, Seitz contends that solicitation alone, without engaging in any services for them is not enough to impose liability for damages on him. [*11] For those reasons, he argues that he is entitled to the relief sought.

Oral arguments on the motions were held on March 7, 2001 and March 15, 2001. All briefing having been completed and reviewed, that which follows is the Court's resolution of the issues so presented.

**DISCUSSION**

As indicated above, both parties have filed motions seeking partial summary judgment pursuant to Rule 56. The law is well settled in this area. "Summary judgment may be granted only where, considering the facts in a light most favorable to the non-moving party, there is no material issue of fact and the moving party is entitled to judgment as a matter of law." Pullman, Inc. v. Phoenix Steel Corp., Del. Super., 304 A.2d 334, 334 (1973). If, after viewing the evidence, the court finds that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances, then the court may not grant the motion for summary judgment. Guy v. Judicial Nominating Comm'n., Del. Super., 659 A.2d 777 (1995); and Wilson v. Triangle Oil Co., Del. Super., 566 A.2d 1016 (1989). [*12] It is the movant's burden to demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Borish v. Graham, Del. Super., 655 A.2d 831 (1994). The party opposing that motion must be afforded the opportunity to come forward with evidence showing the existence of a dispute as to an issue of material fact. Phillips v. Del. Power and Light, Del. Super., 59 Del. 179, 216 A.2d 281 (1966). It is with these standards in mind that the Court must review the motions filed by the parties.

**Partnerships' Motion for Partial Summary Judgment on Seitz' Complaint**

**Whether Compensation Deferred Constitutes "Wages"**

The Partnerships' first contention in its motion is that the deferred incentive compensation sought by Seitz is not "wages " for purposes of the Delaware Wage Payment and Collection Act. While the Partnerships do not dispute that any amounts due and payable to Seitz up to the maximum amount permissible under the ICA and the TCA during each of the partnership fiscal years in question here were wages, the Partnerships argue that incentive compensation which was deferred [*13] to be paid in future years, or in the case of termination, to be added to the Seitz Note, did not fall within that term. As a result, Seitz has failed to state a claim upon which relief can be granted under the aforementioned statute as to those monies which he had earned but had not been paid.

In support of this argument, the Partnerships cite Dep't of Labor Ex Rel. Commons v. Green Giant Co., Del. Super., 394 A.2d 753 (1978). That case held that wages are funds "ordinarily paid at the end of each period of a certain number of workdays." Id. at 755. The argument that is suggested is that because the funds were not subject to payment at the end of a period of a certain number of work days, they are not wages. Defs.' Mot. for Partial Summ. J. Upon Pl.'s Comp. at P3. Seitz responds

that this argument is flawed because the amount in question was a year-end bonus or commission based upon Seitz' performance on behalf of the Partnerships and therefore constituted wages according to SOCA Indus., Inc. v. Bracken, Del. Supr., 374 A.2d 263 (1977). The Court agrees.

The Delaware Wage Payment and Collection Act defines wages as, "compensation for [*14] labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." 19 Del. C. § 1101(a)(2). Clearly this definition of wages does not limit wages to those amounts included in an employee's normal paycheck. The courts in both Green Giant and SOCA Industries recognized that year-end bonuses or amounts earned on commission *are* considered wages. Green Giant at 756; and SOCA Indus. at 264. The ICA and TCA provide little assistance in determining whether the amount of incentive compensation that is to be deferred falls within the definition of wages for purposes of the statute in question. However, Paragraph 4(f)(iii) of the TCA makes it abundantly clear that any such excess amount is deemed to have been "earned" by Seitz. These monies are without doubt based upon services Seitz rendered to the Partnerships. As a consequence, the Court finds as a matter of law that the monies in question are wages because they are either a year-end bonus based upon his performance, a commission based upon his performance, or a combination of both.

The finding that Seitz' [*15] deferred incentive compensation constituted "wages", leads the Court to the Partnerships' alternative argument, i.e., that Seitz' claims are barred by the one-year statute of limitations applicable to wage claims set forth in 10 Del. C. § 8111. Because Seitz was terminated on August 11, 1997, the Partnerships contend that the limitations period expired on August 11, 1998. As a result, Seitz' complaint was not timely when it was filed over a year later. Seitz responds that this cause of action did not arise and the limitations period did not begin to run until he received notice on December 7, 1998 of the Partnerships' calculation of the amount of incentive compensation which had been deferred for FY 1996 and 1997.

10 Del. C. § 8111 holds:

No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with [*16] any such action, shall be brought after the expiration of one *year from the accruing of the cause of action* on which such action is based. (emphasis added).

In a case very similar to the case sub judice, the United States District Court of the District of Delaware held that the plaintiff's cause of action did not arise until he had actual notice of the amount of his bonus. The Court made this finding despite a provision in the employment agreement that stated that the bonus was due at the closing of a merger. It reasoned that the cause of action did not mature until the bonus check was tendered to the plaintiff, which put him on notice that the amount was in dispute. Compass v. American Mirrex Corp., D. Del., 72 F. Supp. 2d 462, 468 (1999).

In this case, Seitz' cause of action did not arise until December 7, 1998, the date the Partnerships provided Seitz with the amount of deferred incentive compensation which they calculated was due him Seitz under the terms of the ICA and TCA. See Pl.'s Resp. at Ex. 7. As such, the limitations period did not begin to run until that date and would not have been tolled until one year later, on December 7, 1999. Stated [*17] differently, it had not expired when Seitz filed his complaint on December 3, 1999, and the Partnerships' motion in this regard must be denied.

**Calculation of Incentive Compensation**

The Partnerships also seek the entry of judgment on their behalf concerning the mechanism used to calculate the incentive compensation for their 1996 fiscal year. To be specific, the Partnerships contend that Seitz erroneously uses a 4.2 scoring component to calculate the amount due for that period of time Seitz 1996 incentive compensation. The factor that should have been used, it is argued, would be adjusted by factoring in aspects of Seitz' performance more fully set out in the TCA. n11 The result would be a scoring component of 3.68. As might be expected, Seitz is equally adamant that the factor he used is correct based upon the agreements between the parties. Moreover, it is consistent with the factor used without by the Partnerships in pre-litigation calculations.

n11 TCA at P4(d).

Viewed in a light most favorable [*18] to the non-moving party, the Court is unable to conclude that the Partnerships are entitled to summary judgement as a matter of law on this issue. There are material facts in dispute and the application of the law to the facts given would not be appropriate at this stage of the proceedings.

2001 Del. Super. LEXIS 364, *

Guy at 780. Indeed, given the aforementioned disputes of fact and the use of language readily susceptible of differing interpretations, it does not seem likely that this issue can be resolved summarily and short of a trial on the merits.

### Section 401(k) Contribution

Finally, the Partnerships move for summary judgment on Seitz' claim to the funds that were withheld for his 401(k) plan. The Partnerships argue that participation in the plan was mandatory for Seitz and that he is not entitled to the contributions about which he complains as a result. Seitz responds that the Partnerships characterize the amount in question as a profit-sharing contribution they made on his behalf, but that they also subtracted that figure from his deferred incentive compensation calculation for 1997. He argues that it is a breach of the underlying employment agreements to calculate or use it both ways. The [*19] contribution is either a profit-sharing contribution or an employee contribution, but not both.

In this case, it does appear that there is a material dispute of fact concerning whether the Partnerships have categorized and treated these funds as a mandatory 401(k) contribution by Seitz or by the Partnerships on his behalf. Also, there is the legal impact of whatever designation that is deemed to apply, which from the record as it presently stands, is unclear. Further proceedings are therefore necessary to clarify the application of the facts to the law before this issue can be resolved.

In sum, the motion of the Partnerships seeking summary judgment on the Seitz' complaint must denied in all respects

### Seitz' Motion on the Partnerships' Counterclaim

### Arbitration of Counts II - IV & VI

Succinctly stated, Seitz argues that the claims set forth in Counts II, III, IV and VI of the Partnerships' counterclaim arise out of the Partners' Agreement and must be submitted to arbitration pursuant Paragraph 15 of that document. The Partnerships counter that the aforementioned claims do not arise out of the Partners' Agreement. More specifically, They contend that the Partners' [*20] Agreement concerns Class A Units of partnership interest and the redemption of those interests, but does not concern the terms and conditions of the partnerships. These issues are dealt within the separately executed limited liability partnership agreements, n12 the Employment Agreement or the common law. As a result, the Partnerships argue that the arbitration clause in the Partners' Agreement does not apply. The Court agrees.

n12 On the same date that the Partners' Agreement was executed, January 4, 1996, three separate limited liability partnership agreements were also executed for Siegfried Schieffer & Seitz, SSS Strategic Resources and Siegfried Consulting.

Counts II and IV allege breaches of fiduciary duties and contract while Counts III and VI set forth allegations of fraud/misrepresentation. As stated above, the Partners' Agreement deals specifically with the issuance and the redemption of the Class A Units of partnership stock. It does not, in any way, deal with the rights and/or obligations between [*21] Seitz and the Partnerships. The liability partnership agreements on the other hand do in fact define and/or address those relationships. n13 The Court must agree as a result that Counts II, III, IV and VI do not arise from the Partners' Agreement and need not be submitted to arbitration pursuant to the provisions of Paragraph 15 of that agreement.

n13 See Def.'s Resp. to Pl.'s Mot., Ex. A., Siegfried Schieffer & Seitz, LLP Limited Liability Partnership Agreement at PP 1, 11; Ex. B., SSS Strategic Resources, LLP Limited Liability Partnership Agreement at PP 1, 11; and Ex. C., Siegfried Consulting, LLP Limited Liability Partnership Agreement at PP 1, 11.

### Damages for Solicitation of Clients

The second contention raised by Seitz is that the Partnerships' claims for damages relating to his alleged solicitation of business from the DuPont Company and the Elzufon law firm must be dismissed. He argues that even if one were to assume that he solicited business from those two entities, the Employment Agreement [*22] requires that services be performed for those to whom the solicitation was directed. Since the Partnerships allege mere solicitation and not that he provided services, those claims must be dismissed because they do not state a cause of action upon which relief can be granted under the terms of the Employment Agreement.

The Partnerships admit that Paragraph V(C)(3)(b) of the Employment Agreement upon which Seitz relies, relates to the timing of the damages payments should Seitz *provide services* to a client of the Partnerships and that it is silent in that regard where there had been solicitation only. However, they argue that the failure to do so is not fatal to this aspect of their claims because the agreement clearly states that Seitz is prohibited from soliciting Siegfried clients and subjects him to liquidated damages if he violates that restriction.

A review of the Employment Agreement reveals that when read as a whole, it holds Seitz liable for damages for any solicitation without further qualification. Notwithstanding the provision upon which Seitz relies, Paragraph V(C)(3)(a) states in relevant part:

> In addition, in the event of any breach by Employee of the covenants [*23] contained in subparagraph (V)(D)(1) n14 of this Agreement, Employee shall pay to Employer, with respect to each client of Employer whom Employee solicits or for whom Employee provides Accounting Services, and amount equal to one hundred fifty percent (150%) of the amount of Employer's twelve months average billings to the client . . . .

This paragraph clearly demonstrates the parties' intentions that should Seitz solicit a Partnerships client, he would be liable for the specified amount of damages to the Partnerships. That measure of damages is based on the billings from the Partnerships to the client solicited and/or for whom work was performed. Consequently, to be activated, no work need be performed by Seitz and his motion in this regard is without merit.

> n14 Paragraph V(C)(1) includes the covenant to not solicit clients.

In light of these conclusions, Seitz' motion seeking summary judgment as to certain counts contained in the counterclaim filed by the Partnerships and as to the solicitation claim [*24] as described above, is denied in its entirety.

**The Partnerships' Motion on Their Counterclaim**

### Solicitation of Clients of the Partnerships

The Partnerships have moved for summary judgement on the issue of Seitz' liability for soliciting and/or performing services for certain partnership clients in violation of the Employment Agreement. The clients were identified as the DuPont Company and the law firms of Elzufon & Austin; Richards, Layton & Finger and Richard R. Wier, Jr., P.A. In support of this claim, the Partnerships cites to evidence that Seitz met with and actively pursued those entities for purposes of soliciting or entering into a business relationship with them. In the case of the Richards and Wier firms, services were actually provided.

Seitz does not deny that he solicited DuPont and Elzufon but argues that since he did not perform any services for them, he did not violate the Employment Agreement. For the reasons discussed in addressing Seitz' motion for partial summary judgment, n15 the Court disagrees. Again, the Employment Agreement, specifically Paragraph V(C)(1), prohibits solicitation of clients of the Partnerships and that is what the record [*25] reveals Seitz did. Therefore, the Partnerships are entitled a judgment as a matter of law insofar as the issue of whether the solicitation by Seitz, without more, constitutes a breach of the Employment Agreement, and their motion must be granted as it applies to DuPont and Elzufon. n16

> n15 See supra pp. 21-23.

> n16 Given the tangential reference by the parties to the subject, the Court has not decided what, if any, damages might flow from the violation of the prohibition against solicitation contained in Paragraph V(C)(1) or whether the measures of damages provision in Paragraph V(C)(3)(a)(ii) applies and/or is enforceable. Resolution of those issues will require more discussion than that presented thus far.

A different result obtains relative to Richards and Weir. Seitz contends that they were not clients of the Partnerships. n17 Those firms retained his services on behalf of individuals and/or entities who were represented by the firms in legal matters. The services were provided by the Partnerships [*26] to those individuals and/or entities. No relationship involving the provision of services between the Partnerships and the law firms was established while Seitz was professionally associated with the Partnerships. As a result, he could not have violated the Employment Agreement by performing work for either firm.

> n17 Reference is initially made to the Elzufon firm by Seitz in this regard but no further mention is made relative to that entity on the issue. Accordingly, the Court will view it as an inadvertent typographical error. See Seitz' Resp. to Defs.' Mot. Partial Summ. J. on Their Countercl. at 2.

There is no legal authority cited by Seitz in support this contention and there does not appear to be no controlling law in this jurisdiction on this issue. However, even if such authority existed, the Court would still be

2001 Del. Super. LEXIS 364, *

unable grant summary judgment on this issue in light of the status of the record relative to this issue. Simply put, the factual circumstances surrounding the contacts between Seitz and the law firms in question, as well as the purpose of those meetings, is not altogether clear. Therefore, this is a case where summary judgment is inappropriate because an inquiry into the facts and circumstances of Seitz' contacts with these parties is in order to clarify the application of the law to the circumstances. It would not, as a result, be appropriate to grant summary judgment as requested.  [*27]

Given the foregoing discussion, the Partnerships' motion must be granted in part and denied in part as to the issue of the solicitation of clients.

**CONCLUSION**

For the reason set for above, the Partnerships' Motion for Partial Summary Judgment on the Complaint and the Seitz' Motion for Summary Judgment on the Partnerships' Counterclaim must be, and hereby are, **denied**. In addition and also as described above, the Partnerships' Motion for Summary Judgment on Their Counterclaim is **granted in part** and **denied in part**.

