LEXSEE

**EDWARD GLOVER, Plaintiff, -against- NEW YORK CITY TRANSIT AUTHORITY, Defendant.**

**03 CV 1140 (RJD)(LB)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 80661**

**September 6, 2006, Decided**
**September 7, 2006, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Summary judgment granted by Glover v. New York City Transit Auth., 2006 U.S. Dist. LEXIS 76590 (E.D.N.Y., Oct. 20, 2006)

**COUNSEL:** [*1] For Edward Glover, Jr., Plaintiff: Becky Tung, Leeds, Morelli & Brown, P.C., Carle Place, NY; Robert J. Valli, Jr., Leeds, Morelli and Brown, Carle Place, NY.

For New York City Transit Authority, Defendant: Ann Burton Goetcheus, Office of the General Counsel, New York, NY; Joyce Rachel Ellman, New York City Transit Authority, Brooklyn, NY.

**JUDGES:** LOIS BLOOM, United States Magistrate Judge.

**OPINION BY:** LOIS BLOOM

**OPINION:**

**REPORT AND RECOMMENDATION**

**BLOOM, United States Magistrate Judge:**

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the New York State Executive Law § 290 *et seq.,* and New York City Human Rights Laws, N.Y.C. Admin. Code Title 8, alleging that the New York City Transit Authority ("NYCTA") discriminated against him on the basis of his disability by failing to reinstate him as a Train Operator. Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Honorable Raymond J. Dearie [*2] referred this motion to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the following reasons, it is respectfully recommended that defendant's motion for summary judgment should be granted with respect to plaintiff's Title VII claim. It is further recommended that defendant's motion should be granted in part and denied in part with respect to plaintiff's ADA claims. Plaintiff's supplemental claims under the New York State Human Rights Laws should be dismissed because they are barred by the election of remedies.

**BACKGROUND**

**I. Plaintiff's History With the NYCTA**

The following facts are not in dispute, unless otherwise noted. Plaintiff Edward Glover has been employed by the New York City Transit Authority since June of 1983. (Compl. P 6). Initially Glover worked as a Train Conductor; in 1985, plaintiff was promoted to work as a Train Operator, a position he held until 2000. (Compl. PP 7-8, 33; Pl. Rule 56.1 Stmt. P 1; Def. Rule 56.1 Stmt. PP 1-2). Since April 16, 2001, Glover has worked at NYCTA as a Transit Property Protection Agent ("TPPA"). n1 Id. Plaintiff was diagnosed with high blood pressure in 1983 [*3] and with diabetes in 1985. (Pl. Rule 56.1 Stmt. P 4-5). As a result of being diagnosed with these conditions, Glover claims he was subjected to a "litany" of medical tests and procedures by the NYCTA Medical Assessment Center ("MAC"), and

as such, was "constantly forced out of work," which required him to use his sick time. (Compl. PP 9-10; Pl.'s Rule 56.1 Stmt. P 6).

n1 Plaintiff references the TPPA position as a "Security Guard" position in his second amended complaint.

Glover claims that on or about July 30, 2000, God entered his heart and he became a born-again Christian. (Pl. Rule 56.1 Stmt. P 7). Glover recounts that when he asked his wife to join him in prayer, she instead called the Crisis Intervention Emergency Unit because she was concerned about his behavior. (Pl. Rule 56.1 Stmt. P 8). Glover was taken to the hospital by ambulance for observation. (Pl. Rule 56.1 Stmt. P 9; Def. Rule 56.1 Stmt. P 4). Ms. Taylor, a crisis worker who was summoned to the Glover residence along with the police, reported [*4] "that Plaintiff had threatened to kill white people in his neighborhood," although plaintiff disputes the that he made such a threat. (Pl. Rule 56.1 Stmt. PP 9-10). Glover exhibited "acute psychosis" and was diagnosed with Bipolar disorder. n2 He remained hospitalized from July 31 through August 4, 2000. (Compl. P 12; Pl. Rule 56.1 Stmt. P 11; Def. Rule 56.1 Stmt. P 4; Emergency Department Record dated July 30, 2000, Declaration of Joyce Rachel Ellman, Exhibit 4.).

n2 The emergency room record states that plaintiff was found running up and down Routes 1 and 9; was shaking everyone's hands on the boardwalk in Atlantic City and told his wife they would pretend that they were former president Clinton and his wife Hillary; that plaintiff refused to eat and drank only juices because food was contaminated with chemicals; stopped taking his medication for high blood pressure and diabetes; dismantled the doorknobs and the alarm system in his house and that his family became afraid of him. Emergency Department Record, Declaration of Joyce Rachel Ellman, Exhibit 4.

[*5]

Glover was treated at the hospital by Dr. Ronald G. Silikovitz who continued to see plaintiff after he was released. (Pl. Rule 56.1 Stmt. PP 14-15, 18-19). In a recommendation to the NYCTA dated August 10, 2000,

Dr. Silikovitz noted that he had examined plaintiff on August 8, 2000 and concluded, "I find him able to work." (Compl. P 15). Dr. Silikovitz later stated that on August 29, 2000, plaintiff was not agitated, was "in full contact with reality [and] is feeling much better." (Compl. P 18). On September 18, 2000, NYCTA requested that Dr. Silikovitz report the results of his examinations of Glover. Three days later Dr. Silikovitz wrote to NYCTA:

9/21/00 - I am seeing Mr. Glover for his seventh consecutive weekly psychotherapy session. He continues to comply fully with treatment. In my professional opinion Mr. Glover's condition is in Full Remission, and there are no symptoms of psychotic process or impulsivity. From a psychological point of view, there is no reason why Mr. Glover cannot resume fully responsibilities as a Train Operator immediately. Prognosis for symptom-free is excellent.

(Compl. P 21; Pl. Rule 56.1 Stmt. Ex. E) (emphasis in original). [*6]

On September 20, 2000, Glover was examined by another doctor, Dr. Rodriguez, "at the expressed [sic] request of the MTA solely to evaluate and report on the claimant's mental status." (Compl. P 24; Pl. Rule 56.1 Stmt. PP 13-14, 16-17, Ex. F at 2). Dr. Rodriguez reported that "[Glover] is not currently psychotic. He is not perceived as manic. He denies symptoms of depression. At this time, he is deemed fit to return to regular duty." (Compl. P 26; Pl. Rule 56.1 Stmt. Ex. F at 2). Dr. Rodriguez also recommended that Glover "should continue psychiatric follow-up and regular reports from his therapist, Dr. Silikovitz, should be obtained." Id. Dr. Silikovitz prepared a supplemental report to NYCTA on October 26, 2000, that indicated "Mr. Glover's current DSM IV diagnosis is 296.80 bipolar disorder w/ reported psychotic features in full remission . . . Mr. Glover is fully prepared emotionally to resume his train operation responsibilities full time." (Compl. P 29; Pl. Rule 56.1 Stmt. P 19).

Meanwhile, over the course of several months beginning August 10, 2000, Glover was examined by doctors DiTullio, Johnson and Isenberg at NYCTA's Medical Assessment Center. (Pl. Rule 56.1 [*7] Stmt. Ex. C). In his deposition, Dr. Isenberg, who is employed

by NYCTA, stated that NYCTA "wanted to be certain that the [hospital discharge] diagnosis was correct because if the discharge diagnosis is correct, then we had to proceed to transfer him out of the [Train Operator] title." (Isenberg Dep. 4/22/04 at 21). Dr. Isenberg further outlined the process by which NYCTA transfers an employee to a different job title when deemed unfit for a public safety position:

> Most of the time, they are restricted duty temporarily, so they have some type of intercurrent illness which does not allow them to perform full duty in their title. We then decide with most of the time little guidance from the medical standards whether they should be able to do restricted duty in their title at all, "no work" meaning no work in the universe that they can do short of working at home. If an employee is permanently disabled, then a designation is made of restricted duty permanent.

(Isenberg Dep. 4/22/04 at 12-13).

As a result of the hospital's diagnosis that plaintiff suffered Bipolar disorder, plaintiff was placed on Restricted Work Permanent Status effective November 13, 2000. On November 16, 2000, plaintiff [*8] was scheduled for a reclassification examination in order to determine what positions would be available to plaintiff given this diagnosis. (Ellman Decl. Ex 5 at 1). Plaintiff's reclassification examination was conducted by Dr. Isenberg on November 20, 2000. Dr. Isenberg found plaintiff unfit to return to his position as Train Operator and effectively barred him from this or other "public safety-sensitive titles." However, Dr. Isenberg found plaintiff medically fit to perform the full duties of a Transit Property Protection Agent ("TPPA") and certain other non-public safety positions. (Pl. Rule 56.1 Stmt. P 20; Def. Rule 56.1 Stmt. P 5). By certified letter dated December 20, 2000, Glover was informed that NYCTA Medical Services Department determined that he was "medically eligible for placement into an alternative job title." (Ellman Decl. Ex. 5 at 4). This effectively cleared the way for plaintiff's return to employment with NYCTA, albeit in a position other than Train Operator.

On December 21, 2000, Glover signed the reclassification acknowledgment form given to him which put him on a leave of absence pending the reclassification process. (Ellman Decl. Ex 5 at 5). In a NYCTA memorandum [*9] dated January 18, 2001, the Director of Employee Scheduling wrote to the Coordinator of Employee Relations, stating that Glover was "found qualified to perform the duties of either a Transit Property Protection Agent (TPPA), Cleaner or Station Agent." (Ellman Decl. Ex 5 at 6). The memorandum also stated that "[w]e, [NYCTA Employee Scheduling,] anticipate both Cleaner and TPPA vacancies, but we do not have specific training classes at this time." Id.

Plaintiff denies that he was ever Bipolar or that he had experienced a psychotic break. (Pl. Rule 56.1 Stmt. P 12; Glover Dep. 3/18/04 at 54-56). At his deposition, Glover stated "I am claiming in this lawsuit that the only disability I had was high blood pressure and diabetes. The allegations of Bipolar Manic Depressive placed upon me never exists [sic]." (Glover Dep. 3/18/04 at 56). Glover returned to work in April 16, 2001 as a Transit Property Protection Agent ("TPPA"), four months after he was cleared for reclassification. (Pl. Rule 56.1 Stmt. P 21; Def. Rule 56.1 Stmt. P 5). Although Glover is paid at the same rate he earned as a Train Operator, and is still currently employed by NYCTA as a TPPA, (Id.), plaintiff testified [*10] that as a result of plaintiff's discrimination, he was "placed out of work eight months no pay" and experienced significant financial distress as a result. (Glover Dep. 3/18/04 at 69).

**PROCEDURAL HISTORY**

Glover filed a charge alleging racial, religious and disability discrimination with the New York State Division of Human Rights ("NYSDHR") and with the United States Equal Employment Opportunity Commission ("EEOC"), based in part on having a Bipolar disorder. (NYSDHR Compl. *P* 1; Def. Rule 56.1 Stmt. Ex. 6, 8; Pl. Rule 56.1 Stmt. Ex. D at 8). Plaintiff then amended his charge on March 2, 2001 and stated that he had been "mis-diagnosed as having Bipolar disorder." (NYSDHR Am. Compl. *P* 1; Def. Rule 56.1 Stmt. Ex. 6). On October 2, 2002, the NYSDHR, issued a finding that there was "no probable cause" to believe that the NYCTA was engaged in unlawful discriminatory behavior, dismissed plaintiff's charge and informed Glover of his ability to pursue his claim in court. (Def. Rule 56.1 Stmt. Ex. 7). The EEOC issued Glover a right-to-sue letter on December 10, 2002. (Def. Rule 56.1 Stmt. at 8; Pl. Rule

56.1 Stmt. Ex D at 8).

Glover filed his *pro se* complaint in this Court [*11] on March 7, 2003, and an amended complaint on March 28, 2003. Defendant filed an answer to the amended complaint on April 22, 2003. Plaintiff retained counsel and filed a second amended complaint on October 17, 2003. Plaintiff's complaint seeks "judgment against the defendant for all compensatory, physical, and punitive damages, lost pay, front pay, injunctive relief, reinstatement and any other damages permitted by law . . ." (Second Am. Compl. P 36). Defendant filed an answer to the second amended complaint on November 5, 2003. After the conclusion of discovery, defendant moved for summary judgment; plaintiff opposed the motion and defendant filed a reply.

