IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RENEE M. BUTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-495 (JJF) |
| | ) | |
| LAWNS UNLIMITED, LTD., and | ) | |
| EDWARD FLEMING, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS LAWNS UNLIMITED, LTD., AND EDWARD FLEMING'S
OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
William W. Bowser, Esquire (Bar I.D. 2293)
Margaret M. DiBianca, Esquire (Bar I.D. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-5008
Facsimile : (302) 576-3476
mdibianca@ycst.com
Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ..................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................. 2

STATEMENT OF FACTS ............................................................................................. 4

      A.     Plaintiff's Employment with Lawns ..................................................... 4

      B.     Employee Benefits ................................................................................ 5

      C.     Plaintiff's Relationship With the Flemings .......................................... 6

      D.     Plaintiff's Termination ......................................................................... 7

      E.     Plaintiff Responds to the Termination Letter ..................................... 11

ARGUMENT ................................................................................................................ 13

  I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT MEET HER BURDEN OF PROOF ........................ 13

      A.     Summary Judgment Standard .............................................................. 13

      B.     PDA Analytical Framework ................................................................ 14

      C.     Defendant Fleming Is Not Subject to Liability Under Title VII ......... 15

  II.    PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF PREGNANCY DISCRIMINATION ................................................................ 15

      A.     Plaintiff Admits That She Was Terminated For Reasons Other Than Her Pregnancy ........................................................................................... 16

      B.     Plaintiff Admits That She Cannot Identify Any Similarly Situated, Non-Pregnant Employees ............................................................................ 18

  III.   Plaintiff Cannot Demonstrate That Defendants' Proffered Legitimate, Non-Discriminatory Reasons Were Pretextual ...................................................... 20

      A.     Defendants Terminated Plaintiff Because She Abandoned Her Job ....... 20

B.    Plaintiff Cannot Produce Any Evidence that Defendants' Proffered Reasons Did Not Actually Motivate The Termination ...............................................22

IV.    PLAINTIFF'S REFUSAL TO PRODUCE ANY SUPPORTIVE DOCUMENTS PRECLUDES an award OF DAMAGES in any amount ................................................29

    A.    Plaintiff's Refusal to Produce Any Documentary Evidence Precludes An Award of Back Pay Damages ................................................29

    B.    Plaintiff's Refusal to Produce Any Documentary Evidence Precludes an Award of Medical Expenses ................................................31

    C.    Plaintiff's Refusal to Produce Any Documentary Evidence Precludes an Award of Insurance Premiums................................................32

    D.    Plaintiff's Claims for Back Pay Fail Regardless of Whether She Provides Documentary Evidence ................................................34

    E.    Plaintiff's Claims for Insurance Premiums and Medical Expenses Fail................37

V.    PLAINTIFF HAS FAILED TO MEET HER BURDEN OF PROOF AS TO EMOTIONAL DISTRESS OR PUNITIVE DAMAGES................................................39

CONCLUSION................................................ 40

# TABLE OF AUTHORITIES

**Cases**

Abramson v. William Paterson Coll.,
  260 F.3d 265 (3d Cir. 2001) ............................................................ 24

Amato v. Verint Sys., Inc.,
  No. 04-3489-RBK,
  2007 U.S. Dist. LEXIS 11673 (D.N.J. Feb. 16, 2007) ........................... 24

Anderson v. CONRAIL,
  C.A. No. 98-6043,
  2000 U.S. Dist. LEXIS 15978 (E.D. Pa. Oct. 26, 2000) .......................... 29

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ........................................................................ 13

Bates v. Board of Educ.,
  C.A. No. 97-394-SLR,
  2000 U.S. Dist. LEXIS 4873
  (D. Del. Mar. 31, 2000) ................................................................... 30

Berndt v. Kaiser Aluminum & Chem. Sales, Inc.,
  604 F. Supp. 962 (E.D. Pa. 1985)
  aff'd, 789 F.2d 253 (3d Cir. 1986) .................................................... 32

Birkbeck v. Marvel Lighting Corp.,
  30 F.3d 507 (4th Cir. 1994) ............................................................. 24

Bonura v. Chase Manhattan Bank, N.A.,
  629 F. Supp. 353 (S.D.N.Y. 1986) ............................................... 35, 36

Brewer v. Quaker State Oil Ref. Corp.,
  72 F.3d 326 (3d Cir. 1995) .......................................................... 13, 15

Burks v. City of Phila.,
  974 F. Supp. 475 (E.D. Pa. 1997) ..................................................... 37

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ........................................................................ 13

Conway v. Hercules, Inc.,
  831 F. Supp. 354 (D. Del. 1993) ....................................................... 34

Dici v. Pa.,
  91 F.3d 542 (3d Cir. 1996) .............................................................. 15

Dryer v. Arco Chem. Co.,
   801 F.2d 651 (3d Cir. 1986),
   cert. denied, 480 U.S. 906 (1987) ........................................................................ 40

EEOC v. Century Broad. Corp.,
   957 F.2d 1446 (7th Cir. 1992) ............................................................................. 40

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
   983 F.2d 509 (3d Cir. 1992) ................................................................................. 24

Francis v. Joint Force Headquarters,
   C.A. No. 05-4484 (RBK),
   2006 U.S. Dist. LEXIS 72738 (D.N.J. Oct. 4, 2006) ............................................ 15

Fuentes v. Perskie,
   32 F.3d 759 (3d Cir. 1994) ....................................................................... 20, 23, 24

Gelof v. Papineau,
   648 F. Supp. 912 (D. Del. 1986),
   aff'd in part, vacated in part on other grounds,
   829 F.2d 452 (3d Cir. 1987) ................................................................................ 34

Glanzman v. Metro Mgmt. Corp.,
   391 F.3d 506 (3d Cir. 2004) ........................................................................... 14, 16

Grindstaff v. Burger King, Inc.,
   494 F. Supp. 622 (E.D. Tenn. 1980) .................................................................... 35

Hensley v. Boddie-Noell Enters., Inc.,
   No. 98-6125,
   2000 U.S. App. LEXIS 14100 (6th Cir. June 14, 2000) ........................................ 23

Horn v. Duke Homes,
   755 F.2d 599 (7th Cir. 1985) ............................................................................... 30

Hussein v. Genuardi's Family Markets,
   C.A. No. 00-CV-4905,
   2002 U.S. Dist. LEXIS 430 (E.D. Pa. Jan. 15, 2002) ........................................... 22

In re Carnegie,
   129 F.3d 290 (3d Cir. 1997) ................................................................................. 18

James v. Woodbridge Dev. Ctr.,
   C.A. No. 95-6151,
   1997 U.S. Dist. LEXIS 16148 (D.N.J. Sept. 30, 1997) .......................................... 22

Jones v. Hosp. of Univ. of Pa.,
    No. 03-4938,
    2004 U.S. Dist. LEXIS 15711 (E.D. Pa. Aug. 5, 2004) .......................................... 26

Jones v. Sch. Dist. of Phila.,
    198 F.3d 403 (3d Cir. 1999) ........................................................................................ 15

Kappes v. DuPont,
    No. 97-443-SLR,
    1999 U.S. Dist. LEXIS 3580 (D. Del. Mar. 18, 1999) ............................................. 27

Kautz v. Met-Pro Corp.,
    412 F.3d 463 (3d Cir. 2005) ........................................................................................ 23

Keller v. Orix Credit Alliance, Inc.,
    130 F.3d 1101 (3d Cir. 1997) ................................................................................ 23, 24

Kennedy v. Schoenberg, Fisher & Newman, Ltd.,
    140 F.3d 716 (7th Cir. 1998) ....................................................................................... 27

Kolb v. Goldring, Inc.,
    694 F.3d 869 (1st Cir. 1982).......................................................................................... 37

Kowalski v. L & F Prods.,
    82 F.3d 1283 (3d Cir. 1996) .................................................................................. 14, 20

LaResca v. AT&T,
    161 F. Supp. 2d 323 (D.N.J. 2001) ............................................................................. 22

Lisbon v. United Nat'l Group Ins. Co.,
    No. 03-6207,
    2006 U.S. Dist. LEXIS 6676 (E.D. Pa. Feb. 21, 2006) ............................................ 25

Manns v. Leather Shop Inc.,
    960 F. Supp. 925 (D.V.I. 1997) ................................................................................... 15

Marshall v. Am. Hosp. Assoc.,
    157 F.3d 520 (7th Cir. 1998) ....................................................................................... 23

Mason v. Assoc. for Indep. Growth,
    817 F. Supp. 550 (E.D. Pa. 1993) ............................................................................... 35

Maull v. Div. of Police,
    141 F. Supp. 2d 463 (D. Del. 2001).............................................................................. 22

Mauro v. S. New Eng. Telecomms.,
    208 F.3d 384 (2d Cir. 2000) ........................................................................................ 20

McDonnell-Douglas Corp. v. Green,
    411 U.S. 792 (1973) ................................................................................. 13, 14

Mershon v. Woodbourne Family Practice, LLC,
    No. 06-00253,
    2006 U.S. Dist. LEXIS 49577 (E.D. Pa. July 19, 2006) ............................ 18

Olabode v. William Hecht Inc.,
    No. 95-6221,
    1997 U.S. Dist. LEXIS 20983 (E.D. Pa. Dec. 30, 1997) ............................ 35

Ostapowicz v. Johnson Bronze Co.,
    541 F.2d 3941 (3d Cir. 1976),
    cert. denied, 429 U.S. 1041 (1977) ........................................................... 35

Reeves v. Sanderson Plumbing Prods.,
    530 U.S. 133 (2000) .................................................................................. 14

Russell v. Acme-Evans Co.,
    No. 94-3008,
    1995 U.S. App. LEXIS 5535 (7th Cir. Mar. 20, 1995) .............................. 14

Russell v. Delco-Remy Div.,
    No. 96-3647,
    1997 U.S. App. LEXIS 22265 (7th Cir. Aug. 13, 1997). ........................... 14

Schlifke v. Trans World Entm't Corp.,
    479 F. Supp. 2d 445 (D. Del. 2007) ................................................ 15, 19, 25