**IT IS SO ORDERED.**

**Toliver, Judge**

1 of 1 DOCUMENT

**ELLIOT SPIEGEL n1 and JONATHAN SCHATZBERG, Plaintiffs, -against- DANIEL "TIGER" SCHULMANN and UAK MANAGEMENT COMPANY, INC., Defendants.**

n1 Although plaintiffs' pleadings consistently refer to Mr. Spiegel as "Elliot," a sworn affidavit submitted by Spiegel himself in response to defendants' motion for summary judgment reveals that his first name is spelled "Eliot." To be consistent with the pleadings, this Court hereafter refers to Spiegel as "Elliot Spiegel."

**03-CV-5088 (SLT) (RLM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 86531*

**November 30, 2006, Decided**
**November 30, 2006, Filed**

**COUNSEL:** [*1]  For Elliot Spiegel, Johathan Schatzberg, Plaintiffs: Eric Joseph Grannis, LEAD ATTORNEY, Law Offices of Eric J. Grannis, New York, NY.

For Daniel Schulmann, "Tiger", UAK Management Company, Defendants: Scott Craig Levenson, LEAD ATTORNEY, Scott Levenson, Esq., Montvale, NJ.

**JUDGES:** SANDRA L. TOWNES, United States District Judge.

**OPINION BY:** SANDRA L. TOWNES

**OPINION:**

   **MEMORANDUM and ORDER**

**TOWNES, United States District Judge:**

   Plaintiffs Elliot Spiegel and Jonathan Schatzberg, both of whom were formerly employed at various Tiger Schulmann Karate Centers ("Centers"), bring this action under the Americans with Disabilities Act, *42 U.S.C. § 12101 et seq.* ("ADA"), other federal statutes, and various State and local laws, principally alleging that Spiegel was twice wrongfully terminated on account of his obesity and that defendants retaliated against both plaintiffs after Spiegel sought legal remedies for the alleged discrimination. Defendants now move for summary judgment pursuant to *Fed. R. Civ. P. 56*, and plaintiffs cross-move for leave to further amend their pleadings to add a new defendant. For the reasons [*2]  stated below, defendants' motion for summary judgment is granted with respect to Counts I, II, III, IV, V, VI and IX of the Second Amended Complaint ("Second Am. Complt."). This Court declines to exercise supplemental jurisdiction with respect to Counts VII and VIII, which are, therefore, dismissed without prejudice. Plaintiffs' cross-motion is denied.

Case 1:05-cv-00495-JJF     Document 45-2     Filed 01/31/2007     Page 91 of 120

Page 2
2006 U.S. Dist. LEXIS 86531, *2

BACKGROUND

Defendant Daniel "Tiger" Schulmann is the founder and developer of the "Tiger Schulmann Karate" system of martial arts. Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Memo") at 2; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Memo") at 1. n2 This system is taught at approximately forty franchised Tiger Schulmann Karate schools or "Centers," including Centers in Bensonhurst, Brooklyn (the "Bensonhurst Center"); Paramus, New Jersey (the "Paramus Center"); Stamford, Connecticut (the "Stamford Center") and Rego Park, Queens (the "Rego Park Center"). *Id.*

n2 Defendants' Memo is not paginated. However, its "Table of Contents" indicates that defendants meant to designate the page on which the "Preliminary Statement" appears as page 1. The Court has therefore numbered the pages sequentially beginning with that page.

[*3]

Plaintiffs were employed at several of these Centers. Defendants' Rule 56.1 Statement ("Def. 56.1") at P 2; Plaintiffs' Response to Defendants' Rule 56.1 Statement ("Pl. 56.1") at p. 2. Both plaintiffs were ultimately fired, giving rise to the instant action. Defendants -- who allege that plaintiffs were employed by franchisees and not by them, Def. 56.1 at P 2 -- do not provide the dates on which plaintiffs were hired or fired. However, the relevant dates can be ascertained by scrutinizing and comparing the exhibits offered by the parties. n3

n3 This task could have been rendered much easier if defendants had provided an adequate Rule 56.1 Statement. Such statements are to provide a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." *See Local Civil Rule 56.1(a).* In addition, each statement of material fact is to be "followed by citation to evidence which would be admissible, set forth as required by *Federal Rule of Civil Procedure 56(e).*" *Local Civil Rule 56.1(d).*

As originally filed, defendants' 56.1 statement alleged very few uncontested material facts and failed to cite the evidence with adequate specificity. In September 2006, this Court's case manager advised defendants' Connecticut-based counsel of *Rule 56.1*'s requirements and directed him to re-file the statement. Although the amended statement contains adequate cites, it still alleges very few uncontested facts. Rather, defendants' 56.1 statement primarily sets forth the defendants' position with respect to contested issues.

Failure to submit a *Rule 56.1* statement "may constitute grounds for the denial of the motion." *Local Civil Rule 56.1(a).* However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may "opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)* (internal quotations omitted). Since the exhibits are not particularly voluminous and since defendants' counsel is located in Connecticut, this Court will exercise its discretion to decide this motion on the merits. However, defendants' counsel is admonished to review the *Rule 56.1* requirements and to strictly adhere to them in making any future motions for summary judgment before this Court.

[*4]

Although defendants have denied knowledge or information sufficient to form a belief as to the truth of plaintiffs' allegation that Spiegel was first hired in April 1999, *see* Second Am. Complt. at P 9; Answer to Second Am. Complt. at P 2, defendants represent that plaintiff executed an Employee Model Release on July 18, 2000. *See* Defendants' Memo, Ex. M. That release, in which Spiegel agreed to be photographed and to have his photographs used in promotional materials, expressly states that Spiegel's agreement is "in consideration of [Spiegel's] employment and/or continued employment with an entity and/or entities that operate Tiger Schulmann's Karate Centers." *Id.* Therefore, while

2006 U.S. Dist. LEXIS 86531, *4

defendants may not agree concerning the exact duration of Spiegel's employment, defendants implicitly agree that Spiegel was employed at one of the Centers as early as July 2000.

Defendants also deny knowledge or information sufficient to form a belief as to the truth of plaintiffs' detailed allegations concerning Spiegel's employment at various Centers between July 2000 and August 2001. *See* Second Am. Complt. at PP 14-20; Answer to Second Am. Complt. at P 2. However, according to documents [*5] attached to and relied upon in Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Defendants' Reply Memo"), Spiegel was working for the Bensonhurst Center (Bensonhurst Karate, Inc.) in mid-August 2001, when he was fired by the Center's manager, Vincent Gravina. *See* Defendants' Reply Memo, Ex. B., at 17. As will be discussed in greater detail below, the parties disagree as to why Gravina fired Spiegel: defendants claim that Spiegel was fired because he did not get along with his co-workers, while Spiegel maintains that he was fired because he was overweight. However, the parties agree that Spiegel was almost immediately rehired by the Stamford Center (Stamford Karate, Inc.). Spiegel himself testified at his deposition that there was no gap between the time he ceased working at the Bensonhurst Center and the time he started working at the Stamford Center. *See* Deposition of Elliot Spiegel (Ex. B to the Declaration of Eric J. Grannis in Opposition to Defendants' Motion for Summary Judgment ("Grannis Declaration")) at 17, 21. Spiegel's testimony is corroborated by payroll records which indicate that Spiegel was hired by Stamford Karate, [*6] Inc., on September 4, 2001. Defendants' Memo, Ex. D.

According to those same payroll records, Spiegel worked in Stamford until June 2002. *Id.* In December 2001, while attending a Challenge of Champions tournament, Spiegel discovered that an altered photograph of his torso was being used in an unflattering manner in advertisements for defendants' "Evolve" nutrition program. *See* Affidavit of Elliot Spiegel, dated Oct. 7, 2005 ("Spiegel Aff.") (Ex. P to the Grannis Declaration) at P 2. Defendants admit that the overweight torso depicted in the advertising is Spiegel's, but note that the photograph did not show Spiegel's head or face or anything else which would permit it to be identified as a picture of Spiegel. *See* Defendants' Memo at 10. Spiegel, however, states that some of his colleagues, including Schatzberg and Gravina, recognized his torso and "mocked" him. Spiegel Aff. at P 2.

On June 2, 2002, plaintiff was fired from the Stamford Center. Defendants' Memo, Ex. D, Ex. N at P 7. Schulmann admitted at his deposition that he, who owned a controlling interest in Stamford Karate, Inc., ordered Gregory Hunko, who ran the Stamford Center, to fire Spiegel. Deposition of Daniel [*7] Schulman dated Jan. 5, 2005 (Ex. C to the Defendants' Memo and Ex. H to the Grannis Declaration) at 28. However, the parties disagree as to why Schulmann fired Spiegel. Spiegel claims that he was fired because of his weight, while Schulmann asserts that he fired Spiegel after employees at the Paramus Center told him that Spiegel said he had "no respect" for Schulmann.

At the time of Spiegel's termination, Spiegel's good friend, Schatzberg, was also working at the Stamford Center. Although defendants have denied knowledge or information sufficient to form a belief as to the truth of the allegation, the Second Amended Complaint alleges that Schatzberg decided to quit working at the Stamford Center sometime after Spiegel was fired. Second Am. Complt. at P 40; Answer to Second Am. Complt. at P 2. The Second Amended Complaint further alleges, and payroll records attached to Defendants Memo confirm, that in early November 2002 Schatzberg was hired by Vincent Gravina to work at the Rego Park Center (Rego Park Karate, Inc.). *See* Second Am. Complt. at P 41; Defendants' Memo, Ex. E.

On November 25, 2002, Spiegel filed charges with the Connecticut Commission on Human Rights and Opportunities. [*8] *See* Grannis Declaration, Ex. A. Two or three days later, Gravina fired Schatzberg. *See* Defendants' Memo, Ex. E; Affidavit of Penelope Kousis dated Oct. 21, 2005 (Ex. E to Defendants' Reply Memo) at P 2. The parties do not agree as to why Schatzberg was fired. Plaintiffs allege that defendants, aware of the close relationship between Spiegel and Schatzberg, fired Schatzberg to retaliate against Spiegel for filing charges with the Connecticut Commission on Human Rights and Opportunities. Defendants assert that Schatzberg was fired for various reasons relating to the quality of his work.

The Plaintiff's Complaints in the Instant Action

On October 8, 2003, plaintiffs commenced the instant action against Schulmann and a New Jersey Corporation -- variously named as UAK Management Company, Inc., and UAK Management, Inc. ("UAK") -- which allegedly was owned solely by Schulmann and operated the Centers. Complaint at PP 6-7. Although the original complaint alleged that all parties were citizens of New Jersey, plaintiffs nonetheless chose to file the action in this Court. Moreover, for reasons which are not altogether clear, plaintiffs elected to bring this action solely against [*9] Schulmann and UAK. They did not name, and have never sought to add, Bensonhurst Karate, Inc., Stamford Karate, Inc., or Rego Park Karate, Inc., as defendants.

The original complaint asserted five causes of action against these defendants: (1) an ADA claim arising from Spiegel's June 2002 termination from the Stamford Center: (2) a claim pursuant to the New York State Human Rights Law, *N.Y. Exec. Law § 290 et seq.* ("NYSHRL"), relating to Spiegel's August 2001 termination from the Bensonhurst Center; (3) a claim pursuant to the New York City Human Rights Law, N.Y. City Admin. Code *§ 8-107 et seq.* ("NYCHRL"), also relating to the Spiegel's Bensonhurst termination; (4) a cause of action alleging that defendants' use of Spiegel's photograph violated unspecified New York State defamation and privacy laws; and (5) a cause of action alleging that defendants had intentionally inflicted emotional distress upon Siegel. In addition, the complaint alleged that Schulmann used UAK as his "alter ego," and that Schulmann should, therefore, be liable for the debts of UAK. Complaint at PP 75-79.

Defendants subsequently moved to dismiss this complaint on various grounds. [*10] Judge Allyne R. Ross (who was previously assigned to this case) granted the motion only to the extent of (1) dismissing with prejudice the claim for intentional infliction of emotional distress and (2) dismissing without prejudice all claims against Schulmann on the ground that the complaint failed to allege facts sufficient to make out personal jurisdiction over him. *See Spiegel v. Schulmann,* No. 03 CV 5088 (ARR), slip op. at 27-28 (E.D.N.Y. June 16, 2004). Judge Ross granted plaintiffs leave to amend the complaint "with regard to the plaintiffs' claims against Schulmann" and with regard to the allegations of alter ego liability. *Id.* Judge Ross denied defendants' motion to the extent that it sought to dismiss plaintiffs' first four claims as against UAK. *Id.* at 27.

In July 2004, plaintiffs amended their complaint to add jurisdictional allegations concerning Schulmann. Specifically, plaintiffs added allegations that Schulmann owns "at least 51 percent" of each Center and, "as the sole shareholder, president and director of UAK, derives substantial revenue from services rendered in New York." Amended Complaint ("Am. Complt.") at P 7. Plaintiffs also added an allegation [*11] that Gravina "told Spiegel that he was being terminated at the insistence of Schulmann who said to Gravina, 'I own 51 percent of the school and what I say goes.'" *Id.* at P 24. The Amended Complaint did not specifically allege "alter ego" liability and did not add any new causes of action, but clarified that the ADA claims in Count I and the defamation and privacy law claims in Count IV were being asserted solely against UAK. Am. Complt. at 13.

In August 2004, Stamford Karate, Inc., filed suit against Spiegel in Connecticut Superior Court, alleging that, during the first five months of 2002, Spiegel had "continuously solicited" Hunko -- Stamford Karate's Head Instructor -- to breach his contractual obligations and to start a new karate school with Spiegel. *See* Defendants' Memo, Ex. N at PP 9-12. Stamford Karate claimed that Spiegel, an employee, had breached his fiduciary duty of loyalty and that his actions both constituted tortious interference with contract and violated the Connecticut Unfair Practices Act.

In November 2004, plaintiffs filed a Second Amended Complaint, principally adding retaliation claims relating both to the Connecticut state action and to UAK's alleged [*12] failure to pay Spiegel's medical claims. In that complaint, Spiegel alleges that following his termination from the Stamford Center, he elected to continue his health coverage with UAK as permitted under the Employee Retirement Income Security Act of 1974, *29 U.S.C. §§ 1001 et seq.* ("ERISA"), and the Consolidated Omnibus Budget Reconciliation Act of 1986, *29 U.S.C. §§ 1161 et seq.* ("COBRA"). Second Am. Complt. at PP 86-87. Plaintiffs allege, upon information and belief, that UAK is self-insured with respect to "some claims," and assert that "UAK has refused to pay Spiegel's qualifying medical expenses." *Id.* at PP 85, 90. The Second Amended Complaint does not identify the claims UAK allegedly failed to pay or the dates on which such claims were rejected, and does not specify the types of claims for which UAK is "self-insured."