### DISCUSSION

#### I. Standard of Review: Summary Judgment

Summary judgment should be granted if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact in and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*12] "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997) (quoting Anderson, 477 U.S. at 248); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000). For the purposes of summary judgment, the facts here are viewed in the light most favorable to plaintiff. "An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) [*13] ; see Matsushita, 475 U.S. at 586-87 (1986). In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Niagra Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

#### II. Plaintiff's Second Amended Complaint

As an initial matter, this Court notes that "a pleading that has been amended under Rule 15(a) [of the Federal Rules of Civil Procedure] supercedes the pleading it modifies . . . Once an amended pleading is interposed, the original pleading no longer performs any function in the case . . ." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and [*14] Procedure § 1476 (2d Ed. 1990). Therefore, this Court will only address plaintiff's claims in the second amended complaint. n3

n3 Although never explicitly stated, plaintiff apparently abandoned some of his original claims when he filed his second amended complaint. Plaintiff initially alleged that NYCTA retaliated and intentionally discriminated against him based on his religion and his disability. Retaliation is not mentioned in his second amended complaint and although plaintiff does reference religion in his second amended complaint, he provides no specific allegation of religious discrimination to support a claim under Title VII.

#### III. Title VII Claims

Plaintiff references Title VII in paragraphs 1 and 35 of his second amended complaint, but otherwise makes no allegations to support a claim based on this statute. Glover received an EEOC right-to-sue letter on December 10, 2002 which noted Title VII as a possible ground. Plaintiff had checked the box for Title VII in his original complaint, but [*15] he later amended his

complaint twice, only mentioning Title VII in the "jurisdiction" and "claims for relief" sections. No "affirmative evidence" is presented for a reasonable jury to return a verdict for Glover on any Title VII claim. Defendant's motion for summary judgment on plaintiff's claim under Title VII should therefore be granted.

## IV. ADA Claims

### Standard of Review

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Courts reviewing discrimination claims under the ADA apply the burden-shifting framework established for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002) (applying McDonnell Douglas burden-shifting framework to analyze a claim of intentional discrimination under the ADA). First, the plaintiff must demonstrate [*16] a prima facie case of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407, (1993). If the plaintiff meets its burden of establishing a prima facie case, the burden then shifts to the defendant to articulate evidence that the adverse employment action was taken for a legitimate, non-discriminatory reason. See id. at 506-07; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). If the defendant successfully does so, the burden of persuasion then shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253.

## 1. Plaintiff's Removal from the Train Operator Position

The first question that must be addressed is whether plaintiff demonstrates a *prima facie* case of discrimination. To establish a prima facie case of discrimination under the ADA, plaintiff must show that: (1) the defendant employer is subject to the ADA; (2) the plaintiff suffers from a qualifying disability within the meaning of the ADA; (3) the plaintiff could [*17] perform the essential functions of the job with or without reasonable accommodation; and (4) the plaintiff was suspended because of his disability. See Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998); see also Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2002). For the reasons that follow, I find that because plaintiff was diagnosed with a Bipolar disorder, he could not perform the essential functions of Train Operator. He thus fails to present a *prima facie* case that his removal from this position was in violation of the ADA.

It is undisputed that NYCTA is an employer subject to the ADA. Next, plaintiff must assert that he has a disability cognizable under the ADA, or that he was perceived as having a disability by the NYCTA. The Court is presented with the unusual circumstance for an ADA case that plaintiff "vehemently denies that he was suffering from any kind of psychotic disorder during his hospitalization." (Compl. P 13). The record however demonstrates otherwise. The record clearly establishes that on or about July 30, 2000, Glover was diagnosed with Bipolar disorder during his hospitalization. Plaintiff's [*18] exhortations to the contrary, however heartfelt, will not overcome the hospital's diagnosis that plaintiff suffered a Bipolar disorder. The second prong of the *prima facie* analysis is thus satisfied. See e.g., Siederbaum v. New York City Transit Authority, 309 F. Supp. 2d 618, 623 (S.D.N.Y. 2004) (a diagnosis of Bipolar disorder constitutes a disability under the ADA).

The NYCTA has developed regulations that prohibit and disqualify any person diagnosed with a Bipolar disorder from holding certain "public safety-sensitive" positions. There are four job titles that NYCTA has designated as "public safety-sensitive": Train Operator, Bus Conductor, Conductor and Tower Operator. (Clarke-Belgrade Decl. P 5). The "public safety-sensitive" designation was made in order "to strike the right balance between the ability of employees to perform the essential functions of the position while protecting the safety of the public." (Clarke-Belgrade Decl. P 4). "NYCTA has concluded that bipolar disorder, treated or untreated, poses an unacceptable safety risk for four public safety-sensitive titles, including Train Operator, such that the disorder *disqualifies* persons with [*19] bipolar disorder from holding those four positions." (Clarke-Belgrade Decl. P 10) (emphasis supplied). n4

n4 The NYCTA's Occupational Health Services Division ("OHS") developed these medical standards in consultation with the Occupational and Industrial Orthopedic Center of the New York Hospital for Joint Diseases. (Def. Rule 56.1 Stmt P 3; Clarke-Belgrade Decl. P 3). These standards "represent professional medical judgment regarding the impact of various medical and psychiatric conditions on the ability or acceptability of an individual to perform the duties of the covered job titles." (Clarke-Belgrade Decl. P 3).

Plaintiff argues that two doctors, Drs. Silkovitz and Rodriguez, medically cleared him to return to work as Train Operator as early as September 18, 2000. No clearance however was granted by NYCTA. NYCTA argues that, as a matter of policy, plaintiff was disqualified for the Train Operator position, which is a "public-safety sensitive" position, once he was diagnosed with Bipolar disorder. NYCTA policy [*20] disqualifies anyone who is diagnosed with Bipolar disorder from a Train Operator position, because "bipolar disorder, treated or untreated, poses an unacceptable safety risk . . ." for employees in this job title. (Clarke-Belgrade Decl. P 10). The policy leaves no room for an employee diagnosed with Bipolar disorder to be reinstated as a Train Operator.

The Second Circuit has cautioned courts not to second guess an employer's judgment regarding the qualifications deemed essential to the performance of a particular job. In Shannon v. N.Y. City Transit Auth., 332 F. 3d 95, 97 (2d Cir. 2003) the Court found that NYCTA had not violated the ADA when it prevented a color blind bus driver from resuming his position because of concerns over public safety. With respect to NYCTA's determination of an employee's eligibility for a particular position, Judge Jacobs wrote for a unanimous panel in Shannon that:

[e]mployers formulate jobs to fit the needs of their enterprises, and cannot fill jobs without deciding what attributes are essential to those needs. The essential character of a particular job qualification is therefore a matter of judgment and opinion. No [*21] reasonable jury could

find that NYCTA exceeded the broad bounds necessarily afforded it under the ADA to decide as an employer whether color vision is an essential qualification for driving a NYCTA bus. NYCTA has a statutory responsibility to operate the transit system "for the safety of the public."

Id. at 102-03 (citing New York City Transit Auth. v. Transp. Workers Union, Local 100, 243 A.D.2d 567, 567, 663 N.Y.S.2d 114 (2d Dep't 1997)); see also N.Y. Pub. Auth. L. § 1204 (describing powers of NYCTA to make "without limitation rules relating to . . . the conduct and safety of the public"). The Circuit also noted that when evaluating what qualifications are required for a specific position "[e]mployment decisions must be made in light of that public interest." Id.

Where public safety is at issue, the employer is afforded discretion to determine the essential qualifications of a particular job. Moreover, the Second Circuit has recently held that "the factual validity of the underlying imputation against the employee is not at issue," meaning the factual validity of plaintiff's diagnosis is not paramount here-the Court must [*22] focus on "what motivated the employer." McPherson v. New York City Dep't of Education, 457 F.3d 211, 2006 WL 1967033 (2d Cir. July 13, 2006). NYCTA has demonstrated that it transferred plaintiff out of the Train Operator position for the safety of the public. Therefore, defendant's motion for summary judgment should be granted regarding plaintiff's removal from the Train Operator position.

## 2. Failure to Timely Reclassify Plaintiff

Plaintiff also alleges that defendant's failure to timely reclassify and reinstate him into an alternate position constituted discrimination under the ADA. Glover was placed on "Restricted Work Permanent" by defendant on November 13, 2000 and was found to be "medically eligible for placement into an alternative job title" by NYCTA on December 20, 2000. On December 21, 2000, plaintiff was required to sign a form to be put on leave from NYCTA pending reclassification. Glover was not returned to gainful employment with NYCTA until April 16, 2001. Plaintiff asserts that the delay in reclassification is due to defendant's discrimination against him based on

a perceived disability. Plaintiff states that his perceived disability [*23] resulted in his being "placed out of work [for] eight months [with] no pay." (Glover Dep. 3/18/04 at 69).

In considering this claim, the Court must again determine if plaintiff has made a *prima facie* case of discrimination. Here, plaintiff has established the first three prongs of his *prima facie* case: the NYCTA is an employer subject to the ADA; plaintiff is disabled or is perceived to be disabled within the meaning of the ADA and, since the NYCTA sought to reclassify plaintiff to a TPPA position, it is presumed that he was qualified for this position.

As to the fourth prong of the *prima facie* case, plaintiff must show that "he suffered adverse employment action because of his disability." See Giordano, 274 F.3d at 747. A delay in reinstating an employee constitutes an adverse employment action for the purposes of establishing a *prima facie* case. Greenberg v. New York Transit Authority, 336 F. Supp. 2d 225, 246 (E.D.N.Y. 2004) (citing to Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999)) n5 A reasonable juror could find that defendant's delay in reclassifying and reinstating plaintiff constituted an adverse employment [*24] action. Thus, the Court finds that plaintiff suffered an adverse employment action as a result of NYCTA's lengthy reclassification process and as such plaintiff has made his *prima facie* case. See e.g. Burlington Northern and Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (finding a 37 day suspension without pay in a Title VII retaliation claim constituted an adverse employment action).

> n5 For all practical purposes, the terms "reclassification" as used in this case and "reinstatement" as used in the Greenberg case are interchangeable. Both cases involve transit employees who were found unfit for their positions as Train Operators and brought claims, in part, due to the delay in their reclassification to TPPA positions.

Since plaintiff states a *prima facie* case, under the McDonnell Douglas burden-shifting framework, the burden falls on defendant to establish that its delay in reinstating plaintiff was based on a legitimate, non-discriminatory reason. Defendant fails to meet [*25]

this burden. The NYCTA addresses plaintiff's delay in reclassification in a single footnote found in Defendant's Reply Memorandum of Law In Support of Motion for Summary Judgment. Def.'s Reply Mem. of Law at 6, n.2. There, defendant summarily dismisses plaintiff's claim as "irrelevant" and states in bald and conclusory terms that "there were no vacancies available, and that plaintiff was reclassified to TPPA when vacancies became available." Id. This unsworn, unsubstantiated statement, made by an attorney for defendant lacking any basis for personal knowledge of position vacancies in the NYCTA, is plainly insufficient to meet defendant's burden for summary judgment. See Fed. Rule Civ. Pro. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). See also, Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 156 (2d Cir. 1999); Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d. Cir.), cert. denied, [*26] 528 U.S. 965, 120 S. Ct. 399, 145 L. Ed. 2d 311 (1999); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985).

Defendant's delay in reinstating plaintiff without pay for a period of over four months was certainly not irrelevant to plaintiff. n6 Moreover, it is not irrelevant to this Court. Accordingly, there is an outstanding material issue of fact in dispute as to why defendant failed to restore plaintiff to a paid position until April 16, 2001. Because defendant's unsworn conclusory statement regarding why plaintiff was not timely reinstated cannot be accepted, defendant fails to satisfy its burden on the instant record. I therefore recommend that defendant's motion for summary judgment should be denied on plaintiff's claim that defendant discriminated against him by failing to timely reinstate him.

> n6 Although the length of plaintiff's unpaid leave is unclear--plaintiff states that he was unpaid for a total of eight months--it is undisputed that plaintiff was cleared for an alternate position as of December 20, 2000. Clearly, had plaintiff been put back on the payroll pending his reinstatement, defendant's delay would not be as troubling. However, as discussed in by the Supreme Court in White, working people of modest income cannot live without a paycheck.

White, 126 S. Ct. at 2417 ("White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship.").

[*27]

## V. New York State and City Claims

### A. Election of Remedies

Plaintiff's claims under the New York State Executive Law are barred by the election of remedies. New York State Executive Law § 297(9) provides that:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any such court of appropriate jurisdiction for damages, .. . and such other remedies as may be appropriate, unless such person has filed a complaint hereunder or with any local commission on human rights . . .