Schoch v. First Fidelity Bancorporation,
    912 F.2d 654 (3d Cir. 1990) ...................................................................... 13

Sennello v. Reserve Life Ins. Co.,
    667 F. Supp. 1498 (S.D. Fla.1987),
    aff'd, 872 F.2d 393 (11th Cir. 1989) .......................................................... 36

Shovlin v. Timemed Labeling Sys., Inc.,
    C.A. No. 95-4808,
    1997 U.S. Dist. LEXIS 2350 (E.D. Pa. Feb. 28, 1997) ............................. 29

Silver v. GM Corp.,
    No. 99-2121,
    2000 U.S. App. LEXIS 17752 (4th Cir. July 24, 2004) .............................. 25

Smith v. Wade,
    461 U.S. 30 (1983) .................................................................................... 40

Speed v. Adidas Am., Inc.,
   No. 04-CV-1430-PK,
   2006 WL 897978 (D. Or. Apr. 6, 2006) ................................................................. 26

Spencer v. Wal-Mart Stores, Inc.,
   C.A. No. 03-104-KAJ,
   2005 U.S. Dist. LEXIS 4373 (D. Del. Mar. 11, 2005) ........................................... 30

Stephens v. CIT Group,
   955 F.2d 1029 (5th Cir. 1992) ............................................................................... 36

Taylor v. Philips Indus., Inc.,
   593 F.2d 783 (7th Cir. 1979) (*per curiam*) ............................................................ 30

Torre v. Casio, Inc.,
   42 F.3d 825 (3d Cir. 1994) .................................................................................... 14

United Steel, Paper & Forestry v. Neville Chem. Co.,
   No. 06-640,
   2007 U.S. Dist. LEXIS 55435 (W.D. Pa. July 31, 2007) ....................................... 33

Waldron v. SL Indus., Inc.,
   56 F.3d 491 (3d Cir. 1995) .................................................................................... 14

Waltson v. Sch. Bd.,
   566 F.2d 1201 (4th Cir. 1977) ............................................................................... 35

Williams v. Borough of W. Chester,
   891 F.2d 458 (3d Cir. 1989) .................................................................................. 14

Younge v. St. Paul Fire & Marine Ins. Co.,
   No. 01-4218,
   2002 U.S. Dist. LEXIS  12293 (E.D. Pa. June 20, 2002) ....................................... 23

**Statutes**

18 Del. C. § 3335 ...................................................................................................... 39

Conway v. Hercules, Inc.,
    831 F. Supp. 354 (D. Del. 1993)............................................................................ 35

Newborns' and Mothers' Health Protection Act of 1996,
   42 U.S.C. § 300gg-51 ............................................................................................ 38

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................ 13

## NATURE AND STAGE OF THE PROCEEDINGS

The present matter is a claim of employment discrimination filed by Plaintiff *pro se* Renée M. Butz on July 15, 2005, alleging discriminatory treatment based on pregnancy. (D.I. 2). Plaintiff named Lawns Unlimited, Ltd. ("Lawns"), and its President, Edward Fleming, as Defendants. Plaintiff filed her First Amended Complaint on August 16, 2006, (D.I. 19), her Second Amended Complaint on August 20, 2007, (D.I. 105), and, on the same day, filed a Motion to Add a New Claim. (D.I. 106). Defendants filed their opposition to that Motion, which is still pending. (D.I. 112).

After the close of discovery, Defendants filed a Motion for Judgment on the Pleadings, (D.I. 44), which was subsequently denied. (D.I. 99). The Court granted in part and denied in part, (D.I. 100), Defendants' and Plaintiff's Motions for a Protective Order. (D.I. 68 and 75). In its Order, the Court held that Plaintiff was seeking damages only for the period of December 23, 2003, through March 1, 2004. (D.I. 100).

Discovery closed on September 21, 2007. (D.I. 20). On September 19, 2007, Plaintiff filed a Motion to Extend Discovery, (D.I. 115), and her Third Requests for Productions directed to Defendants. (D.I. 116). Defendants filed an Opposition to the Motion to Extend, (D.I. 121). but responded to Plaintiff's Requests.

Defendants have filed their Motion for Summary Judgment, (D.I. 123), and this is their Opening Brief in Support Thereof.

## SUMMARY OF THE ARGUMENT

Plaintiff Renee Butz cannot establish a claim for pregnancy discrimination under the Pregnancy Discrimination Act ("PDA"), and, therefore, her claim must be dismissed for the following reasons:

1.     Plaintiff's admission that she believes she was terminated for reasons unrelated to her pregnancy requires dismissal of the present claim.

2.     Plaintiff cannot establish a *prima facie* case because she admits that she believes that Defendants terminated her because she abandoned her job.

3.     Plaintiff also cannot establish a *prima facie* case because she admits that she believes that Defendants terminated her because of increased financial costs.

4.     Plaintiff admits that she cannot identify any similarly situated, non-pregnant employees.

5.     The admitted absence of any appropriate comparators precludes Plaintiff from proving that she was treated less favorably than someone outside her protected class.

6.     Plaintiff admits that she was terminated because her employer believed she had abandoned her job, which is a legitimate, non-discriminatory reason.

7.     Plaintiff's contention that Defendants' decision to terminate her was misguided is insufficient to establish that Defendants' reasons for termination were pretextual.

8.     Plaintiff admits that one of the two decision makers did not harbor any discriminatory animus towards her.

9.     Plaintiff admits that the second of the two decision makers, who hired her, also treated her "like family," tending to disprove a hidden discriminatory animus.

10.     Plaintiff's assertion that the second of the two decision makers did harbor some discriminatory animus is a vague allegation, unsupported by other evidence in the record and, thus, is insufficient to establish pretext.

11.     Defendants' offer of reinstatement tends to further demonstrate the absence of pretext.

12.     Defendants' payment for Plaintiff's extended insurance coverage is further evidence to disprove a finding of pretext.

13.     Plaintiff's admitted refusal to produce any documents in support of her damages claim precludes the award of any compensatory damages, including any information relating to her income or insurance coverage.

14.     Even if Plaintiff had produced documents in support of her claim for damages, she is not entitled to an award of holiday pay, vacation pay, or PTO because, as she admits, she was fully compensated for that time when earned.

15.     Plaintiff is precluded from an award of damages because the only evidence she has produced are her own conclusions, estimates, and calculations, which are insufficiently specific and far too speculative to justify any damages award.

16.     Plaintiff has failed to allege any conduct or effect that would justify the imposition of emotional distress damages, especially considering she was unemployed only for seven days.

17.     Plaintiff has failed to allege any conduct that would justify the imposition of punitive damages, especially given Defendants' terminated Plaintiff at the advice of legal counsel.

## STATEMENT OF FACTS[1]

### A.  Plaintiff's Employment with Lawns

Defendant Lawns Unlimited, Ltd. ("Lawns"), is a small lawn and tree business operating in Milton, Delaware.  (A1).  Lawns provides various horticultural services, such as lawn care, landscaping, and irrigation installation, among others.  (A1).  Defendant Edward Fleming ("Mr. Fleming"), and his wife, Jeanne Fleming ("Mrs. Fleming") (collectively, the "Flemings"), founded the business in 1987.  (A1).  Since then, they have managed its operation together and are active in its daily operations.  (A3).  Including the Flemings, Lawns currently employs approximately thirty people, many of whom are part-time seasonal help.  (A1).

Lawns has two types of employees—Field and Office.  (A1).  Field employees provide the physical labor, working at one or more job site.  (A1).  Office employees interact with the customer for ordering and invoicing purposes, and also handle payroll, accounting, and other administrative functions.  (A3).  Mr. Fleming, who holds the title of President, works hands-on in the Field and is responsible for Field employees.  (A2).  Mrs. Fleming, who holds the title of Secretary-Treasurer, manages the behind-the-scenes operations in the Office.  (A3).

At the time of Butz's employment, Lawns had two full-time Office positions, Office Manager and Office Assistant.  (A2).  Butz was hired as a "temporary to permanent" employee in September 2002.  (A2).  She became the full-time Office Manager on October 16, 2002, and held that position until her termination.  (A62; A246).

As Office Manager, Butz was responsible for accounts receivable and accounts payable, payroll, as well as general clerical duties, such as taking phone messages and filing paperwork.

---

[1] The facts in this matter are largely undisputed.  The parties filed a list of uncontested facts to which they have jointly stipulated as uncontested for the limited purpose of the present Motion.  (D.I.123).  A copy of the Uncontested Facts is included in Defendants' Appendix.  (A1-A6).

(A232; A61; A5). She was also responsible for communicating and developing employee policies. (A5; A235). She encouraged the employees to communicate their ideas or suggestions with her or Laurie Schatz, who was the Office Assistant at that time. (A235; A5). Finally, she discussed the tardiness and absenteeism policies. (A5). She explained that employees must complete and submit a Vacation Request Form prior to taking any scheduled time off. (A236).

After Butz was hired, Lawns created the additional position of Office Assistant. Laurie Schatz was the first Office Assistant, followed by Dina Alderucci, and finally, Debra Watson, who was hired shortly before Butz left. Office positions were considered "key" positions. (A4).

### B. Employee Benefits

Butz was earning $12.00 per hour and received certain benefits at her termination. (A4).

### 1. Paid Vacation, Paid Holidays, and Paid Time Off

After one year of employment, key personnel became eligible for one week of paid vacation. (A23; A54). Only key employees received paid vacation. (A4). Upon completion of their second anniversary year, key personnel became eligible for up to two weeks of paid vacation. (A248).

Employees were required to submit a Vacation Request Form prior to taking scheduled vacation time. (A86; A87). Once Mr. Fleming approved the request, the form was given to Butz for use in payroll, (A8-9; A11, A52-53; A58), ensuring efficient scheduling.

Butz understood and utilized the Vacation Request Form. (A240; A198-A204). Butz took five days of paid vacation in 2003—four days in February and one day in September. (A55). Butz admits that she was fully compensated for all vacation time. (A56). All five days were taken before Butz actually became eligible for paid vacation. (A57).