The Second Amended Complaint raises five new causes of action (Counts V through IX), four of which allege retaliation. n4 Counts V and VI both allege that defendants retaliated against Spiegel in violation of Title IV of the ADA, *42 U.S.C. § 12203*; Count V alleges that the Connecticut [*13] action constituted such retaliation, and Count VI alleges that defendants retaliated against Spiegel by refusing to pay his medical claims. Count VII alleges that defendants have retaliated against plaintiffs in violation of the NYSHRL by (1) filing a frivolous lawsuit against Spiegel, (2) withholding Spiegel's medical benefits and (3) terminating Schatzberg "because of his anticipated testimony and assistance in Spiegel's claim under *New York Executive Law § 296* and because of his opposition to practices forbidden by that statute." *Id.* at PP 97-98. Count VIII alleges that defendants have retaliated against plaintiffs in violation of the NYCHRL by (1) filing a frivolous lawsuit against Spiegel, (2) withholding Spiegel's medical benefits and (3) terminating Schatzberg "because of his anticipated testimony and assistance in Spiegel's claim under New York City Administrative Code *§ 8-107* and because of his opposition to practices forbidden by that chapter." *Id.* at PP 101-02. Count IX seeks to enforce Spiegel's rights under ERISA and COBRA by "enjoin[ing] UAK to honor the terms of Spiegel's continuing coverage and to pay his eligible medical expenses. [*14] " *Id.* at P 107.

       n4 Plaintiffs' ninth cause of action is erroneously designated in the Second Amended Complaint as a second "Count IV." To avoid confusion, this cause of action is hereafter referred to as "Count IX."

The Motions at Issue

Defendants now move for summary judgment with respect to each and every count of the Second Amended Complaint. Defendants preliminarily argue that all causes of action should be dismissed because this Court lacks personal jurisdiction over both defendants and because neither defendant ever employed plaintiffs. Defendants then raise arguments specific to the various causes of action, which are described in detail in the discussion below. Plaintiffs cross-move pursuant to *Fed. R. Civ. P. 15(a)* and *20* to further amend their pleadings in order to add a new defendant, TSK Franchise Systems, Inc. ("TSK").

DISCUSSION

The Summary Judgment Standard

Summary judgment is appropriate only when [*15] "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e); Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)*. The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World, 922 F.2d at 121* (internal quotations and citations omitted). Moreover, the non-movant cannot rely on hearsay testimony which would not be admissible if testified to at trial. *See, e.g., Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999); Fed. R. Civ. P. 56(e)* [*16] .

Personal Jurisdiction

Defendants' first argument in their motion for summary judgment asserts, *inter alia,* that this action must be dismissed because defendants "are not subject to personal jurisdiction within the State of New York." Defendants' Memo at 6. Noting that Judge Ross dismissed without prejudice the claims against defendant Schulmann on the ground that the original complaint did not allege facts which, if true, would establish personal jurisdiction over him, defendants first argue that plaintiffs' Amended Complaint failed to cure this defect. *Id.* at 6-7. Next, citing to a portion of Schulmann's deposition in which he states that he never travels to New York City "for business" and an affidavit in which the Chief Financial Officer of UAK denies that the corporation has ever transacted business in New York,

defendants argue that they do not have "sufficient New York contacts . . . to subject them to jurisdiction in this state." *Id.* at 6 (citing Ex. C and Ex. Q). Finally, defendants argue that "[p]laintiffs have not . . . alleged a sufficient nexus between the defendants, the causes of action asserted, and the State of New York . . . ." *Id.* at 7. [*17]

"A two-pronged test decides the question of personal jurisdiction: 1) 'whether there is jurisdiction over the defendant under the relevant forum state's laws'; and 2) 'whether an exercise of jurisdiction under these laws is consistent with federal due process requirements.'" *Time, Inc. v. Simpson, No. 02 Civ. 4917 (MBM), 2003 U.S. Dist. LEXIS 23061, 2003 WL 23018890, at *1 (S.D.N.Y. Dec. 22, 2003)* (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999)).* Plaintiffs bear the burden of establishing personal jurisdiction over the defendant. *See, e.g., Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993).* The showing needed to meet that burden varies depending on the stage of the litigation. Prior to trial or an evidentiary hearing on the issue of personal jurisdiction, a plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).* However, when no evidentiary hearing has been held "but the parties have conducted extensive [*18] discovery into the . . . defendants contacts with the forum state, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)* (internal quotations and citations omitted; bracketed material, but not elipses, in original). These averments must be construed in the light most favorable to plaintiffs and all doubts must be resolved in plaintiffs' favor. *See, e.g., Landoil Res. Corp. v. Alexander & Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir. 1991).*

This Court has Personal Jurisdiction over Schulmann

When Judge Ross addressed defendants' motion to dismiss -- approximately eight months after the action had been filed and prior to the initial conference before Magistrate Judge Mann - there was nothing to suggest that substantial discovery had taken place. Accordingly, Judge Ross applied the least exacting standard, reviewing the allegations in the complaint to determine if they made out a *prima* [*19] *facie* showing of jurisdiction. *See Spiegel,* slip op. at 13. Judge Ross held that the allegations in the original complaint were insufficient to make such a showing with respect to Schulmann. *Id.* at 20. However, noting that plaintiffs' memorandum of law in opposition to the motion to dismiss suggested that plaintiffs were "in a position to make a much stronger case for jurisdiction over Schulmann," *id.,* Judge Ross dismissed the claims against Schulmann without prejudice, and granted plaintiffs leave to amend their complaint in an effort to make a sufficient showing of personal jurisdiction. *Id.* at 28.

Contrary to defendants' assertions, plaintiffs have cured the deficiencies in their original pleading. In their Amended Complaint, filed in July 2004, plaintiffs allege that Schulmann owns "at least 51 percent" of each Center. Am. Complt. at P 7. In addition, plaintiffs allege that, in firing Spiegel from the Bensonhurst Center, Gravina "told Spiegel that he was being terminated at the insistence of Schulmann who said to Gravina, 'I own 51 percent of the school and what I say goes.'" *Id.* at P 24.

These allegations are sufficient to establish personal jurisdiction [*20] over Schulmann. Although plaintiffs do not expressly allege that Schulmann himself does business in New York, there is no question that the entities which fired plaintiffs -- Bensonhurst Karate, Inc. and Rego Park Karate, Inc. -- are domestic corporations. n5 Moreover, the allegations in the Amended Complaint at least imply that Schulmann ordered the terminations in his capacity as a principal of those corporations.

n5 This Court will take judicial notice that Bensonhurst Karate, Inc., and Rego Park Karate, Inc., are both domestic business corporations, and that documents filed with the Department of State name Schulmann as the Chief Executive Officer. *See* www.dos.state.ny.us.

"Under New York law 'individual corporate officers may be subject to jurisdiction in New York if it is established that the corporation is acting as their agent here.'" *Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 253 (S.D.N.Y. 2003)* (quoting *Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976, 984 (S.D.N.Y. 1992)).* [*21] While plaintiffs cannot establish jurisdiction simply by establishing that Schulmann is an officer in a New York corporation, they may do so by establishing "that the corporation acted 'with the knowledge and consent of the officer and the officer . . . exercised control over the corporation in the transaction.'" *Id.* The Amended Complaint explicitly alleges that Schulmann, as owner of 51 percent of the corporation, used his control over the corporation to effect the firing of Spiegel. Accordingly, the allegations in the Amended Complaint are sufficient to establish personal jurisdiction over Schulmann under *N.Y.C.P.L.R. § 301.*

The allegations are also sufficient to establish personal jurisdiction over Schulmann under *N.Y.C.P.L.R. § 302(a)(1). Section 302(a)(1)* provides that a court may exercise personal jurisdiction "over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," but only with respect to any cause of action arising from that transaction of business. This provision "extends the jurisdiction of New York state courts to any nonresident who has 'purposely availed [himself] [*22] of the privilege of conducting activities within New York.'" *Bank Brussels Lambert, 171 F.3d at 787* (quoting *Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 18, 308 N.Y.S.2d 337, 341, 256 N.E.2d 506 (1970))* (bracketed material in *Bank Brussels Lambert*). A single transaction is sufficient to fulfill this requirement, provided that "the relevant cause of action also arises from that transaction." *Id.*

The determination of whether a party has "transacted business" in New York is based on "the totality of circumstances concerning the party's interactions with, and activities within, the state." *Id.* On similar facts, another court has performed this fact-specific analysis and determined that Schulmann is transacting business in New York. In *Mehrkar v. Schulmann, No. 99 Civ. 10974 (DC), 2001 U.S. Dist. LEXIS 717, 2001 WL 79901 (S.D.N.Y. Jan. 30, 2001),* a former minority shareholder and employee of Yonkers Karate, Inc. -- the Center operating in Yonkers, New York -- brought an action against Schulmann, alleging the breach of a stock agreement entered into by the parties. Although Judge Chin granted the defendants' motion to dismiss, he held that the allegations in [*23] the complaint in that case established personal jurisdiction against Schulmann, stating:

> Schulmann was a 51% shareholder of Yonkers Karate, a New York corporation . . .; he received 50% of Yonkers Karate's profits; he owns or operates at least 16 karate centers in New York; he is the president, director, and sole shareholder of UAK, which provided services to Yonkers Karate and received revenue from Yonkers Karate; and . . . Schulmann signed the Stock Agreement with plaintiff, as the "President" of Yonkers Karate, Inc.

*Mehrkar, 2001 U.S. Dist. LEXIS 717, 2001 WL 79901, at *3.* Judge Chin further held that the causes of action in that case "arose out of these activities." *2001 U.S. Dist. LEXIS 717, [2001 WL 79901] at *4.*

In this case, the Amended Complaint and the Second Amended Complaint both allege that Schulmann "owns at least 51 percent of each Tiger Schulmann Karate School" and that, "as the sole shareholder, president and director of UAK," Schulmann "derives substantial revenue from services rendered in New York." Am. Complt. at P 7; Second Am. Complt. at P 7. Although neither complaint alleges the number of New York Centers, the pleadings specifically name two Centers in New York: Bensonhurst and Rego Park. [*24] Neither complaint alleges what percentage of the profit from these Centers flows to Schulmann or what position Schulmann holds in these New York corporations, but both imply that Schulmann receives some portion of these profits and controls the corporations.

Accordingly, under the totality of the circumstances, the facts alleged in the Amended and Second Amended Complaints in this case, like the allegations in the *Mehrkar* complaint, are sufficient to establish that Schulmann is transacting business in New York. The claims alleged in this case arise from that business. Therefore, this Court concludes that the allegations of the pleadings are sufficient to establish that there is personal jurisdiction over

2006 U.S. Dist. LEXIS 86531, *24

Schulmann under both *N.Y.C.P.L.R. § 301* and *§ 302(a)(1)*. In addition, the pleadings allege that Schulmann has sufficient "minimum contacts" with New York to satisfy the due process prong.

To make a *prima facie* showing of personal jurisdiction at this juncture, however, plaintiffs cannot merely rely on the allegations in their pleadings. Because the instant motion for summary judgment was made following the close of discovery in this case and long [*25] after defendants raised the personal jurisdiction issue in their motion to dismiss, this Court presumes that the parties have conducted extensive discovery into defendants' contacts with New York. Therefore, plaintiffs "must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Kernan, 175 F.3d at 240*.

The facts averred by plaintiffs provide a less solid basis for asserting personal jurisdiction over Schulmann than do the facts alleged in the amended complaints. Nonetheless, the averred facts, if credited by the trier of fact, would be sufficient to establish personal jurisdiction. Plaintiffs' Memo states that Schulmann "holds at least a 50% equity interest" in every Center and "majority or sole voting rights" in the corporations controlling those Centers. Plaintiffs' Memo at 13. These averments are substantiated by portions of Schulmann's deposition testimony (Ex. H to the Grannis Declaration) in which Schulmann testified that he had a "controlling interest" in both Bensonhurst Karate, Inc., and Rego Park Karate, Inc., *id.* at 14-15, and by portions of the deposition testimony [*26] of Gregory Hunko -- part owner of the Stamford Center -- in which Hunko testified that Schulmann realized 50% of the profits generated by the Centers. *See* Grannis Declaration, Ex. C at 12. In addition, Plaintiffs' Memo avers that Schulmann used his controlling interest in the Stamford Center to fire Spiegel -- an averment which is amply substantiated by the deposition testimony of both Schulmann and Hunko. *See* Grannis Declaration, Ex. C. at 30. Although plaintiffs do not aver facts to support the claim, set forth in their pleadings, that Schulmann similarly ordered that Spiegel be fired from the Bensonhurst Center, Spiegel's deposition testimony concerning the circumstances of his firing -- including the fact that it immediately followed a meeting between Gravina and Schulmann -- provides circumstantial evidence that Schulmann may also have ordered the Bensonhurst termination. Construed in the light most favorable to plaintiffs, *see Landoil Res. Corp., 918 F.2d at 1043*, these averments make out the *prima facie* showing necessary to defeat defendants' motion to dismiss all claims against Schulmann for lack of personal jurisdiction.

This Court Lacks  [*27]  Personal Jurisdiction over UAK

On the other hand, the averments in Plaintiffs' Memo and the exhibits attached thereto are insufficient to substantiate the allegation -- contained in all three of plaintiffs' complaints -- that UAK "does business within New York." Second Am. Complt. at P 6; Am. Complt. at P 6; Complt. at P 6. Under longstanding New York caselaw -- expressly retained as a basis for personal jurisdiction under *N.Y.C.P.L.R. § 301* -- "[a] corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction . . . if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985)* (quoting *Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917))*. A plaintiff seeking to establish personal jurisdiction under a "doing business" theory "must show that a defendant engaged in 'continuous, permanent, and substantial activity in New York.'" *Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000), cert. denied,* [*28] *532 U.S. 941, 121 S. Ct. 1402, 149 L. Ed. 2d 345 (2001)* (quoting *Landoil Res. Corp., 918 F.2d at 1043*).

The test for determining whether to find jurisdiction under this theory "is a simple pragmatic one, . . . which is necessarily fact sensitive because each case is dependent upon its own particular circumstances." *Landoil Res. Corp., 918 F.2d at 1043* (internal citations and quotations omitted). In making this determination, federal and state courts alike have "focused on a traditional set of indicia: for example, whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." *Wiwa, 226 F.3d at 98* (citing *Hoffritz for Cutlery, 763 F.2d at 58*, and *Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 537, 227 N.E.2d 851, 281 N.Y.S.2d 41, 44 (1967))*. However, because a finding that a corporation is "doing business" subjects that corporation to personal jurisdiction "with respect to any cause of action, related [*29] or unrelated to the New York

contacts," *Hoffritz for Cutlery, 763 F.2d at 58*, "the 'doing business' standard has, for practical reasons, been applied stringently." *Yanouskiy v. Eldorado Logistics Sys., No. 05-CV-2202 (ENV), 2006 U.S. Dist. LEXIS 76604, 2006 WL 3050871, at \*2 (E.D.N.Y. Oct. 20, 2006)* (citing *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001))*.