Plaintiff filed a claim with the New York State Division of Human Rights (NYSDHR) on March 2, 2001. The NYSDHR determined that "it cannot be determined probable that Complainant [Glover] was subject to impermissible discrimination." See NYSDHR Order, October 2, 2002. Thus, Glover's complaint was decided on the merits. Plaintiff's attempt to re-litigate this claim in the United States District Court should be denied. N.Y. Exec. Law § 297(9) and N.Y. Exec. Law § 298; York v. Assoc. of the Bar of the City of New York, 286 F.3d 122 (2d Cir. 2002) (plaintiff cannot [*28] re-litigate adverse rulings by the NYSDHR). Plaintiff's state law claims are thus barred by the election of remedies and therefore they should be denied.

## CONCLUSION

Accordingly, it is recommended that defendant's motion for summary judgment should be GRANTED as to plaintiff's Title VII claim and plaintiff's claims under New York State Law. It is further recommended that defendant's motion for summary judgment should be GRANTED regarding plaintiff's removal from the position of Train Operator. Defendant's motion for summary judgment should be DENIED as to plaintiff's ADA claim that defendant failed to timely reclassify him.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the ten day period. [*29] Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital District Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

SO ORDERED.

LOIS BLOOM

United States Magistrate Judge

Dated: September 6, 2006

Brooklyn, New York

LEXSEE

**HANS P. HEINEMAN, Plaintiff, Vs. UNITED STATES OF AMERICA, UNITED STATES ARMY, FEDERAL BUREAU OF INVESTIGATION, UNITED STATES MARSHALS SERVICE, and LAW ENFORCEMENT AT CITY, COUNTY, AND STATE LEVELS, Defendants.**

**No. 06-4086-SAC**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

**2006 U.S. Dist. LEXIS 83592**

**November 16, 2006, Decided**
**November 16, 2006, Filed**

**COUNSEL:** [*1] Hans P Heinemann, Plaintiff, Pro se, Topeka, KS.

For Topeka Police, Jerry Stanley, Topeka Police Department, Roger Smith, Topeka Police Department, Tom Glor, Topeka Police Department, Departments, Janene Falley, Defendants: Sherri L. Price, LEAD ATTORNEY, City of Topeka, Kansas - Legal Department, Topeka, KS.

For Topeka Housing Authority, Defendant: David R. Cooper, LEAD ATTORNEY, Fisher, Patterson, Sayler & Smith-Topeka, Topeka, KS.

For Cornerstone of Topeka, Inc., Ken Williams, Cornerstone Employee, Barry McMurphy, Ex Director, Cornerstone of Topeka, Defendants: Terry A. Iles, LEAD ATTORNEY, Frieden & Forbes, Topeka, KS.

For Social and Rehabilitation Services, Kansas Department of, Defendant: Danny J. Baumgartner, LEAD ATTORNEY, Kansas Department of SRS- Docking State, Topeka, KS.

For United States Government, and all levels of law enforcement, United States Army, Federal Bureau of Investigation, US Marshals Service, Defendants: Jackie A. Rapstine, LEAD ATTORNEY, Office of United States Attorney - Topeka, Topeka, KS.

**JUDGES:** Sam A. Crow, U.S. District Senior Judge.

**OPINION BY:** Sam A. Crow

**OPINION:**

MEMORANDUM AND ORDER

The case comes before the court on a motion to dismiss [*2] (Dk. 32) filed by the defendants Topeka Police Department, Roger Smith, Janene Falley, Jerry Stanley and Thomas Glor; motion for summary judgment and amend complaint filed by the plaintiff Hans P. Heinemann (Dk. 45); motion for default judgment filed by the plaintiff (Dk. 48); motion for reconsideration filed by the plaintiff (Dk. 50); and motion to dismiss filed by the defendant Kansas Department of Social & Rehabilitation Services (Dk. 53).

The plaintiff is pro se and has filed numerous pleadings and documents with lengthy attachments and exhibits. The plaintiff's pleadings are difficult to understand as they are filled with unclear references, vague language, random events, and unrelated claims. The record is made the more confusing by the plaintiff repeatedly filing pleadings that are contradictory and inconsistent with earlier filings. The court's responsibility in interpreting such pleadings and applying the rules of civil procedure to them is well defined.

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Even so, [*3] a pro se litigant is not exempt from following the same rules of procedure as any other litigant. *See Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992), *cert. denied*, 507 U.S.

940, 113 S. Ct. 1336, 122 L. Ed. 2d 720 (1993). "At the same time, we do not believe it is the proper function of the district court to assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d at 1110. Nor is the court to "supply additional factual allegations to round out a plaintiff's complaint." *Whitney v. State of New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

The plaintiff filed his complaint on August 4, 2006, alleging first, discrimination by the Kansas Legislature's denial of his claim for personal injuries against the Kansas Department of Social and Rehabilitation Services, and second, retaliation and harassment by the State of Kansas and its representatives as evidenced by his loss of Section Eight housing and related incidents with Topeka police officers. (Dk. 1). The plaintiff's motion to proceed in forma pauperis was granted, and the summons and complaint were served on the following defendants named in the plaintiff's original complaint: [*4] Topeka Police Department, Jerry Stanley, Roger Smith, Tom Glor, Genna Falley, Topeka Housing Authority, Don Miller, Jerome Miller, Cornerstone of Topeka, Inc., Ken Williams, Kansas Department of Social and Rehabilitation Services, Sam Brownback, Jim Ryun, and Barry McMurphy. On August 22, 2006, the plaintiff filed, as a matter of course, his amended complaint naming as the only defendants: United States Army, Federal Bureau of Investigation, "all Northeast KS Law enforcement," United States Marshal, and "city, county, state enforcement." (Dk. 6). The plaintiff alleged a claim for these defendants to provide all of his records and files "related to this case" or pertaining to the U.S. Army's investigation in 1997. (Dk. 6, p. 3). The amended complaint does not incorporate or adopt by reference the plaintiff's original complaint or the claims and parties alleged there. *See* Fed. R. Civ. P. 10(c).

"An amended complaint supersedes the original complaint and renders the original complaint of no legal effect." *Franklin v. Kansas Dept. of Corrections*, 160 Fed. Appx. 730, *733-734, 2005 WL 3515716 at *1 (10th Cir. 2005) [*5] (citing *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991); *see Davis v. TXO Production Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) ("[i]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect") (internal quotations marks and citations omitted)); *Gilles v. United States*, 906 F.2d 1386, 1389 (10th Cir. 1990); *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) ("It is well-established that an amended complaint

supercedes an original complaint and renders the original complaint without legal effect." (citing *See Washer v. Bullit County*, 110 U.S. 558, 562, 4 S. Ct. 249, 28 L. Ed. 249 (1884))); 6 Charles A. Wright, et al., *Federal Practice and Procedure* § 1476, at 556-57 (2d ed. 1990) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case. . . ." (footnote omitted)). Upon the proper filing of an amended complaint, the district court limits its examination to those claims included in the most recently amended complaint. *Id.* Thus, "[t]he fact that a party was named in the original complaint [*6] is irrelevant; an amended pleading supersedes the original." *Hal Roach Studios Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1990); *see* 6 *Federal Practice and Procedure* § 1476 p. 559 ("the original pleading, once superseded, cannot be utilized to cure defects in the amended pleading, unless the relevant portion is specifically incorporated in the new pleading." (footnote omitted)). "However, pursuant to Rule 10(c), specific allegations of the prior complaint may be referenced or incorporated by the amended complaint, but only if reference to allegations in the prior complaint is direct and specific." *Fullerton v. Maynard*, 943 F.2d 57, 1991 WL 166400, *2 (10th Cir. 1991) (Table) (citations omitted). It is not enough that the amended complaint "mentions the existence of a prior original complaint and refers generally to the 'informal relief sought in that complaint, [if] the amended complaint makes no explicit and direct reference to specific allegations of the original complaint." *Id.* Though his pleadings enjoy a liberal construction, the pro se plaintiff remains "subject to the same rules of procedure that govern [*7] other litigants." *Id.*

Applying the above rules here, the district court must hold that the plaintiff's amended complaint supersedes allegations of his original complaint. The consequence is that the following persons and entities are no longer parties to this action: Cornerstone of Topeka, Inc., Ken Williams, Barry McMurphy, Topeka Housing Authority, Don Miller, Kansas Department of Social and Rehabilitation Services, Sam Brownback, Jim Ryun, Pat Roberts, and Anthony Hensley. n1 *See Scott v. Home Choice, Inc.*, 252 F. Supp. 2d 1129, 1131 (D. Kan. 2003).

n1 The plaintiff also requests in a recent motion that the court dismiss Anthony Hensley, Cornerstone of Topeka, Inc., Ken Williams, and

Barry McMurphy as named defendants. (Dk. 45).

Additionally, the plaintiff has filed a motion requesting that the court dismiss as parties from his lawsuit, the law enforcement community and its officers and the United States Army. (Dk. 45). The federal and local law enforcement defendants agree to their dismissal. [*8] The court grants the plaintiff's request to dismiss these parties who are all the defendants named in the plaintiff's amended complaint. n2

> n2 The plaintiff's request results in the dismissal of the following defendants: Topeka Police Department, Jerry Stanley, Roger Smith, Tom Glor, Jerome Miller, Janene Fally, United States of America, United States Army, Federal Bureau of Investigation, and United States Marshals Service.

In the same motion, the plaintiff alleges that he leaves the Kansas Department of Social and Rehabilitation Services in the case "because of false information" that has caused him irreparable harm. (Dk. 45, p. 2). He further "charge[s]" Phil Kline, Robert Hecht and Pat Roberts with depriving him of "civil liberties because" he is poor, disabled and a crime victim. (Dk. 45, p. 3). Having already amended his complaint once as a matter of course, the plaintiff must have leave of court to amend now. Fed. R. Civ. P. 15(a). The plaintiff's motion does not [*9] comply with D. Kan. Rule 15.1 as it does not "set forth a concise statement of the amendment" or attach the proposed pleading. Nor does the plaintiff's motion satisfy Fed. R. Civ. P. 7(b)(1) which provides that a motion "shall state with particularity the grounds therefor." Rule 7(b)(1) "advances the policies of reducing prejudice to either party and assuring that the court can comprehend the basis of the motion and deal with it fairly." *Calderon v. Kansas Dept. of Social and Rehabilitation Services*, 181 F.3d 1180, 1186 (10th Cir. 1999) (quotation and citation omitted). "[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it." *Id.* 1186-87. Such notices insure "[w]e do not require district courts to engage in independent research or read the minds of litigants to determine if information justifying an amendment exists." *Id.* at 1187 (internal quotation marks and citations omitted).

The plaintiff's motion fails to give [*10] adequate notice of not only the substance but the factual and legal basis for the proposed amendments. The plaintiff's motion does not comply with Fed. R. Civ. P. 7(b)(1) or D. Kan. Rule 15.1. The plaintiff's motion and related filings fall short of the pleading standard in Fed. R. Civ. P. 8 that requires "a short and plain statement of the claim showing that the pleader is entitled to relief." For all these reasons, the court denies the plaintiff's motion to amend.

IT IS THEREFORE ORDERED that with the filing of the plaintiff's amended complaint the following entities and persons were no longer parties to this action: Cornerstone of Topeka, Inc., Ken Williams, Barry McMurphy, Topeka Housing Authority, Don Miller, Kansas Department of Social and Rehabilitation Services, Sam Brownback, Jim Ryun, Pat Roberts, and Anthony Hensley;

IT IS FURTHER ORDERED that plaintiff's motion (Dk. 45) is granted to the extent that the law enforcement community and officers named as defendants--Topeka Police Department, Jerry Stanley, Roger Smith, Tom Glor, Jerome Miller, Janene Fally, United States of America, United States [*11] Army, Federal Bureau of Investigation, and United States Marshals Service--and the United States Army are dismissed as parties in this action;

IT IS FURTHER ORDERED that the plaintiff's motion (Dk. 45) is denied in all other respects including the plaintiff's request to add as defendants, the Department of Social and Rehabilitation Services, Phil Kline, Robert Hecht and Pat Roberts;

IT IS FURTHER ORDERED that in light of the above rulings there are no pending claims or parties, the following motions are denied as moot: motion to dismiss (Dk. 32) filed by the defendants Topeka Police Department, Roger Smith, Janene Falley, Jerry Stanley and Thomas Glor; motion for default judgment filed by the plaintiff (Dk. 48); motion for reconsideration filed by the plaintiff (Dk. 50); and motion to dismiss filed by the defendant Kansas Department of Social & Rehabilitation Services (Dk. 53), and the case shall be closed.

Dated this 16th day of November, 2006, Topeka, Kansas.