Key employees also received paid holiday time.  (A4).  They were paid at their regular rate for certain company-designated holidays.  (A258; A4).  Butz concedes that she was paid for each of these designated holidays during her employment.  (A59; A4).

Lawns gave key employees three days of paid time off ("PTO"), per anniversary year. Employees became eligible to take PTO after completing two months of employment.  (A248; A10).  PTO time was not rolled over at the end of the year, did not accrue, and was not available as a cash payment upon separation.  (A4).

### 2.    Insurance Coverage

Lawns offered key personnel life and health insurance through its carrier, Optimum Choice.  (A4).  Normally, employees were subject to a six-month waiting period before becoming eligible for these benefits.  (A241-42). When Butz became a permanent employee, the Flemings requested that her waiting period be waived.  (A241-42). This request was approved and Butz had health care coverage from her first day as a Lawns employee.  (A4).

The Optimum Choice plan was "employee-only."  (A66-67; A4).  With this type of plan, an employee's spouse and dependents were not eligible for coverage under the employee's policy.  (A67).  Lawns paid 100% of employees premiums until March 2004, when it switched to 75% coverage.  (A27; A152-56).

### C.  Plaintiff's Relationship With the Flemings

By all accounts, the Flemings treated Butz "like family."  (A98).  When Butz shared the news that she was pregnant, the Flemings were overjoyed for the young couple.  (A12). They looked forward to receiving updates when Butz returned from doctor's visits.  (A12).  They "always asked how [she] was doing" and were excited to see sonogram pictures. (A12).  Mr. Fleming even extended his home to Butz's family for them to use as a place to shower, rest, and regroup after the baby was born.   (A13).

When Butz got married in September 2003, (A30), she invited the Fleming family to her wedding.  (A90; A15; A5).  Butz also invited Mrs. Fleming and the Fleming children to her baby shower.  (A90; A5).  Another example of the close relationship occurred in October 2003, near the end of Butz's employment.  Mrs. Fleming's mother passed away on November 13, 2003, after losing her battle with terminal cancer.  (A16; A5). During the Summer and Fall of that year, Mrs. Fleming made several trips to visit her mother in Missouri during her final months.  (A16).  Despite the mind-numbing grief that inevitably accompanies the death of a parent, Mrs. Fleming made it a point to buy Butz a baby shower gift on one of her trips.  (A18).

When Butz announced that her husband lost his job, Mr. Fleming tried to help Scott in his job search.  (A6). In an act of goodwill typical of the Flemings, Mr. Fleming contacted several of his friends and customers, inquiring about potential work.  (A25). He was even able to get Scott an interview with one company. (A25-26).  At his deposition, Mr. Fleming explained why he reached out and tried to help the couple.  "I felt bad for them.  They were trying to get on their feet.  They were young.  You know, he just lost his job."  (A26).

Scott found work in New Castle County and, in October 2003, the couple moved to Newark, Delaware.  Butz began commuting to Lawns, driving approximately 70 miles each way. (A157; A2).  Perhaps foolishly, the Flemings took Butz at her word when she told them she would continue to commute this distance when she returned to work following the birth of her child. (A150; A151).

### D.  Plaintiff's Termination

### 1.    Plaintiff Leaves Work Early on December 23, 2003

On the morning of December 23, 2003, Butz thought her water broke.  She told her husband that she would "just go to Beebe [Hospital]."  (A92).  Her husband stayed at home and

Butz drove to Lewes, Delaware, approximately 79 miles away.  At the hospital, she was told that she was not yet in labor and was directed to go home. (A92-93).

Instead, Butz decided that she would return to Lawns.  (A93). She arrived at the office shortly after 8 a.m.  She told Mr. Fleming and Ms. Watson about the events of the morning. Before Mr. Fleming left the office, he gave Butz a Vacation Request Form.  (A151).  He asked her to fill it out to indicate when and for how long she would be going out. (A19-20). Butz testified that, as he left, Mr. Fleming said, "If you need anything just, you know, holler."  (A94).

### 2.    Debra Watson Reveals Plaintiff's Plans to Quit

Mr. Fleming returned just as Butz was leaving.  When he got to the office, Ms. Watson said, "Ed, sit down. I need to tell you something." (A13).  Watson revealed that Butz had no intention of returning to Lawns.  She had packed and removed all of her personal belongings from her desk.  (A22). Mr. Fleming was stunned and devastated. (A14).

Watson said that a few weeks earlier, she had overheard Butz on the telephone talking about a job.  (A205-06).  When Watson confronted her, Butz admitted that she was not going to come back to Lawns following the birth of her child and that she had already secured a job with her former employer in Wilmington, Delaware.  (A205).

Butz later told Watson that she was worried about health care.  (A205). Her new job did not provide health insurance and coverage through her husband's work was very expensive. (A205). She confided that she planned to go out on unpaid leave for four weeks and then give two weeks' notice. She told Watson to make sure she was issued her final paycheck.  (A205).

The day she left, Butz told Watson that she planned to have friends call and pretend to be a potential employer.  (A205). She directed Watson to turn over any reference calls to the Flemings.  If they gave her a bad reference, she would sue Lawns.  (A205).

She also gave Watson her new cell phone number with instructions not to share it with the Flemings because she was officially on "maternity leave" and they were not "legally allowed" to call her. (A205). She would not answer if they did call. (A205). Finally, she said that the Flemings were forbidden to come to the hospital to see the baby. (A206). If they tried visit, Scott would have them escorted out. (A206).

### 3.    The Devastated Flemings Try to Contact Plaintiff

Mr. Fleming "was devastated" by Ms. Watson's revelation. (A14; A150). He called his wife and told her that Butz had cleaned out her desk and was not coming back. (A148; A133). Mrs. Fleming could hardly believe it and immediately began to cry. (A148). The Flemings were shocked —Butz had always said that the Flemings were like family to her. (A148; 114).

Mr. Fleming called Butz's home on the way to Church for confession later that night. (A13). He told her about the allegations Ms. Watson had made. (A14). He told Butz that he trusted her judgment and acknowledged that Watson had only been with the company for a short time. (A14). He said he wanted to meet with them both in person the next day so he could get to the bottom of the inconsistencies. (A14). Butz assured him that she was going to return.

Butz did not return to work the next day. Mr. Fleming called her but was able to speak to her for only a minute before her husband took the phone. (A14-15). Scott told Mr. Fleming that Butz was officially out on "maternity leave" and did not have to speak to him. (A14-15).

Mr. Fleming tried to explain to Scott that he needed to know what was going on and who was telling the truth. (A15). He expressed that he was especially troubled because of the close relationship the two families had shared. (A15). He told Scott, "I should not be put in this position, especially. . . because you were part of the family. You went to the girls' swim meets

and Shane's swim meets.  You went to business meetings with the family.  We went to your

wedding."  (A15).

### 4.    Plaintiff Ceases All Communication With Lawns

Butz did not return to work.  She stayed at home until the birth of her daughter on

December 30, 2003.  Before the baby was born, Ms. Watson called Butz twice to ask work-

related questions.  (A16-17).  Butz testified that both of the conversations were "peaceful" and

ended "pleasantly."  (A94; A95; A11).

Despite these "pleasant" interactions, Butz never attempted to contact Mr. Fleming to

clarify what she now contends was a misunderstanding.  She testified that she never called,

wrote, or otherwise tried to reach out to Mr. or Mrs. Fleming to assure them of her intent to

return.  (A99; A101; A22-23).  Although Butz now alleges that loss of work would have been

financially devastating, she never made any attempt to ensure that Lawns would keep her job

open until she returned.

Unable to reach Butz, the anxiety-ridden Flemings felt they had no choice but to believe

Watson even though they were never able to confirm or deny the veracity of her claims.  Plus, if

Watson's story was to be believed, Butz would have to be officially terminated.  In it's 16-year

history, Lawns had never terminated a single employee.  The Flemings sought counsel from

Lawns' attorney, Eric Howard.

Mr. Fleming spoke with Howard shortly after Christmas. He shared the Flemings'

concerns and believed it was highly unlikely that Butz would return as promised.  Howard

recommended they send Butz a letter setting forth their concerns (the "Termination Letter").

(A21; A194-95). The Termination Letter would conclude that Butz's refusal to communicate

with Lawns left the Flemings with no alternative but to believe she had abandoned her job.  They

hoped that the letter would be the motivation Butz needed to at last contact Lawns.

Howard drafted the letter and, after several revisions, Mr. Fleming signed it and mailed it on January 8, 2004. (A196-97). Butz received the letter on January 14, 2004. (A88). She testified that this was the first time she learned that her co-worker had given Mr. Fleming reason to doubt her return. (A103).

### E.  Plaintiff Responds to the Termination Letter

Butz did not pick up the phone and call Mr. Fleming. She did not call the Fleming home and speak to Mrs. Fleming. She did not write a letter or send an e-mail. (A101; A102; A107; A108-09; A123).

#### 1.  Plaintiff's Father-in-Law Calls Mr. Fleming

Instead of calling the Flemings, Butz chose to call her father-in-law, Michael Butz. He offered to call Mr. Fleming in a peace-making effort. Butz agreed, hoping that the men would talk "like two businessmen." (A98; A100; A122).

Michael Butz and Mr. Fleming "had a nice talk." (A115). Mr. Fleming expressed his deep concern about Butz's refusal to communicate with Lawns. (A115-16). At the end of the conversation, Mr. Butz asked Mr. Fleming whether Lawns would rehire Butz/ Mr. Fleming responded, "*Please*, have Renee call me." (A115-16). The men ended the call.

Mr. Butz reported back to Plaintiff. He suggested that she at least go meet with Mr. Fleming. (A107-08). Butz would not hear of it. Only four weeks into the six weeks she had planned to be out of work, Butz decided that she would not make any attempt to secure her job. Instead, she decided she would "just go down to unemployment and see what [she] could collect." (A109). And that is exactly what she did.