In this case, plaintiffs have not averred facts that would suffice to establish any of the traditional indicia of doing business in New York. There is nothing in plaintiffs' papers or in any of the exhibits attached to the motion papers submitted by the parties to suggest that UAK has an office, bank accounts or any other property in New York. Although there is evidence that UAK may assist the Centers with advertising, *see, e.g.,* Deposition of Gregory Hunko (Ex. C to the Grannis Declaration) at 8, there is nothing to suggest that UAK is engaged in any public relations work on its own behalf. Finally, there is nothing to suggest that UAK itself has any employees permanently located in New York State to promote its interests. Accordingly, plaintiffs [*30] have not made a *prima facie* showing that UAK is doing business in New York. *See Kernan, 175 F.3d at 240*.

To be sure, plaintiffs have averred facts tending to show that UAK is transacting business in New York. Plaintiffs allege that "UAK controls most of the [Centers'] day-to-day operations including accounts payable, accounts receivable, bookkeeping, payroll, marketing, legal services, training, employee health insurance, and the like." Plaintiffs' Memo at 13. These allegations are substantiated to some extent by evidence introduced by plaintiffs. For example, Gregory Hunko of the Stamford Center testified at his deposition that UAK provided "[e]verything from bookkeeping services to payroll to certain legal services to advertising management, [and] general training." Grannis Declaration, Ex. C at 8. Similarly, John Evensen testified that in 2001, UAK provided the Bensonhurst Center with accounting, advertising and payroll services. Deposition of John Evensen dated Jan. 5, 2005 (Ex. F to the Grannis Declaration) at 11. Moreover, UAK's Chief Financial Officer, Michael Sachs, testified at his deposition that UAK handled the Centers' "accounts payable" by "help[ing] [*31] cut the checks" and by "pay[ing] their vendors through their accounts"; assisted "in the payment of marketing our materials" and "advertising"; and updated the Centers' software and did some "graphic design work . . . for them." Deposition of Michael Sachs dated Jan. 27, 2005 (Ex. I to the Grannis Declaration) at 9-10.

This proof of UAK's provision of these sorts of "legal, marketing, accounting and advertising services" is sufficient to demonstrate that UAK "availed itself of the privilege of conducting activities in New York." *See Mehrkar, 2001 U.S. Dist. LEXIS 717, 2001 WL 79901, at \*4*. However, as previously noted, a New York court may exercise personal jurisdiction over a non-domiciliary under *N.Y.C.P.L.R. § 302(a)(1)* only "[a]s to a cause of action arising from" that transaction of business. In this case, however, there is nothing to suggest that any of plaintiffs' claims arise from UAK's provision of these services. Although UAK may have processed the Centers' payrolls and prepared paychecks, there is no evidence that UAK ever controlled the Centers or made any staffing decision for them. Indeed, Hunko testified that he himself signed the payroll checks, Deposition [*32] of Gregory Hunko (Ex. C to the Grannis Declaration) at 11, implying that he, as manager of the Stamford Center, was responsible for his own employees. While Hunko had to consult Schulmann in order to hire Spiegel, and was subsequently ordered by Schulmann to fire Spiegel, there is nothing to suggest that Schulmann was acting on behalf of UAK, rather than in his capacity as majority shareholder of Stamford Karate, Inc. Therefore, plaintiffs have not averred facts sufficient to establish personal jurisdiction over UAK under a "transacting business" theory. All claims against UAK are, therefore, dismissed for lack of personal jurisdiction.

Count I

Even if this Court had personal jurisdiction over UAK, it would nonetheless dismiss that portion of Count I which alleges that UAK violated Title I of the ADA by causing Spiegel to be discharged from the Stamford Center. In analyzing an ADA case, one applies the same burden-shifting analysis originally established by the Supreme Court in a Title VII case, *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999)*; [*33] *see also Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998)* (applying *McDonnell Douglas* analysis to an ADA claim). Under the *McDonnell Douglas* burden-shifting framework:

[P]laintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. . . . The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action. Plaintiff then must show that the proferred reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.

*Heyman, 198 F.3d at 72* (internal quotations and citations omitted) (citing *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37-38 (2d Cir. 1994))*.

Although the evidence necessary to establish [*34] plaintiff's initial burden has been characterized by the Second Circuit as "minimal" and "de minimis," *see Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)* (citing cases), "it is not nonexistent." *Almond v. Westchester County Dep't of Corrections, 425 F. Supp. 2d 394, 399 (S.D.N.Y. 2006)*. "[S]ummary judgment must be granted whenever the undisputed facts, viewed most favorably to the non-moving plaintiff, do not make out a *prima facie* case." *Id.* In addition, summary judgment is appropriate where the only evidence offered to prove the *prima facie* case is conclusory and insufficiently particular to permit a defendant to respond, since "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all . . . cases." *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985)*.

In order to make out a *prima facie* case under the ADA, a plaintiff must establish (1) that the plaintiff's employer is subject to the ADA; (2) that the plaintiff [*35] is disabled within the meaning of the ADA; (3) that the plaintiff was otherwise qualified to perform the essential functions of his or her job, with or without reasonable accommodation; and (4) that the plaintiff suffered an adverse employment action because of his or her disability. *See, e.g., Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004)* (citing *Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003))*. Defendants argue, *inter alia*, that Spiegel cannot establish the second of these elements because he is not "disabled" as that term is defined by the ADA. This Court agrees.

The ADA defines the term "disability" to mean: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *42 U.S.C. § 12102(2)*. Many of the terms used in this definition are further defined in regulations promulgated by the Equal Employment Opportunity Commission ("EEOC"). For example, these regulations define a "physical impairment" as "[a]ny physiological [*36] disorder . . . affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory . . ., cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." *29 C.F.R. § 1630.2(h)(1)*. These same regulations also define the term "substantially limits" to mean "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignficantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *29 C.F.R. § 1630.2(j)(1)*. In addition, the regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *29 C.F.R. § 1630.2(i)*.

Obesity alone is not a physical impairment unless it results from a physiological disorder of the sort described in *29 C.F.R. § 1630.2(h)(1)* [*37] . *See Francis v. City of Meriden, 129 F.3d 281, 286 (2d Cir. 1997)*. Plaintiffs have introduced evidence, in the form of a two-sentence letter from Spiegel's doctor, that Spiegel suffers from "hypogonadism," and has low testosterone levels as a result. *See* Letter of Ian H. Levy, DO, dated Jan. 12, 2005 (Ex. N to the Grannis Declaration). However, Dr. Levy's letter does not state that this condition is related to Spiegel's weight

problem, and plaintiffs have not produced any admissible evidence to that effect. n6

> n6 Although Plaintiffs' Memo alleges that "Spiegel's obesity is due to . . . hypogonadism," *id.* at 11, the memorandum does not cite any authority for this proposition. It is possible that this proposition could find some support in testimony from Spiegel himself; Plaintiffs' Memo suggests that page 76 of the Spiegel deposition contains a discussion of his condition. However, this page is not included in the exhibits attached to the Grannis Declaration. Moreover, even assuming, *arguendo,* that Spiegel testified that his doctors informed him that his obesity was related to hypogonadism, such testimony would be hearsay and inadmissible at trial.

[*38]

Even assuming that Spiegel's obesity is a physical impairment, there is nothing in Dr. Levy's letter or elsewhere in the motion papers to suggest that it renders Spiegel unable to perform a major life activity or significantly restricts the condition, manner or duration in which he can perform a major life activity. Dr. Levy's letter states that the "low Testosterone levels" resulting from plaintiffs' hypogonadism are being treated with Andro Gel. n7 Plaintiffs do not contend that Spiegel's condition or weight interfere with his ability to perform his work. Indeed, according to Spiegel's own deposition testimony, his doctor said he was as "healthy as a horse." Deposition of Elliot Spiegel (Ex. J to Defendants' Memo) at 77. Therefore, Spiegel does not meet the definition of "disability" set forth in *42 U.S.C. § 12102(2)(A).*

> n7 This Court will take judicial notice that AndroGel is a brand name for testosterone. *See* www.rxlist.com.

Plaintiffs implicitly concede this point, arguing instead [*39]  that Spiegel is disabled under *42 U.S.C. § 12102(2)(C)* "because his condition was regarded as a disability." Plaintiffs' Memo at 11. An individual need not have a physical impairment to state a claim under *subsection (C),* as long as the individual is "regarded as having such an impairment." *Francis, 129 F.3d at 284.* However, "[a] plaintiff cannot state a claim under the 'regarded as' prong of the ADA . . . simply by alleging that the employer believes some physical condition, such as . . . weight . . ., renders the plaintiff disabled." *Id. at 285.* Rather, the plaintiff must allege (and ultimately establish) that the employer "believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis." *Id.* "Thus, while a cause of action may lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese, . . . or suffers from a weight condition that is the symptom of a physiological disorder . . ., no cause of action [*40]  lies against an employer who simply disciplines an employee for not meeting certain weight guidelines." *Id. at 286* (internal citations omitted).

Accordingly, plaintiffs must allege and prove more than just that Spiegel was discharged because of his weight. Plaintiffs must allege, and adduce evidence to show, that defendants believed, even mistakenly, that Spiegel had a "physical impairment" -- that is, that his weight problem stemmed from a physiological disorder -- and that defendants fired him because of that belief. Plaintiffs have not done so. Plaintiffs do not even allege in their pleadings that defendants believed Spiegel suffered from a physiological disorder. To the contrary, the Second Amended Complaint implies that Schulmann believed Spiegel's weight problem was due to overindulgence. According to the Second Amended Complaint:

> Schulmann explained to Spiegel at considerable length his views about overweight people. Defendant Schulmann told him that the fact that he was fat demonstrated that he had no self-esteem and was a weak person. As such, Schulmann thought Spiegel could not be a proper role model for others. It was clear that it was not Schulmann's [*41]  view that Spiegel was physically unable to teach karate, at least at the beginner level. Rather, it was simply his view that fat people are essentially undisciplined and weak, and

therefore cannot be in a role in which others are supposed to look up to and respect them.

Second Am. Complt. at P 36.

Since there is nothing in the complaint, or in any of the evidence produced by plaintiffs, to suggest that Schulmann (or UAK) believed that Spiegel's weight condition was the symptom of a physiological disorder, plaintiffs have neither alleged nor established that Spiegel is disabled under *42 U.S.C. § 12102(2)(C)*. Accordingly, even if this Court had personal jurisdiction over UAK, it would find that plaintiffs' allegations concerning UAK's termination of Spiegel from the Bensonhurst Center failed to state a *prima facie* case of discrimination under the ADA.

Count II

Plaintiffs' second cause of action alleges that both defendants violated the NYSHRL by causing Spiegel to be fired from the Bensonhurst Center. In analyzing discrimination claims under the NYSHRL, New York State courts apply the same *McDonnell Douglas* burden-shifting framework [*42] which is applied in analyzing ADA claims. *See North Shore Univ. Hosp. v. Rosa, 86 N.Y.2d 413, 419-20, 657 N.E.2d 483, 633 N.Y.S.2d 462, 464 (1995)*. Under this framework, "summary judgment for the defendant is appropriate when the plaintiff either (1) fails to establish a prima facie case, or (2) fails to present evidence contradicting a well-presented legitimate reason, offered by the defendant, for the adverse employment action." *Branson v. Ethan Allen, Inc., No. 02 CV 6588 (JG), 2004 U.S. Dist. LEXIS 22135, 2004 WL 2468610, at *3 (E.D.N.Y. Nov. 3, 2004)*.

The elements for establishing a *prima facie* case of discrimination under the ADA and the NYSHRL are the same. *Mark v. Burke Rehabilitation Hosp., No. 94 Civ. 3596 (RLC), 1997 U.S. Dist. LEXIS 5159, 1997 WL 189124, at *2, n. 3 (S.D.N.Y. April 17, 1997)*. To establish a *prima facie* case of discrimination, a plaintiff must show "(i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination." *Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002)*. In arguing that plaintiffs [*43] have not met their burden of establishing a *prima facie* case, defendants principally argue that Spiegel is not "disabled" and therefore not a member of a protected class.

The NYSHRL defines "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . ." *N.Y. Exec. Law § 292(21)*. Although the legislative history of the NYSHRL indicates that "the statutory definition of disability was intended to be coextensive with that of the federal disability statutes," *Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 155 (2d Cir. 1998)*, the New York Court of Appeals "has interpreted the meaning of 'disability' under the NYSHRL to be broader than the meaning of 'disabled' under the ADA." *Shannon v. New York City Transit Auth., 332 F.3d 95, 104 n. 2 (2d Cir. 2003)*. Under the NYSHRL, "weight, in and of itself, does not constitute a disability for discrimination qualification purposes," but plaintiffs who [*44] are "medically incapable of meeting . . . weight requirements due to some cognizable medical condition" may be disabled. *Delta Air Lines v. New York State Div. of Human Rights, 91 N.Y.2d 65, 73, 689 N.E.2d 898, 666 N.Y.S.2d 1004, 1008 (1997)*. Moreover, "a cause of action based on disability discrimination remains viable even if the employer was not aware of any clinical diagnosis, as long as the condition existed." *Branson, 2004 U.S. Dist. LEXIS 22135, 2004 WL 2468610, at *4 (citing Hazeldine v. Beverage Media, 954 F. Supp. 697, 1997 WL 469597, at *10 (S.D.N.Y. 1997))*.

In this case, plaintiffs have adduced evidence that Spiegel suffers from "hypogonadism," and has low testosterone levels as a result. *See* Letter of Ian H. Levy, DO, dated Jan. 12, 2005 (Ex. N to the Grannis Declaration). However, as previously noted, Dr. Levy's letter does not state that this condition is related to Spiegel's weight problem, and plaintiffs have not produced any admissible evidence to that effect. Moreover, although Spiegel alleges that he has been unable to lose weight through exercise and sensible eating alone, Second Am. Complt. at P 30, there is no evidence that Spiegel is [*45] medically incapable of losing weight. Therefore, this Court does not find that plaintiffs have met the burden of establishing a *prima facie* case of discrimination against Spiegel under the NYSHRL.

Even assuming that plaintiffs could establish a *prima facie* case, however, plaintiffs have failed "to present evidence contradicting a well-presented legitimate reason, offered by the defendant, for the adverse employment action." *Branson, 2004 U.S. Dist. LEXIS 22135, 2004 WL 2468610, at *3*. Defendants have introduced evidence that Gravina, not defendants, fired Spiegel from the Bensonhurst Center because of "personality conflicts" between Spiegel and other, more essential employees. *See* Deposition of Vincent Gravina (Ex. H to Defendants' Memo) at 10. Specifically, Gravina testified that John Evensen, "[t]he instructor . . . that was basically running the classes and teaching all the classes," did not "get along at all" with Spiegel. *Id.* Indeed, Gravina testified that he "had to basically calm down the other instructor from sometimes wanting to kill" Spiegel. *Id.* at 11. Gravina's testimony was corroborated by that of Evensen himself, who testified that he had told Gravina, "I can't [*46] continue to work with him [Spiegel] anymore, so . . . either I leave or he leaves." Deposition of John Evensen (Ex. L to Defendants' Memo) at 9.