2006 U.S. Dist. LEXIS 83592, *11

s/ Sam A. Crow                                     U.S. District Senior Judge

LEXSEE

**PHILIP J. KERRIGAN, Plaintiff, v. ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, Defendant.**

**CIVIL ACTION NO. 04-CV-1189**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2004 U.S. Dist. LEXIS 21500**

**October 26, 2004, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Kerrigan v. Chou, 2005 U.S. App. LEXIS 21973 (3d Cir. Pa., Oct. 11, 2005)

**DISPOSITION:** Plaintiff's Motion for Summary Judgment denied, Defendant's Motion to Dismiss granted, and Complaint dismissed.

**COUNSEL:** [*1] PHILIP J. KERRIGAN, Plaintiff, Pro se, PHILADELPHIA, PA.

For ELAINE CHOU, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, Defendant: VIRGINIA A. GIBSON, U.S. ATTORNEY'S OFFICE, PHILADELPHIA, PA. SUSAN DEIN BRICKLIN, U.S. ATTORNEY'S OFFICE, PHILADELPHIA, PA.

**JUDGES:** Paul S. Diamond, J.

**OPINION BY:** Paul S. Diamond

**OPINION: Diamond, J.**

**MEMORANDUM**

Plaintiff Philip Kerrigan has brought this action *pro se*, alleging that the Secretary of Labor violated his Due Process and Equal Protection rights, and his rights under the Federal Employees Compensation Act, when the Labor Department terminated his disability benefits. The Secretary has moved to Dismiss; Plaintiff has moved for Summary Judgment. I deny the Plaintiff's Motion, grant the Secretary's Motion, and Dismiss the Complaint.

**STANDARD OF REVIEW**

Although the Secretary has moved to dismiss pursuant to Fed. Rule Civ. P. 12(b)(1) -- for want of jurisdiction -- the Secretary also argues that the Plaintiff has failed to state viable causes of action. (See, e.g., Secretary's Brief at 18). Accordingly, I will review the Secretary's Motion under Rule 12(b)(1) and [*2] Rule 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(1) can challenge a complaint on its face -- a "facial attack" -- or it can challenge the existence of subject matter jurisdiction -- a "factual attack." Krumins v. Edwin Cedric Atkinson & Elrac, Inc., 1996 U.S. Dist. LEXIS 10542, No. 95-5737, 1996 WL 432477, at *1 (E.D. Pa. July 22, 1996) (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). The Third Circuit has directed that:

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Mortensen, 549 F.2d at 891. The plaintiff has the burden

of persuading the Court that it has jurisdiction. Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).

A motion to dismiss pursuant to Rule [*3] 12(b)(6) tests the legal sufficiency of a complaint. LaFate v. Hosp. Billing & Collections Serv. Ltd., No. 03-985, 2004 U.S. Dist. LEXIS 17592, *2 (E.D. Pa. Sept. 1, 2004) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). In considering a Rule 12(b)(6) motion, the Court is required to accept all well-pleaded allegations in the complaint as true, and view these allegations in the light most favorable to the non-moving party. Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989) (citations omitted); Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 77 (3d Cir. 2003). Dismissal is warranted only if the plaintiff cannot obtain relief under any set of facts that could be established. Ramadan v. Chase Manhattan Corp., 229 F.3d 194, 195 (3d Cir. 2000) (citing Alexander v. Whitman, 114 F.3d 1392, 1397-98 (3d. Cir. 1997)). In reviewing the propriety of administrative proceedings -- like those at issue here -- the Court may consider at the Rule 12(b)(6) stage the record of administrative actions, opinions, and decisions on which a Plaintiff bases his complaint. [*4] Pension Benefit Guar. Corp. v. White Consol Indus., 998 F.2d 1192, 1196-1197 (3d Cir. 1993); Tlush v. Mfrs. Res. Ctr., 315 F. Supp. 2d 650, 654 (E.D. Pa. 2002).

Courts are obligated liberally to construe *pro se* pleadings to ensure that *pro se* litigants are afforded proper deference. Castro v. Chesney, No. 97-4983, 1998 U.S. Dist. LEXIS 17278, *26 (E.D. Pa. Nov. 3, 1998) (citing Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); Lancaster County Office of Aging v. Schoener, No. 02-7248, 2003 U.S. Dist. LEXIS 1342, *3, . (E.D. Pa. Jan. 13, 2003) n1 (citations omitted); see also United States ex rel. Turner v. Rundle, 438 F.2d 839, 845 (3d Cir. 1971) (*pro se* petitions may be inartfully drawn and should be read "with a measure of tolerance") (citations omitted). "Pro se plaintiffs . . . are entitled to even greater deference when the sufficiency of their pleadings is [sic] called into question." Boone v. Chesney, No. 94-3293, 1994 U.S. Dist. LEXIS 12339, at *1 (E.D. Pa. Sept. 2, 1994) (citing Haines; Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)). [*5] A court may dismiss a *pro se* complaint under Rule 12(b)(6) only when it "appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." McDowell v. Del. State Police, 88 F.3d 188, 189 (3d Cir. 1996) (quoting Haines, at 520). "On the other hand, a judge may not become a surrogate attorney for the party, even one who is proceeding *pro se*." Taylor v. Diznoff, 633 F. Supp. 640, 641 (W.D. Pa. 1986) (quoting Mazur v. Pa. Dept. of Transp., 507 F. Supp. 3, 5 (E.D. Pa. 1980), aff'd 649 F.2d 860 (3d Cir. 1981).

## THE COMPLAINT, THE INSTANT MOTIONS, AND THE RECORD IN THIS CASE

The confusing nature of Plaintiff's pleadings and allegations has encumbered the evaluation of both sides' Motions. For instance, Plaintiff's Complaint is two pages long and includes only the barest allegations of governmental misconduct. Plaintiff has appended to his Complaint a "Declaration," numerous documents from his administrative proceedings, and a supporting "Memorandum." Plaintiff has also filed a "Response" to the Secretary's Motion to Dismiss, to which he has [*6] also appended numerous administrative proceeding documents.

I have combined all the allegations in these pleadings and filings so that, together, they constitute Plaintiff's Complaint for purposes of evaluating the Secretary's Motion to Dismiss. I have also considered the documents that Plaintiff has appended to those "Complaint" papers, both because they are the documents on which Plaintiff bases his Complaint, and because they constitute part of his administrative record. Weinberg v. J.S. Cornell & Son, Inc., No. 01-5706, 2004 U.S. Dist. LEXIS 19052, *3-4 (E.D. Pa. Sept. 21, 2004) (citing Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)).

In moving to dismiss, the Secretary has also provided me with extensive documentation from Plaintiff's administrative proceedings. Under Rule 12(b)(6), I may consider these documents without converting the Secretary's Motion into one for Summary Judgment. In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 292-293 (3d Cir. 1999) (a court may consider documents integral to or relied on in the complaint, letter decisions of government agencies, and published reports [*7] of administrative bodies, without converting a motion to dismiss into a motion for summary judgment); Pension Benefit Guar. Corp., 998 F.2d at 1196-1197; Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 781-782 (W.D. Pa. 2000); Mitchell v. Cellone, 291 F. Supp. 2d 368, 371

(W.D. Pa. 2003); In re Wellbutrin/Zyban Antitrust Litig., 281 F. Supp. 2d 751, 755 (E.D. Pa. July 25, 2003).

Finally, Plaintiff's "Motion for Summary Judgment" is little more than a restatement of why he believes his benefits were improperly terminated. Accordingly, I will consider the allegations in Plaintiff's Summary Judgment Motion and the documents he appended to his "Motion" as part of his "Complaint" in this Court.

## PROCEDURAL HISTORY

On March 3, 1986, Plaintiff, a carpenter with the United States Navy, injured his back while working at the Public Works Center in San Diego, California. (Plaintiff's Brief, Exhibit C at 1). Plaintiff missed several weeks of work as a result of the injury. In April 1986, Plaintiff sought workers' compensation benefits pursuant to FECA, claiming that he injured his back in the course of his federal [*8] employment. 5 U.S.C. § 8101 et seq.; (Plaintiff's Brief, Exhibit C at 2). The Office of Workers' Compensation Programs accepted Plaintiff's claim for a herniated disc in January 1987. (Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Declaration at 2). Plaintiff was paid retroactive compensation for wages lost from April 23, 1986 through May 25, 1986, and July 4, 1986 through May 19, 2002. (Secretary's Brief, Attachment A at 3; Attachment D at 1-2).

In July 1986, Plaintiff received psychological counseling for an emotional condition purportedly caused by his back injury. Plaintiff's claim for psychiatric treatment was initially denied by the OWCP, but, following an appeal to the Office Hearing Representative, the claim was remanded to the OWCP for further development. (Secretary's Brief, Attachment A at 5-7, 14). Following a review of Plaintiff's medical history, Dr. Bruce Smoller, a physician specializing in neurology and psychology, concluded that Plaintiff suffered a work-related emotional condition that was resolved in January 1987. Based on Dr. Smoller's opinion, the OWCP issued a de novo decision that Plaintiff suffered [*9] a temporary psychiatric problem in 1986. The OWCP agreed to compensate Plaintiff for approximately six months of psychiatric treatment; Plaintiff was required either to submit the related medical bills or appeal through customary administrative procedures. It is unclear from the record what actions Plaintiff has taken, if any.

In 1992, Plaintiff began receiving back treatment from Dr. James Webber, a family practitioner. Plaintiff applied to the OWCP seeking payment for Dr. Webber's continuing treatment. The OWCP denied this request in February 1995 because Dr. Webber was not an appropriate specialist for Plaintiff's back injuries. On appeal, the Office Hearing Representative affirmed the OWCP decision, stating that Dr. Webber did not specialize in disc injuries. (Secretary's Brief, Attachment A at 11). Plaintiff appealed this ruling to the Employees Compensation Appeals Board, which affirmed. (Secretary's Brief, Attachment B at 1). Plaintiff filed a Petition for Reconsideration which the ECAB denied on April 15, 1999. (Secretary's Brief, Attachment C at 2). On March 21, 2002, OWCP issued a final decision denying Plaintiff's request for a lump sum payment of his disability benefits. [*10] The decision included an explanation of Plaintiff's rights to further administrative review.

Following the ECAB decision, the OWCP referred Plaintiff to Anthony W. Salem, a Board-certified orthopedic surgeon, for examination. Dr. Salem concluded that Plaintiff could resume full-time work with restrictions. OWCP then referred Plaintiff for vocational rehabilitation to commence on December 18, 2001. Plaintiff refused to participate in the vocational rehabilitation. By letter dated January 30, 2002, OWCP informed Plaintiff that a failure to cooperate with the vocational counselor could result in a reduction or termination of his benefits. (Secretary's Reply Brief, Attachment A at 1). In response, Plaintiff claimed that the OWCP claims examiner failed adequately to notify him of the vocational rehabilitation and based his conclusion on a false medical opinion. Plaintiff also asserted his disagreement with the Statement of Accepted Facts provided to Dr. Salem.

On May 19, 2002, OWCP terminated Plaintiff's compensation benefits because of his refusal to participate in vocational rehabilitation. (Secretary's Reply Brief, Attachment B at 1). At Plaintiff's request, the Office Hearing Representative [*11] reviewed the OWCP decision. On August 20, 2002, the OHR ruled that termination was proper because of Plaintiff's failure to show good cause for refusing to participate in vocational rehabilitation. Plaintiff unsuccessfully sought a second hearing before the Branch of Hearings and Review. Plaintiff was informed that he could submit evidence to OWCP as a request for reconsideration.

Plaintiff appealed these rulings to the ECAB. On September 16, 2003, ECAB affirmed the OWCP's termination of Plaintiff's benefits, again citing Plaintiff's failure to demonstrate "good cause" for refusing to participate in vocational rehabilitation. (Secretary's Brief, Attachment D at 2-3). ECAB also held that the OHR properly denied Plaintiff's request for a second hearing. (Secretary's Brief, Attachment D at 4).

Plaintiff filed the instant Complaint in March 2004, alleging that the 2002 termination of benefits violated his Due Process and Equal Protection rights and his rights under FECA. He accuses the Secretary of retaliation, perjury, forgery, misrepresentation, concealment of material facts, abuse of process, abuse of discretion, psychiatric abuse, and malfeasance. Plaintiff not only relies on the [*12] administrative proceedings just described, he also refers the Court to his efforts to persuade the government to initiate a criminal investigation of these proceedings.

On May 4, 2001, Plaintiff informed the Department of Defense Office of Inspector General of alleged abuse, fraud, and illegality committed by the Labor Department. (Plaintiff's Declaration under FECA at 9). On September 19, 2001, Plaintiff was notified that the case had been transferred to the Labor Department. (Plaintiff's Declaration under FECA at 10). The Office of Inspector General for the Department of Labor requested, and Plaintiff claims to have provided, additional information regarding the allegations. (Plaintiff's Declaration under FECA at 10). On February 6, 2002, the Inspector General's Office concluded there was "no impropriety" in the Department's actions. (Plaintiff's Declaration under FECA at 10). On October 9, 2002, Plaintiff, purportedly acting on instructions from the United States Attorney's Office, submitted documents pertaining to the same alleged improprieties to the Philadelphia Office of the Federal Bureau of Investigation. (Plaintiff's Declaration under FECA at 12). Plaintiff has not alleged [*13] whether the FBI conducted any further investigation.