#### 2.  Defendants Hold Butz's Job and Extend Her Insurance, Hoping She Returns

Hopeful that Butz would finally contact the office at the recommendation of her father-in-law, Lawns did not fill the Office Manager position. In fact, the position still had not been

filled on March 22, 2004, when the parties attended Butz's unemployment appeal hearing. (A157-61).  Eventually, the two Office positions were combined and there is currently only one Office employee.

Lawns held the position open, hoping that Butz would return to work.  (A117).  Even after making the determination that she had abandoned her position, Mr. Fleming still suggested an offer of reinstatement to Howard.  (A174).  And, in correspondence with the Unemployment Insurance Division, Mrs. Fleming reiterated that Butz's position had not yet been filled. (A179).

Butz testified that she would not have accepted reinstatement when it was offered at her Unemployment Appeals Hearing. She was already employed with the Cecil County Government ("CCG"), where she was paid more and enjoyed her job. (A128; A32).  Lawns' offer of reinstatement is further proof of the absence of pretext. (A135).

Lawns voluntarily extended Butz's insurance coverage.  Mr. Fleming requested the insurance company extend Butz's coverage through December 31, 2003, so she would be covered for the delivery of her child. (A196). At his deposition, Mr. Fleming explained that, when his first two children were born, his health care covered only a portion of the costs.  (A27-28).  He wanted to spare Butz from the same burden (A28).

Lawns did not report Butz's disenrollment to Optimum Choice until January 22, 2004. (A192-93).  Lawns' billing records showed that it paid 100% for Butz's coverage through January 14, 2004.  (A162-66).  This was after an entire month had passed without any communication from Butz.

### 3.    Plaintiff Is Unemployed for Seven Days Before Finding Higher Paying Employment

When Butz left Lawns on December 23, 2003, she intended to be out for six weeks, or until February 4, 2004.  Two weeks before her intended return date, Butz decided that she would,

in fact, not return to her job at Lawns.  She waited until the expiration of the six-week period before beginning her job search.  The search was not a lengthy one—she was hired by the first and only employer to whom she submitted an application.  (D.I. 78 at 14).

Butz completed an application for the CCG on February 6, 2004.  (A129-132).  Her application was received on February 11, 2004, and she was offered a position as a Junior Accountant on the same day.  (A173).  She took the required medical exams on February 18, 2004, and began work on March 1, 2004.  (A167; A2).  She began her new employment at an hourly rate of $12.75. (A85).

## ARGUMENT

I.    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT MEET HER BURDEN OF PROOF**

Plaintiff cannot establish the essential elements of her discrimination claim under the standard enumerated by the Supreme Court in McDonnell-Douglas Corporation v. Green, 411 U.S. 792 (1973) (detailing the burden-shifting framework to be used in Title VII discrimination claims); see also Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326 (3d Cir. 1995).   Because Butz is unable to satisfy the required elements, the claim is unmeritorious as a matter of law and should be dismissed.

### A.  Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  To that end, "[m]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials."  Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  The Motion should

be granted where the plaintiff's evidence is nothing more than a reassertion of unsupported allegations. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). In performing this analysis, the evidence is to be construed in the light most favorable to the non-moving party.

### B. PDA Analytical Framework

Because Butz has not alleged any direct evidence in support of her claim, the analysis must proceed under the McDonnell-Douglas burden-shifting framework.[2] Glanzman v. Metro Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 141 (2000)). The first step of the analysis requires Butz to prove her *prima facie* case by a preponderance of the evidence. Id. Only if she can satisfy that burden would the burden of production then shift to Lawns. Id. Lawns' burden at this stage is extremely light. It need only "articulate a legitimate, non-discriminatory reason" for its decision. Kowalski v. L & F Prods., 82 F.3d 1283, 1289 (3d Cir. 1996).

The burden then switches back to Butz to prove that the proffered reasons were pretextual. Waldron v. SL Indus., Inc., 56 F.3d 491 (3d Cir. 1995). Pretext means "a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., No. 94-3008, 1995 U.S. App. LEXIS 5535, at *3 (7th Cir. Mar. 20, 1995). Pretext is concerned with whether the employer honestly believes in the reasons it sets forth to justify its actions. See Russell v. Delco-Remy Div., No. 96-3647, 1997 U.S. App. LEXIS 22265, at *4 (7th Cir. Aug. 13, 1997). To show pretext, Butz must provide additional evidence to demonstrate that discrimination was the real reason for her termination or that will otherwise "cast doubt on the employer's stated

---

[2] The Third Circuit has explained that direct evidence is that, which "if believed, would prove the existence of the fact (in issue) *without inference or presumption*." Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994) (emphasis supplied).

reasons by identifying such weaknesses, inconsistencies, incoherencies, or contradictions" in the proffered reasons.  Brewer, 72 F.3d at 331.

### C.  Defendant Fleming Is Not Subject to Liability Under Title VII

As an initial matter, summary judgment should be granted to Edward Fleming, who, as an individual defendant, is not subject to suit under Title VII.  "Title VII does not permit the imposition of liability upon individuals unless they meet . . . [the] definition of 'employer.'" Manns v. Leather Shop Inc., 960 F. Supp. 925, 928 (D.V.I. 1997); see also Dici v. Pa., 91 F.3d 542, 552 (3d Cir. 1996) (holding that individual employees cannot be held liable under Title VII).  Butz has failed to demonstrate any evidence in support of such a finding.  As a matter of law, Butz's claims against Mr. Fleming are unsustainable and subject to summary judgment. Francis v. Joint Force Headquarters, C.A. No. 05-4484 (RBK), 2006 U.S. Dist. LEXIS 72738, at *15 (D.N.J. Oct. 4, 2006) (dismissing the plaintiff's claims against the individual defendants).

## II.    PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF PREGNANCY DISCRIMINATION

Butz must first satisfy her burden to prove each element of a *prima facie* case of pregnancy discrimination.  To do so, she must establish that (1) she is a member of a protected class; (2) she suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person who is not of the protected class is treated differently.  Schlifke v. Trans World Entm't Corp., 479 F. Supp. 2d 445 (D. Del. 2007) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)).  By her own admission, Butz is unable to satisfy the third prong of her *prima facie* case.

**A.  Plaintiff Admits That She Was Terminated For Reasons Other Than Her Pregnancy**

Butz's claims cannot withstand the present Motion because, at the outset, she cannot establish a *prima facie* case of pregnancy discrimination.  The most fundamental part of a discrimination claim is that the adverse action was taken "because of" the claimant's protected characteristic.  The plaintiff has the burden to demonstrate that, in fact, the complained-of decision was "actually motivated" by her protected characteristic.  Glanzman, 391 F.3d at 512. She must also demonstrate, as part of her *prima facie* case, that similarly situated employees outside of her protected class were treated more favorably under similar conditions.  Again, Butz admits that she cannot make this showing.  Thus, Butz's *prima facie* case fails in two respects.

Butz has stated repeatedly what she believes are the reasons for her termination.  She believes she was terminated because (1) Mr. Fleming believed that Butz had secured another job and had no intention of returning to Lawns; and (2) the cost of insurance increased sharply as a result of Butz's deception.  (A3).  She does not claim that she was terminated due to a discriminatory animus harbored by one of the relevant decision makers.  As a matter of law, then, she cannot establish her *prima facie* claim.

Butz admits that Mr. Fleming's decision to terminate her was likely influenced by Watson's story, though she disputes its validity.  (A115-16). Butz also believes that there was a second reason for the decision.  In the parties' Uncontested Facts, Butz admits that **she "believes that Defendants terminated her due to increased health care premiums."**  (D.I. 123 at 36). This court-filed admission precludes her claim for pregnancy discrimination **as a matter of law**.

Butz initially made this admission to the DDOL, "I believe I was let go due to insurance reasons."  (A191).  She made this admission less than two weeks after first learning that she had

been terminated. (A191). And at her deposition, more than three and a half years later, Butz

reiterated her belief that she "was let go due to insurance reasons." (A125-26).

Butz believes that she was terminated because Mr. Fleming thought she abandoned her

job and because the abandonment resulted in financial cost to Lawns. Butz made this clear when

she testified:

> A:   [Mr. Fleming] believed that fellow co-workers said I wasn't
>      coming back.
> Q:   You believe that that was part of the reason
> A:   and because I cost him too much money in his health
>      insurance. (A115).
> Q:   Did you think that he was concerned that fellow co-workers
>      told him that you never had any intentions of returning at all
>      from your maternity leave? Do you think he was concerned?
> A:   I believe the first or second paragraph [of the Termination
>      Letter] . . . the "per conversation with our health insurance"
>      is the biggest thing because usually you write [the] most
>      important thing up on top and then the next important thing
>      at the bottom.

 (A118-19). Butz believes that she was terminated because of reasons unrelated to her

pregnancy. Prior to hearing Watson's shocking story, Mr. Fleming had never considered

terminating Butz. When presented with information that Butz had lied about her intent to return,

Mr. Fleming had no choice but to consider termination as a possibility. Butz seems to believe

that, despite Mr. Fleming's reasonable belief that she had purposefully misled him, she was safe

from termination so long as she was out on "maternity leave." She contends not that the

termination was unlawful, but that the timing of the termination rendered the act unlawful.

Butz seems to believe that, despite Mr. Fleming's reasonable belief that she had lied

about her intentions, she was safe from termination so long as she was on maternity leave. She

explained at her deposition that, upon hearing that Butz had abandoned her job, Mr. Fleming

must have thought, "hell with it, she's not coming back. I'm firing her while she's out on

maternity leave." (A117). The mere fact that she was terminated while she was on maternity leave is not, by itself, sufficient to trigger liability for pregnancy discrimination. "The PDA does not require an employer to grant maternity leave or to reinstate an employee after a maternity leave. The PDA merely requires that an employer treat a pregnant woman in the same fashion as any other temporarily disabled employee." In re Carnegie, 129 F.3d 290, 297 (3d Cir. 1997).

An adverse employment action is not transformed into unlawful discrimination merely by the employee's membership in a protected class. "[I]t is not unlawful under the PDA to terminate an employee absent by reason of pregnancy if the employer would have terminated an employee absent by reason of a different temporary disability." Id. Butz's admission that she believes she was terminated for reasons unrelated to her pregnancy requires dismissal for failure to meet her *prima facie* burden.