Plaintiffs have not adduced any admissible evidence to contradict this testimony or to show that Gravina's stated reasons for terminating Spiegel are pretextual. At his deposition, Spiegel testified that Gravina said he was firing Spiegel because of his weight and that he had been told to fire him. Deposition of Elliot Spiegel (Ex. B to Grannis Declaration) at 17, 37. However, this testimony was not only hearsay, but insufficient to establish that defendants had ordered the firing. According to Spiegel, Gravina never named the person or persons who had told him to fire Spiegel. *Id.* at 37. Rather, as is evident from the following exchange, Spiegel merely speculated that the person was Schulmann, not Evensen:

Q. You think the order came down from Schulmann above?

A. In my opinion, I think that may be it, yes.

*Id.* at 18. However, that assumption was inconsistent with Spiegel's own testimony that Schulmann "had no problem" employing Spiegel at a time when he weighed 300 pounds, *id.* at 10-11, and that Schulmann [*47] allowed Spiegel to be re-hired at Stamford almost immediately after the Bensonhurst termination. Deposition of Elliot Spiegel (Ex. B to Defendants' Reply Memo) at 22.

Spiegel's hearsay testimony and unsubstantiated speculation is insufficient to establish that Gravina's and Evensen's explanations for Spiegel's termination are pretextual. Accordingly, defendants' motion for summary judgment with respect to plaintiffs' second cause of action is granted.

Count III

Plaintiffs' third cause of action is almost identical to the second cause of action, except that it alleges that both defendants violated the NYCHRL, rather than the NYSHRL, by causing Spiegel to be fired from the Bensonhurst Center. Although claims brought under the NYCHRL are generally subject to the same analysis as claims brought under the NYSHRL and the ADA, "there are a few differences between the ADA and the state and city codes." *Greenberg v. New York City Transit Auth., 336 F. Supp. 2d 225, 248 (E.D.N.Y. 2004)*. In particular, the NYCHRL's definition of "disability" is "even broader" than that of the NYSHRL, encompassing "any physical, medical, mental or psychological impairment, or a history [*48] or record of such impairment." *Id.* (quoting N.Y. City Admin. Code *§ 8-102(16)(a)*).

Although Spiegel may be disabled under the NYCHRL and may be able to state a *prima facie* case under the Code, Spiegel's NYCHRL claim must nonetheless be dismissed. Like NYSHRL claims, NYCHRL claims are examined using the *McDonnell Douglas* burden-shifting analysis. *Id.* As noted in the preceding section, defendants have produced evidence to establish that Spiegel's termination was motivated by a legitimate, nondiscriminatory reason, but plaintiffs have not adduced evidence that Gravina's and Evensen's explanations for Spiegel's termination are pretextual. Therefore, defendants' motion for summary judgment is also granted with respect to plaintiffs' third cause of action.

Count IV

Plaintiffs' fourth cause of action alleges that UAK violated unspecified New York State defamation and privacy laws by using an altered photograph of Spiegel for advertising purposes either without having obtained his permission or without having obtained his permission to use the photograph "in the manner in which it was used." Second Am. Complt. at PP 70-71. Defendants argue that this cause of action [*49] must be dismissed because (1) Spiegel executed a written release granting UAK the right to use his photograph in any manner and (2) Spiegel cannot be identified in the photograph. Defendants' Memo at 9-10. In response, plaintiffs argue that the scope of Spiegel's consent presents a genuine issue of material fact which must be decided by the finder of facts. Plaintiffs' Memo at 21.

Although plaintiffs' pleadings do not specify the statutory basis for the fourth cause of action, both parties agree that this action is brought pursuant to *New York Civil Rights Law § 51*. *See* Defendants' Memo at 9; Plaintiffs' Memo at 21. That section provides that any person whose "portrait or picture" is used within New York State for advertising purposes without "written consent" may institute an equitable action for injunctive relief and damages. *N.Y. Civil Rights Law § 51*. Since "[t]he statute is designed to protect a person's identity, not merely a property interest in his or her 'name', 'portrait' or 'picture', . . . it implicitly requires that plaintiff be capable of identification from the objectionable material itself." *Cohen v. Herbal Concepts, Inc., 63 N.Y.2d 379, 384, 472 N.E.2d 307, 482 N.Y.S.2d 457, 459 (1984)*. [*50]

It is not necessary that a plaintiff's face be visible in an advertisement for the plaintiff to maintain an action under *§ 51. Id.* The statute bars "the improper use of a 'picture' of plaintiff which does not show the face." *Id.* However, if the plaintiff is not recognizable from the picture -- such as where the picture depicts only a hand or a foot without identifying features -- a *§ 51* privacy action cannot be sustained. *Id.*

The question of whether a photograph "presents a recognizable likeness is generally a jury question unless plaintiff cannot be identified because of the limited subject matter revealed in the photograph or the quality of the image." *Id.* However, "[b]efore a jury may be permitted to decide the issue, to survive a motion for summary judgment, plaintiff must satisfy the court that the person in the photograph is capable of being identified from the advertisement alone and that [the] plaintiff has been so identified." *Id.* It is unclear whether proof that third parties identified the plaintiff is required to surmount this hurdle; although the New York Court of Appeals does not appear to have directly addressed this issue, the *Cohen* Court [*51] noted that evidence that a plaintiff identified himself or herself "may be sufficient." *Id., 63 N.Y.2d at 385*, n. *, *482 N.Y.S.2d at 460*, n. *.

In this case, the evidence adduced by plaintiffs may be sufficient to raise a jury question as to whether the photograph of Spiegel's torso constitutes a "recognizable likeness." Plaintiffs have submitted an affidavit in which Spiegel implies that he recognized his torso in an advertisement promoting defendants' "Evolve" nutrition program and that Gravina, Schatzberg and other people in the Tiger Schulmann Karate organization told him that they recognized him and "mocked [him] because of it." Spiegel Aff. at P 2. Although Spiegel's testimony that other people recognized him may be inadmissible hearsay, his testimony concerning their mocking comments may be sufficient to prove circumstantially that they recognized him. Moreover, Spiegel's testimony that he recognized himself may, standing alone, be sufficient to establish that the image was recognizable as Spiegel. *See Cohen, 63 N.Y.2d at 385*, n. *, *482 N.Y.S.2d at 460*, n. *.

However, the evidence introduced by plaintiffs is not [*52] sufficient to create a genuine issue of fact concerning the scope of the consent. As the New York Court of Appeals has repeatedly noted, "a defendant's immunity from a claim for invasion of privacy is no broader than the consent executed to him." *Dzurenko v. Jordache, Inc., 59 N.Y.2d 788, 790, 451 N.E.2d 477, 464 N.Y.S.2d 730, 731 (1983)* (quoting *Shields v. Gross, 58 N.Y.2d 338, 347, 448 N.E.2d 108, 461 N.Y.S.2d 254, 258 (1983))*. Therefore, if there is a "limitation in the consent . . . as to time, form or forum, the use of a name, portrait or picture is without consent if it exceeds the limitation." *Id.*

The three cases cited in plaintiffs' responsive papers are all cases in which some sort of limitation existed in the consent. In *Manger v. Kree Inst. of Electrolysis, Inc., 233 F.2d 5 (2d Cir. 1956)*, for example, the plaintiff agreed in writing to have a specific letter and her photograph published in the defendant's magazine. The defendant thereafter

Case 1:05-cv-00495-JJF     Document 45-2     Filed 01/31/2007     Page 104 of 120

Page 15
2006 U.S. Dist. LEXIS 86531, *52

changed the letter without the plaintiff's permission. The Second Circuit found that the change was "so substantial as to vitiate her written consent," and therefore found that the trial court had correctly allowed [*53] the plaintiff's *§ 51* claim to go to the jury. *Id. at 8.*

In *Russell v. Marboro Books, 18 Misc.2d 166, 183 N.Y.S.2d 8 (Sup. Ct. N.Y. County 1959)*, a professional photographer's model signed a release consenting to the unrestricted use of a particular photograph. The defendant thereafter used an altered version of the photograph in an objectionable advertisement. The court noted that this photo, if "altered sufficiently in situation, emphasis, background or context, . . . would no longer be the same portrait, but a different one." *Id., 18 Misc.2d at 182, 183 N.Y.S.2d at 27.* The court thus held that "although the plaintiff consented in writing to the use of her portrait for advertising purposes . . ., it does not follow that the consent signed by the plaintiff goes beyond its wording so as to exculpate, as a matter of law, the dissemination of all types of altered pictures . . . ." *Id., 18 Misc.2d at 182, 183 N.Y.S.2d at 27-28.*

Similarly, in *Carlson v. Hillman Periodicals, Inc., 3 A.D.2d 987, 163 N.Y.S.2d 21 (App. Div. 1st Dep't 1957)*, a model executed a consent which gave the defendant "the right to [*54] publish a photograph of the plaintiff in a manner which is 'composite or distorted in character, or form.'" *Id., 3 A.D.2d at 987, 163 N.Y.S.2d at 21.* Thereafter, the defendant had the photograph retouched to remove the plaintiff's hair. The court could not determine from the consent itself whether the parties intended to permit the defendant to use the photograph in that manner, and therefore held that testimony could be introduced to aid in construction of the written consent.

In this case, plaintiffs concede that Spiegel signed a "general release" at the time he began participating in a weight-loss program. Plaintiffs' Memo at 22. Plaintiffs allege that Spiegel understood that his photograph would be used to show his torso before entry into the program, and that he neither agreed to alteration of the photograph nor anticipated that it would be used in any other way. *Id.* However, the release which Spiegel signed contained no such limitations. Rather, the consent signed by Spiegel provides:

> That he . . . may be photographed, cast, involved and/or portrayed in what is defined below as Promotional Material, to be broadcast and/or otherwise disseminated into [*55] the public domain by TSK. The undersigned hereby agrees and consents for all purposes, to the sale, reproduction and/or *use in any manner* of any and all photographs, videos, films, audio, or any depiction or portrayal of the undersigned or his . . . likeness and/or voice whatsoever, with or without the use of the undersigned's name (hereinafter, "Promotional Material") by TSK and by any nominee or designee of TSK, including without limitation, any agency, client, periodical or other publication, in all forms of media and in all manners, including without limitation advertising, trade, display, editorial, art and exhibition.

Defendants' Memo, Ex. M (emphasis added).

Unlike the releases in *Manger, Russell* and *Carlson,* this release does not relate to a single photograph or document, much less contain any language limiting the use of that photograph or document. To the contrary, the release expressly provides that Spiegel may be "photographed," and that any photographs taken of Spiegel may be used "in any manner." Since there is no question as to very broad scope of Spiegel's written consent, there is no genuine issue of material fact to be determined by a jury. Spiegel [*56] is not entitled to relief under *New York Civil Rights Law § 51,* and defendants' motion for summary judgment with respect to Count IV is, therefore, granted.

Counts V, VI, and IX

Plaintiffs' fifth and sixth causes of action both allege retaliation in violation of *42 U.S.C. § 12203.* This section of the ADA provides, *inter alia,* that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *42 U.S.C. § 12203(a).* Plaintiffs allege that defendants violated this section by (1) filing a frivolous lawsuit against Spiegel in Connecticut state

court (Count V) and (2) refusing to pay Spiegel's "qualifying medical expenses" (Count VI).

Claims of retaliation under the ADA are analyzed using the same *McDonnell Douglas* burden-shifting framework discussed above. *See, e.g., Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).* Under that framework, [*57] a plaintiff has the initial burden of establishing a *prima facie* case of retaliation by showing (1) that the plaintiff engaged in a activity protected by the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse employment action against the plaintiff; and (4) that a causal connection exists between the alleged adverse action and the protected activity. *See id.* A plaintiff's burden at this *prima facie* stage is *de minimis. Id.*

In this case, defendants raise two arguments suggesting that plaintiffs have not met their initial burden because they have not proved the third of the four elements listed above. First, defendants argue, under the broad heading that "the entire complaint must be dismissed as it fails to state a prima facie case for liability against the defendants," that Spiegel has never been employed by either defendant. Defendants' Memo at 3-4. Second, defendants argue that they are not parties to the Connecticut lawsuit, which was brought in the name of Stamford Karate, Inc., and that they, therefore, did not take any adverse action against Spiegel. Defendants' Memo at 10-11. Plaintiffs respond by arguing, *inter alia,* [*58] (1) that a lawsuit can be an adverse employment action for purposes of the ADA and (2) that defendants may be held liable because they caused the lawsuit to be brought against Spiegel. Plaintiffs' Memo at 17-18.

Preliminarily, this Court notes that even if Spiegel were bringing these ADA retaliation claims against his employer, plaintiffs might not be able meet the burden of showing a *prima facie* case as to Count V. Plaintiffs do not cite, and this Court's independent research has not found, any Second Circuit caselaw to support the proposition that an employer's lawsuit against a former employee can constitute an "adverse employment action." While plaintiffs have cited to cases from other circuits for this proposition -- *e.g., Ward v. Wal-Mart Stores, Inc., 140 F. Supp. 2d 1220 (D.N.M. 2001); E.E.O.C. v. Levi Strauss & Co., 515 F. Supp. 640 (N.D.Ill 1981);* and *E.E.O.C. v. Virginia Carolina Veneer Corp., 495 F. Supp. 775 (W.D. Va. 1980)* -- they fail to note that there are also courts which have declined to hold that a post-termination lawsuit can be an adverse employment action. *See, e.g., Hernandez v. Crawford Bldg. Material Co., 321 F.3d 528* [*59] *(5th Cir.), cert. denied, 540 U.S. 817, 124 S. Ct. 82, 157 L. Ed. 2d 34 (2003)* (holding that an employer's counterclaim against the plaintiff was not actionable retaliation under Title VII or the ADEA).