## DISCUSSION

Construing the collection of documents I deem to be Plaintiff's Complaint as liberally as I reasonably can, I believe that Plaintiff seeks to make the following claims:

> 1. Under FECA, the Secretary improperly denied his claim for benefits.

> 2. That in denying his claim, the Secretary violated his Due Process and Equal Protection protections rights under the Fifth Amendment to the Constitution, and those rights provided by 42 U.S.C. § 1983.

The Secretary has moved to dismiss.

## Federal Employees Compensation Act

The Labor Department terminated Plaintiff's benefits because he refused to participate in vocational rehabilitation. (Secretary's Brief, Attachment D at 2). Plaintiff claims that this decision was incorrect under FECA. (Plaintiff's Memorandum of Points at 17). The Secretary correctly notes that the statute itself provides that this Court does not have jurisdiction to review a claim for a denial of benefits under FECA:

> The action of the Secretary or his designee in allowing or denying a payment under this subchapter is -- (1) final and conclusive for [*14] all purposes and with respect to all questions of law and fact; and (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.

5 U.S.C. § 8128(b); see also Miller v. Bolger, 802 F.2d 660, 662 (3d Cir. 1986) ("after an administrative review procedure, the Secretary's decision is final, and 'not subject to review by another official of the United States or by a court by mandamus or otherwise'" (quoting 5 U.S.C. § 8128(b))). Accordingly, I dismiss for want of jurisdiction Plaintiff's claim that the Secretary improperly terminated his FECA benefits.

## Due Process

A limited exception to 5 U.S.C. § 8128(b) has been recognized for consideration of "substantial, cognizable constitutional claims." Freeman v. Herman, No. 98-2649, 1998 U.S. Dist. LEXIS 18645, *11 (E.D. Pa. Nov. 24, 1998); Garner v. United States DOL, 221 F.3d 822 (5th Cir. Miss. 2000); Carson v. United States DOL, No. 04-1171, 2004 U.S. Dist. LEXIS 16621, *4 (E.D. La. Aug. 19, 2004); Ramirez v. Dir. Office of Workers' Comp. Programs, No. 02-188, 2003 U.S. Dist. LEXIS

24326, [*15] *10 (W.D. Tx. Sep. 16, 2003). Judicial review is permitted where the challenge is to the manner in which the claim was decided, rather than the substantive merits of the case. See Ramirez, 2003 U.S. Dist. LEXIS 24326, at *10.

Plaintiff argues that the Secretary's 2002 termination of his FECA benefits violated his Due Process rights. The Secretary contends that Plaintiff's Due Process claim is actually a restatement of his claim that his denial of benefits violated FECA. Accordingly, the Secretary contends that this Court is without jurisdiction to hear the claim. Fed. R. Civ. P. 12(b)(1); (Secretary's Brief at 9-10). I agree that Plaintiff has sought to recast his FECA challenge as a Due Process violation and thus evade § 8128(b)'s jurisdictional bar. To reach this conclusion, however, I must first determine that the Due Process claim is facially inadequate. Accordingly, I must evaluate the claim under Rule 12(b)(6).

"Claims of entitlement to federal disability payments are secured through laws passed by Congress, 5 U.S.C. §§ 8101-8193, and therefore, entitlement to the benefits cannot be taken away without due process." Raditch v. United States, 929 F.2d 478, 480 (9th Cir. 1991); [*16] see Ramirez, 2003 U.S. Dist. LEXIS 24326, at *13 (disability benefits procured under FECA are valid property interests subject to Due Process protections).

Due Process is a flexible concept and the procedural protection required depends upon the circumstances of the case. Wehner v. Levi, 183 U.S. App. D.C. 328, 562 F.2d 1276, 1278 (D.C. Cir. 1977) (citing Morrissey v. Brewer, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972)). Due Process has been interpreted to require "at least notice and an opportunity to be respond in some manner, whether in writing or at an oral hearing, before termination of that [property] interest." Raditch, 929 F.2d at 480 (citing Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 546, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985)).

Here, the Secretary afforded the Plaintiff ample process. Plaintiff was given both notice and the opportunity to submit evidence before the reduction of his benefits, including the opportunity to show good cause for his failure to accept vocational rehabilitation counseling. After the reduction in benefits, Plaintiff requested and received hearings before the OHR and the ECAB. The OWCP warned [*17] Plaintiff that his refusal to participate in vocational rehabilitation could result in a termination of his benefits. (Secretary's Reply

Brief, Attachment A at 1). It was only after Plaintiff ignored this warning that the Labor Department terminated his benefits. (Secretary's Brief, Attachment D at 2). These procedural safeguards were certainly sufficient to ensure both fairness and reliability of the Secretary's actions. See, e.g., Carson, 2004 U.S. Dist. LEXIS 16621, at *4 (Plaintiff was afforded Due Process when, after she received notice, the OWCP conducted a review of medical documentation rather than hold an evidentiary hearing).

As part of his Due Process claim, Plaintiff also makes scatter-shot allegations against the Secretary, accusing her of malfeasance for having destroyed, lost, and forged documents; presented perjured testimony; and concealed adverse facts. These are, presumably, the same allegations made unsuccessfully to two Inspectors General and the FBI.

Plaintiff's only specific allegation is that the CA-1 accident report, witness statement, and CA-17 status report of May 28, 1986 were lost. (Pl. Declaration at 1; Pl. Reply to Motion to Dismiss at 5). In raising this allegation [*18] at the administrative level, Plaintiff failed to produce any evidence of government malfeasance. More significant, Plaintiff fails to allege -- and, has never shown -- what information is or may be contained in those documents, or how he has been prejudiced by the absence of the documents. See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994) (party must show, at the very least, prejudice, in addition to other factors to receive relief for loss or destruction of evidence); Kalumetals, Inc. v. Hitachi Magnetics Corp., 21 F. Supp. 2d 510, 520 (W.D. Pa. 1998).

Plaintiff does not otherwise specify here -- nor did he specify during his administrative proceedings -- exactly what other evidence was forged, destroyed, perjured, or concealed. It is clear, however, that Plaintiff had more than ample opportunity to raise these claims at the administrative level. The record is replete with references to Plaintiff's allegations of government malfeasance, including numerous letters from Plaintiff to administrative representatives in the Department of Labor and even an attempt by Plaintiff to involve his Congressman in the proceedings. (Affidavit [*19] of Philip Kerrigan, 10/09/02; Letter to Robert Barnes, 9/07/02; Letter to Employees' Compensation Board, 3/18/03; Letter to Congressman Chaka Fattah, 04/26/02).

Further, Plaintiff repeatedly raised these allegations before administrative fact-finders; they were repeatedly rejected as grounds for reinstatement of his benefits following his refusal to participate in vocational rehabilitation. (Decision of Hearing Representative, 09/16/02, at 2; Decision of ECAB, 9/16/02, at 3; Letter from William J. Staarman, District Director, to Philip Kerrigan 10/15/03). Accordingly, because Plaintiff had numerous opportunities to challenge the allegedly false evidence, Due Process requirements were satisfied. See, e.g., Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (as long as procedural requirements are satisfied, "mere allegations of falsified evidence . . . without more, are not enough to state a due process claim").

The vehemence of Plaintiff's allegations is not a substitute for a legally viable cause of action. Here, Plaintiff essentially pleads that only a corrupt and illegal administrative process could result in his 2002 termination of benefits. The Secretary [*20] correctly argues that this is merely a restatement of Plaintiff's contention that he was improperly denied FECA benefits.

Similarly, Plaintiff contends his denial of FECA benefits was wrongful and made "in retaliation for plaintiff's reporting of [a] six month international investigation by Naval Criminal Investigative Service as an act of fraud to [the] Department of Defense." (Plaintiff's Declaration at 11). Again, Plaintiff may not circumvent this Court's jurisdictional limits "by collaterally attacking a denial of FECA benefits as retaliatory." Nicastro v. Runyon, 60 F. Supp. 2d 181, 186 (S.D. N.Y. 1999).

The relief Plaintiff requests further confirms that what Plaintiff seeks here is not additional "process." Plaintiff asks me to reinstate his benefits, enjoin the Secretary from interfering with those benefits, and award Plaintiff compensatory and special damages. (Plaintiff's Memorandum of Points at 19; Plaintiff's Response Brief at 18). Yet, these remedies are not available for an alleged Due Process violation. See Raditch, 929 F.2d at 481 ("[a] violation of procedural rights requires only a procedural correction, not the reinstatement [*21] of a substantive right to which the claimant may not be entitled to on the merits"); Casper v. Herman, 1998 U.S. Dist LEXIS 1845, *12 (E.D. Pa. Feb. 10, 1998) (holding that "any relief at best would be an order allowing Plaintiff an administrative appeal"); Ramirez, 2003 U.S. Dist. LEXIS 24326, at *13. This is undoubtedly why the Secretary believes Plaintiff's "Due Process" complaint has nothing to do with Due Process, but, rather, is simply a claim for FECA benefits -- a claim I am without jurisdiction to hear. 5 U.S.C. § 8128(b).

There is nothing in the administrative record suggesting that Plaintiff was not allowed to litigate fully his governmental malfeasance claims. Nor is there any evidence in the record to support those claims or to show that he suffered any prejudice because of governmental unfairness. In these circumstances, it is apparent that the procedural protections Plaintiff claims he was afforded before the Secretary terminated his benefits were certainly adequate. See, e.g., Carson, 2004 U.S. Dist. LEXIS 16621, at *4. Accordingly, I dismiss Plaintiff's Due Process claim.

**Equal Protection**

Plaintiff also asserts that the Secretary's denial of his benefits [*22] claim violated his Equal Protection rights. Once again, the Secretary argues that this is simply a restatement of his claim for benefits.

Plaintiff argues that the ECAB did not properly follow its own decision in In the Matter of Ernest Dillon, No. 90-78, 41 ECAB 653 (1990) (holding that it is improper for the OWCP to advise an evaluating physician that he may not consider the location of the injured individual's assignment in assessing his ability to return to work). Thus, Plaintiff argues that his Equal Protection rights were violated because the ECAB treated him differently than it treated Ernest Dillon. This is not an Equal Protection claim at all, but, rather, a claim that the Secretary improperly terminated Plaintiff's FECA benefits.

To make out an Equal Protection claim, Plaintiff must allege that he is part of a class -- even a "class of one" -- that "has been intentionally treated differently from others similarly situated, and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 145 L. Ed. 2d 1060, 120 S. Ct. 1073 (2000). Thus, Plaintiff's allegation -- that the ECAB erroneously failed [*23] to follow one of it own holdings -- does not raise an Equal Protection claim. If it did, this might improperly transform virtually any contention that a court or agency erroneously failed to follow an earlier decision into a claim of unconstitutional discrimination. Accordingly, I dismiss Plaintiff's Equal Protection claim.

Finally, Plaintiff asserts pursuant to 42 U.S.C. § 1983 a "denial of civil rights under the color of law." (Plaintiff's Memorandum of Points at 16). Yet, § 1983 prohibits a deprivation of a constitutional right under color of state or territorial law. 42 U.S.C. § 1983 (2004). As Plaintiff makes claims here against only federal employees acting pursuant to federal law, he has not articulated a cognizable § 1983 claim. See Soeken v. Herman, 35 F. Supp. 2d 99, 102 (D.C. 1999). Accordingly, I dismiss Plaintiff's § 1983 claim.

The Secretary's Motion to Dismiss is **GRANTED**.

Plaintiff's Motion for Summary Judgment is **DENIED**.

An appropriate Order follows.

**Paul S. Diamond, J.**

Order

AND NOW, this 26th day of October, 2004, upon consideration of the Secretary's Motion to [*24] Dismiss and Plaintiff's response, it is **ORDERED** that the Secretary's Motion is **GRANTED**. Upon consideration of the Plaintiff's Motion for Summary Judgment and the Secretary's response, it is **ORDERED** that the Plaintiff's Motion is **DENIED**.

The Complaint is **DISMISSED WITH PREJUDICE**.

The Clerk of Court shall close this matter for statistical purposes.