### B. Plaintiff Admits That She Cannot Identify Any Similarly Situated, Non-Pregnant Employees

Butz's repeated admissions about the non-discriminatory reasons for her termination require dismissal of her claim. Although no additional support is necessary to grant summary judgment, her *prima facie* case fails in yet another respect. Her inability to point to even a single suitable comparator further prevents Butz's case from proceeding. Mershon v. Woodbourne Family Practice, LLC, No. 06-00253, 2006 U.S. Dist. LEXIS 49577, at *7 (E.D. Pa. July 19, 2006) (citing In re Carnegie, 129 F.3d at 297).

Butz initiated the Charge process with the Delaware Department of Labor ("DDOL"), within one week of receiving the Termination Letter.[3]   (A168-72). As part of that process,

---

[3] The timeline is worthy of note. Butz received the Termination Letter two weeks before the expiration of her planned six-week maternity leave. She did not begin her job search until after the six weeks ended. She did, however, file her Charge a week within receiving the Termination Letter, one week before she planned to end her maternity leave.

Butz completed the DDOL's Discipline Questionnaire, in which she sets out the details of her claim. (A186-91). When asked to identify "all persons in comparable positions" who were terminated as a result of the same conduct, Butz responded, "None." (A189). She was then asked to identify "all persons in comparable positions" who were *not* terminated as a result of the same conduct. She again responded, **"None."** (A189).

Butz admits that Lawns never gave a similarly situated employee more favorable treatment as is required for the third prong of the *prima facie* case. (A91). In <u>Schiflke v. Trans World Entertainment</u>, a pregnancy discrimination case decided earlier this year, the Honorable Sue L. Robinson granted summary judgment to the defendant. The court noted the absence of any "testimony or documentary evidence[,]…which might establish an inference that [the plaintiff] was treated differently than other similarly situated individuals." 479 F. Supp. 2d at 451. The plaintiff's failure to show that she was treated "differently than other disabled employees" was fatal to her claim. <u>Id.</u> Here, as in <u>Schiflke</u>, Butz cannot point to any evidence that other employees who were "similarly unable to work were given a special accommodation," which she did not receive. <u>See id.</u>

Lawns did not have any leave policy in place. As Butz concedes, she was the only Lawns employee ever to have requested or taken a leave of absence for any reason, including maternity leave. (A91).

Butz admits that she cannot point to even a single comparator. Certainly she is unable to proffer any evidence tending to indicate that she was somehow treated less favorably than a similarly situated employee outside of the protected class. As the <u>Schiflke</u> decision makes strikingly clear, Butz's inability to identify a proper comparator requires the dismissal of her claim for failure under the third prong of her *prima facie* burden.

III.   **PLAINTIFF CANNOT DEMONSTRATE THAT DEFENDANTS' PROFFERED LEGITIMATE, NON-DISCRIMINATORY REASONS WERE PRETEXTUAL**

Although Butz disagrees with the prudence of the decision to terminate her, she does not point to any evidence tending to show that the reasons for the decision were not true. Lawns terminated Butz when she refused to communicate with them. Lawns believed that Butz had abandoned her job. Butz may have been insulted or hurt by Lawns' decision. She may have been disappointed that Lawns did not give her the benefit of the doubt despite her refusal to return Mr. Fleming's calls. What Butz cannot do is show that Lawns made the decision for any unlawful reason.

Thus, even assuming, *arguendo*, that Butz could meet her *prima facie* burden, her claim is still subject to dismissal. Lawns has articulated legitimate, non-discriminatory reasons for its decision to terminate Butz. See Fuentes, 32 F.3d at 763 (describing the burden-shifting framework). Lawns believed Butz had lied about her intentions and had abandoned her job. Butz does not dispute that this belief is the true reason motivating the decision to terminate her employment. Because she agrees that this was the reason for the decision, she cannot satisfy her burden to demonstrate pretext. See Mauro v. S. New Eng. Telecomms., 208 F.3d 384, 388 (2d Cir. 2000).

### A.  Defendants Terminated Plaintiff Because She Abandoned Her Job

Lawns has satisfied its "extremely light" burden to "articulate a legitimate, non-discriminatory reason for terminating Plaintiff." See Kowalski, 82 F.3d at 1289. On December 23, 2003, Butz packed her personal belongings and left. She did not tell Mr. or Mrs. Fleming that she was going to begin her planned leave. She did not leave her keys to the office or any instructions for Watson to use during her absence. She did not tell Lawns the length of time she expected to be out.

Lawns did not have a leave policy. Lawns did not provide for paid or unpaid "maternity leave." (A91). In fact, Lawns did not provide for any type of leave. No Lawns employee had ever requested or taken any type of leave before.

Although Lawns hoped that Butz would return to work full-time after her child was born, she certainly was not under any obligation to do so. Nor did Lawns have any obligation to keep Butz employed during an unpaid leave of an undetermined duration. Thus, when Mr. Fleming learned that Butz had left without notice and under false pretenses, he was well within his managerial rights to consider the possibility of termination. Butz's uncooperative attitude and hostility towards Mr. Fleming just hours later seemed to confirm Ms. Watson's story.

According to Watson, Butz had secured another job. Mr. Fleming tried to contact Butz in the hope that she would deny this allegation. Instead, he was met with forceful resistance from Butz and her husband. Having been cut off from further communications with Butz, Mr. Fleming was left without many options, despite his strong desire to have her return as planned. Further evidence of Lawns' desire to have Butz return is seen in the fact that it held open her job and offered her reinstatement on more than one occasion.

As Butz herself alleges, she was terminated as a result of Ms. Watson's assertion that Butz intended to abandon her job. Yet, when she learned that Lawns had been given what she now contends was inaccurate information, Butz ceased all communication with both Lawns and the Flemings. Her total and complete refusal to correct this allegedly incorrect information provided further support for the decision to terminate her employment.

Other facts supported the conclusion that she had no intention to return to Lawns. Butz was commuting seventy miles each way to work at Lawns from Newark. This meant she had to drive 140 miles per day, 700 miles per week to get to a job that paid $12.00 an hour. And, Butz

had moved downstate only to follow her then-boyfriend Scott, who had moved downstate for work. (A31). Here, the facts were nearly identical. Scott and Butz moved to New Castle County because of Scott's new job. Watson's story certainly seemed logical based on these facts.

An employer who reasonably believes that an employee has abandoned her job has a legitimate, non-discriminatory reason for termination. See Hussein v. Genuardi's Family Markets, C.A. No. 00-CV-4905, 2002 U.S. Dist. LEXIS 430 (E.D. Pa. Jan. 15, 2002); LaResca v. AT&T, 161 F. Supp. 2d 323 (D.N.J. 2001); James v. Woodbridge Dev. Ctr., C.A. No. 95-6151, 1997 U.S. Dist. LEXIS 16148, at *28 (D.N.J. Sept. 30, 1997).

Here, the Flemings desperately wanted to believe that Butz had *not* abandoned her job. Yet, they were faced with Ms. Watson's credible and convincing story, Butz's recent move and resulting commute, and her outright refusal to communicate with them. In light of this evidence, and with the guidance of Attorney Howard, the decision to terminate Butz seemed to be the only reasonable and prudent option. Certainly, Lawns has articulated a legitimate, non-discriminatory reason for its decision.

### B. Plaintiff Cannot Produce Any Evidence that Defendants' Proffered Reasons Did Not Actually Motivate The Termination

The record in the present case is bereft of evidence from which a reasonable juror could infer that Lawns discriminated against Butz on the basis of her pregnancy. Because Lawns has demonstrated a legitimate, non-discriminatory reason for its decision, the burden shifts back to Butz to show that the reason is actually a pretext for discrimination. Maull v. Div. of Police, 141 F. Supp. 2d 463, 470 (D. Del. 2001). To satisfy her burden at this stage, Butz must show that a reasonable jury could either (1) disbelieve the articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Lawns' actions. See Younge v. St. Paul Fire & Marine Ins. Co., No. 01-4218, 2002 U.S. Dist.

LEXIS  12293, at *17 (E.D. Pa. June 20, 2002) (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3d

Cir. 1994)).

Regarding the first method, it is not enough to show that an employer's decision was

wrong or misguided.  Instead, the analysis turns on "whether discriminatory animus motivated

the employer, not whether the employer is wise, shrewd, prudent or competent."  Keller v. Orix

Credit Alliance, Inc., 130 F.3d 1101, 1108-9 (3d Cir. 1997).  Alternatively, using the second

method, Butz must demonstrate some evidence of pretext, "such as by showing that her former

employer previously discriminated against other persons within her class or gave more favorable

treatment to similarly situated persons not within her class."  Younge, 2002 U.S. Dist. LEXIS at

*17 (internal citations omitted).

Butz cannot provide evidence in support of either method.  She is unable to point to any

evidence that the Flemings were subjectively motivated by discriminatory animus towards her

because of her pregnancy.  Nor can she demonstrate that similarly situated, non-pregnant

employees were treated more favorably under similar conditions.  Kautz v. Met-Pro Corp., 412

F.3d 463, 467 (3d Cir. 2005); see Hensley v. Boddie-Noell Enters., Inc., No. 98-6125, 2000 U.S.

App. LEXIS 14100, at *14-15 (6th Cir. June 14, 2000) (declining to find pretext because the

plaintiff "admits that she knows of no other person who took a medical leave"); Marshall v. Am.

Hosp. Assoc., 157 F.3d 520, 527 (7th Cir. 1998) (finding no pretext where the plaintiff did not

present evidence that a non-pregnant employee who was going to be on extended leave in the

months immediately preceding the annual conference would not have been terminated.")

Without the requisite demonstration of discriminatory animus, Defendants cannot be held

liable for making a reasonable, though difficult, business decision.