Although there is a substantial question as to whether the rationale underlying *Hernandez* and other, similar cases is still valid in the wake of the Supreme Court's recent decision in *Burlington Northern & Santa Fe Ry. Co. v. White, U.S.    , 126 S.Ct. 2405, 165 L. Ed. 2d 345 (2006),* n8 this Court need not address this conflict or predict what position the Second Circuit would take. Even assuming that plaintiffs could establish that an *employer's* post-termination, frivolous lawsuit could constitute an "adverse employment action," plaintiffs have not cited any persuasive caselaw, or advanced any theory, in support of the proposition that individuals -- much less individuals who are not the employer -- can be liable under the ADA for retaliatory lawsuits. The only case cited by plaintiffs in support of this proposition -- *Martinez v. Deaf County Grain Processors, Inc., 583 F. Supp. 1200 (N.D. Tex. 1984)* -- did not involve Title VII or ADA retaliation claims, [*60] but involved allegations that a corporation had filed a lawsuit against a farm worker to retaliate for the worker's having filed an action pursuant to the Fair Labor Standards Act ("FLSA") and the Farm Labor Contractor Registration Act ("FLCRA"). Although the farm worker had been hired by one Skiles, the principal owner, manager and supervisor of the corporation, the court found, "based on the totality of the circumstances and the economic realities of [the] Plaintiff's employment," that the corporation was the plaintiff's "employer." *Id. at 1203.* The *Martinez* court then reasoned, based in part on *Levi Strauss* and *Virginia Carolina Veneer,* that the corporation's lawsuit could constitute retaliation under the FLSA and FLCRA. *Id. at 1208-09.*

n8 The decision in *Hernandez* was based on the Fifth Circuit's very narrow definition of "adverse employment action," which required plaintiffs to show that their employer subjected them to an "ultimate employment decision." *See Hernandez, 321 F.3d at 531.* Under that standard, actionable retaliatory conduct was limited to acts "such as hiring, granting leave, discharging, promoting, and compensating." *White, 126 S.Ct. at 2410* (quoting *Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997)).* However, the Supreme

Case 1:05-cv-00495-JJF    Document 45-2    Filed 01/31/2007    Page 106 of 120

Page 17
2006 U.S. Dist. LEXIS 86531, *60

Court's June 2006 opinion in *White* abrogated *Mattern* and similar cases, holding that retaliation claims were not limited to acts affecting employment or altering the conditions of employment. *Id. at 2412*. It is, therefore, unclear whether the Fifth Circuit would adhere to its holding in *Hernandez,* or join those courts which have defined "adverse employment action" more broadly and have held that a frivolous post-termination lawsuit can constitute such action. *See, e.g., Berry v. Stinson Chevrolet, 74 F.3d 980 (10th Cir. 1996)* (finding actionable retaliation where employer filed false criminal charges against former employee who had complained about discrimination).

[*61]

In this case, plaintiffs assert that Schulmann, a principal of Stamford Karate, approved Hunko's decision to hire Spiegel. Even assuming that Schulmann did so, however, there is nothing to suggest that Spiegel ever became Schulmann's employee, rather than an employee of Stamford Karate. The *Martinez* opinion, which did not explore the question of whether Skiles could be held personally liable for his corporation's actions, does not suggest any theory for holding Schulmann personally liable for Stamford Karate's lawsuit.

*Martinez* is also distinguishable in that it involved allegations of retaliation under the FLSA and FLCRA, not Title VII or the ADA. "It is well settled that an individual may not be held personally liable under the ADA," even on retaliation claims. *King v. Town of Wallkill, 302 F. Supp. 2d 279, 295 (S.D.N.Y. 2004)*. Thus, even if *Martinez* had held that Skiles could be liable for retaliation in connection with his corporation's lawsuit, this would not support the proposition that Schulmann could be individually liable under the ADA for similar acts.

Although this Court has previously held that Schulmann is the only defendant over which it [*62] has personal jurisdiction, the Court notes that plaintiffs have adduced no evidence that UAK was involved in the decision to file the Connecticut lawsuit. This lawsuit was unquestionably brought in the name of Stamford Karate, Inc., *see* Defendants' Memo, Ex. N, and plaintiffs have not introduced any evidence to suggest that UAK directed the filing of the lawsuit. Indeed, plaintiffs' own theory is that the Connecticut lawsuit "was in fact instigated by Schulmann." Plaintiffs' Memo at 19.

Similarly, with respect to Count VI -- alleging that defendants retaliated against Spiegel in violation of the ADA by denying his medical claims -- plaintiffs have not introduced any evidence to suggest that defendants were in any way involved in the alleged retaliation. Defendants have produced evidence that all decisions regarding payment of Spiegel's medical claims were made by a health insurance carrier -- not defendants -- and that Spiegel was not paid upon the disputed claims because he had not yet met the $ 500 deductible. Affidavit of Penelope Kousis dated Sept. 8, 2005 (Ex. O to the Defendants' Memo) at PP 3-4. Although plaintiffs' pleadings allege that UAK pays some medical claims itself, [*63] *see, e.g.,* Second Am. Complt. at P 85, and implies that the unpaid medical claims were among those for which UAK was self-insured, *id.* at P 90, plaintiffs have not introduced any evidence to substantiate these allegations.

Plaintiffs' ninth cause of action, which alleges that defendants violated ERISA and COBRA, are based on the same factual allegations which underlie Count VI. Accordingly, defendants are awarded summary judgment with respect to Count IX, as well as Counts V and VI.

Counts VII and VIII

Plaintiffs' two remaining causes of action allege that defendants retaliated against plaintiffs in violation of the NYSHRL and NYCHRL by, among other things, filing the Connecticut lawsuit against Spiegel. Under *28 U.S.C. § 1367(c)*, this Court may decline to exercise supplemental jurisdiction over these claims if (1) they raise "a novel or complex issue of State law," (2) these claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction," (3) this Court "has dismissed all claims over which it has original jurisdiction," or (4) "in exceptional circumstances, there are other compelling [*64] reasons for declining jurisdiction." As discussed below, claims included within Counts VII and VIII fit within at least two, and possibly three, of these subsections.

Accordingly, this Court declines to exercise pendant jurisdiction over them.

First, these counts appear to raise an issue of first impression: whether defendants' allegedly frivolous Connecticut lawsuit against Spiegel can serve as a basis for a retaliation claim under either the NYSHRL and NYCHRL. Plaintiffs have not cited, and this Court's independent research has not found, any New York State cases addressing this issue. This issue is not only novel, but unquestionably complex. For this reason alone, it is appropriate that this Court not exercise supplemental jurisdiction over Counts VII and VIII. *See 28 U.S.C. § 1367(c)(1).*

Second, this Court has granted defendants' motion for summary judgment with respect to all federal claims. In deciding whether to exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state law claims, this Court must "consider and weigh . . . the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988).* [*65] "When the balance of these factors indicates that a case properly belongs in state court, . . . the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* However, the Second Circuit "has held, as a general proposition, that if [all] federal claims are dismissed before trial . . ., the state claims should be dismissed as well." *Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004), cert. denied, 544 U.S. 1044, 125 S. Ct. 2270, 161 L. Ed. 2d 1080 (2005)* (internal quotations and emphasis omitted).

Since all federal claims in this case have now been dismissed, this Court deems it appropriate to decline to exercise supplemental jurisdiction. In so doing, this Court is cognizant that "when the dismissal of the federal claim[s] occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair." *Id., 388 F.3d at 56* (internal quotations omitted; bracketed material added). However, the rejection of supplemental jurisdiction at this juncture is not belated. [*66] Although Judge Ross decided a motion to dismiss counts of the original complaint, Counts VII and VIII first appeared in the Second Amended Complaint, which was filed after Judge Ross decided the motion to dismiss. Accordingly, this Court has not had a previous opportunity to consider whether to exercise supplemental jurisdiction over these two causes of action.

Moreover, rejection of supplemental jurisdiction in this case is not only fair, but necessary. These two claims present exceptional circumstances which compel the decision to decline to exercise jurisdiction. In asserting that the Connecticut lawsuit was retaliatory, both claims implicitly assert that the state action was frivolous and brought solely to retaliate against Spiegel for pursuing his employment discrimination claims. Assuming, *arguendo,* that these facts even state a retaliation claim under the NYSHRL or NYCHRL, determination of the claims will necessarily require a determination of the merits of the Connecticut action. That determination could be inconsistent with, and undercut, the determination of the state court addressing the very same issue. Accordingly, this Court, in its discretion, elects not to exercise [*67] discretion over Counts VII and VIII.

Plaintiffs' Motion to Further Amend their Pleadings

At the same time defendants filed the above-discussed motion for summary judgment, plaintiffs filed a cross-motion pursuant to *Fed. R. Civ. P. 15(a)* and *20* to further amend their complaint in order to add a new defendant, TSK Franchise Systems, Inc. ("TSK"). In their memorandum of law in support of this motion, plaintiffs assert that "UAK was in effect replaced" by TSK in 2002, after the New York State Attorney General brought suit against UAK for "operating franchises illegally." Plaintiffs' Memorandum of Law in Support of Motion for Leave to Amend at 1. Although plaintiffs assert that they did not learn that TSK had replaced UAK until "the last day of discovery," *id.* at 2, plaintiffs do not seek to conduct further discovery with respect to TSK. To the contrary, plaintiffs represent that TSK's liability "stem[s] directly from the same findings of law and fact regarding the alleged discriminatory actions required to impose liability on the current Defendants," and that "[p]laintiffs are asserting no [*68] claims against TSK that have not already been asserted against . . . UAK." *Id.* at 5. True to these representations, plaintiffs' proposed Third Amended Complaint (Ex. A to the Declaration of Eric J. Grannis in Support of Plaintiffs' Motion for Leave to Amend or Join an Additional Defendant) adds virtually no new factual allegations, aside from a paragraph making the same jurisdictional

allegations with respect to TSK as are made with respect to UAK. *See* Proposed Third Am. Complt. at P 7.

Although *Rule 15(a)* specifically provides that "leave shall be freely given when justice so requires," district courts have discretion to deny leave "where amendment would be futile." *In re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187, 220 (2d Cir. 2006)* (citing *Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91-92 (2d Cir. 2003)).* Since plaintiffs contend that TSK has effectively replaced UAK, it would obviously be futile for this Court to grant leave to amend the pleading after granting defendants' motion for summary judgment as to all claims against UAK. Accordingly, plaintiffs' motion for leave to further amended their pleadings is denied.

CONCLUSION [*69]

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to Counts I, II, III, IV, V, VI and IX of the Second Amended Complaint. This Court declines to exercise supplemental jurisdiction with respect to Counts VII and VIII and, therefore, these two counts are dismissed without prejudice to raising these claims in state court. *See 28 U.S.C. § 1367(c).* n9 Plaintiffs' cross-motion to further amend their pleadings in order to add a new defendant is denied. The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order and to close this case.

n9 By operation of *28 U.S.C. § 1367(d)*, the period of limitations for these claims has been tolled during the pendency of this action, and shall be tolled for at least 30 days from the date of this Memorandum and Order.

**SO ORDERED.**

SANDRA L. TOWNES

United States District Judge

Dated: Brooklyn, New York

November 30, 2006

LEXSEE

**State ex rel, Board of Pension Trustees, et al v. Dineen**

**Civil Action No. 5882**

**Court of Chancery of Delaware**

**1981 Del. Ch. LEXIS 496**

**October 9, 1981, Submitted**
**October 29, 1981, Decided**

**CORE TERMS:** unused, vacation, sick leave, pension, retired, retirement, entitled to receive, accumulated, retire, years of service, termination of employment, reported decision, terminated, right to receive, service pension, compensated, termination, covered employment, discharged, suspension, employing, withdrawn, entitle, voluntary retirement, distinguishable, accorded, accrued, accumulated sick leave, mandatory retirement, vacation time

**COUNSEL:** [*1]

W. Harding Drane, Jr., Esquire, Department of Justice, 820 French Street, Wilmington, Delaware 19801; Don C. Brown, Esquire, Department of Justice, 820 French Street, Wilmington, Delaware 19801; Peter M. Sieglaff, Esquire, Potter, Anderson & Corroon, Post Office Box 951, Wilmington, Delaware 19899; P. Clarkson Collinson, Jr., Esquire, Morris, James, Hitchens & Williams, Post Office box 2306, Wilmington, Delaware 19899

**OPINION BY:**

BROWN

**OPINION:**

GROVER C. BROWN, VICE-CHANCELLOR

UNREPORTED OPINION

This constitutes the last facet of this case. It was previously held that although the defendant Dineen had been terminated from his public employment for cause, he was nonetheless entitled to receive his State pension based upon his 35 years of service with the State. State ex rel. State Bd., Etc. v. Dineen, Del.Ch., 409 A.2d 1256 (1979). The remaining issue is whether or not Dineen is also entitled to be compensated for such unused vacation and sick leave time as had been accumulated by him prior to the date of his involuntary termination. The matter is before the Court on summary judgment motions based upon a stipulated set of facts.

I shall not recite the facts giving rise to [*2] Dineen's termination of employment. The parties are familiar with them and they are set forth in the foregoing reported decision. Suffice it to observe that Dineen was terminated after pleading guilty to criminal misconduct in office. At the time he had more than 30 years of service with the State and thus was eligible for voluntary retirement with pension under 29 Del.C. § 5522. At the time of his discharge he had accumulated 107 unused vacation days with the School District by which he was employed. He had also accumulated more than 90 unused sick leave days.

The accumulated vacation leave represented days which Dineen had actually worked for the School District rather than taking vacation to which he was otherwise entitled. Under the controlling statute, cited hereafter, 90 days is the maximum number of sick leave days for which a State employee may be paid upon retiring from service. It is stipulated by the parties that the value of the 107 vacation days is $20,014.35 and that the value of 90 days of sick leave accumulated by Dineen would be $4,313.80. * It is further stipulated between the parties that if Dineen was entitled to receive payment for either, [*3] such payment should have been made on January 1, 1979.

---

* The reason for the disparity between the two figures apparently derives from the formula contained in 14 Del.C. § 1318(g) which values sick leave on a discounted basis for the purpose of post-employment compensation.

Taking first the matter of the unused vacation leave, I find on the facts and arguments presented that Dineen is entitled to be paid for the full 107 days. Dineen's contract with his employing School Board provided that he was entitled to receive all fringe benefits afforded to other professional employees of the School District, including vacation days. He worked those days over the years as opposed to taking them. The School Board indicated that it was proper and necessary for him to have done so and it submitted a voucher to the State for payment.It was the policy and practice of the School District to pay its professional employees for unused vacation leave upon termination of employment, and in terminating Dineen the School Board made no effort to forfeit such entitlement.

In fact, the State does not dispute any of the foregoing. Rather, it relies on the argument that Dineen waived [*4] his right to be paid for the vacation time. This argument is based on the fact that following his guilty plea to the criminal charge, and pending a termination by his employing School Board as to what action it might take as a result, Dineen's counsel directed a letter to the School Board in which it was stated as follows:

"It is my understanding that Mr. Dineen has been suspended with pay from his present position pending disposition of the criminal charges. Mr. Dineen does not wish to be paid for services that he does not render to the County Board. I have been advised that he has accumulated more than 100 vacation days, and I have been authorized by Mr. Dineen to request that the period of suspension be treated as vacation for as long as Mr. Dineen remains entitled to accumulated vacation days."

The State argues that this amounted to an intentional relinquishment of a known right on the part of Dineen, and that since a waiver is referable to the act or conduct of one party only, Dineen's request constituted a deliberate waiver of payment as to any accrued vacation leave, citing Hirzel v. Silker, Del.Supr., 156 A.360 (1930); Nathan Miller v. Northern Insurance [*5] Company of New York, Del.Super., 39 A.2d 23 (1944).