**BY THE COURT:**

**Paul S. Diamond, J.**

LEXSEE

**MAGTEN ASSET MANAGEMENT CORPORATION, suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC, Plaintiff, v. PAUL HASTINGS JANOFSKY & WALKER LLP, Defendant.**

**Civil Action No. 04-1256-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2007 U.S. Dist. LEXIS 2786**

**January 12, 2007, Decided**

**PRIOR HISTORY:** Magten Asset Mgmt. Corp. v. NorthWestern Corp., 2006 U.S. Dist. LEXIS 71002 (D. Del., Sept. 29, 2006)

**COUNSEL:** [*1] Magnet Asset Management, Suing Individually and drivatively on behalf of Clark Fork and Blackfoot, LLC., Plaintiff: David A. Jenkins, Kathleen M. Miller, LEAD ATTORNEYS, Smith, Katzenstein, & Furlow, Wilmington, DE; Mark J. Packel, Blank Rome LLP, Wilmington, DE; Bijan Amini, Esquire and Avery Samet, Esquire of STORCH AMINI & MUNVES PC, New York, New York.

Paul Hastings Janofsky & Walker LLP, Defendant: Robert J. Dehney, LEAD ATTORNEY, Curtis S. Miller, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Joseph J. Farnan, Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

### MEMORANDUM OPINION

January 12, 2007
Wilmington, Delaware

**Farnan, District Judge**

Presently before the Court is a Motion For Judgment On The Pleadings (D.I. 86) filed by Defendant, Paul Hastings Janofsky & Walker, LLP. For the reasons set forth below, the Court will grant the Motion.

### I. BACKGROUND

By its Complaint, Plaintiff Magten Asset Management Corporation, alleges that Northwestern Corporation ("Northwestern") attempted to cover up its losses from poor investment decisions by stripping the assets of its solvent and profitable subsidiary, Clark Fork and [*2] Blackfoot LLC ("Clark Fork"). Specifically, Magten contends that Northwestern transferred to itself assets of Clark Fork, valued between $ 1.1 and 1.4 billion, in exchange for Northwestern's assumption of $ 700 million in Clark Fork's debt. Magten contends that this consideration was inadequate and illusory, and that Northwestern subsequently encumbered Clark Fork's assets with new debt, which resulted in the disenfranchisement of Clark Fork's creditors. Shortly thereafter, Northwestern filed for Chapter 11 bankruptcy protection.

Paul Hastings has admitted that it represented both Northwestern and Clark Fork in the transfer. However, Magten contends that Paul Hastings aided and abetted Clark Fork's directors and officers in breaching their fiduciary duties and knowingly designed and implemented the transfer with the purpose of defrauding Clark Fork's creditors.

One of Clark Fork's creditors was Montana Power Capital I (the "QUIPS Trust"). Pursuant to an Indenture Agreement (the "Indenture") dated November 1, 1996 between Clark Fork's predecessor, the Montana Power Company, and Bank of New York n1, the QUIPS Trust was issued $ 65 million in bonds by the Montana Power Company. Instead [*3] of selling these bonds directly to

investors, the QUIPS Trust issued Series A 8.45% Quarterly Preferred Securities (the "QUIPS"), whose value was based entirely on Clark Fork's ability to pay interest and principal to the Quips Trust. The Indenture also provided that the holders of the QUIPS were the intended beneficiaries of Clark Fork's obligations to the QUIPS Trust and that, if the trust failed to act, any holder of the QUIPS could sue directly to enforce the rights of the QUIPS Trust. Magten owns in excess of 33% of the QUIPS and contends that it is an express third-party beneficiary under the Indenture.

> n1 The Bank of New York has been succeeded by Law Debenture Trust Company of New York.

By its Complaint, Magten asserts four causes of action individually and derivatively on behalf of Clark Fork against Paul Hastings. Specifically, Magten contends that Paul Hastings (1) aided and abetted the officers of Clark Fork in breaching the fiduciary duties they owed to Clark Fork's creditors by carrying out the [*4] allegedly fraudulent transfer without adequate consideration and rendering Clark Fork insolvent; (2) aided and abetted the allegedly fraudulent transfer by structuring the transaction to leave Clark Fork insolvent and providing substantial assistance and guidance to Northwestern and Clark Fork to carry out the transaction; (3) engaged in a civil conspiracy to conduct the allegedly fraudulent transfer; and (4) committed malpractice by breaching its duties to Clark Fork in failing to disclose its conflict of interest to Clark Fork's officers and directors.

## II. PARTIES' CONTENTIONS

By its Motion, Paul Hastings contends that Magten's claims should be dismissed, because Paul Hastings was not the transferee of the assets in question. According to Paul Hastings, Montana's Uniform Fraudulent Transfer Act ("MUFTA") does not impose liability on non-transferees, and the imposition of any such liability would be inconsistent with the purpose of fraudulent transfer statutes in general.

Paul Hastings also contends that Magten does not have standing to assert its claims against Paul Hastings, because those claims are derivative claims accruing to Clark Fork and not to any creditors of [*5] Clark Fork. Paul Hastings also contends that Clark Fork is a limited

liability company under Montana law and the applicable Montana statute only authorizes members of the limited liability company to bring derivative claims. Paul Hastings further contends that, in any event, Magten was not a creditor of Clark Fork at the time of the allegedly fraudulent transfer, and therefore, Magten lacks standing to bring this derivative law suit.

In response, Magten contends that the MUFTA preserves principles existing at equity and common law, and Montana courts have long-recognized a cause of action for conspiracy to defraud creditors. Magten contends that courts have upheld claims for conspiracy and aiding and abetting fraudulent conveyances under the Uniform Fraudulent Conveyance Act.

With respect to the question of standing, Magten contends that Montana's limited liability code says nothing about the rights of creditors, and therefore, these statutes do not limit Magten's ability to sue. Magten also contends that it is an express third party beneficiary under the Indenture, and both the United States Bankruptcy Court for the United States District Court for the District of Montana rejected [*6] Paul Hastings' lack of standing arguments.

## III. STANDARD OF REVIEW

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is governed by the same standards that apply to a motion to dismiss under Rule 12(b)(6). Specifically, the Court must accept the facts alleged in the pleadings as true and draw all reasonable factual inferences in the light most favorable to the nonmovant. A motion for judgment on the pleadings may only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The movant bears the burden of demonstrating that no material issue of fact remains to be resolved and judgment as a matter of law is appropriate. Institute for Scientific Info v. Gordon & Breach, Sci. Publs., Inc., 931 F.2d 1002, 1005 (3d Cir. 1991).

## IV. DISCUSSION

Magten's claims in this action are based upon an alleged fraudulent transfer under Mont. Code Ann. § 31-2-326, et seq. At least one court interpreting the MUFTA [*7] has recognized that it "bear[s] a close

resemblance" to the language of the Bankruptcy Code, and therefore, the fraudulent transfer provisions of the MUFTA should be interpreted "contemporaneously with those of the Bankruptcy Code." Samson v. U.S. West Communications, Inc. (In re Gigonis), 208 B.R. 950, 958 (Bankr. D. Mont. 1997). The majority of courts interpreting the Bankruptcy Code have declined to impose liability for fraudulent transfers on third parties who did not receive the assets in question. See e.g., Mack v. Newton, 737 F.2d 1343, 1358 (5th Cir. 1984) (recognizing that holding nontransferee liable for fraudulent transfer is inconsistent with purpose of fraudulent transfer statutes which is to "preserve the assets of the bankrupt" and not "to render civilly liable all persons who may have contributed in some way to the dissipation of those assets"); Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 737 & n. 10 (1st Cir. 1982) (finding no liability because neither defendant received any of the fraudulently transferred property); Jackson v. Star Sprinkler Corp., 575 F.2d 1223, 1234 (8th Cir. 1978) [*8] (holding that "recovery under the Bankruptcy Act does not extend to permit a judgment against 'conspirators' who did not receive the property transferred").

The MUFTA also expressly provides that it should "be applied and construed to effectuate the general purpose of making uniform the law with respect to the subject of this part among states enacting it." Mont. Code Ann. § 31-2-327. The majority of courts interpreting state UFTA laws, whose provisions have been similar to those enacted by the State of Montana, have concluded that liability cannot be imposed on non-transferees under aiding and abetting or conspiracy theories. See e.g., In re Parmalat Sec. Litig., 377 F. Supp. 2d 390, 417 (S.D.N.Y. 2005) (holding that aiding and abetting claims do not exist under Illinois UFTA and recognizing that courts have been reluctant to impose such liability absent statutory authorization); Baker O'Neal Holdings v. Ernst & Young, 2004 U.S. Dist. LEXIS 6277 (S.D. Ind. Mar. 24, 2004) (holding that "catch-all" provision similar to one contained in MUFTA did not encompass aiding and abetting liability); Rohm & Haas Co. v. Capuano, 301 F. Supp. 2d 156, 161 (D.R.I. 2004) [*9] (refusing to extend liability for fraudulent transfer to a nontransferee under the Rhode Island UFTA); Freeman v. First Union Nat'l Bank, 865 So. 2d 1272 (Fla. 2004) (holding that aiding and abetting claims may not be brought under Florida UFTA).

It is evident from the pleadings in this case, that Paul Hastings did not receive the assets in question. As the Complaint alleges. Northwestern was "the only party that benefitted in the transaction." (D.I. 1 at P 5). Because the Court concludes its interpretation of the MUFTA should be guided by the majority approach to this issue, the Court concludes that Magten cannot establish its claims for aiding and abetting and conspiracy based upon an alleged fraudulent transfer under the MUFTA. Accordingly, the Court will grant Paul Hastings Motion for Judgment on the pleadings.

To the extent that any issue remains regarding Magten's claims that Paul Hastings committed malpractice and aided and abetting the officers and. directors of Clark Fork to breach their fiduciary duties, the Court concludes that Magten lacks standing to pursue these claims. Under Montana law, "stockholders and guarantors of a corporation do not have the [*10] right to pursue an action on their own behalf when the cause of action accrues to the corporation." Kondelik v. First Fidelity Bank, 857 P.2d 687, 692, 259 Mont. 446 (Mont. 1993) (citations omitted). Regardless of any claims that Clark Fork was "in the zone of insolvency," the Court concludes that Magten's claims are appropriately considered to be derivative claims. See e.g., Production Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 776, 792 (Del. Ch. Ct. 2004). Under the Montana statue authorizing derivative claims against limited liability companies, such claims may only be brought by member of the company, who was a member at the time of the transaction at issue. Mont. Code Ann. 35-8-1104(2).

Magten contends that it has third party beneficiary standing under the Indenture, and therefore, it has standing to sue Paul Hastings regardless of the express provisions of Section 35-8-1104(2). While the Indenture may give Magten the right to enforce the Trust's rights, in the Court's view, it does not provide Magten with the right to bring its derivative claims on behalf of Clark Fork. Even if Magten can bring a derivative claim [*11] against Clark Fork as a creditor, Magten has not demonstrated that it was a creditor of Clark Fork at the time of the alleged transaction at issue. Thus, Magten cannot satisfy the "contemporaneous ownership" requirements of Section 35-8-1104, whose purpose is particularly applicable here, i.e. to prevent courts from litigating "purchased grievances." Cf. Kaliski v. Bacot (In re Bank of N.Y. Derivative Litig.), 320 F.3d 291, 297 (2d

2007 U.S. Dist. LEXIS 2786, *11

Cir. 2003) (discussing contemporaneous ownership provision in context of Federal Rule of Civil Procedure 23.1 pertaining to derivative actions). Accordingly, the Court concludes, in the alternative, that Magten lacks standing to bring its derivative claims against Paul Hastings.

## V. CONCLUSION

For the reasons discussed, the Court will grant Paul Hastings' Motion For Judgment On The Pleadings.

An appropriate Order will be entered.

### ORDER

At Wilmington, this 12 day of January 2007, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion For Judgment On The Pleadings (D.I. 86) is **GRANTED.**

Joseph J. Farnan, [*12] Jr.