### 1.    Plaintiff's Contention That Defendants Made a "Bad" Decision is Not Evidence of Pretext

Butz contends that Defendants made a "bad decision" when they terminated her employment.  (A121).  She contends that Defendants should not have believed Ms. Watson when she reported that Butz had secured another job and did not intend to return to Lawns.  (A106).  "[I]t is not enough for a plaintiff to show that the employer's decision was wrong or mistaken because the issue is whether the employer acted with discriminatory animus."  Amato v. Verint Sys., Inc., No. 04-3489-RBK, 2007 U.S. Dist. LEXIS 11673, at *15 (D.N.J. Feb. 16, 2007) (quoting Abramson v. William Paterson Coll., 260 F.3d 265, 283 (3d Cir. 2001)).  Poor decision making is not evidence of pretext.

Plaintiff cannot meet her burden to establish pretext simply by disagreeing with Defendants' decision.  Fuentes, 32 F.3d at 765; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 533 (3d Cir. 1992).  The employer is entitled to make a business decision without fear of second guessing.  Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994).  The question is not whether Lawns made the best, or even a sound, business decision.  The only question is whether its real reason for the decision was discrimination based on her pregnancy.  Keller, 130 F.3d at 1009.

The Flemings were the decision makers responsible for hiring Butz.  (A114).  They were also responsible for her termination.  (A24).  Therefore, Butz has the burden to prove that the Flemings acted with a discriminatory bias based on her pregnancy when making the decision to terminate her employment.  Butz cannot carry this burden.  Butz's conclusory allegations, which are unsupported by fact or logic, are insufficient as a matter of law to withstand the present Motion.

2.    **Plaintiff Admits That Mrs. Fleming Harbored No Discriminatory Animus Towards Her**

Butz does not contend that Mrs. Fleming harbored any discriminatory animus towards her because of her pregnancy.  (A127; A112).  This concession resonates with logic.  Mr. and Mrs. Fleming have five children.  In Butz's own words, Mrs. Fleming treated her like one of her "own children."  (A98).  Certainly, this thoughtful demonstration of kindness by Mrs. Fleming during her own time of need cannot be said to show any type of animus.

3.    **Plaintiff Cannot Show That Mr. Fleming Harbored Any Discriminatory Animus Towards Her**

For her claim to survive, Butz must prove that one of the decision makers was motivated by a discriminatory animus.  She admits that Mrs. Fleming had no such animus.  Thus, she must proffer some evidence that the other decision maker, Mr. Fleming, did have a discriminatory bias towards pregnant women.  Butz cannot make this proffer.

All Butz has offered is a single, conclusory allegation.  She claims that Mr. Fleming "*believed* that women should stay home to take care of their children."  (A113) (emphasis supplied).  Butz was unable to provide any type of contextual framework for this claim.  She did not identify how she was able to determine what Mr. Fleming did or did not believe.

Such a claim, "vague, undated, and unsupported," is the type of uncorroborated, conclusory allegation insufficient to withstand the present Motion.  See Lisbon v. United Nat'l Group Ins. Co., No. 03-6207, 2006 U.S. Dist. LEXIS 6676, at *25 (E.D. Pa. Feb. 21, 2006); Silver v. GM Corp., No. 99-2121, 2000 U.S. App. LEXIS 17752, at *16 (4th Cir. July 24, 2004) ("[Plaintiff]'s vague allegations, unsupported by other evidence in the record, cannot defeat a properly supported motion for summary judgment.");  see also Schlifke, 479 F. Supp. 2d at 451 (granting summary judgment in PDA case where "[t]he only 'proof' plaintiff submitted is her own conclusory assertions").

Not only does Butz fail to provide any support for her independently drawn conclusion, but the undisputed factual record supports the opposite conclusion. She testified that there were four office employees, including herself, Laurie Schatz, Dina Alderucci, and Debra Watson, in addition to Mrs. Fleming. (A113). Of the three, Schatz and Watson were both mothers, (A113-14), and Schatz had two young children at home. (A114). All three were interviewed and hired by Mr. and Mrs. Fleming. (A114-15). In fact, throughout the entire history of the business, there have always been female employees, with and without children. It is illogical to conclude from this undisputed evidence that Mr. Fleming was biased against women as a class or against women with children specifically. Such a conclusion simply does not comport with the plain facts.

Butz testified numerous times about the warm, familial relationship she shared with the Fleming family. (A98). In fact, she was most upset by the Termination Letter because she felt that she and the Flemings were "like family." (A98). Mr. Fleming gave similar testimony. He and his wife considered Butz to be a part of their family and they were "devastated" when she simply cut them out of her life and walked off the job without explanation or apology. (A15-16).

Such evidence weighs strongly against a finding of pretext. Instead, it indicates that it is "illogical to assume" that the Flemings "would suddenly turn against [plaintiff] and fire her based on [her pregnancy]." Speed v. Adidas Am., Inc., No. 04-CV-1430-PK, 2006 WL 897978, at *7 (D. Or. Apr. 6, 2006); see also Jones v. Hosp. of Univ. of Pa., No. 03-4938, 2004 U.S. Dist. LEXIS 15711, at *20 (E.D. Pa. Aug. 5, 2004) (finding the plaintiff's concession that there was no negative history between her the decision maker tends to disprove pretext).

And, even if one were to overlook the lack of factual support for her conclusion and ignore the evidence that directly contradicts her presumption, the alleged "belief" is still

insufficient to support a finding of pretext.  In Kennedy v. Schoenberg, Fisher & Newman, Ltd., the Seventh Circuit evaluated a comment made by the relevant decision maker.  140 F.3d 716, 724 (7th Cir. 1998).  The decision maker told the plaintiff, "if you were my wife, I would not want you working after having children."  Id.  The court found that this was not evidence of pretext because it was not made in reference to the plaintiff but to the speaker's wife.  Id.  Similarly, Butz's conclusion that Mr. Fleming "believed" that "women should stay home" simply cannot be causally linked to Plaintiff in any sufficient way.

Butz's unsupported speculations and suspicions are insufficient to demonstrate pretext.  See Randolph v. Ind. Reg'l Council of Carpenters & Millwrights, 453 F.3d 413 (7th Cir. 2006).  Plaintiff's burden requires production of evidence more than her own "subjective beliefs of discriminatory conduct."  Id.  Such self-interested opinion testimony is insufficient to create an issue of material fact.  Kappes v. DuPont, No. 97-443-SLR, 1999 U.S. Dist. LEXIS 3580 (D. Del. Mar. 18, 1999)  ("Conclusory assertions of fact cannot overcome a motion for summary judgment.").

### 4.    Defendants' Offer of Reinstatement and Extension of Insurance Coverage Further Demonstrates the Absence of Pretext

Lawns held the position open, hoping that Butz would call to reconcile and return to work. (A17). Even after making the determination that she had abandoned her position on December 23rd, Mr. Fleming still suggested an offer of reinstatement to Howard.  (A174-75). And, in correspondence with the Unemployment Insurance Division, Mrs. Fleming again reiterated that Butz's position had not yet been filled, should she want to return.  (A179).

Butz testified that Lawns' offer of reinstatement was discussed at her Unemployment Appeals Board Hearing in March 2004.  She testified that she would not have accepted reinstatement because, at that time, she was already employed with CCG, where she was paid

more and was enjoying her job. (A128; A32). Lawns' offer of reinstatement is further proof of the absence of pretext. (A135).

Additional evidence that Lawns had no discriminatory intent can be seen in the voluntary extension of Butz's insurance coverage. In the Termination Letter, Mr. Fleming explained that the insurance company mandated that her disenrollment date was the last day of work. (A196-97). For Butz, that meant her disenrollment date would be December 23, 2003. Yet, Mr. Fleming went on to explain that he had requested the insurance company extend Butz's coverage through December 31, 2003, so that she would not incur any expenses for the delivery of her child. (A196-97).

Although the Termination Letter stated that Butz's health care would expire on December 31, 2003, Lawns had not taken any steps towards cancellation. In fact, the first time Lawns reported Butz's disenrollment to Optimum Choice was on January 22, 2004. (A192-93).This step was taken only after an entire month had passed without any communication from Butz. Only after Butz had received the Termination Letter, after Mr. Fleming had spoken with Michael Butz and asked him to have Butz contact Lawns, and after still receiving no communication, did Lawns notify Optimum Choice of the need to remove Butz from its policy. At that point, the Flemings began to realize that Butz was not going to reconcile the relationship.

The Flemings made repeated efforts to refrain from making any official decisions for as long as possible, in the hope that Butz would reconsider and return to work. This certainly does not evidence any discriminatory motive or intent. Instead, it is yet additional evidence of the absence of pretextual motives.

**IV.   PLAINTIFF'S REFUSAL TO PRODUCE ANY SUPPORTIVE DOCUMENTS PRECLUDES AN AWARD OF DAMAGES IN ANY AMOUNT**

This Court has previously ruled, in response to Plaintiff's Motion for Protective Order (D.I. 75), that Butz may seek damages for the limited time period of December 2003 through March 2004.  (D.I. 100).  And, from that period, Butz admits that she does not seek damages for the six weeks during which she was unable to work.   (A231).  Thus, her entire damages claim is limited to the three week period from February 9, 2004, through March 1, 2004, between the end of her planned maternity leave and the start of her new job.  This suit was brought in the name of three weeks worth of damages.

Regardless, Butz's failure to produce any documentary evidence in support of her damages claim precludes her from any award at all.  Calculations based on Butz's own estimates and rough calculations are too speculative to justify an award

**A.   Plaintiff's Refusal to Produce Any Documentary Evidence Precludes An Award of Back Pay Damages**

In short, Butz is precluded from an award of back pay damages because of her absolute and repeated refusal to produce any supporting documents.  Speculative damages may not be awarded and back pay damages may not be presumed.  The burden of proof rests with the plaintiff to establish the amount of back pay damages with enough certainty to warrant their award.  See e.g., Anderson v. CONRAIL, C.A. No. 98-6043, 2000 U.S. Dist. LEXIS 15978, at *14-15 (E.D. Pa. Oct. 26, 2000) (refusing to adjust award to account for tax consequences because such amendment would be speculative, noting the plaintiff had not supported her request with any evidence); Shovlin v. Timemed Labeling Sys., Inc., C.A. No. 95-4808, 1997 U.S. Dist. LEXIS 2350, at *7 (E.D. Pa. Feb. 28, 1997) (same).  Butz has failed to provide Defendants with any documents that would meet the minimum standards of certainty required for an award of back pay.