I cannot follow this line of reasoning for the simple reason that the employing School Board did not honor Dineen's request. It continued his suspension. It did not treat his suspension as vacation time. Dineen states that he did not want the stigma of being suspended, and for this reason made the request. However, the School Board did not accept his offer.

Intention is the foundation of the doctrine of waiver and such intention must clearly appear from the facts. George v. Frank A. Robino, Inc., Del.Supr., 334 A.2d 223 (1975). Here, Dineen clearly did not intend to waive the value of his unused vacation leave. He offered to trade it to the School Board if it would agree not to continue his suspension. The School Board chose not to do so. That is the long and the short of it. There was no waiver.

As the sick leave question, it is another matter. The parties agree that a determination of the question involves a consideration of 14 Del.C. § 1318(g) which reads as follows:

"An employee retired subsequent to June 1, 1969, after serving in covered employment under Chapter 55 of Title 29, shall, [*6] on retirement be paid for each unused sick leave day, not to exceed 90 days." (Emphasis added.)

The State argues that Dineen does not qualify under this statute for the simple reason that he did not retire. Rather, he was discharged for cause. Since the General Assembly has spoken on the subject, there is no basis for compensating him for unused sick leave except as found in the statute. Since Dineen did not retire as required by the statute, the State concludes that he has no claim to be paid for accumulated sick leave.

Dineen contends, however, that he served in covered employment for more than 30 years and that he has been found by this Court to be entitled to receive a pension based upon such service just as though he had taken voluntary retirement. He argues, based on the rationale of the prior reported decision in this case, that if he has not forfeited his right to receive a pension, he cannot be held to have forfeited his right to receive what others qualifying for a retirement pension are entitled to receive along with it. He relies further on a 1971 Attorney General's opinion which concluded, in effect, that any employee who terminates his State employment under [*7] circumstances which would entitle him immediately to receive a pension is "retired" within the meaning of § 1318(g) and is therefore entitled to be compensated for accumulated sick leave up to 90 days. (I note, however, that the Attorney General's opinion was rendered with regard to the statute compelling mandatory retirement at a specified age, and that it did not consider the situation presented here.)

Thus, for the purpose of § 1318(g), the State would limit the words "retired" and "on retirement" to cover a voluntary termination of employment by the employee under conditions which would entitle him to then receive a service pension, as opposed to a discharge for cause by the State agency. Dineen, on the other hand, would construe the terms to refer to anyone who is entitled to receive a service pension, regardless of how the termination of employment came about.

It is, of course, an accepted principle of law that language in a statute must be accorded its ordinary meaning unless the context dictates otherwise. Moore v. Chrysler

1981 Del. Ch. LEXIS 496, *

Corporation, Del.Supr., 233 A.2d 53 (1967); Haddock v. Board of Public Education in Wilmington, Del.Ch. 84 A.2d 157 (1951).

With [*8]  this in mind, the problem here, in one sense, presents a neat little exercise in the use of the English language, and one which, I am somewhat chagrined to admit, may be more than I can fathom given the years that have passed since my days of grammatical schooling.  However, I set forth the elements.

The key words in the statute are "retired" and "retirement." Unfortunately, they are subject to a fluctuating meaning.In Webster's Third New International Dictionary the word "retired," an adjective, is defined as "withdrawn from active duty or business; having concluded one's working or professional career." The word "retirement," a noun, is defined as "an act of retiring or state of being retired." In addition, the word "retire," when used as an intransitive verb in the sense of not having a direct object, means "to withdraw from office, public station, business, occupation or duty." However, when used as a transitive verb, i.e., characterized by having or containing a direct object, the term is defined to mean "to cause to retire." Thus, the terms can refer either to one's own voluntary act in withdrawing from employment or to a conclusion of employment brought [*9]  about by another.

To add to the problem § 1318(g) does not presently appear in the Delaware Code in the Form in which it was originally enacted by the General Assembly.  The statute came into being in 1969 by virtue of 57 Del.L. Ch. 238. As enacted, the first sentence read as follows:

"In the case of an employee to be retired subsequent to June 1, 1969, after serving in covered employment under provisions of Title 29, Chapter 55, Delaware Code, payment shall be made for each unused sick leave day, not to exceed 90 days, upon retirement." (Emphasis added.)

In a subsequent amendment found at 58 Del.L. Ch. 120 this identical language was retained.  I can find no other separate act of the General Assembly whereby this language was changed.  Had it remained in this form, I feel that it might add support to Dineen's argument since it would seem to cover an employee who was relegated to pension status by the act of another as well as by his own voluntary act.

However, as now included in the 1974 Delaware Code, the first sentence of § 1318(g) has been completely rearranged and it no longer contains the words "to be retired." It has been held that the 1974 Revised [*10] Delaware Code, as adopted by the General Assembly, constitutes the positive law of this State as opposed to being a mere compilation of existing statutes. Roy v.

Williams, Del.Supr., 382 A.2d 1351 (1978). See also, Monacelli v. Grimes, Del.Supr., 99 A.2d 255 (1953). Thus, the language as it now appears in § 1318(g) of the 1974 Revised Code constitutes the law which must be applied even though I doubt seriously that any substantive legislative intent can be ascribed to the change in wording that has resulted.  At the same time, we must work with what we have, and on that basis I find that Dineen's argument must fail.

I am not truly certain as to how the word "retired" is used in the statute as it presently exists.  I presume that it is used as an adjective, which, from a grammatical standpoint, provides little assistance.  but I find it unnecessary to pursue the matter further because I feel that Dineen's argument attempts to equate the term "retirement" with the right to receive a service pension, a linkage which is neither required nor acceptable in the context of matters.   This is so because under the pension statutes, one becomes eligible to receive a service [*11] pension after he has terminated employment and has either the necessary years of service or the necessary combination of years of service plus the attainment of the required age.   Moreover, a former employee with a vested pension right is entitled to receive a pension upon reaching the required age.  See 29 Del.C. § 5522.

Thus age and years of service govern the right to receive a pension, nd not the manner in which the cessation of employment came about.  This is basically the holding of the prior reported decision in this case.  Thus, the entitlement to compensation for unused sick leave under § 1318(g) must derive solely from that statute.

This brings us back to the meaning to be accorded the term "retirement" as used in the statute.  In the legal sense it has been held to be distinguishable from a termination for cause.  In Jacobs v. New Jersey State Highway Authority, N.J. Supr., 255 A.2d 266, 268 (1969) the New Jersey Supreme Court made the following observation:

"Retirement from employment has a connotation different from discharge.  The former ordinarily signifies voluntary withdrawal.  The latter compulsory dismissal."

And in Brown v. Little, Brown [*12]  & Co., Mass.Supr.Jud., 168 N.E. 521, 526 (1929) the word "retire," as there used in the intransitive sense, was given legal effect as follows:

 "When thus used it means voluntary withdrawal and not compulsory discharge.  This is the consensus of opinion among lexicographers as to its signification.  Often it carries the implication of recognition of honorable service.  It is the antithesis of enforce resignation.

It is not synonymous with 'expel,' 'remove,' 'dismiss,' or words of similar import."

Also, In State v. Levine, Conn. Super., 145 A.2d 378, 379 (1958) it was observed that in the popular sense "to retire means that at least part of the motive power creating the resulting situation originated in the person whose status is changed."

Accordingly, while it is not altogether free from doubt, I feel that the most sensible interpretation of § 1318(g) is that a retired employee who is entitled to be compensated for unused sick leave "on retirement" is one who either terminates his employment voluntarily so as to thereby take his pension under 29 Del.C. Ch. 55 or one whose employment is terminated through no fault of his own under conditions which entitle him [*13] to a pension (mandatory retirement at a prescribed age being one example). In my view, the statute does not warrant a construction that would afford the same benefit to one who has been discharged from State service for cause.

Since Dineen was discharged for cause here as a result of his criminal misconduct, I conclude that he is not entitled to payment for his accrued and unused sick leave under 14 Del.C. § 1318(g). I hasten to point out that this ruling does not amount to a forfeiture of something to which he was otherwise entitled. Rather, it is a ruling that he does not qualify for payment of the benefit provided by the statute.

The only remaining issue is whether Dineen is entitled to receive interest on the value of his unused vacation pay dating from January 1, 1979. I hold that he is. My reason is the same as expressed in the prior reported decision in which it was held that Dineen was entitled to interest on his unpaid pension payments. I find the intervening decision in Department of Health and Social Services v. Crossan, Del.Supr., 424 A.2d 3 (1980) to be distinguishable since the rationale there was based on the construction of a statute and [*14] not on the contractual obligation of the State.

As to Dineen's request for an allowance of counsel fees and attendant expenses, it is considered withdrawn, and appropriately so, in light of the recent decision of the Delaware Supreme Court in Wilmington Medical Center, Inc. v. Severns, Del.Supr., 433 A.2d 1047 (1981).

Judgment will be entered in favor of Dineen in the amount of value of the unused vacation leave, with interest from January 1, 1979. Judgment will be entered in favor of the State on the unused sick leave issue. The application for counsel fees and expenses is considered withdrawn. An appropriate form of order may be submitted.

4 of 49 DOCUMENTS

**CLIFFORD D. SYKES, Appellant v. BLOCKBUSTER VIDEO; VIACOM**

**No. 06-1745**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 28424*

**November 15, 2006, Submitted Under Third Circuit LAR 34.1(a)**
**November 15, 2006, Filed**

**NOTICE:** **[\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the District of New Jersey. (D.C. No. 04-cv-06260). District Judge: Honorable Dennis M. Cavanaugh. *Sykes v. Blockbuster Inc., 2006 U.S. Dist. LEXIS 4720 (D.N.J., Feb. 2, 2006)*

**COUNSEL:** CLIFFORD D. SYKES, Appellant, Pro se, Edgewood, MD.

For BLOCKBUSTER VIDEO; VIACOM, Appellees: Eric S. Lasky, Morgan, Lewis & Bockius, Princeton, NJ.

**JUDGES:** Before: FISHER, ALDISERT and WEIS, Circuit Judges.

**OPINION:** PER CURIAM

Clifford D. Sykes appeals the order of the United States District Court for the District of New Jersey dismissing his Title VII complaint against Blockbuster Video and Viacom. The court dismissed his complaint because he failed to serve the defendants within the 120-day period required under *Federal Rule of Civil Procedure 4(m)*. We will affirm.

Sykes filed his complaint in the District Court on December 21, 2004, with an application to proceed in forma pauperis. The District Court granted Sykes' application, ordered the clerk to issue summonses, and directed Sykes to serve each defendant with **[\*2]** the summons and complaint in accordance with *Fed. R. Civ. P. 4*. The District Court clerk issued the summonses on January 13, 2005, but apparently, Sykes never received the mailed summonses because he had moved. (He filed a notice of change of address with the Court on March 28, 2005.) In his notice of appeal, he states that he nonetheless picked up the summonses in person "from the court clerk in February 2005."

Since he filed his complaint on December 21, the 120-day period would have expired on April 20, 2005. Sykes served Blockbuster with a copy of the summons (but apparently not a copy of the complaint) on May 16, 2005, which was 26 days beyond the *Rule 4(m)* deadline. He served Viacom on August 25, 2005, four months after the deadline. Blockbuster and Viacom filed motions to dismiss the actions based on Sykes's failure to effect proper service.

*Fed. R. Civ. P. 4(m)* provides that if service of the summons and complaint is not made within 120 days after the filing of the complaint, the court "shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specific **[\*3]** time." Id. If the plaintiff shows good cause for the failure, the court shall extend the time for service. Id. Generally, we have plenary review over issues concerning the propriety of service under *Rule 4*. *McCurdy v. American Bd. of Plastic Surgery, 157 F.3d 191, 194 (3d Cir. 1998)* (citing *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 481 (3d Cir. 1993))*. We review decisions of whether good cause exists to extend the 120-day period under *Rule 4(m)* under an abuse of discretion standard. *Ayres v. Jacobs & Crumplar, P.A., 99 F.3d 565, 570 n.4 (3d Cir. 1996)*.

2006 U.S. App. LEXIS 28424, *3

Here, Sykes clearly failed to serve appellee Viacom within 120 days of filing his complaint, as required under *Rule 4(m)*. It is also clear that he failed to serve appellee Blockbuster within the 120-day period. n1 Under *Rule 4(m)*, unless there was some good cause for Sykes' failure to comply with the rule, the District Court was compelled to dismiss the action. See *id*.

> n1 This is true, regardless of the time-frame used to calculate the 120-day period under *Rule 4(m)* here. Sykes argues in a document construed as his Reply Brief that, for purposes of *Rule 4(m)*, the 120 days should be calculated from January 13, 2005, the date that the District Court filed the January 4, 2005 order granting him in forma pauperis status. Setting aside for the moment that this belated argument was not presented to the District Court in the first instance and we will not entertain it, we would point out that this argument would only minimize the number of days that he tardily served the complaint; it would not cure his failure altogether to serve the complaint in accordance with the 120-day period under *Rule 4(m)*.

[*4]

Sykes never responded to the defendants' motions to dismiss, n2 nor did he ever file a motion to enlarge the time for serving the defendants under *Rule 4(m)*. The District Court appropriately granted the unopposed motions to dismiss, after determining that there was not good cause for the failure to comply with *Rule 4* under the facts that were before the court.

> n2 Sykes submitted a letter to the District Court approximately five weeks after Blockbuster filed its motion to dismiss, but that letter did not respond to the motion to dismiss, and instead provided additional information regarding the substance of his Title VII allegations.

It is only on appeal that Sykes has attempted to explain why he did not comply with the federal rules for service, but once again, his explanations have come too late because he never gave the District Court the opportunity to consider them. See *Harris v. Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994)* (explaining that this

court will not consider issues raised for [*5] the first time on appeal). n3 They are meritless, in any event. In his notice of appeal, Sykes claims that he did not receive a copy of the January 4, 2005 order directing him to serve the papers in accordance with *Rule 4*. However, a litigant's compliance with the Federal Rules of Civil Procedure is expected whenever he or she files a lawsuit in federal court. That Sykes did or did not receive the District Court's January 2005 order which directed him to comply with *Rule 4* is irrelevant; he was still expected to comply with the rules of procedure, as are all litigants, whether they are represented by counsel or not. The District Court correctly found that Sykes's ignorance of the rules would not provide good cause to excuse his failure to serve the defendants within the time allotted under the rules. See *Kersh v. Derozier, 851 F.2d 1509, 1512 (5th Cir. 1998)* (pro se plaintiff's ignorance of service rules does not constitute good cause); cf. *Lovelace v. Acme Markets, Inc., 820 F.2d 81, 84 (3d Cir. 1987)* (inadvertence of counsel does not constitute good cause for failure to timely serve defendants under former *Rule 4(j)*).