UNITED STATES DISTRICT JUDGE

LEXSEE

**DOREEN M. MCQUAID v. ACTS RETIREMENT COMMUNITIES - SOUTHAMPTON ESTATES, ET AL.**

**CIVIL ACTION NO. 04-3620**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2005 U.S. Dist. LEXIS 18565**

**August 8, 2005, Decided**

**PRIOR HISTORY:** McQuaid v. Acts Ret. Cmtys. Southampton Estates, 2004 U.S. Dist. LEXIS 15276 (E.D. Pa., Aug. 2, 2004)

**DISPOSITION:** [*1] Defendants' Motion to Dismiss granted.

**COUNSEL:** DOREEN M. MCQUAID, Plaintiff, Pro se, LANGHORNE, PA.

For ACTS RETIREMENT COMMUNITIES-SOUTHAMPTON ESTATES, CATHERINE HOAG, SUPERVISOR, GLORIA HOAG, SUPERVISOR'S SISTER, FERNANDUS HALL, DEPARTMENT HEAD, SUSAN ARCADIA, EXECUTIVE DIRECTOR, CLAIRE HALTON, DIRECTOR OF EMPLOYEE RELATIONS, Defendants: ALISON C. FINNEGAN, ELISE A. FIALKOWSKI, SCHNADER HARRISON SEGAL AND LEWIS LLP, PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION:**

**ORDER-MEMORANDUM**
**Padova, J.**

**AND NOW,** this 8 day of August, 2005, upon consideration of Defendants' Motion to Dismiss (Docket No. 11), **IT IS HEREBY ORDERED** that the Motion is **GRANTED. n1 IT IS FURTHER ORDERED** that this case is **DISMISSED** in its entirety. The Clerk shall close this case statistically.

n1 Although Plaintiff requested, and was granted, an extension of time to respond to the instant Motion to Dismiss until June 30, 2005, Plaintiff did not file a response to the Motion. Although the Motion is therefore unopposed, the Court declines to grant the Motion as uncontested pursuant to Local Rule of Civil Procedure 7.1(c), and instead has considered the Motion on its merits.

[*2]

The Complaint, which was filed by Plaintiff acting *pro se,* consists of a form listing Plaintiff's address and the address of Defendant ACTS Retirement Communities - Southampton Estates ("ACTS") and a request for the following relief: "1) a lawyer to assist me with this case, 2) all charges waived, 3) to have my case reconsidered successfully. This company will not change if it is not held accountable." (Compl. P4.) Plaintiff has attached to the Complaint a Charge of Discrimination ("COD") which she filed with the Pennsylvania Human Relations Commission on December 12, 2003 and a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). (Compl. Attachments 1 and 2.) The Court will treat the COD as alleging the factual and legal basis of Plaintiff's claims in this Court. A few weeks after filing the Complaint, Plaintiff moved to add additional defendants. (Docket No. 4.) This Motion was granted in accordance with Federal Rule of Civil Procedure 15(a) which permits a party to amend her

pleading "once as a matter of course at any time before a responsive pleading is served . . . ." Fed. R. Civ. P. 15(a). The individual defendants were then added as defendants [*3] in this action. (Docket No. 5.) Plaintiff's request for appointment of counsel was granted on November 8, 2004. (Docket No. 10.) The November 8, 2004 Order was vacated on April 1, 2005, however, because the employment panel was unable to obtain counsel willing to represent Plaintiff in this matter. (Docket No. 13.)

The COD states that Plaintiff was hired by Defendant ACTS on May 5, 2000. (COD at 1.) She was injured on the job on October 6, 2001 and placed on restricted duty. (Id.) The COD does not state the nature of Plaintiff's injury. She was released to full duty on March 28, 2002. (Id.) She was harassed by her supervisor, Defendant Catherine Hoag; her department head, Defendant Fernandus Hall; the executive director, Defendant Susan Arcadia; and certain medical aids. (Id.) Her complaints about this harassment were ignored. (Id.) She was discharged on June 11, 2003, after an incident in which she left work to take a break after being falsely accused of not removing trash from the dining room. (Id.) The COD asserts the following claim of discrimination: "I have been discriminated against because of my disability and retaliated against because I complained of [*4] harassment in violation of the Americans with Disabilities Act of 1990." (Id. at 2.) Based upon the COD, the Court infers that Plaintiff is asserting claims of employment discrimination consisting of harassment and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951, et seq.

Defendants have moved to dismiss the Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). When determining a motion to dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff. Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985). A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would [*5] entitle him or her to relief. Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).

Documents "integral to or explicitly relied upon in the complaint" may be considered on a motion to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

The Motion to Dismiss requests dismissal of Plaintiff's ADA claim against the individual Defendants because the ADA does not provide for individual liability. "The ADA forbids discrimination by any 'covered entity,' defined as 'an employer, employment agency, labor organization, or joint labor-management committee.'" McInerney v. Moyer Lumber and Hardware, Inc., 244 F. Supp. 393, 397-98 (E.D. Pa. 2002) (citing 42 U.S.C. §§ 12112(a), 12111(2)). An employer is defined in the ADA as "a person engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person." 42 U.S.C. § 12111(5)(A). The COD does not allege that the five individual Defendants are employers, as defined by the ADA, but identifies them as employees of ACTS.

Neither the United States Supreme Court nor the United [*6] States Court of Appeals for the Third Circuit (the "Third Circuit") has directly addressed the question of whether individuals may be held liable for violating the ADA. McInerney, 244 F. Supp. 2d at 398. However, the Third Circuit has noted, in dicta, that "there appears to be no individual liability for damages under Title I of the ADA." Koslow v. Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002) (citation omitted). Moreover, the consensus view in this judicial district appears to be that there is no individual liability under the ADA. See McInerney, 244 F. Supp. 2d at 398 (collecting cases finding that there is no individual liability under the ADA); see also Douris v. Office of Pa. Attorney Gen., 2004 U.S. Dist. LEXIS 2484, Civ.A.No. 03-CV-5661, 2004 WL 322907, at *2-3 (E.D. Pa. Feb. 19, 2004) (same). In addition, the "Courts of Appeals that have directly addressed the issue of individual liability under the ADA have concluded that no such liability exists." Douris v. Schweiker, 229 F. Supp. 2d 391, 397 (E.D. Pa. 2002) (quotation omitted) (collecting cases). In light of this overwhelming authority, the Court finds that there [*7] is no individual liability under the ADA and Plaintiff's claim of employment discrimination in violation of the ADA is hereby dismissed as against the individual Defendants.

The Motion to Dismiss also seeks dismissal of Plaintiff's claim of employment discrimination in

violation of the PHRA against the individual Defendants. Defendants argue that Plaintiff's PHRA claim should be dismissed against the individual Defendants because she failed to exhaust her administrative remedies against these Defendants prior to filing suit in this Court.

"To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from pursuing judicial remedies. The Pennsylvania courts have strictly interpreted this requirement."

Waters v. Genesis Health Ventures, Inc., 2004 U.S. Dist. LEXIS 25604, Civ.A.No. 03-CV-2909, 2004 WL 2958436, at *5 (E.D. Pa. Dec. 21, 2004) (quoting Richards v. Foulke Assocs., Inc., 151 F. Supp. 2d 610, 613 (E.D. Pa. 2001)). In Vincent v. Fuller Co., 532 Pa. 547, 616 A.2d 969 (Pa. 1992), [*8] the Pennsylvania Supreme Court stated that:

persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act. This rule of "exhaustion of remedies" has long been applied by the courts of this Commonwealth to claims under the Act."

Id. at 974 (internal citation omitted). The individual Defendants in this action were not named as defendants in the COD. The Court finds, therefore, that Plaintiff has not exhausted her administrative remedies as against the individual Defendants in this action and her PHRA claim is dismissed as against them.

The Motion to Dismiss also seeks dismissal of Plaintiff's claims of employment discrimination pursuant to both the ADA and PHRA as against ACTS. The COD asserts a claim for employment discrimination pursuant to the ADA and PHRA on the grounds that Plaintiff was retaliated against because she complained of harassment

in violation of the ADA. The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of [*9] such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a)). The Third Circuit has determined that "an 'analysis of an ADA claim applies equally to a PHRA claim.'" Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)). Consequently, the Court "will only discuss [Plaintiff's] ADA claim because our analysis of that claim is, under the circumstances of this case, coterminous with the PHRA claim." Id.

Defendants seek dismissal of these claims against ACTS for failure to state a claim upon which relief may be granted because there is no allegation in the Complaint or the COD that Plaintiff was disabled at the time of the alleged employment discrimination. The ADA defines disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; [*10] or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Consequently, in order to state a claim for employment discrimination pursuant to the ADA, the Complaint must allege that Plaintiff has a physical or mental impairment. See Toyota Motor Mfg., Kentucky, Inc. v. Willams, 534 U.S. 184, 194, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002) (citing 42 U.S.C. § 12102(2)(A)). However, "merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." Id. (citing 42 U.S.C. § 12102(2)(A)). The term "major life activities" refers to "those activities that are of central importance to daily life." Id. at 197. Moreover, "to qualify as disabled, a claimant must further show that the limitation on the major life activity is 'substantial.'" Id. at 195 (citing 42 U.S.C. § 12102(2)(A)). In considering whether an

2005 U.S. Dist. LEXIS 18565, *10

impairment constitutes a substantial limitation on a major life activity, the Court looks at: "the nature and severity of the impairment; the duration [*11] or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." Id. at 196 (citing 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)).

The COD alleges that Plaintiff was injured on the job on May 5, 2000, and placed on restricted duty. The COD further alleges that Plaintiff was released to full duty on March 28, 2002. The COD does not allege the type of impairment incurred by Plaintiff on May 5, 2000, or whether that impairment substantially limited any of Plaintiff's major life activities. The COD also fails to allege whether Plaintiff suffered any sort of impairment after March 28, 2002. The Court finds, accordingly, that the Complaint does not allege that Plaintiff suffered a disability for purposes of the ADA. Consequently, the Court further finds that the Complaint does not state a viable claim against ACTS for employment discrimination in violation of the ADA. Plaintiff's claims of employment discrimination pursuant to the ADA and the PHRA are, therefore, dismissed as against ACTS.

For the forgoing reasons, Defendants' Motion to Dismiss is granted.

BY THE COURT:

John R. Padova, [*12] J.

LEXSEE

**DOTTIE V. PUTIGNANO, Plaintiff, v. SENIOR LIFESTYLE CORP., Defendant.**

**No. 94 C 3203**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1995 U.S. Dist. LEXIS 11228**

**August 4, 1995, Decided
August 7, 1995, DOCKETED**

**COUNSEL:** [*1] For DOTTIE V PUTIGNANO, plaintiff: Catherine A. Daubard, Schiff, Hardin & Waite, Chicago, IL.

Dottie V Putignano, plaintiff, [PRO SE], Chicago, IL.

For SENIOR LIFESTYLE CORP., defendant: Joseph Michael Gagliardo, James J. Convery, Clifford Raymond Perry, III, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, IL.

**JUDGES:** Paul E. Plunkett, UNITED STATES DISTRICT JUDGE

**OPINION BY:** Paul E. Plunkett

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Dottie V. Putignano ("Putignano") has sued her former employer, Senior Lifestyle Corporation ("Lifestyle"), for employment discrimination. Lifestyle has moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, we grant the motion and dismiss this case with prejudice.

### Background

Putignano was hired by Lifestyle, a home for the elderly, on August 24, 1991, as a part-time front desk receptionist. n1 On March 26, 1993, after allegedly being warned about her poor performance the year before, she had a confrontation with her supervisor when she failed to follow an internal procedure. Specifically, when a resident was being transported by ambulance to the hospital, Putignano contacted the resident's family before it was known which hospital the resident would be taken to, a violation of Lifestyle's internal procedures. On March 30, 1994, she was terminated as a result of this incident. She was forty-two; her supervisor was under thirty years of age, and another receptionist was under twenty-five. [*2]

n1 We considered both the EEOC charge and right-to-sue letter in deciding this motion, both of which Lifestyle attached to its motion to dismiss. We also considered the documents attached to Putignano's March 8 filing, which she entitled, "Pretrial Conference." Those attachments consist of a brief request for a pretrial conference, along with seven memos sent between Putignano and Lifestyle during her employment, an interim letter to her from the EEOC dated February 1, 1994, a narrative she supplied to the EEOC on February 9, 1994, a copy of an undated newspaper article on sexual harassment, and what appears to be a proposed letter of reference drafted by Putignano that she wanted Lifestyle to supply as part of a settlement. We had to rely upon these documents to determine the facts of this case, as we were unable to discern them from the amended complaint.

On March 31, 1993, Putignano filed a charge with the Equal Employment Opportunity Commission

("EEOC"), asserting that she had been discriminated against [*3] on account of a disability in violation of the Americans with Disabilities Act of 1990 ("the ADA"). She did not identify the nature of her disability. She also asserted that she had been retaliated against for writing memos to her employer after the March 26 incident. n2

> n2 As far as we can tell, Putignano wrote a memo on March 27, 1993, which did not relate to the March 26 incident, and a memo of March 29, which discussed Putignano's feeling that her supervisor had behaved in a harassing and intimidating manner on March 26.