The determination of back pay damages falls squarely within the province of the court. Spencer v. Wal-Mart Stores, Inc., C.A. No. 03-104-KAJ, 2005 U.S. Dist. LEXIS 4373, at *7 (D. Del. Mar. 11, 2005) (citing Bates v. Board of Educ., C.A. No. 97-394-SLR, 2000 U.S. Dist. LEXIS 4873, at *24-25 (D. Del. Mar. 31, 2000)).  Thus, it is appropriate for the court to determine whether Butz has met her burden so that her damages claim could survive summary judgment.  See Horn v. Duke Homes, 755 F.2d 599, 606 (7th Cir. 1985) (holding that the plaintiff has the burden of proving the damages caused her).  Other than speculation and estimation, Butz has provided no evidence in support of her damages claim.

For example, when asked how she calculated her claim for "Lost Earnings," Butz could not even identify the period of time supposedly reflected by her calculations.  (A48). When asked whether she had produced any documentation to support her calculations, she responded:

> Q:   Did you submit that, the 1099 [reflecting unemployment
>        earnings]?
> A:   I don't believe so.
> Q:   Why not?
> A:   I'm not really sure. (A49).
>                         ***
> Q:   Did you produce copies of your tax returns?
> A:   No.  (A50).
>                         ***
> Q:   Just for clarity purposes, I'm not referring only to pay stubs.
>        It could be anything at all such as income taxes.  There is no
>        documentation produced to show what you earned at Lawns,
>        not just limited to pay stubs, is that correct?
> A:   Correct.

 (A51).  Butz failed to produce any documents as evidence of her earnings at Lawns or any subsequent employer.  See Taylor v. Philips Indus., Inc., 593 F.2d 783, 786 (7th Cir. 1979) (per curiam) (reversing an award of back pay where the plaintiff failed to introduce any evidence of actual earnings subsequent to her discharge).

The back pay analysis, then, is simple.  Despite Defendants' repeated requests and an Order from this Court instructing her to fully respond to those requests, Butz never produced any documents reflecting her past or present earnings.  The absence of any documentary evidence in support of her claim for lost wages is an absolute bar to an award of back pay.

### B.  Plaintiff's Refusal to Produce Any Documentary Evidence Precludes an Award of Medical Expenses

As with her claim for back pay damages, Butz has failed to produce any documents in support of her claimed medical expenses.  During discovery, Butz produced numerous documents, asserting that they were evidence of her medical expense damages.  But, during her deposition, it became clear that the produced documents were a smoke screen of papers without a shred of actual evidentiary value.

The produced documents included invoices and statements from various health care providers. (A83).  Some of the statements do not identify the name of the patient treated, the services that were rendered, or the date of the service.  (A71). Without this crucial information, these documents lack sufficient detail.  Further, the statements do not identify what portion of the bill was paid by Optimum Choice.   (A83-84). Thus, her calculations do not reflect the amount of any out-of-pocket expenses she may have incurred.  (A68).

In fact, Butz admitted that she had submitted proof of payment for only $40 in medical expenses.  (A75-76).  She further admitted those $40 in payments were likely her co-pays and deductibles, which she would have been required to pay had she never been terminated.  (A77-78). As discussed below, Butz refused to produce any documents that would tend to prove the amount of her current or previous co-pays and deductibles.  Thus, even an award in the amount

of $40 would be impermissible as too speculative.[4]  To permit recovery of moneys Butz would

have been accountable for with or without the adverse employment action is not consistent with

the "make whole" policy of Title VII.  See Berndt v. Kaiser Aluminum & Chem. Sales, Inc., 604

F. Supp. 962, 965 (E.D. Pa. 1985), aff'd, 789 F.2d 253 (3d Cir. 1986) ("Requiring [Defendant] to

reimburse plaintiff for the amounts it would have incurred in providing insurance coverage when

no loss has been suffered by the plaintiff is not consistent with the 'make whole' policy of the

ADEA").

### C.  Plaintiff's Refusal to Produce Any Documentary Evidence Precludes an Award of Insurance Premiums

The same documentary analysis results in the preclusion of an award of insurance

premiums, as well.  Butz seeks damages for "insurance premiums" representing biweekly

payments of $30 for the period of her employment with CCG.[5]   (A35). Without qualification,

Butz admits that she has not produced any documents in support of her claim for insurance

premiums.

> Q:  And your current insurance, have you told me anything about
>      your current insurance coverage?
> A:  No
> Q:  Have you provided the Court with any information about
>      your current insurance coverage?
> A:  No.  (A36).

---

[4] The extent of speculation required is seen in her claim for expenses from Bayside Health. She admitted that she had incurred a "huge balance" with Bayside Health prior to January 2004, so any amounts incurred during her period of unemployment "could have [been] wrapped in with that [old] balance." (A74).  She provided no way to determine what amount she incurred during the permissible time period.

[5] This Court's prior ruling makes clear that Butz is precluded from seeking any damages past March 1, 2004, when she began her current job.  Her claim for insurance premiums, however, is based on a gross estimation of the cost of health care coverage with her current employer.  In accordance with the Court's Order, Plaintiff's requested damages must be denied.  For the purposes of thoroughness, Defendants will address the several other reasons that Butz is precluded from seeking insurance premiums.

> Q:   As of today, you have not produced any documents that
>       reflect what insurance coverage you receive from the CCG, is
>       that correct?
>
> A:   Correct.
>
> Q:   And then, . . . , as of today you have not produced any
>       documents that reflect your premium payments for your
>       current employer's health care coverage, is that correct?
>
> A:   Correct.
>
> Q:   Have you produced any other documents that reflect anything
>       related to your current insurance coverage?
>
> A:   I don't believe so.

(A39).  Without any documentary support to show the cost or descriptions of the two insurance plans, any award for "insurance premiums" would be based entirely on speculation.

Further, Butz has never provided any evidence that shows she actually incurred any costs for the $30 biweekly premiums she seeks.  This may be because, as Butz admits, she does not currently *pay* $30 biweekly in insurance premiums.  (A34; A38).  Because she currently has family, not single-person, coverage, she has provided only the estimated cost for single-person coverage with CCG.  She admits that the $30 is "based on speculation."  (A47). Her speculation is wholly insufficient to support a claim for damages in the form of insurance costs.  See United Steel, Paper & Forestry v. Neville Chem. Co., No. 06-640, 2007 U.S. Dist. LEXIS 55435, at *13-15 (W.D. Pa. July 31, 2007) (plaintiff must introduce evidence of costs he actually incurred as support for insurance cost damages).

Butz admits that she does not know and has not produced any information about the details of either plan, such as specialist visits, referrals, or emergency room costs.   (A40-41; A65; A70).  Nor could she recall what her co-payments for doctors visits were under the Lawns insurance plan.  (A124). She could not even recall the various components of her current benefits scheme, such as whether she was enrolled in life insurance, disability insurance, or pension plans or any combination thereof.  (A66).

She also admitted that she had not compared the two plans.  (A45; A46). One would expect there to be significant differences in coverage between the insurance plan offered by Lawns, a small business with less than thirty employees, and CCG, a government employer.  At Lawns, Butz was eligible for employee-only coverage, whereas she has family coverage at CCG. (A37; A66-67).

Butz testified that she was not aware of the differences in the two plans and could not testify as to whether they were comparable.  (A44).  And, even if she had compared them, she pointed out that she is "an accountant," (A42), not an insurance "expert."  (A43).  Again, Butz clearly fails to carry her burden of proving her case, including her damages, by a preponderance of the evidence.  Conway v. Hercules, Inc., 831 F. Supp. 354, 357-58 (D. Del. 1993) (citing Gelof v. Papineau, 648 F. Supp. 912 (D. Del. 1986), aff'd in part, vacated in part on other grounds, 829 F.2d 452 (3d Cir. 1987)).  Her failure to prove damages with some measure of certainty precludes her from receiving any damages award.

### D.  Plaintiff's Claims for Back Pay Fail Regardless of Whether She Provides Documentary Evidence

### 1.  Plaintiff Was Fully Compensated for All Holidays

As part of her claim for back pay wages, Butz also claims damages in the form of holiday pay, vacation pay, and PTO.  Like claim for lost wages, Butz has produced no documentary evidence to support such awards.

Butz claims damages in the form of holiday pay over and above back wages.  She asserts that she should have been paid for a full day of work for Christmas Day 2003 and New Year's Day 2004.  (A59). Lawns paid employees at their regular rate of pay for holiday time.  Thus, this amount would already be included in any back pay award Butz could receive.  (A59). Butz cannot collect double what she would have received had she still been employed.

Also, she has already admitted that she would have been unable to work on both dates in accordance with her doctor's orders. (A109-10). "[A] plaintiff 'will not be allowed back pay during any periods of disability.'" Olabode v. William Hecht Inc., No. 95-6221, 1997 U.S. Dist. LEXIS 20983, at *34 (E.D. Pa. Dec. 30, 1997) (quoting Mason v. Assoc. for Indep. Growth, 817 F. Supp. 550, 554 (E.D. Pa. 1993)). "The rationale for this rule is that a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the employment discrimination." Id. (internal citations omitted); see Grindstaff v. Burger King, Inc., 494 F. Supp. 622, 625 (E.D. Tenn. 1980) (plaintiff not awarded back pay for time she would have been on maternity leave); Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 401 (3d Cir. 1976), cert. denied, 429 U.S. 1041 (1977) (back pay could be reduced based upon period of unemployment due to illness); see also Waltson v. Sch. Bd., 566 F.2d 1201, 1206 (4th Cir. 1977) (denying back pay for teacher who was unable to teach because pregnant). Thus, she is precluded from collecting damages in the form of holiday pay for these dates. (A109-10).