> n3 Sykes does not make any arguments with respect to the timeliness of service on Viacom in his brief on appeal.

[*6]

In his appellate brief, Sykes also claims that the summonses were reissued on March 18, 2005, presumably arguing that the 120-day period should have been measured from that date. (This is apparently an alternative argument to his claim that he picked up the summonses by hand in February 2005.) His contention that the 120-day deadline should have commenced when the summonses were reissued in March, apparently at his request, fails once again because the rule specifies that the 120-day period begin when the plaintiff files the complaint-not when summonses are issued.

Finally, Sykes maintains that his non-compliance with the rules was not deliberate, but merely a product of his not having a permanent address during the pertinent time. We recognize that Sykes apparently had difficulty receiving mail because he did not have a permanent address during the relevant period of 2005, but this situation has no bearing on the issue here. By his own admission, Sykes picked up the summonses by hand in February 2005, which was well before the April 20

2006 U.S. App. LEXIS 28424, *6

deadline. See Sykes's Notice of Appeal. We would also note that Sykes could have avoided the problem by notifying the District Court with his **[*7]** new addresses in a timely fashion.

We will affirm the District Court's February 3, 2006 order dismissing Sykes's action without prejudice. n4

n4 In July, after the case had been briefed, Sykes filed a document termed as a "Motion to Reject Motion of Appellees to Dismiss," which was construed as his Reply Brief. No action will be taken on Appellees' "Opposition" filed in response to that Reply Brief. The Federal Rules of Appellate Procedure do not provide for the filing of an "opposition" to a reply brief.

LEXSEE 2005 U.S. DIST. LEXIS 43270



Positive
As of: Jan 31, 2007

**Berry Allen Willis, Plaintiff v. Thad Tarasen, State of Minnesota Justice Department, City of Brooklyn Park, Roger J. Fellows, Jensen & Sondrall, P.A., Hennepin County District Court, Defendants n1**

n1 On May 2, 2005, this Court issued a Report and Recommendation recommending that Defendants City of Brooklyn Park, Jensen & Sondrall, P.A., and Roger J. Fellows' Motions for Summary Judgment be granted.

**Civil No. 04-4110 (JMR/FLN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2005 U.S. Dist. LEXIS 43270*

**July 13, 2005, Decided**
**July 14, 2005, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Dismissed without prejudice by, Motion to strike denied by, Motion denied by *Willis v. Tarasen, 2005 U.S. Dist. LEXIS 43261 (D. Minn., Sept. 8, 2005)*

**COUNSEL:** [*1] Berry Allen Willis, Plaintiff, Pro se, Brooklyn Park, MN.

Thad Tarasen, Defendant, Pro se, Minot, ND; Sandra L Woessner, Woessner Law Office, Osseo, MN.

For Brooklyn Park, City of, Defendant: Jon K Iverson, Iverson Reuvers, LLC, Bloomington, MN; Jason M Hiveley, Iverson Reuvers, LLC, Bloomington, MN.

For Roger J. Fellows, Jensen & Sondrall, P.A., Defendant: Bryon G Ascheman, Burke & Thomas, PLLP, Arden Hills, MN; Richard J Thomas, Burke & Thomas, PLLP, Arden Hills, MN.

For Hennepin County District Court, Defendant: Michael J Tostengard, Minnesota Attorney General's Office, St. Paul, MN.

**JUDGES:** FRANKLIN L. NOEL, United States Magistrate Judge.

**OPINION BY:** FRANKLIN L. NOEL

**OPINION:**

**AMENDED REPORT AND RECOMMENDATION**

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 20, 2005, on Defendant Thad Tarasen's Motion to Dismiss [# 44]; and on Plaintiff's Motions for Default Judgment [# 28], and for an Injunction to Strike Defendant's Motion [# 55]. The matter was referred to the undersigned for Report and Recommendation pursuant to *28 U.S.C. § 636* and Local Rule 72.1(c). For the reasons which follow, this Court recommends [*2] Defendant Tarasen's Motion be granted and that Plaintiff's Motions be denied.

### I. Defendant Tarasen's Motion to Dismiss

#### A. Findings of Fact

Plaintiff Berry Allen Willis brings suit, alleging he was improperly charged in Hennepin County District Court for fifth-degree assault following an altercation he had with Defendant Thad Tarasen. On April 26, 2004, Plaintiff and Defendant Tarasen were drinking at Kelly's 19th Hole Restaurant in Brooklyn Park. See Complaint, Ex. 1. At one point, they argued about Plaintiff's retirement account. Plaintiff punched Tarasen in the face and left the bar. Tarasen called the Brooklyn Park police and three officers responded to Kelly's Restaurant. Tarasen filed a Citizen's Arrest Complaint and stated he wanted to pursue charges against Plaintiff for assault. In September 2004, Plaintiff pled guilty in Hennepin County to an amended charge of disorderly conduct. Id. at P 19, Ex. C.

On September 14, 2004, Plaintiff filed a Complaint against Defendants. He alleges Defendant Tarasen's statement to the Brooklyn Park police was false, and that in actuality, Tarasen assaulted him. Plaintiff personally served Tarasen with the Summons and [*3] Complaint on September 15, 2004. Defendant Tarasen moves to dismiss, claiming he was improperly and untimely served.

#### B. Standard of Review

*Rule 12 of the Federal Rules of Civil Procedure* provides that a party may move to dismiss claims for insufficiency of process or of service of process. See *Fed. R. Civ. P. 12(b)(4)*; *Fed. R. Civ. P. 12(b)(5)*. *Rule 12* also allows dismissal for lack of personal jurisdiction. See *Fed. R. Civ. P. 12(b)(2)*. n2

> n2 *Rule 12(b)(4)*, "insufficiency of process," concerns the form of process, such as a summons not properly containing the names of the parties. *Rule 12(b)(5)*, "insufficiency of service of process," concerns the mode of delivery of the summons and complaint. See *Anzulewicz v. National Fuel Gas Supply, 208 F.R.D. 47, 49 n. 5 (W.D.N.Y. 2002)* citing 5A Charles Alan Wright & Arthur R. Miller. Federal Practice & Procedure: Civil § 1353, p.2777 (2d ed. 1990). Objections pursuant to *Rule 12(b)(2)* concern lack of personal jurisdiction, which results when a summons and complaint have not been served on the defendant pursuant to *Rule 12(b)(5)*. Id.

[*4]

In considering a motion to dismiss, a court must construe the pleadings in the light most favorable to the non-moving party, and must take the facts alleged in the complaint as true. *Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994)*; *Ossman v. Diana Corp., 825 F.Supp. 870, 879-80 (D. Minn. 1993)*. Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the non-moving party. *Ossman, 825 F. Supp. at 880*. A complaint should be dismissed only if no relief could be granted under any set of facts that could be proved consistent with the allegations. *Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995)*; *Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996)*.

#### C. Improper Service

Defendant argues that Plaintiff's claim should be dismissed because service of process was ineffective under the rules of civil procedure. Properly effected service of process is a fundamental element to any lawsuit. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999)*. Defects in service of process are jurisdictional in nature. If a defendant is improperly [*5] served, a federal court lacks jurisdiction over the

2005 U.S. Dist. LEXIS 43270, *5

defendant. *Printed Media Services, Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993)*(citations omitted): *Lewis v. Contracting Northwest, Inc., 413 N.W.2d 154, 157 (Minn. App. 1987)*.

Under the federal rules, a plaintiff may commence an action in the United States District Court for the District of Minnesota by "delivering a copy of the summons and of the complaint to the individual personally" or by complying with the Minnesota rules of service. See *Fed. R. Civ. P. 4(e)*("service upon an individual . . . may be effected in any judicial district of the United States . . . pursuant to the law of the state in which the district court is located"). Under the Minnesota rules, a plaintiff may commence an action through personal service of the summons on the defendant, or by mailing a copy of the summons to the defendant. Minn. R. Civ. P. 4.03(a); Minn. R. Civ. P. 4.05. n3

> n3 If a plaintiff serves the summons by mail, he must include a "notice of acknowledgment . . . and a return envelope, postage prepaid, addressed to the sender." Minn. R. Civ. P. 4.05. If the plaintiff does not receive acknowledgment of service within the time defendant is required to serve an answer, service is ineffectual. Id.

 [*6]

Here, it is uncontested that Defendant was served. Tarasen admits that Plaintiff handed him a Summons and Complaint on September 15, 2004, when he was waiting to testify against him in his state court proceeding. It is the manner in which service took place that is at issue.

Both the federal and state rules restrict the individuals able to administer service. See *Fed. R. Civ. P. 4(c)(2)*("Service may be effected by any person who is not a party and who is at least 18 years of age"); Minn. R. Civ. P. 4.02 ("the sheriff or any other person not less than 18 years of age and not a party to the action, may make service of a summons or other process"). Neither the federal or state rules permit a party to administer service. The rationale behind this restriction is to eliminate the bias, acrimony and possible oppression inherent in litigation. *Lewis, 413 N.W.2d at 155*. Here, Willis personally served Defendant Tarasen. Because Willis is a party to the action, the service was invalid under the Federal and Minnesota rules of Civil Procedure. Such a delivery, although personal, was plainly insufficient.

### 1. Actual Notice

Willis [*7]  argues that any insufficiency of process is inconsequential because Tarasen had actual knowledge of the suit. Even though the delivery provided Tarasen with actual notice of Willis' claims, when a defendant has been improperly served, a federal court lacks jurisdiction over that defendant whether or not the defendant had actual notice of the lawsuit. See *Printed Media Services, 11 F.3d at 842*; *McKenzie v. Lunds, Inc., 63 F.Supp.2d 986, 994-95 (D. Minn. 1999)*. Unless a defendant voluntarily makes an appearance or waives defective service, a federal court is without jurisdiction to render personal judgment against a defendant if service of process is not made in accordance with applicable federal or state statutory requirements. *Printed Media Services, 11 F.3d at 843*, citing *Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982)*. This principle remains true despite any actual notice a defendant may have of the lawsuit.

### 2. Waiver

Willis also argues that Tarasen waived any defective service because he participated telephonically in the *Rule 16* pretrial scheduling conference. The Court disagrees and finds that Tarasen [*8]  properly and timely asserted his defense, and that his participation in the conference does not constitute a waiver of that defense.

The requirement of personal jurisdiction is intended to protect a defendant's liberty interests, and because it represents an individual right, it can be waived. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702-03 , 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982)*. *Rule 12* contemplates the lodging of certain defenses at the earliest point in a lawsuit, and mandates a waiver of those defenses if not presented at the first available opportunity.

2005 U.S. Dist. LEXIS 43270, *8

See *Fed. R. Civ. P. 12(h)*.

In this case, Willis filed the Complaint on September 14, 2004. [# 1]. Tarasen filed his first "response" to the Complaint on October 1, 2004. [# 5]. He did not contest service of process in the response. Six days later, however, Tarasen filed an "Amendment to Answer," in which he raised an insufficient process defense. [# 15]. Under the rules, Tarasen's Amendment constituted a timely assertion of the defense. See *Fed. R. Civ. P. 12(h)(1)(B)*(defense not waived if raised in a responsive pleading [*9] or amendment thereof permitted by *Rule 15(a)* as a matter of course); *Fed. R. Civ. P. 15(a)*(permitting a defendant to amend his Answer "once as a matter of course . . . within 20 days after it is served").

Having timely asserted his insufficient process defense, Tarasen did not, as Willis argues, waive that defense by participating in the pretrial scheduling conference, which occurred on November 23, 2004. [# 29]. See *Vilter Mfg. Co. v. Rolaff, 110 F.2d 491, 495 (8th Cir. 1940)*(finding that because the defendant had raised the question of jurisdiction, he did not waive his jurisdictional defense by participating in the trial and defending the matter on the merits); see also *In re Asbestos School Litigation, 1990 U.S. Dist. LEXIS 8366, No. 83-0268, 1190 WL 96161 (E.D.Pa)*(explaining affect of Federal Rules of Civil Procedure on difference between special and general appearances). While under certain circumstances a defendant's strategic delay in addressing a claimed absence of personal jurisdiction can constitute a waiver of that defense, no such delay is evident here. See *McKenzie, 63 F.Supp.2d at 994*. Tarasen asserted [*10] his insufficiency of process defense and his participation in the scheduling conference does not constitute submission to the Court's jurisdiction.

In sum, Willis' personal service upon Tarasen violated the requirement that service cannot be affected by any party. Thus, service upon Tarasen was ineffective. Tarasen timely asserted, in his Amended Answer, his defense of insufficient process and he did not waive that defense by his minimal participation in this suit. Accordingly, this Court lacks jurisdiction over him. The Complaint against Defendant Tarasen should be dismissed without prejudice, pursuant to *Rule 12(b)(5)*, for Plaintiff's failure to comply with *Rule 4*. n4

> n4 Accordingly, the Court recommends that Plaintiff's Motion for an Injunction to Strike Defendant's Motion [# 55], which the Court interprets to be a response in opposition to Defendant Tarasen's Motion to dismiss, should be denied.

## II. Plaintiff's Motion for Default Judgment

On November 22, 2004, Plaintiff moved for default judgment [*11] against the "State of Minnesota Justice Department," Hennepin County District Court ("the County"), and Thad Tarasen. [# 28]. He argued that default judgment should be entered against those Defendants because they failed to comply with the Summons and Complaint served upon them, and failed to enter a pleading within the time requirements set forth in the Federal Rules of Civil Procedure. See Def. Mem. p. 2.

In light of the Court's determination that Defendant Tarasen was never properly served, the Court recommends that Plaintiff's Motion for Default Judgment against him be denied.

Insofar as Plaintiff's Motion pertains to Defendants State of Minnesota Justice Department and the County, the Court also recommends the Motion be denied. The County filed an Answer to Plaintiff's Complaint on January 20, 2005. [# 41]. In its Answer, it asserted that it did not receive Plaintiff's Complaint until January 4, 2005. It also asserted a number of affirmative defenses, including that Plaintiff's Complaint fails for insufficient service of process, and because it is barred by the doctrine of judicial immunity. n5 See Ans. p. 3. Because it appears the County timely Answered Plaintiff's [*12] Complaint after its receipt in early January, the Court recommends that Plaintiff's Motion for Default Judgment against it be denied.

2005 U.S. Dist. LEXIS 43270, *12

n5 The County, represented by the Attorney General's Office, also stated that "[b]ecause there is no such entity as the "Minnesota Justice Department" no answer will be made on behalf of this nonexistent entity." See Answer p. 1.

### III. RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

I. Defendant Tarasen's Motion to Dismiss [# 44] be **GRANTED,** and that the Complaint against him be **dismissed without prejudice;**

II. Plaintiff's Motion for Injunction to Strike Defendant's Motion [# 55] be **DENIED;**

III. Plaintiff's Motion for Default Judgment [# 28] be **DENIED.**

DATED: July 13, 2005

s/ FRANKLIN L. NOEL

United States Magistrate Judge