On May 17, 1994, the EEOC issued a right-to-sue letter, concluding that there was no reasonable cause to believe that Lifestyle had violated the ADA. The letter noted that Putignano had been warned about her poor performance since early 1992, that Lifestyle terminated nineteen other employees from February 1992 to March 1993 for violating internal procedures, and that there was no connection between Putignano's termination and the memo she had written to Lifestyle after the March 26 incident [*4] (presumably, the March 29 memo). n3

> n3 The right-to-sue letter also noted that Putignano's memo to Lifestyle following the March 26 incident neither mentioned any disability nor asserted that her supervisor had behaved in a discriminatory fashion, and thus she had not engaged in a protected activity in writing it.

On July 5, 1994, Putignano filed a pro se complaint. Counsel was appointed for her on August 11, 1994, when Lifestyle moved to dismiss. That counsel soon sought to have his appointment vacated, which we allowed, and new counsel was appointed on September 6, 1994. Once again, the attorney requested leave to withdraw, which we granted. Finally, on September 22, 1994, her current attorney was appointed. n4

> n4 We note that Putignano's appointed counsel have been attorneys at Baker & McKenzie, Jenner & Block, and Schiff, Hardin & Waite. All three have made an appropriate effort to assist her in this case.

[*5]

On October 17, 1994, this Court gave Putignano the choice of either responding to Lifestyle's motion to dismiss or filing an amended complaint by December 28, 1994. Putignano filed her amended complaint, again pro se despite having appointed counsel, on December 22, 1994. n5

> n5 The original complaint also named Breakers at Edgewater Beach as a defendant. They were dropped from the amended complaint.

On November 17, 1994, this Court held a lengthy pretrial conference with Putignano, her appointed counsel, and counsel for Lifestyle. At that time, Putignano identified her disability as her mental condition, although she did not specify the nature of that condition. n6 Despite explicit instruction from this Court that she had to plead that disability specifically in her amended complaint, she indicated that she would not do so. Moreover, although her appointed counsel made a small settlement demand which Lifestyle appeared willing to accept, Putignano herself would not agree. She also indicated her refusal [*6] to work with her appointed counsel in preparing the amended complaint.

> n6 Putignano's right-to-sue letter from the EEOC identifies her disability as a "neurological disorder." We do not know where the EEOC obtained this information or what the precise nature of the "neurological disorder" is.

Lifestyle filed its motion to dismiss the amended complaint on February 23, 1995. It seeks dismissal under Rule 12(b)(6) on the grounds that Putignano's amended complaint is incomprehensible and fails to state any claim upon which relief can be granted, and that her amended complaint purports to raise claims of gender and age discrimination and sexual harassment, which are beyond the scope of her EEOC charge. Because we also find that Putignano's pleading is incomprehensible, because we have been advised of no facts which indicate that Putignano has viable claims against Lifestyle for disability discrimination, gender discrimination, or

retaliatory discharge, because her age discrimination claim is beyond the scope of [*7] her EEOC charge, and because she has repeatedly refused to follow the instructions and advice of this Court and her appointed counsel, we grant the motion to dismiss, and we dismiss this case with prejudice.

**Discussion**

On a motion to dismiss under Rule 12(b)(6), we must take all well-pleaded allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the plaintiff. Rueth v. U.S.E.P.A., 13 F.3d 227, 229 (7th Cir. 1994). We may dismiss a complaint for failure to state a claim upon which relief may be granted only if it is clear from the pleading that there exists no set of facts which would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

Putignano's amended complaint purports to state claims of disability discrimination, retaliatory discharge, gender harassment, and age discrimination; it also makes references to sexual harassment and breach of contract. n7 Lifestyle moves to dismiss on the grounds that no comprehensible claim has been stated and that, interpreting the purported allegations as liberally as possible, they extend well beyond the claims of disability discrimination and retaliatory discharge [*8] that Putignano asserted in her EEOC charge. In opposing the motion, Putignano (by her appointed counsel) argues that we should liberally construe the amended complaint because it was prepared pro se, that the amended complaint can be read to raise claims of age, gender and disability discrimination, and that her supervisor responded with hostility after the March 26 incident.

> n7 By their context, we understand the references to gender harassment to mean gender discrimination.

We address first the question of whether Putignano's amended complaint can be read to assert any claim. We note, as a preliminary matter, that although the pleading was prepared pro se, Putignano was represented by counsel at the time. We are less sympathetic to technical flaws in a pro se pleading where the party is represented by an attorney but refuses to cooperate with them or allow them to prepare documents for submission to the

court. And, when we consider the substance of the pleading, even the most liberal of pleading [*9] standards is of little help. Lifestyle has described it very accurately in calling it "incomprehensible." n8 It does not identify either of the parties, does not identify Putignano's position with Lifestyle, does not state any of the facts regarding the March 26 incident or even that it occurred, and does not identify any disability from which Putignano suffers. The only facts we are able to discern from the face of the amended complaint are that Putignano worked for Lifestyle, that she was hired on August 24, 1991, that she was forty-two years old in March 1992 and that her supervisor was under thirty years old, that she received an evaluation from Lifestyle on January 7, 1992, that she received some kind of oral warning from Lifestyle on April 30, 1992, that she wrote a letter to Lifestyle on March 29, 1994, and her supervisor treated her in a hostile and harassing manner as a result of the March 26 incident. Moreover, by our reading of the amended complaint, her supervisor's behavior appears to be the real thrust of Putignano's unhappiness. The pleading does not even disclose that she was terminated, and she did not attach either her EEOC charge or right-to-sue letter. It is clear [*10] that, if we were to consider the amended complaint alone, Putignano could not possibly state any claim of employment discrimination.

> n8 We do not use this term lightly. While there are many complete and coherent sentences in the amended complaint, some simply do not make sense. For example, on the third page, the amended complaint says, "Plaintiff commentary IV summarized, learned communication capability, when altercations filtered plaintiff quietly clarified the overspeculative."

Even if we consider all the facts supplied by the exhibits to Lifestyle's brief and by Putignano's "Pretrial Conference" submission, she does not fare any better. It is undisputed that Putignano was hired on August 24, 1991, that she received some kind of warning regarding her performance early in 1992, that she had a confrontation with her supervisor over an alleged violation of Lifestyle's procedures on March 26, 1994, that she wrote a memo to Lifestyle's management on March 29 about the incident, that she was terminated on March [*11] 30, 1994, that she was over forty years old

at the time of her termination while her supervisor and co-worker were under thirty, and that she filed an EEOC charge asserting disability discrimination and retaliation. There is also no dispute that Putignano received a warning about her performance in early 1992, although we suspect she would dispute that her performance was poor, or about her conduct on March 26, although she does dispute that what she did was a violation of Lifestyle's procedures.

In determining whether Putignano could state a claim for any type of employment discrimination, we have considered all of the facts before us, since the amended complaint contains so little information. We have drawn all reasonable inferences in Putignano's favor, even where we have some contradictory information. For example, we have inferred that Putignano's performance was adequate, as we believe she would allege, although there are facts before us indicating that Lifestyle was not satisfied with it.

To state a claim for violation of the ADA, a plaintiff must allege that he or she is a qualified individual with a disability, that he or she has suffered an adverse employment action, and [*12] that a causal connection exists between the adverse employment action and the disability. See Smith v. Upson County, Georgia, 859 F. Supp. 1504, 1514 (M.D. Ga. 1994), aff'd, 56 F.3d 1392 (11th Cir. 1995). Putignano has failed to identify her disability and to allege that Lifestyle even knew of it. n9 She has alleged that she suffered an adverse employment action, her termination, but she has not alleged a causal connection between her termination and her alleged disability. Rather, she disputes that she violated Lifestyle's procedures, and she asserts that her supervisor acted in a hostile and harassing manner after she sent the March 29 memo. However, as the EEOC noted in the right-to-sue letter, the March 29 memo cannot be read to assert that Putignano suffers from a disability or that she believed her supervisor acted in a discriminatory manner based on her disability. She has put forth no facts showing, or from which we may infer, that her termination was based on her disability. As a consequence, she cannot stated a claim for disability discrimination.

n9 Since Putignano informed this Court during the pretrial conference that her disability is her mental condition, it is axiomatic that she would have to allege that Lifestyle knew of the disability (which would not necessarily be obvious) in order to state a claim for discrimination on the basis of that disability.

[*13]

Similarly, to state a claim for gender or age discrimination, a plaintiff must either allege overtly discriminatory conduct by his or her employer or allege the four elements of the McDonnell Douglas burden-shifting test. Kirk v. Federal Property Mgmt. Corp., 22 F.3d 135, 138 (7th Cir. 1991); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The four elements are that first, the plaintiff is a member of a protected class; second, that he or she was meeting the employer's legitimate expectations; third, that he or she suffered an adverse employment decision; and fourth, that other employees who were not members of the protected class were treated more favorably. Samuelson v. Durkee/French/ Airwick, 976 F.2d 1111, 1113 (7th Cir. 1992). Putignano has not alleged, and we are not aware of, any overt acts of discrimination. Therefore, we must use the McDonnell Douglas test. With regard to Putignano's gender discrimination claim, she cannot satisfy the fourth element, for we have discerned no facts from which we may infer that Lifestyle treated male employees more favorably. Consequently, she cannot state a claim for gender discrimination.

As for Putignano's [*14] purported age discrimination claim, we infer that she could allege the second element, that she was meeting Lifestyle's legitimate expectations. We also infer that she could allege the fourth element, that employees who were not members of the protected class were treated more favorably, since she stated in her amended complaint that both her supervisor and another receptionist were less than thirty years old. She can also satisfy the first and third elements, since she is over forty, and she was terminated. As a result, Putignano can allege a prima facie claim of age discrimination.

We must consider next whether Putignano's claim of age discrimination is barred because it is beyond the scope of her EEOC charge and right-to-sue letter, as Lifestyle contends. On Putignano's EEOC charge form, only the boxes indicating disability discrimination and retaliation were checked. Moreover, the facts included in the charge state only her date of hiring and her position,

that she was harassed by her supervisor, that she was terminated, that she was told she was terminated for poor performance, and that she believed that her supervisor's harassment and her termination were discrimination [*15] in violation of the ADA, and, finally, that she was retaliated against for writing a letter to her employer. In addition, the right-to-sue letter addresses only disability discrimination and retaliation, a clear indication that the EEOC did not understand Putignano's charge to include age discrimination.

The timely filing of an EEOC charge which encompasses the conduct complained of is a condition precedent to filing suit in federal court. Babrocky v. Jewel Food Co., 773 F.2d 857, 863 (7th Cir. 1985); Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989); Kirk, 22 F.3d at 139. The purpose behind this rule is that to allow allegations beyond the scope of the EEOC charge to be raised in a federal lawsuit

"would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge . . . ." In other words, the reason behind the requirement that allegations not contained in an EEOC charge cannot be contained in the complaint is that the defendant must have notice of the charge, and the EEOC must have the opportunity to investigate and conciliate the charge, in order to attempt to obtain voluntary compliance [*16] with Title VII.

Schnellbaecher, 887 F.2d at 127 (quoting Babrocky, 773 F.2d at 863.) This rule requires us to determine whether the allegations in the amended complaint are "like or reasonably related to the EEOC charge," rather than whether they were part of the actual investigation done by the EEOC. Id. However, "the [EEOC] investigation may help define the scope of the charge." Id.

Putignano's EEOC charge cannot be read to include allegations of age discrimination. Even when interpreted as liberally as possible in Putignano's favor, the charge is devoid of any facts or assertions which would have put Lifestyle or the EEOC on notice that she intended to make such a claim. If we were to hold otherwise, a plaintiff asserting employment discrimination of any kind in his or her EEOC charge based on a particular adverse employment action would be able to raise in a lawsuit any other kind of employment discrimination based on the same adverse action. But, the standard of "like or reasonably related to" means just what it says; it does not mean one claim of discrimination arising from, for example, the plaintiff's termination is "like or reasonably related to" [*17] all other claims of discrimination which might have been raised, but were not, regarding that termination. Age discrimination is not "like or reasonably related to" disability discrimination and retaliatory discharge, and Putignano's EEOC charge did not put provide either Lifestyle or the EEOC with notice of that claim. n10 Therefore, she is barred from bringing a claim for age discrimination in this suit.

n10 Putignano cannot state a claim for retaliatory discharge based on age discrimination, for just as her March 29 memo does not mention or suggest her disability or any discriminatory conduct by her supervisor, it also does not mention or suggest her age or discriminatory conduct by her supervisor relating to her age.

**Conclusion**

For the forgoing reasons, we grant defendant Senior Lifestyle Corporation's motion to dismiss the amended complaint, and we dismiss this case with prejudice. This order is final and appealable.

ENTER:

Paul E. Plunkett

UNITED STATES DISTRICT JUDGE

DATED: August [*18] 4, 1995