### 2.    Plaintiff Was Fully Compensated for All PTO and Vacation Pay

Similarly, Butz is precluded from collecting PTO or vacation pay, for which she admits she has already been paid. She admits that she took five vacation days in 2003—four days in February and one day in September, despite not being eligible for paid vacation until November 2003. (A56). She admits that she was "fully compensated" for all five days. (A56). Butz cannot collect twice for what she was not entitled to by virtue of the fact that she paid herself for time she had not accrued.

### 3.    Plaintiff Would Not Have Received a Bonus Even If She Had Remained Employed

Butz's claim for damages in the amount of $500 for a future bonus is entirely speculative. Bonura v. Chase Manhattan Bank, N.A., 629 F. Supp. 353, 361 (S.D.N.Y. 1986) (refusing to

award lost bonuses as back pay because bonuses were not mandatory on the part of the employer

and any award would be "rearview fortune-telling").  She bases her bonus claim on the illogical

argument that, because she received a bonus in the amount of $397 in 2002, she should have

received a bonus of $500 in 2003.  Butz has failed to provide any evidence tending to show that,

had she not been terminated, she would have been awarded a bonus in any amount.  Stephens v.

CIT Group, 955 F.2d 1029 (5th Cir. 1992) (no evidence to support award for bonus where the

plaintiff had never earned a $14,000 bonus).  The "end-of-the-year bonus" was fully

discretionary and was distributed only when appropriate in the context of business needs.

(A60). Discretionary bonuses that are not mandatory on the part of the employer are too

speculative to constitute awardable damages.  Bonura, 629 F. Supp. at 361.

 The more compelling fact, as Butz admits, is that no office employee received a bonus in

any amount in 2003.  (A207-30).  Butz attempts to ignore this undisputable fact.  It is, however,

inevitably fatal to her claim for an unpaid bonus.

 How Butz would somehow be made the exception is impossible to imagine.  Even

Mauricio Miranda, Lawns' most senior employee who had been with the company for 15 of its

16 years in operation, did not receive a bonus.  (A219).  Butz's failure to provide any evidence to

substantiate her claimed bonus precludes the award of this amount for damages.  Sennello v.

Reserve Life Ins. Co., 667 F. Supp. 1498, 1517 (S.D. Fla.1987), aff'd, 872 F.2d 393 (11th Cir.

1989) (refusing to award claim for "lost vacation" because the plaintiff could not substantiate the

amounts claimed).

 Even if Butz had not been terminated and had remained employed by Lawns, she would

not have been entitled to the holiday pay, vacation pay, PTO, or bonus she claims for damages.

The purpose of an award of back pay is to make the plaintiff whole for any losses incurred as a

result of the alleged unlawful act.  Because Butz has suffered no loss of holiday, vacation, bonus pay, or PTO, she is not eligible for an award of damages for those items.

### 4.    Plaintiff Arbitrarily Changed Her Rate of Pay in Damages Calculations

All of Plaintiff's damages calculations are based on an hourly rate of $12.75.  (A64).  Yet, Butz earned only $12 per hour with Lawns.  (A63).  When questioned about the discrepancy, Butz testified that, although she was never promised a raise, she independently concluded that, due to her "excellent review," she should have been given an increase to the larger rate.  (A64).  She drew this conclusion despite the fact that, when she asked Mrs. Fleming about the possibility of a raise, the only response she received was that they could discuss it when Mrs. Fleming returned from arranging her mother's funeral and estate arrangements in Missouri.  (A65).

In the absence of expert testimony, which Butz has not provided, a plaintiff may not collect lost wages based on an anticipated wage increase.  Burks v. City of Phila., 974 F. Supp. 475 (E.D. Pa. 1997).  In Kolb v. Goldring, Inc., 694 F.3d 869 (1st Cir. 1982), the plaintiff sought to recover a raise that he claimed he would have received had he remained employed.  The court held that in the absence of expert testimony, proof of future raises was too speculative to warrant an award calculation based on anything other than his rate of pay at the time of separation.  Id. at 873.

### E.  Plaintiff's Claims for Insurance Premiums and Medical Expenses Fail

### 1.    Butz's Daughter Is Not Eligible for an Award of Medical Expenses

Butz seeks, as part of her claim for "medical expenses," certain costs incurred for her daughter's health care during the thirty days following the birth.  Butz admits that Lawns did not provide coverage for dependents through its "employee-only" policy.  Thus, had Butz remained employed, her daughter could not have been added as an insured dependent under Butz's policy.  Pursuant to the Newborns' and Mothers' Health Protection Act of 1996, 42 U.S.C. § 300gg-51

(the "Newborns' Act"), her daughter would have been covered only for the first 96 hours following delivery.[6]

Butz asserts that the Delaware Insurance Code requires substantially more coverage. Title 18 does not impose civil liability upon employers. Title 18 regulates only insurance providers. It does not regulate employers who are merely insurance subscribers. If Butz had remained employed at Lawns, her daughter would not have been eligible for coverage under Butz's policy. Thus, Butz is precluded from an award of any damages incurred as part of her daughter's care.

### 2.     Plaintiff Had Health Insurance Coverage

Plaintiff admits that she was never actually billed for any health care services rendered during the period of her unemployment. Yet, she claims that she did not have insurance coverage at that time. These two facts cannot be reconciled.

It is virtually inconceivable that Butz could have received health care services and pharmaceuticals and be billed nothing. For example, she sought medical care on January 14, 2004, and on February 11, 2004. Neither of these bills was rejected by Optimum Choice. (A162-66). Also, she never received any bills from Beebe Medical Center for the costs incurred during delivery and subsequent treatment. (A72-73). Considering the costs were in excess of $6,000, it seems only logical that, if Butz did not pay the amount, then Optimum Choice must have accepted and paid the claim. Even Butz admits as much:

> Q:   I'm saying, based on the fact that you only had to pay less than $5 per prescription, is it fair to assume you were covered by insurance?

---

[6] The Newborns' Act affects the amount of time insurance issuers must provide coverage following the birth of a child. For caesarian deliveries, the carrier must provide coverage for the first 96 hours following delivery.

A:  Assume, yes. . . But I would have to guess probably it was
covered.

(A78-80; A81). This is explainable only by the conclusion that she did, in fact, have health
insurance, which paid the claims as they were submitted.  Lawns did extend Butz's health care
coverage through January 14, 2004 and has produced proof that it paid all of Butz's premiums
throughout that time. (A69; A178).

## V.    PLAINTIFF HAS FAILED TO MEET HER BURDEN OF PROOF AS TO
EMOTIONAL DISTRESS OR PUNITIVE DAMAGES

Plaintiff has filed a Motion for Leave to Add a New Claim (D.I. 106), in which she seeks
to amend her Complaint for the third time to add a claim for punitive and pain and suffering
damages.  Defendants have filed their opposition to this Motion.  (D.I. 112).  If permitted to
pursue claims for these damages, Butz seeks $50,000 in pain and suffering damages.  She has
alleged this amount "because it is the maximum" that can be awarded.  (A89). She seeks the
same amount in punitive damages.  (D.I. 25)

Even assuming, *arguendo*, that the Motion was granted, Butz cannot establish a claim for
emotional distress damages or punitive damages.  Butz was unemployed for approximately three
weeks.  This includes the time period following the end of the six weeks she intended not to
work and her first day of work at the CCG.  Butz accepted the job offer at CCG on February 11,
2004.  Butz was uncertain about where she would work for *one week*.  There were only *seven
days* when Butz did not have secure employment.

The present claim is not subject to an award of punitive damages.  Defendants sought
counsel from their attorney immediately.  Based on his advice, they sent Butz the Termination
Letter.  There is no evidence of intent sufficient to warrant a finding of punitive damages.

This Circuit requires the plaintiff to demonstrate evidence of willfulness over and above
the evidence she relied upon to prove the underlying liability.  Dryer v. Arco Chem. Co., 801

F.2d 651 (3d Cir. 1986), <u>cert. denied</u>, 480 U.S. 906 (1987).  Butz has provided no evidence at all

that Defendants acted with "malice or evil motive or intent, or with reckless disregard or callous

indifference" to her constitutional rights.  <u>Smith v. Wade</u>, 461 U.S. 30 (1983).  That the Flemings

sought the advice of their legal counsel disproves such an intent.  <u>EEOC v. Century Broad.</u>

<u>Corp.</u>, 957 F.2d 1446, 1459 (7th Cir. 1992) (the fact that the defendant did not meet with the

company's attorneys about whether the plan to fire the plaintiff would violate the ADEA

supported an award of punitive damages).

## CONCLUSION

For the reasons set forth in the brief above, Defendants Lawns Unlimited, Ltd., and

Edward Fleming respectfully request that summary judgment be granted and that Plaintiff Renee

Butz's Complaint be dismissed in its entirety.

Respectfully Submitted,

/s/ Margaret M. DiBianca, Esquire
William W. Bowser, Esquire (Bar I.D. 2293)
Margaret M. DiBianca, Esquire (Bar I.D. 4539)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone:  (302) 571-5008
Facsimile:  (302) 576-3476
mdibianca@ycst.com
Attorneys for Defendants

DATED: October 17, 2007

## CERTIFICATE OF SERVICE

I, Margaret M. DiBianca, Esquire, hereby certify that on **October 17, 2007,** I

electronically filed a true and correct copy of the foregoing **Defendants' Motion for Summary**

**Judgment, Opening Brief in Support** thereof, and corresponding **Appendix** with the Clerk of

the Court using CM/ECF.  I further certify that on October 17, 2007, I caused to be served a true

and correct copy of **Defendants' Motion for Summary Judgment, Opening Brief in Support**

thereof, and corresponding **Appendix** on the following non-registered participant via postage

prepaid, First Class Certified U.S. Mail/Return Receipt Requested:

> Renee M. Butz
> 58 Hickory Drive
> North East, MD  21901
> Plaintiff *Pro Se*


YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Margaret M. DiBianca, Esquire
_____
William W. Bowser, Esquire (Bar I.D. 2293)
Margaret M. DiBianca, Esquire (Bar I.D. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone:  (302) 571-5008
Facsimile :  (302) 576-3476
mdibianca@ycst.com
Attorneys for Defendants