IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RENEE BUTZ, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | C.A. No. 05-495 (JJF) |
| | ) | |
| LAWNS UNLIMITED, LTD., and | ) | |
| EDWARD FLEMING, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**


YOUNG CONAWAY STARGATT & TAYLOR, LLP
William W. Bowser, Esquire (Bar I.D. 2293)
Margaret M. DiBianca, Esquire (Bar I.D. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone:  (302) 571-5008
Facsimile :  (302) 576-3476
mdibianca@ycst.com
Attorneys for Defendants


Dated: October 17, 2007

# TABLE OF CONTENTS

2007.10.17 Jointly Stipulated Uncontested Facts ................................................................ A1

2007.08.29 Excerpts from Fleming Deposition Transcript ................................................... A6

2007.08.28 Excerpts from Butz Deposition Transcript ...................................................... A28

2006.02.04 Cecil County Government Application ............................................................. A129

2005.02.25 Jeanne Fleming Timeline ................................................................................ A133

2005.02.25 Howard Letter to DDOL re: Charge Response ................................................ A135

2005.02.25 Edward Fleming Timeline .............................................................................. A151

2004.06.17 Group Agreement, Optimum Choice .............................................................. A152

2004.03.26 Unemployment Hearing Appeals Decision ..................................................... A157

2004.02.23 Optimum Choice Subscriber Reconciliation ................................................. A162

2004.02.18 Cecil County to Butz Offer of Employment .................................................. A167

2004.02.17 DDOL Charge of Discrimination ................................................................... A168

2004.02.11 Cecil County to Butz Letter of Hire .............................................................. A173

2004.02.06 Fleming Fax to Howard re: Unemployment Claim ......................................... A174

2004.02.05 DDOL Employer Fact Finding Document ...................................................... A176

2004.02.03 Notice of Employment Separation re: Butz ................................................... A179

2004.01.24 DDOL Sexual Harassment Questionnaire ...................................................... A180

2004.01.24 DDOL Discipline Questionnaire .................................................................... A186

2004.01.22 Fleming to Optimum Choice re: Butz Disenrollment ..................................... A192

2004.01.08 Fleming Fax to Howard re Termination Letter ............................................... A194

2004.01.07 Fleming to Butz Termination Letter .............................................................. A196

2004.00.00 Watson Vacation Request Forms .................................................................... A198

2004.00.03 Affidavit of Watson ...................................................................................... A205

2003.12.31 Lawns Unlimited Year-End Summary re: Payroll .......................................... A207

2003.12.29 Bayside Health Absence Excuse .................................................................... A231

2003.10.01 Lawns Unlimited Office Manager Job Duties ................................................ A232

2003.01.01 Butz Agenda for Employee Meeting .............................................................. A235

2003.03.19 Butz Vacation Request Form ......................................................................... A240

2002.11.04 Fleming Fax to Optimum Choice re: Insurance Waiver .................................. A241

2002.10.16 Butz Performance Appraisal .......................................................................... A245

2001.01.01 Lawns Unlimited Vacation Policy ................................................................. A247

2001.01.01 Lawn Unlimited Policy Handbook ................................................................. A249

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RENEE M. BUTZ                          )
                                       )
                    Plaintiff,         )
                                       )        C.A. No.: 05-495 (JJF)
         v.                            )
                                       )
LAWNS UNLIMITED LTD., and              )
EDWARD FLEMING                         )
                                       )
                    Defendants.        )

## JOINTLY STIPULATED FACTS

WHEREFORE, the parties agree and understand that dispositive motions brought

pursuant to Rule 56 of the Federal Rules of Civil Procedure can be determined only  where there

"is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  In order to provide the Court

with as clear a record as possible, the parties hereby stipulate that, for the limited purposes of

summary judgment, the following facts are not in dispute:

1.      Defendant Lawns Unlimited, Ltd. ("Lawns"), is a small business operating in

Milton, Delaware.

2.      Lawns provides various types of lawn care, including landscaping, hardscaping,

and irrigation services, among others.

3.      Lawns was founded by Defendant Edward Fleming and his wife, Jeanne Fleming

in 1987.

4.      Including the Flemings and their children, Lawns currently has approximately

thirty employees.

5.      Lawns employees are divided into two general categories—Field and Office.

6.      Field employees work directly on-site at the job location.

1

A1

7.    Mr. Fleming, who holds the title of President of Lawns, works hands-on in the Field.  He also shares the responsibilities for Office employees with his wife.

8.    Defendants hired Plaintiff in September 2002 to replace the previous Office Manager.

9.    Plaintiff held the position of Office Manager for her entire period of employment.

10.    Dina Alderucci was hired after Ms. Schatz left in June 2003.

11.    Debbie Watson replaced Ms. Alderucci in November 2003.

12.    In the Field, the Foremen are key employees.

13.     Mauricio Miranda and Hugo Sanchez have been Lawns' two Foreman.

14.    Plaintiff began working at Lawns on September 4, 2002, as a temporary employee with permanent employment as the final goal.

15.    Plaintiff became a full-time Lawns employee on October 16, 2002.

16.    Defendant terminated Plaintiff effective December 23, 2003.

17.    Beginning in approximately October 2003 until the time of her termination, Plaintiff commuted to Defendants' office in Milton from her home in Newark, Delaware.

18.    Plaintiff began her new job as a Junior Accountant for the Cecil County Government on March 1, 2004.

19.    Plaintiff received a bonus in 2002.

20.    Plaintiff did not receive a bonus in 2003.

21.    Plaintiff did not receive a pay increase on or after her first anniversary date.

22.    Plaintiff received unemployment compensation after her termination from Lawns.

23.    There are two full-time Office positions, Office Manager and Office Assistant.

24.    Plaintiff announced her pregnancy in approximately April 2003.

25.     Defendants knew that Plaintiff intended to take maternity leave following the birth of her child.

26.     In an e-mail dated December 24, 2003, Plaintiff told Defendants that her maternity leave had begun, effective December 23, 2003.

27.     Defendants believed that Plaintiff had secured other employment prior to December 23, 2003.

28.     For the past twenty years, the Flemings have operated the business and actively manage its operations.

29.     Office employees handle the payroll, accounting, and other administrative duties.

30.     Mrs. Fleming, who holds the titles of Secretary and Treasurer, shares responsibilities for the behind-the-scenes operations of the business.

31.     During the December 24, 2003, telephone conversation, Plaintiff told Mr. Fleming that she intended to return to work after her maternity leave.

32.     During the December 24, 2003, telephone conversation, Plaintiff's husband told Mr. Fleming that she intended to return to work after her maternity leave.

33.     Plaintiff called the Lawns office on January 5, 2004 after the birth of her child, and left a message.

34.     Plaintiff's father-in-law called Defendant after Plaintiff received her termination letter.

35.     In the Termination Letter, Defendants cited increased health care premiums as a reason for Plaintiff's termination.

36.     Plaintiff believes that Defendants terminated her due to increased health care premiums.

37.     Defendant's appeal of the findings of the Delaware Unemployment Insurance Referee was unsuccessful.

38.     At the time of her termination, Butz was paid $12.00 per hour.

39.     The number of Lawns employees eligible for these employee benefits is low.

40.     The only Field employees who have been eligible for benefits were Miranda and Sanchez, the key foreman.

41.     As owners, the Flemings also receive certain benefits, such as health and life insurance.

42.     Defendants provided its key employees with paid time off as well as paid vacation.

43.     Key employees were paid at their regular rate for certain designated holidays.

44.     Plaintiff was paid for each of the designated holidays during her employment.

45.     Request forms were submitted to Mr, Fleming for approval.

46.     Debbie Watson utilized Vacation Request Form.

47.     Plaintiff had health care coverage immediately after she became a permanent employee without a waiting period.

48.     At the time of Plaintiff's employment, Defendants' health insurance provider was Optimum Choice.

49.     At the time of Plaintiff's employment, Defendants' health care plan provided for "employee-only" coverage.

50.     At the time of Plaintiff's employment, Lawns paid 100% of the health care premium for key personnel.

51.     Plaintiff moved to the Bethany area from Cecil County, Maryland in 2002.

52.    Plaintiff moved to Bethany area to be with her now-husband, Scott Butz, who had moved to the area for a job.

53.    As Office Manager, Plaintiff was responsible for accounts receivable and accounts payable, payroll, and general clerical duties such as taking phone messages and filing paperwork.

54.    As Office Manager, Plaintiff was responsible for communicating and developing workplace procedures.

55.    In 2003, Defendants held a staff meeting that all employees were required to attend.

56.    At the meeting Plaintiff spoke/addressed workplace procedures and practices including the importance of teamwork and the value of feedback and employee suggestions.

57.    At the staff meeting, Plaintiff encouraged the employees to communicate their ideas or suggestions with her or Laurie Schatz.

58.    At the meeting, Plaintiff explained the importance to accurately record time worked on a Lawns production sheet.

59.    At the meeting, Plaintiff explained that accounts payable invoices must be kept current and that any problems should be brought to her attention right away.

60.    At the meeting, Plaintiff discussed the tardiness and absenteeism policies.

61.    Plaintiff invited the Fleming family to her wedding.

62.     Plaintiff invited Mrs. Fleming and their children to her baby shower.

63.    Mrs. Fleming spent most of the summer of 2003 visiting her mother in Missouri, who was suffering from terminal lymphoma cancer.

64.    Mrs. Fleming's mother passed away on November 13, 2003.

65.    Mr. Fleming put Scott Butz in touch with a potential job lead.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

| /s/ Renee M. Butz | /s/ Margaret M. DiBianca, Esq. |
|---|---|
| Renee M. Butz, Pro Se Plaintiff | Margaret M. DiBianca (No. 4539) |
| 58 Hickory Drive | The Brandywine Building, 17th Floor |
| North East, Maryland 21901 | 1000 West Street |
| Telephone: (410) 441-4300 | P.O. Box 391 |
| Email: renee@scottbutz.com | Wilmington, Delaware 19899-0391 |
| *Pro Se* Plaintiff | Telephone: (302) 571-5008 |
| | Facsimile: (302) 576-3476 |
| | Email: mdibianca@ycst.com |
| | Attorneys for Defendants |

Butz v. Lawns Unlimited, Ltd. and Fleming

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


RENEE M. BUTZ,                    )
                                 )
          Plaintiff;             )
                                 )
v.                               ) Civil Action No.
                                 ) 05-495-JJF
LAWNS UNLIMITED, LTD.,           )
and EDWARD FLEMING,              )
                                 )
          Defendants.            )


        Deposition of EDWARD WILLIAM FLEMING taken
pursuant to notice at the Law Offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 17th
Floor, 1000 West Street, Wilmington, Delaware,
beginning at 2:24 p.m. on Thursday, August 30, 2007,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.


APPEARANCES:

          RENEE M. BUTZ, pro se

          MARGARET M. DiBIANCA, Esquire
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            The Brandywine Building - 17th Floor
            1000 West Street
            P.O. Box 391
            Wilmington, Delaware  19899-0391
            on behalf of the Defendants.


          WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 13

1    A.    It was presented to you at the time of your
2    employment with Lawns Unlimited.
3    Q.    Does the policy cover the health plan?
4    A.    The employee policy?
5    Q.    Yes.
6    A.    No.
7    Q.    Why not?
8    A.    Because it doesn't.
9    Q.    What about leave policy?
10   A.    What type of leave policy are you talking
11   about?
12   Q.    Medical, non-medical, short-term leave,
13   long-term leave?
14   A.    No.
15   Q.    Why not?
16   A.    Because it's not in there.  It doesn't cover
17   it.
18   Q.    Since there's no written leave policy, what is
19   the company's practice in handling medical and
20   non-medical requests for leave?
21   A.    What type of leave are you asking?
22   Q.    Medical or non-medical?
23   A.    For medical leave -- for sick time, for
24   vacation, and personal days off, there's a form that

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 14

1  needs to be filled out and authorized by myself or

2  Jeanne so that the office manager knows exactly what

3  day a particular employee was off so it can be

4  documented if they are receiving paid time off,

5  holiday pay, sick time off, personal days.  How long

6  they plan to be off.  When they return back to work.

7  It can be taken as a full day or it can be taken for a

8  few hours depending upon the leave.

9      Q.   How about unpaid leave?

10     A.   Unpaid leave is the same.  On that form it will

11 have paid leave or unpaid leave.  So that we know when

12 employees, after it's authorized, when they will be

13 leaving work and when they will be returning to work

14 so that we can continue to run the business

15 effectively.

16     Q.   Why are so many of your policies not

17 documented?

18     A.   I don't understand the question.

19     Q.   Why are so many of your leave policies, your

20 vacation policies, your health insurance not covered

21 in your employee handbook?

22     A.   It's not included in the employee policy.

23     Q.   I'm asking you, why not?

24     A.   Because it's not.

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 22

1    know when it was.

2      Q.   Do you have any vacation forms when I went on

3    vacation?

4      A.   I don't have your file in front of me.

5            Here's one here 3/19 of '03.  So that's in

6    here.  10:00 o'clock, 11:30.

7      Q.   Based on your testimony, I had to wait one

8    year, which would have put us November of '03.  So how

9    did I get paid vacation?

10     A.   Well, vacation is lumped into personal time

11   off, which would be sick leave and also personal days

12   off, and you are qualified for that after two months

13   of employment.

14     Q.   That would have been three days, 24 hours.  So

15   can you explain the additional?

16     A.   No.  You -- you got paid for vacation.  You got

17   lucky I guess and got paid for paid time off.  That

18   you weren't supposed to.

19     Q.   But you sign off on payroll, correct?

20     A.   I sign off on the payroll, that's correct.  The

21   time sheets, I sign off on the time sheets.  You

22   produced the payroll checks.

23     Q.   Was office personnel treated any differently

24   than field personnel with regards to completion of the

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 24

1   were off so that you knew what to pay them based on if

2   they were there that particular day or not there that

3   particular day.

4        Q.   So, from my understanding, you're saying no, so

5   the office staff had to fill out these forms as well

6   as the field office.

7        A.   Field office?

8        Q.   Field personnel.

9        A.   I only had one office --

10       Q.   Field personnel?

11       A.   Well, you would fill them out for them so that

12  you could track their time so that you could figure

13  out if they were going to get paid for that day or not

14  get paid for that day.

15       Q.   So the office manager would fill out the field

16  personnel's vacation forms?

17       A.   They would make sure to get them filled out if

18  they were not there that particular day so you could

19  do your payroll.  Yes.

20       Q.   If the office manager filled out the forms,

21  then how could they be approved?

22       A.   When you filled the forms out, that gave you a

23  running paper trail so that you could do your payroll,

24  so that you can make sure that they were -- most all

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 50

1    A.    I remember when you were pregnant we were very

2    happy for you, yes.  You were very excited and happy

3    also.  And our kids -- my wife was very excited for

4    you too.  My children.

5    Q.    Do you remember when you -- when did you

6    discuss her pregnancy?

7    A.    Do I remember when I discussed your pregnancy

8    with whom?

9    Q.    Was it daily, weekly, every day, or you know,

10   all ninth months?

11   A.    No.  I don't remember.  But I'm -- when you

12   went on your check-ups, we always asked you how

13   things -- how you were doing and you would bring in

14   the pictures, the sonograms.  And we were excited to

15   see those.  Having five children of our own, we are

16   very happy and excited for you and Scott.

17   Q.    How often would you have discussed her

18   pregnancy?

19   A.    I don't know, Renee.

20   Q.    Did plaintiff discuss maternity leave with you?

21   A.    Yes.

22   Q.    Did plaintiff train employees to perform her

23   job during her maternity leave?

24   A.    As much as you could, yes.

Electronically signed by ann calligan (501-267-394-7784)                    a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 53

1   you were unable to be reached by telephone.

2      Q.    So you never spoke to plaintiff?

3            MS. DiBIANCA:   Objection.  Misrepresents

4   his testimony.  Go ahead and speak.

5      Q.    Well, defendant said many, many phone calls not

6   being returned.  When were these messages left?

7      A.    I talked to you on December 23rd.  We were very

8   excited for you to have this baby.  We were -- I

9   offered for your family and your mother-in-law and

10  father-in-law and your mom and dad, if they needed to

11  use our house to shower or whatever the case may be,

12  which is only a mile from Beebe hospital.

13            I left the day that you were leaving to go

14  to the hospital.  Scott and your mom came into the

15  driveway.  I waved to them real big, and they didn't

16  react at all.  I went Christmas shopping, came back,

17  and Debby said, "Ed, sit down.  I need to tell you

18  something."

19            Debby only was with us a very short time,

20  as you know.  And she told me that you were leaving;

21  you weren't coming back.  You have my letter my

22  timeline in there.  And we were headed -- I was

23  leaving the office.  And I was headed down to church

24  to go to confession with my family.

Electronically signed by ann calligan (501-267-394-7784)                      a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 54

1    And I called you on the phone.  I was

2    devastated.  I said, "Renee, you are like family to

3    us.  You are the office manager.  I just want to

4    know -- let you know what Debra Watson has said to

5    me."  I said, "I need for you and for her to come into

6    the office tomorrow, whatever time is convenient for

7    you to get down here."  I said, "This is not fair to

8    me to have two individuals, one saying one thing, one

9    saying another."  I said, "I trust your judgment.

10   You've been here longer than her.  I just need you

11   guys to come down here."  I said, "I need to figure

12   out who's telling the truth and who's not telling the

13   truth."

14   Q.   Were these other many phone calls after

15   December 23rd, when did you call again?

16   A.   Well, I called your cell phone.  You gave Debra

17   Watson a different phone number and instructed her

18   that I could not use that phone number.  And she was

19   the only one that could use that phone number to call.

20   So I called your cell phone because we had questions

21   about other items.

22        The last phone call that I was able to

23   call you on was the next morning, December 24th.  I

24   talked to your husband Scott.  He would not allow me

Electronically signed by ann calligan (501-267-394-7784)                    a3c36d78-8ff2-4b4b-b837-29887a824778

A14

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 55

1    to talk to you.  He informed me that you were
2    officially on maternity leave and she doesn't have to
3    talk to you or see you until the end of that maternity
4    leave.  And I asked him nicely.  I said, "I need to
5    talk to Renee.  This is between Renee and I."  I said,
6    "I need to know what's going on.  She's the office
7    manager of our company.  I can't be left hanging, can
8    not be left like this."  I said, "I need to figure out
9    who's telling the truth.  I should not be put in this
10   position, especially yourself because you were part of
11   the family.  You went to the girl's swim meets and
12   Shane's swim meets.  You went to business meetings
13   with the family.  We went to your wedding."
14          We just felt that it was -- I was just
15   trying to gather the facts, but I could not get any
16   phone calls from you.  I could not get any
17   correspondence back from you until after the letter
18   was written.  Then I got correspondence from your
19   father-in-law.  At that point in time, your
20   father-in-law and I had a nice talk.  We went over the
21   exact timeline that I just explained to you, what
22   happened.  And he said, "Will you give Renee her job
23   back?"  I said, "Please, just have her give me a
24   call."  Period.  We don't have any labor contracts in

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 56

1    Lawns Unlimited.  We never had a labor contract in

2    Lawns Unlimited.  All we wanted to do was to hear from

3    you, Renee.  And that's it.  And we couldn't get any

4    correspondence out of you.

5        Q.    So after December 24th, you no longer spoke to

6    plaintiff?

7        A.    I was unable to speak to the plaintiff because

8    she would not return phone calls.  She gave Debby a

9    telephone number that I couldn't use.  I didn't

10   understand that.  Jeanne and I were both devastated.

11   And you know, Jeanne's mom -- the reason why Jeanne

12   wasn't there most of the summer is because her mom had

13   terminal lymphoma cancer, and she had passed away on

14   November 13th.  And she was gone for two to three

15   weeks to the funeral and to take care of the estate.

16            So she had a very traumatic 2003, trying

17   to raise four children plus work in the office plus

18   take care of her mom in Missouri, which was 1200 miles

19   away.  And I had extra responsibilities on myself also

20   because I had to take care of the children, which

21   would have been four children left at home.  Shane was

22   in college in Denver -- University of Colorado at

23   Boulder, Colorado.

24       Q.    So you did not speak to plaintiff on December

Electronically signed by ann calligan (501-267-394-7784)          a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 57

1    26th or 29th of December?

2        A.    I don't remember.  I don't think I did, but I

3    know Debby did because we had a problem with the

4    computer and Debby had your phone number.

5        Q.    Did Debby have plaintiff's cell phone number?

6        A.    No.  She had another phone number that only she

7    could use.

8              We waited for your call after I talked to

9    your father-in-law.  We did not fill your position.

10   And I guess we were saddened and disappointed that you

11   didn't call to talk to us at all about the baby and

12   about your job.

13       Q.    Did plaintiff call you to let you know the

14   birth of her child?

15       A.    Yes, she did.  She left a message after the

16   baby was born.

17       Q.    Did you call plaintiff to congratulate her?

18       A.    I don't remember.  But all I know is the kids

19   were very excited.  We were very excited.  And it

20   would have been nice to get a phone call so we could

21   come see you at the hospital, and the baby.  But

22   Debby's testimony said that Scott was not going to

23   allow us to see the baby, and if we did go into the

24   room, that he would escort us out of the room.

Electronically signed by ann calligan (501-267-394-7784)                a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 60

1        It would have been from today, so it would

2   have been a late number, above 10.

3        I have it as Butz 19.

4        MS. BUTZ:  Yes.  Butz 19.

5        MS. DiBIANCA:  I don't know if he needs

6   it, but just so it's on the record.

7   BY MS. BUTZ:

8     Q.   Did you call the plaintiff after writing the

9   termination letter?

10    A.   No.  We were waiting for you to call after I

11  spoke to your father-in-law.

12    Q.   Did your wife buy the plaintiff a baby gift?

13    A.   Yes, she did.  When she was out in Missouri,

14  she bought the baby gift in Missouri, and then flew

15  home.

16    Q.   Did the plaintiff's husband Scott provide IT

17  assistance to Lawns Unlimited?

18    A.   What's IT?

19    Q.   Information technology.  Networking, computer

20  networking, computer problems, questions.

21    A.   At the house, yes.  And I think when you had

22  problems at the office, he did, yes.

23    Q.   Was he paid for these services?

24        MS. DiBIANCA:  I want to get back to the

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 68

1    Q.    Was it sent certified?

2    A.    Yes.

3    Q.    What date did you terminate plaintiff's health

4    insurance?

5    A.    Based on the letter, it was December 31st of

6    2003.  Coverage was extended to January 14th of 2004.

7    Q.    When was she notified of cancellation?

8    A.    I don't know.

9    Q.    Was plaintiff offered COBRA?

10          MS. DiBIANCA:  I'm going to object because

11   actually the judge did rule in the order that COBRA

12   was not an issue.  But go ahead and answer.

13   A.    I don't know.

14   Q.    Did plaintiff ever tell you she was not coming

15   back to work?

16   A.    No, but she would not return our phone calls.

17   Q.    Prior to termination, did you ask plaintiff for

18   a doctor's note concerning plaintiff's time off?

19   A.    Can you repeat that again please.

20   Q.    Prior to termination, did you ask plaintiff for

21   a doctor's note concerning plaintiff's time off?

22   A.    On December 23rd, I handed you a vacation

23   request form for time off so that you could put down

24   exactly when you were going to be back.  I left before

Electronically signed by ann calligan (501-267-394-7784)                a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 69

1    you left, and you did not fill it out.  So I didn't

2    know when you were planning on coming back.  I

3    requested this.  You did not fill it out.  And we did

4    not get a doctor's notice when your maternity leave

5    was started.

6       Q.   Do you know why plaintiff would not fill out

7    the form at best?

8       A.   I don't know why you didn't fill it out.  No, I

9    don't know why you didn't fill it out.  Can you tell

10   me?

11      Q.   Did you provide any documentation of the fact

12   that you asked for this information?

13      A.   Can you repeat that, please.

14      Q.   Can you provide any documentation of the fact

15   that you gave the form to the plaintiff or asked for a

16   doctor's note?

17      A.   When you were in the office getting your

18   things -- you were in the office that morning to get

19   the some of the paperwork that you had done, and I

20   went over and handed you the paper.  I said, "Renee,

21   please fill this out.  I know you're going to be going

22   on maternity leave.  I need to know how long and when

23   you are going to be back."  When I got back to the

24   office, the form was sitting right there, and it was

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 70

1    blank.

2    Q.    Did you indicate that your insurance premium

3    was much higher due to pregnancy medical bills?

4    A.    Actually the lawyer wrote the letter and I

5    signed it.

6    Q.    So you signed something without reading it?

7    A.    I guess I didn't read it carefully enough, but

8    I did sign it.

9    Q.    So you did not write the termination letter?

10   A.    No.

11   Q.    I'm sorry?

12   A.    No.

13   Q.    How would he have gotten the dates?

14          MS. DiBIANCA:   How would who have gotten

15   the dates?

16   Q.    How would his attorney have gotten the date of

17   the termination for --

18   A.    We gave him the dates.   I gave him the dates.

19   Q.    And how could he come up with a $23,000 figure?

20   A.    I don't know.   Maybe I called Beebe hospital on

21   a C-section.   I don't know.

22   Q.    Did plaintiff's spouse promise you on December

23   24 that plaintiff would be returning to work after

24   maternity leave?

Electronically signed by ann calligan (501-267-394-7784)                a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - Butz

Page 76

1    Q.    What personal belongings did plaintiff remove

2  from the office?

3    A.    Everything that she had in the office.

4    Q.    What items were they?

5    A.    Pictures, all the stuff that you brought to put

6  on your desk.  Your name.  You had your name plaque

7  there.  You had pictures.  You had all of your

8  belongings that you put on your desk, I guess.

9    Q.    Did plaintiff provide defendant's attorney

10  settlement offers?

11          MS. DiBIANCA:  Again, absolutely object.

12  Settlement can't come in.  And we are getting near

13  five o'clock too.

14          MS. BUTZ:  I'm almost done if you'd like

15  to take a break.

16          MS. DiBIANCA:  Okay.

17          (Recess taken.)

18          MS. DiBIANCA:  Can we have Fleming 3.

19          (Fleming Deposition Exhibit 3 was marked

20  for identification.)

21  BY MS. DiBIANCA:

22    Q.    Go ahead and read through it.

23    A.    Okay.

24    Q.    Does this look like plaintiff's performance

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - DiBianca

Page 82

1    Q.   So according to Butz 17, based on that, one of

2    the things you're basing your decision on is the

3    information contained in that document?

4    A.   Yes.

5    Q.   And I'm going to talk about only Ms. Butz's

6    employment and shortly thereafter.  So if I don't

7    specify so, you can assume that.  That is the time

8    frame.

9         What was the vacation policy for new

10   employees?

11   A.   Vacation policy for new employees is one year

12   after their anniversary date.

13   Q.   How much time were they entitled to take?

14   A.   40 hours or more.  A business week.

15   Q.   Did that subsequently increase over time the

16   longer they worked?

17   A.   Yes.

18   Q.   So if Ms. Butz actually took vacation time

19   prior to completing her one year of service, do you

20   know why that would have been?

21   A.   It must have been an oversight on my part if

22   she took vacation.  The forms weren't filled out and

23   she was paid for it.

24   Q.   After the termination letter -- I believe it's

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - DiBianca

Page 87

1    A.    No.

2    Q.    Can you give me some evidence of something I

3    could use to believe that?  Do you have children

4    yourself?

5    A.    Yes, I do.  My wife has been pregnant five

6    times, and I'm still married.

7    Q.    And did she work?

8    A.    She -- as soon as the babies were born, she had

9    them on her knee and she worked every day and night.

10   Q.    Does she still work?

11   A.    Yes, she does.

12   Q.    And does she work for Lawns Unlimited from time

13   to time?

14   A.    Yes, she does.

15   Q.    Did you and your wife interview plaintiff?

16   A.    Yes, we did.

17   Q.    And were hiring decisions made jointly between

18   the two of you?

19   A.    Yes.  They were.

20   Q.    And were firing decisions made jointly between

21   the two of you?  Did you share responsibility for

22   those decisions?

23          And I'm sorry.  I should be fair.  I'm

24   only referring to office personnel.

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - DiBianca

Page 95

1    Q.    Are you aware of any law or rule that would

2    require an employer to provide health care insurance

3    coverage above and beyond what they normally offer to

4    an employee?

5    A.    No.

6    Q.    Did you have any reason to believe that your

7    wife harbored any kind of animus toward pregnant

8    women?

9    A.    No.  Not at all.

10    Q.    Mr. Scott Butz, your relationship with him was

11    what prior to the 23rd of December?

12    A.    Renee's husband.

13    Q.    Did you have interaction with him as far as his

14    work went?

15    A.    Yes.

16    Q.    Can you give me an example?

17    A.    Well, Scott and Renee were having a tough time

18    because Scott was laid off from his job, and we -- I

19    had contacted several of my friends and customers to

20    try to get Scott a job within his -- I guess his

21    work -- line of work, computer programming.  I got him

22    a job interview at Inervet and I can't remember who

23    the other companies were off the top of my head.

24              But I set him up with the head computer

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - DiBianca

Page 96

1   person at Inervet who was the scoutmaster to our

2   troop.  And I was assistant cubmaster or scoutmaster

3   of the troop when Shane was going through his Eagle

4   Scout, and his son got his Eagle Scout at the same

5   time Shane did.  And I got him in contact with Mark

6   and Mark got him in right away and gave him an

7   interview for a job.

8       Q.   Is it fair to say that you reached out and

9   tried to help the plaintiff and her husband?

10      A.   Yes.

11      Q.   And you did that why?

12      A.   Because I felt bad for them.  They were trying

13  to get on their feet.  They were young.  You know, he

14  just lost his job.  He was trying to get contacts to

15  get into places.  And I felt that it was my obligation

16  as, you know, Renee working there that we should try

17  to help him out.

18      Q.   You wanted to help him out, is that fair?

19      A.   Yes.

20      Q.   If you know, the Optimum Choice insurance

21  coverage offered to and received by plaintiff during

22  her employment, are you familiar with that, generally

23  speaking, that plan?

24      A.   The insurance that she had?

Electronically signed by ann calligan (501-267-394-7784)                a3c36d78-8ff2-4b4b-b837-29887a824778

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - DiBianca

Page 98

1    10, 15, 25.  I can't remember but that's --

2        Q.    Fair to say there was, in fact, a co-pay?

3        A.    Oh, yes.  Mm-hmm.

4              And the other nice thing is we paid

5    100 percent of the insurance.  That's what we wanted

6    to do.

7        Q.    Do you pay 100 percent of the insurance now?

8        A.    No, we don't.

9        Q.    How much do you pay now?

10       A.    75 percent.

11       Q.    Do you know the time that you switched that to

12   75 percent coverage?

13       A.    March 15, 2004.

14       Q.    And why did you do that, if you recall?

15       A.    It's just getting too expensive to continue

16   with the 100 percent.

17       Q.    It was a cost issue, then?

18       A.    Yes.

19       Q.    Just give me one moment.  I just want to find a

20   document.

21       A.    I remember when I was working with Monsanto

22   Chemical Company, which was a huge corporation and

23   Jeanne was having all the babies, I mean, it was

24   costing us -- it was an 80/20 program and it was

Butz v. Lawns Unlimited, Ltd. and Fleming
Edward William Fleming - DiBianca

Page 99

1  costing us like $2,000 to have the insurance back

2  then, you know.  1986.  '85, '86, '88, and 1990.

3  Q.  Would that explain at all why, as indicated in

4  one of the documents that's been admitted, although I

5  don't recall the number, why Lawns chose to extend

6  Ms. Butz's insurance coverage throughout the birth of

7  her child?

8  A.  Yes.  We didn't want her to be burdened with

9  them, with those expenses.

10  Q.  And so Lawns Unlimited took the initiative

11  themselves.  That was not something that the insurance

12  company reached out for, correct?

13  A.  That's correct.

14  Q.  Would it be fair to say that's generally not

15  something that you do for someone you harbor an animus

16  towards?

17  A.  That's correct.

18  Q.  Yesterday we painstakingly went through lots

19  and lots of numbers reflecting Ms. Butz's submitted

20  damage.  Do you recall that testimony that she gave?

21  A.  Yes, I do.

22  Q.  If you recall, some of the expenses that she

23  had, medical expenses that she has listed were in

24  amounts like $15, or $60, a variety, some of them

Butz v. Lawns Unlimited, Ltd. and Fleming

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


RENEE M. BUTZ,                    ) Volume I of II
                                 )
          Plaintiff;             )
                                 )
v.                               ) Civil Action No.
                                 ) 05-495-JJF
LAWNS UNLIMITED, LTD.,           )
and EDWARD FLEMING,              )
                                 )
          Defendants.            )


          Deposition of RENEE M. BUTZ taken pursuant
to notice at the Law Offices of Young Conaway Stargatt
& Taylor, LLP, The Brandywine Building, 17th Floor,
1000 West Street, Wilmington, Delaware, beginning at
9:13 a.m. on Wednesday, August 29, 2007, before Ann M.
Calligan, Registered Merit Reporter and Notary Public.


APPEARANCES:

          RENEE M. BUTZ, pro se

          MARGARET M. DiBIANCA, Esquire
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            The Brandywine Building - 17th Floor
            1000 West Street
            P.O. Box 391
            Wilmington, Delaware  19899-0391
            on behalf of the Defendants.


          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 17

1    A.    '94.

2    Q.    Did you attend college?

3    A.    Yes.

4    Q.    And which college did you attend?

5    A.    Goldey Beacom.

6    Q.    And did you graduate from Goldey Beacom?

7    A.    Yes, I did.

8    Q.    What year?

9    A.    '99.

10   Q.    With what degree?

11   A.    A B.S. in accounting and minor in business

12   management.

13   Q.    After that, any kind of post-graduate work?

14   A.    No.

15   Q.    You said you were married, correct?

16   A.    Yes.

17   Q.    And the name of your husband?

18   A.    Are you talking about my current --

19   Q.    Yes.

20   A.    Scott Michael Butz.

21   Q.    When did you marry him?

22   A.    September 6, 2003.

23   Q.    And you're living together now?

24   A.    Yes.

Electronically signed by ann calligan (501-267-394-7784)                    bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 26

1    A.    Down in Millsboro.

2    Q.    So did you move because of the job site move

3    or --

4    A.    No.  I moved to the beach and then they allowed

5    me to work, continue working in Millsboro.

6    Q.    How long did you continue at the Millsboro

7    facility?

8    A.    It was couple months.

9    Q.    What was your job title there -- I'm sorry.

10   Accounts payable manager.  Is that what you continued

11   to do in the Millsboro as well?

12   A.    No.  My job function there was payroll.

13   Q.    And did the job function change?  Did that

14   correspond with the move to Millsboro?

15   A.    Correct.

16          And I just want to emphasize.  I moved

17   down there because of my husband living down there.

18   Q.    Okay.  That's fine.  That was my next question,

19   so...

20          This is Scott Butz, right?

21   A.    Mm-hmm.

22   Q.    Were you married at that time?

23   A.    No.

24   Q.    And you said he moved.  Was he, I guess, living

Electronically signed by ann calligan (501-267-394-7784)                bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 31

1    Q.    Obviously we are going to go back to them, so
2    I'm going to skip forward now and go to current
3    employer.  Who is your current employer?
4    A.    Cecil County Government.
5    Q.    And what's your job title there?
6    A.    Junior accountant.
7    Q.    What office do you work in?
8    A.    Elkton.
9    Q.    Do you like the junior accountant job at Cecil
10   County Government?
11   A.    Yes.
12   Q.    Are you currently seeking other work?
13   A.    No.
14   Q.    After Lawns, that was the first place that you
15   worked; there was no employer in between?
16   A.    No.
17   Q.    And I'm going to guess the -- are you under a
18   doctor's care at the present time?
19   A.    Regular doctor?
20   Q.    Any doctor.
21   A.    Yes.
22   Q.    For what condition?
23   A.    Pregnancy.
24   Q.    Any other reason?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 34

1    going to be reviewing and we are actually going to go

2    through that.  So that's fine.  You can certainly

3    clarify if anything comes up later?

4            Let's go ahead and start with that list.

5    Actually before that list, I think is -- well, the

6    next page, interrogatory response number 9, you've

7    provided a list of damages that you are claiming, is

8    that correct?

9            That would be on page 5.

10           Is that correct?

11   A.    I'm sorry.  Can you repeat the question?

12   Q.    That's quite all right.

13           Your response to interrogatory number 9 is

14   a list of damages that you're claiming, is that

15   correct?

16   A.    Yes.

17   Q.    Pain and suffering in the amount of $50,000, is

18   that correct?

19   A.    Correct.

20   Q.    And punitive damages in the amount of $50,000,

21   is that correct?

22   A.    Correct.

23   Q.    And medical expenses in the amount of

24   $1,127.25, is that correct?

Electronically signed by ann calligan (501-267-394-7784)                    bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 38

1    A.    Correct.

2    Q.    Is that correct?

3    A.    Yes.

4    Q.    So maybe you can give me a little more

5    information based on this chart, sort of how you came

6    up with these numbers, what they are representative

7    of?

8    A.    The -- not having my information with me, the

9    $32.44 is the premium that is biweekly.  And I times

10   it by 24 weeks.  And that is how many weeks that I

11   paid out in 2004.  And then so forth in 2005 and 2006,

12   they were based on 26 weeks.

13   Q.    So when would the 2004 biweekly insurance

14   premium payments have started?

15   A.    March 1st of '04.

16   Q.    But you are not asserting damages past April

17   22nd, 2004, is that correct?

18   A.    Can you repeat the question?

19   Q.    Is it correct that you are not claiming damages

20   past April 22nd, 2004?

21   A.    For the medical?

22   Q.    For anything?

23   A.    Not for the medical premium -- or for the

24   medical premium, yes.  But for everything else, no.

Electronically signed by ann calligan (501-267-394-7784)                    bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 43

1   March of 2004 for the rest of the year, biweekly

2   payments, that's right?

3       A.    Correct.

4       Q.    Why were you January and February not included

5   for 2004?

6       A.    Because I was not employed at Cecil County

7   Government.

8       Q.    So have you produced any documents in support

9   of the amount of the premium?  Is there any document

10  that I have been given that I can verify the amount of

11  your premium?

12      A.    I have to go back through the initial

13  disclosure information that I gave.

14      Q.    Do you believe that you may have produced

15  documents relating to your current employment?

16      A.    I believe I gave some information to my current

17  employment.

18      Q.    If you could, just turn back to Butz Number 1

19  and look at question number 16 and your response

20  thereto.  If you could review the question and the

21  response for me, and then when you have reviewed them,

22  just let us know.

23      A.    Okay.

24      Q.    And could you tell us what the question said,

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 49

1    Q.    And you are still paying those premiums, is
2    that correct?

3    A.    Yes.

4    Q.    When will defendants no longer owe you
5    compensation for insurance premiums paid to your
6    current employer?

7    A.    I guess until we settle this case.

8    Q.    Explain to me the connection between your
9    insurance premiums and defendant's, if you can.

10    A.    Can you elaborate a little bit?

11    Q.    Well, I'm looking actually for you to elaborate
12    because I don't think I quite understand how the two
13    are connected.

14    A.    The defendants insurance was 100 percent
15    covered.  Now I'm paying for it.

16    Q.    And your current insurance, have you told me
17    anything about your current insurance coverage?

18    A.    No.

19    Q.    Have you provided the Court with any
20    information about your current insurance coverage?

21    A.    No.

22    Q.    Is your current insurance as good as it was
23    with Lawns?

24    A.    I don't know until -- I don't know until I look

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 50

1    through, which we discussed prior.

2        Q.    Do you have the same co-pay?

3        A.    If my recollection -- without looking at the

4    documentations, I believe so.

5        Q.    And do you have coverage for yourself and for

6    your husband --

7        A.    Yes.

8        Q.    -- with your current employer?

9        A.    Yes.

10       Q.    Did you have coverage for yourself and your

11   husband at Lawns?

12       A.    No.

13       Q.    Would that be a major difference in the premium

14   payment?

15       A.    This premium payment is based on single, not

16   family.

17       Q.    But you do have family coverage?

18       A.    Yes.

19            MS. DiBIANCA:  And then let's actually

20   enter Butz 5, I believe it is, which will be the

21   Court's order, DI 100.

22            (Butz Deposition Exhibit 5 was marked for

23   identification.)

24

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 53

1   Lawns Unlimited.

2       Q.   And tell me how we are trying to do that?

3       A.   By taking single coverage and not family

4   coverage premium --

5       Q.   But you do -- go ahead.

6       A.   -- premium amount, and that was the

7   calculation.

8       Q.   So you do have family coverage, is that

9   correct?

10      A.   Yes.

11      Q.   Do you currently pay more than what's listed on

12  here?

13      A.   Yes.

14      Q.   What do you currently pay?

15      A.   It's terrible.  I don't remember.

16      Q.   Have you produced any pay stub relating to your

17  current employment?

18      A.   Do I have any pay stubs?

19      Q.   Have you produced any?

20      A.   No.

21      Q.   Why haven't you?

22      A.   Judge's order.

23      Q.   Did you request that you not be required to

24  produce them?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 54

1    A.   Yes.

2    Q.   And why did you request that?

3    A.   It's not relevant to this case.

4    Q.   Do you believe that it's relevant now?

5    A.   Just to premium amounts.

6    Q.   So thus far, as of today, you have not

7  produced -- just want to be clear -- you have not

8  produced any documents that would reflect either --

9  I'll do it one at a time.

10             As of today, you have not produced any

11  documents that reflect what insurance coverage you

12  receive from the Cecil County Government, is that

13  correct?

14    A.   Correct.

15    Q.   And then, sort of a similar question but I want

16  to separate it into two, as of today you have not

17  produced any documents that reflect your premium

18  payments for your current employer's health care

19  coverage, is that correct?

20    A.   Correct.

21    Q.   Have you produced any other documents that

22  reflect anything related to your current insurance

23  coverage?

24    A.   I don't believe so.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 56

1    you --

2        Q.   What documents would help you?

3        A.   Documents from my house regarding my insurance

4    policies.

5        Q.   So like the plan itself, would that --

6        A.   Correct.  The summary page.

7        Q.   Do you know what your current co-payments are?

8        A.   I should know this.  If I can recall, I believe

9    it's 10 and 20.

10       Q.   Reflecting what?

11       A.   20, I believe, is specialty.  And 10 is

12   regular.

13       Q.   And for prescription?

14       A.   I don't remember offhand.

15       Q.   Are you currently getting prescriptions filled?

16       A.   Yes.

17       Q.   Do you recall how much the co-pay was?

18       A.   I believe, without looking at my receipt, I

19   believe it was 10 or 15.

20       Q.   Do you need a referral to see a specialist on

21   your current plan?

22       A.   I don't know without looking at it.

23       Q.   What about emergency room visits, do you know

24   how much that would cost as a co-pay?

Electronically signed by ann calligan (501-267-394-7784)                bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 57

1    A.    No.  I don't without looking at documentation.

2    Q.    Have you been to the emergency room since

3  you've worked at Cecil County Government?

4    A.    Yes.

5    Q.    And when was that?

6    A.    Several months ago I believe.

7    Q.    Was it in 2007?

8    A.    Perhaps.

9    Q.    What was it for?

10   A.    It was for -- gosh -- abdominal pain.

11   Q.    Were you admitted?

12   A.    No.

13   Q.    Were you referred to a specialist?

14   A.    No.

15   Q.    Were you referred back to your primary care

16  physician for follow-up treatment?

17   A.    Yes.

18   Q.    You don't recall what the emergency room

19  service co-payment was then?

20   A.    No, I don't.

21   Q.    For your maternity care, how much is that

22  co-payment?

23   A.    I think that one's 20.

24   Q.    Who do you see for maternity care?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 59

1      MS. DiBIANCA:  Certainly.  Could you

2  actually read it back so we get an accurate

3  transcription?

4      (Record read.)

5      A.   I believe so.

6  BY MS. DiBIANCA:

7      Q.   You believe so.  Do you have any doubt, or is

8  that a yes or unsure?  I just want to be clear.

9      A.   I have doubt.

10     Q.   Tell me what your doubt is.

11     A.   I don't know the law.  I'm an accountant.

12     Q.   Well, I'm very sure that I'm not really

13 referring to the law specifically.  I'm just asking

14 you -- you calculated the damages.  Based on what you

15 are now asserting as damages, how you got to the

16 figures that you got to based on however, you

17 determine them.  If you were to use the same standards

18 and apply them under these circumstances, would you

19 have doubt?

20     A.   Yeah.  I do have doubt.

21     Q.   Go ahead and tell me why.

22     A.   I just -- without looking at everything black

23 and white and comparing everything, I don't know.

24     Q.   Right.  I agree.  Definitely that's correct.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 60

1    I'm not asking you to determine whether they are

2    comparable or whether they are equivalent.  All I'm

3    saying, if you determine later that they are

4    equivalent, in that case, would Lawns still owe you?

5    And that's one question.

6              The second question is, if your current

7    care is better than Lawns, under both circumstances,

8    would Lawns still owe you?

9        A.    It would have to be a lot better.

10       Q.    Tell me how?

11       A.    Just better coverage -- I mean, I can't get

12   into more detail than that because I'm not an expert

13   in those types of things.  I mean, I would have to

14   look at it line by line.

15       Q.    I guess what I'm saying is, you're claiming

16   that you have health care coverage and you're claiming

17   now that, despite the fact that you have health care

18   coverage, that Lawns is still liable to you to pay

19   your health insurance premiums.  So I'm trying to

20   determine how long that's going to go on into the

21   future.  Are they going to be liable to pay your

22   health care premiums forever and ever and ever into

23   eternity?  If you end up getting better much, much

24   better coverage and you are paying for it, should they

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 62

1    Lawns be liable for your choice to do so?

2      A.    No.

3      Q.    Tell me why.

4      A.    Because they are not compatible.

5      Q.    So it's based on comparable insurance coverage?

6      A.    Correct.

7      Q.    But at this time, you do not know whether or

8    not they are comparable?

9      A.    Not without looking at my information.

10     Q.    Tell me exactly what information you need to

11   determine that?

12     A.    The insurance summary pages.

13     Q.    And would you need an expert to testify on

14   that?

15     A.    No.

16     Q.    So if we had a summary page -- do you know what

17   a summary page generally includes?

18     A.    Typically, yes.

19     Q.    And what does it include?

20     A.    Usually your breakdown of the co-pays and

21   deductibles.

22     Q.    So that's what it will be, then, basically

23   based on co-pays and deductibles is how you would --

24     A.    And out-of-pocket expenses.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 67

1  two summary pages and look at the co-pays, the
2  deductibles, and the out-of-pocket expenses, which I
3  will presume would be on both, we would be able to
4  make a valuation of which is the better plan, is that
5  correct?
6      A.    We should, yes.
7      Q.    I should in that there would be a reason why I
8  wouldn't be able to?
9      A.    Well, you got to compare apples to apples.
10 That's what I'm just saying.  I mean, one summary page
11 can have more breakdown, where the other one is more
12 generic.  I mean, until we actually look at the
13 documentation, it's -- we can go back and forth all
14 day long on this.
15          So I will produce the summary pages from
16 my current insurance company, and then we'll go from
17 there.
18     Q.    Have you compared the two already?
19     A.    No.
20     Q.    Then how did you determine that you are owed
21 the $30 premium, approximately #30 premium, if you
22 don't know if one is better or if they are comparable?
23     A.    When this was submitted, it was on a time
24 factor, and I don't know the rules.  I don't know how

Wilcox and Fetzer, Ltd.   Registered Professional Reporters          302-655-0477
Electronically signed by ann calligan (501-267-394-7784)          bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

A45

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 68

1    calculations work.  I was just going based on prior

2    documentation from the Courts and using that.

3        Q.    Meaning what?

4        A.    Using other people's cases to help me with my

5    case.

6        Q.    What other people?

7        A.    Just the Court's -- other court records.  I can

8    not give you exact cases.

9        Q.    Where did you get them from?

10       A.    Through books.

11       Q.    Where were the books?

12       A.    At the library, on Google and Yahoo.

13       Q.    What library?

14       A.    Cecil County.

15       Q.    Cecil County in Elkton?

16       A.    Correct.

17       Q.    What kind of books?

18       A.    How to prepare for a case.  How to be your own

19    attorney.

20       Q.    So I think we are on the same page now in that

21    you did not compare the two summary pages or even the

22    plans generally, compare the Lawns plan to your

23    current plan, is that right?

24       A.    Correct.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 69

1    Q.   So you did get these numbers, roughly $30.  You

2    did get that from your HR department?

3    A.   Correct.

4    Q.   It is related to single coverage?

5    A.   Yes.

6    Q.   But past that, it's based on speculation, is

7    that correct?

8    A.   Yes.

9    Q.   And on Google and Yahoo, what did you look up?

10   A.   You can actually type up cases, depositions.

11   You can find anything on the Internet.

12   Q.   Did you find out something about depositions on

13   the Internet?

14   A.   Yes.

15   Q.   What did you find out?

16   A.   How to prepare.

17   Q.   And how did it say to prepare?

18   A.   Stay calm.

19   Q.   Anything else?

20   A.   It's one-sided argument.

21   Q.   That's how to prepare?

22   A.   Pretty much.

23   Q.   When I asked you earlier at the beginning of

24   the deposition what you did to prepare for the

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 71

1    talked about earlier in DI 107, marked today as

2    Butz 1, the various computations you've made for lost

3    wages, including earnings lost over time, vacation,

4    personal, time, holiday pay, and bonus pay.

5              If we can, can we just start with earnings

6    lost, which was the first one on the list?  Can you

7    explain how you reached that number?

8       A.    That was the amount that I would have been paid

9    if I was working at Lawns Unlimited minus the

10   unemployment amount.

11      Q.    And what period of time does that reflect?

12      A.    That -- without looking at my notes, I'm not

13   sure exactly.

14      Q.    What notes are there?

15      A.    It would be the stubs from unemployment.

16      Q.    So that would be the document that you

17   produced?

18      A.    It should be one of the documents, I believe.

19      Q.    If you did submit that, would that have been

20   submitted with your initial disclosures?

21      A.    Yes.  If it was submitted.

22      Q.    Well, do you have in your possession at home or

23   elsewhere -- not here with you today, but do you have

24   a copy of your unemployment pay stubs?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 72

1    A.    I only have one, but I have the 1099 or

2    whatever they sent you.

3    Q.    Did you submit that, the 1099?

4    A.    I don't believe so.

5    Q.    Why not?

6    A.    I'm not really sure.

7    Q.    Did you believe it was relevant?

8    A.    I believe that defendant should have that

9    information.

10    Q.    But without counselling you on the law, that's

11    irrelevant to whether or not you have copies of it.

12    So I'm just looking through your initial disclosure

13    documents, and there is nothing -- I'll represent to

14    you there is nothing here relating to unemployment.

15    I'll just finish it quickly, but it does not appear

16    there is.

17         So do you recall any documents that you

18    have produced reflecting unemployment payments you've

19    received?

20    A.    Do I --

21    Q.    I'm sorry.  Do you recall what, if any,

22    documents have you produced relating to your

23    unemployment payments?

24    A.    I believe -- I thought I included the one slip,

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 73

1    but I can get that information if it was not included.

2        Q.   That would have been a pay stub?

3        A.   It would have been the pay stub, yes.  Slash

4    1099 or whatever form they call it.

5        Q.   Did you produce copies of your tax returns?

6        A.   No.

7        Q.   Why not?

8        A.   Because there's other information that is not

9    relevant to this case.

10       Q.   Did you, in the library or on the Internet,

11   look up any information to determine what is relevant

12   to this case and what's not relevant to this case, or

13   did you just reach that conclusion on your own?

14       A.   I don't remember looking that information up.

15       Q.   So --

16       A.   I -- go ahead.

17       Q.   No.  Go ahead.

18       A.   Go ahead.

19       Q.   DI 107, which we had looked at before,

20   number 16 that you read and reviewed earlier where you

21   objected to the request to the extent it's irrelevant

22   and based on the judge's ruling.  That was your

23   response to when defendants requested information

24   about income, employment benefits, Social Security,

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 78

1    what you received at Lawns Unlimited, is that correct?

2    A.    Like I said, I don't have that information.  I

3    don't have pay stubs.

4    Q.    So that is correct?

5    A.    Correct.

6    Q.    Just for clarity purposes, I'm not referring

7    only to pay stubs.  I'm referring to anything.  It

8    could be anything at all such as income taxes.  There

9    is no documentation produced to show what you earned

10   at Lawns, not just limited to pay stubs, is that

11   correct?

12   A.    Correct.

13   Q.    Next on the list is overtime.  Could you

14   explain that claim for me, please?

15   A.    Mr. Fleming did not pay me some overtime that

16   was -- that I worked.

17   Q.    A little more detail.

18   A.    He subtracted it from my time sheet, which I

19   gave you a copy of, one of the copies.

20   Q.    You produced --

21   A.    But that happened more than once.

22   Q.    So right now you're claiming more than one

23   occasion or you're claiming one occasion, total of ten

24   hours?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 86

1      A.    Correct.

2      Q.    Were there any other times that that happened?

3      A.    That overtime was subtracted?

4      Q.    Right.

5      A.    Yes.

6      Q.    When were those times?

7      A.    Between the time that I was training which

8   would have been around October, even probably as far

9   back as September into December.

10     Q.    So it occurred after you had copied the time

11  sheet, is that what you're saying, into December?

12     A.    I believe so, if the time sheet was dated in

13  November, yes.

14     Q.    You didn't print copies of those time reports?

15     A.    I don't have those copies.  I only made one

16  copy.  Just once.

17     Q.    Why did you think it is that you would have

18  been paid for some overtime and not for others?

19     A.    I don't know.

20     Q.    Did you do payroll?

21     A.    Yes.

22     Q.    So tell me how it is that you did payroll and

23  didn't pay yourself overtime?

24     A.    Because I don't have the authorization to pay

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 87

1    somebody unless Ed signs off on it.

2        Q.    So how would that work, you would submit a time

3    card or a generated time card and it would have a

4    certain amount of hours and then it would be literally

5    subtracted from that?

6        A.    Correct.

7        Q.    And your contention is that it was subtracted

8    because they did not want to pay you.

9        A.    Correct.

10       Q.    But they did pay you all other occasions?

11       A.    Yes.

12       Q.    Did anyone else not get paid for overtime?

13       A.    Yes.

14       Q.    Who were they?

15       A.    Roberto Gonzales, also known as Raul Rodriguez.

16   There was times where Hugo -- there were times where a

17   lot of people out in the field didn't get overtime.

18       Q.    How would you be aware of that?

19       A.    Because I do payroll.

20       Q.    And tell me, you're doing payroll but what's

21   the connection between you doing payroll, whatever

22   that means, and you actually knowing what someone

23   worked versus someone got paid?

24       A.    Because they used the clock to clock in and

Electronically signed by ann calligan (501-267-394-7784)                     bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 95

1    Q.    Did all employees get vacation?

2    A.    No.

3    Q.    Who was entitled to vacation?

4    A.    Office staff and Hugo and Mauricio.

5    Q.    And office staff, was that because -- or were

6    they all full-time employees?

7    A.    Everybody's full time.

8    Q.    You said you got it when you started there.

9    How much?  How much time did you get when you started?

10   A.    I believe I got 40 hours of vacation time, and

11   then my two or three personal time.

12   Q.    And different employers do it, I'm sure you

13   know, lots of different ways as far as when that time

14   accrues versus when you can use it.  There when could

15   you use it, if you recall?

16   A.    I used mine pretty much right away.

17   Q.    Some employers will allow you to do that.  And

18   some make you wait for a period of time.  You were

19   eligible for use right away.  Did you get more than

20   one week subsequent to that, or did it stay one week

21   vacation time?

22   A.    What do you mean?

23   Q.    I'm sorry.  That wasn't very clear.

24            When you started your employment, you were

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 96

1    eligible for one week paid vacation, is that correct?

2        A.    Correct.

3        Q.    And then in year 2, did you become eligible for

4    additional time and vacation, in other words, more

5    than one week?

6        A.    I don't believe so.

7        Q.    So at the time that you left, you were still on

8    one week?

9        A.    Yeah.  Yes.

10        Q.    Do you remember taking vacation time?

11        A.    Yes.

12        Q.    Do you remember when that was?

13        A.    In February '03 -- no.  February '03.  Yeah.

14    February '03 and then again in September of '03?

15        Q.    You took a full week both of those times?

16        A.    No.

17        Q.    You split it up?

18        A.    Correct.  I took four days or -- four days in

19    February.  I took a week off, but only got paid for

20    four days.  And then one day in September.  I got paid

21    for that day in full.

22        Q.    You took one vacation day in September that you

23    were paid for?

24        A.    Yes.

Electronically signed by ann calligan (501-267-394-7784)                    bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 98

1    Q.    Not employed by defendants in January '04?

2    A.    Correct.

3    Q.    And you did receive full compensation in 2003

4    for your paid vacation for that year, is that correct?

5    A.    Correct.

6    Q.    So the only unpaid vacation time that we are

7    talking about would be January of '04, is that

8    correct?

9    A.    January of '04, yeah, for that year.

10   Q.    How many days was it on the claim?

11   A.    Five days.

12   Q.    Oh, it is.  Okay.

13   A.    40 hours for vacation.

14   Q.    So it wasn't that you didn't -- sorry.  I

15   shouldn't use too many negatives in one sentence.

16   Your claim is not that you -- I'm going to have to say

17   it again.  Sorry.  So strike that.  We'll start again.

18         You don't assert that you were not paid

19   accrued but unused vacation in '03, is that right?  I

20   know that's a lot of double negatives.  I'll turn it

21   around.  Do you assert that you were not paid for

22   accrued but unused vacation time in 2003?

23   A.    Based on how I was getting vacation, I should

24   have been paid my vacation for 2004 starting in 2003.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 99

1    Q.   So that is not what I thought, then.  So we'll

2    have to go back.  Go ahead and explain that to me.

3    A.   Well, I was hired in November, and --

4    Q.   That's when you became full time or that's what

5    you were hired as a temp?

6    A.   I think that's when I went permanent.

7    Q.   Okay.

8    A.   To my recollection that I can recall, that's

9    when I went permanent.

10   Q.   In November 2002?

11   A.   Two.

12   Q.   Okay.

13   A.   And I got vacation the beginning of 2003.

14   Q.   January?

15   A.   February.

16   Q.   February?

17   A.   That's when I took it.

18   Q.   When did you look become eligible for it,

19   though?

20   A.   From my understanding it started right away.

21   Q.   In November?

22   A.   Yes.

23   Q.   So from November -- I think I've got it now.

24   From November 2002 till November 2003, you had

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 101

1   calendar year?

2       A.   That -- I believe so.   I don't know.

3       Q.   How would you know, when you were doing

4   payroll, how would you know whether or not to pay

5   someone for time they were off?

6       A.   Mr. Fleming.

7       Q.   Would --

8       A.   Would notify me or let me know that they were

9   on vacation and pay them.

10      Q.   You said you took in September one day.   So I

11  presume that means that you could have taken

12  intermittent days.   Employees didn't have to take all

13  five days consecutively; they could have taken one day

14  a month if that's what they wanted to do?

15      A.   Yes.

16      Q.   How is that different from personal days?

17      A.   I think, if I can remember, personal days were

18  like sick days.   They could be scheduled or

19  unscheduled.

20      Q.   How would they accrue?

21      A.   I believe they were the same way as the

22  vacation time.

23      Q.   Run on the anniversary calendar based on your

24  day of hire?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 103

1    Q.    Where was your doctor?

2    A.    Three minutes down the street.

3    Q.    What was his or her name?

4    A.    It was Bayside ob/gyn.

5    Q.    So all of your ob/gyn appointments, your

6  maternity care, or prenatal care, rather, are from

7  November to December 2003; you didn't take any days

8  off for that?

9    A.    No.

10    Q.    And no time off for other purposes?

11    A.    Other than those days that I can recall at this

12  point.

13    Q.    Other than what days?

14    A.    It was the February and the vacation.

15    Q.    But not from November to December '03?

16    A.    Not that I can recall, no.

17    Q.    And then holiday pay is next.  Holiday pay,

18  eight hours, unpaid Christmas and New Year's Day.

19              Did you normally get paid time for

20  holidays?

21    A.    Yes.

22    Q.    Did you get your regular rate of pay or did you

23  get --

24    A.    Regular.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 106

1    something similar?

2        A.    To bonuses?

3        Q.    Maybe I should clarify.  Did other employees at

4    the end of the calendar year receive a bonus in the

5    form of cash or a gift certificate or anything like

6    that?

7        A.    Yes.

8        Q.    And who received that?

9        A.    Pretty much everybody.

10       Q.    And did they all receive the same thing?

11       A.    Different amounts.

12       Q.    Do you know why some people would receive more

13   or less?

14       A.    That was Mr. Fleming's decision.

15       Q.    Was it based on seniority?

16       A.    I don't know.

17       Q.    So you don't know how the he came up with the

18   number 395, plus $100 gift certificate.

19       A.    No.

20       Q.    And it wasn't explained to you when you

21   received it?

22       A.    No.

23       Q.    How was it explained to you if at all?

24       A.    Just a bonus.

Electronically signed by ann calligan (501-267-394-7784)                bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

A60

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 123

1    Q.   Let's talk about your job duties, if you could

2    tell me about your job duties.

3    A.   Answering the phone, collections, which is more

4    or less customer receive -- you know, customer

5    service, accounts receivable, accounts payable, and

6    getting the payroll together, and handling the taxes.

7    Q.   Were you in charge of like the documents,

8    filing, things like that?

9    A.   Filing, accounts payable.

10   Q.   Okay.  But not general office filing?

11   A.   You have to get more detailed than that.

12   Q.   The paperwork, were you filing papers that

13   weren't accounts receivable or payroll related?

14   A.   Accounts receivable was pretty much in the

15   system.  Sales office was responsible for the rest of

16   it.  Payroll was just put in a file as their W2s or

17   not -- W4s.

18   Q.   What about new hires, did their paperwork come

19   through to you at any time?  That's what I'm talking

20   about, general office filing?

21   A.   Their W4s was given to them by Ed, and then

22   they would give me the paperwork and it would be

23   filed.

24   Q.   The employees would give them to you?

Electronically signed by ann calligan (501-267-394-7784)                bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 124

1    A.    No.  It would be given to me by Ed.

2    Q.    Any other duties that you had at that time?

3    Your duties, did they change?  I should probably say

4    that first.  Did they --

5    A.    I oversaw those.  Saw all that.  Plus I was in

6    charge of the data, the computer conversion.  But then

7    it didn't really change.  I just took less

8    responsibility on when somebody else was hired.

9    Q.    But the nature of your job didn't change; you

10   didn't have a different title or become promoted or

11   demoted or anything like that.

12   A.    No.

13   Q.    And your job title was -- I may have asked

14   this, and I apologize if I'm asking it again.  Do you

15   recall what your official job title was?

16   A.    Office manager.

17   Q.    What would your interaction have been with the

18   employees, the non-office employees?

19   A.    Just to make sure they gave me their work

20   orders.

21   Q.    And work orders, they are like a time sheet,

22   like a work done report that they would fill out?

23   Would that be accurate?

24   A.    It's -- yeah.  Well, to be a little bit more

Electronically signed by ann calligan (501-267-394-7784)                        bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 125

1   specific, on the actual form, it would be that they

2   went to client number 1 at this time and then client

3   number 2 this time and this is what they did there and

4   this is more or less job allocation form would be the

5   better term for it.

6       Q.   And so they turned that in to you at the end of

7   the week?

8       A.   At the end of the day.

9       Q.   And what if someone didn't turn it that?

10      A.   I would go looking for them the next day.

11      Q.   Did that happen once in a while, regularly,

12  often?

13      A.   Once in a while.  They were pretty good about

14  it.

15      Q.   Any other interactions that you would have had

16  with non-office employees?

17      A.   If they came in and said hello, but that was --

18  because -- to the end of it.

19      Q.   And your hourly rate when you left was how

20  much?

21      A.   12.

22      Q.   I don't have it in front me, but would you

23  switch back to the first one, interrogatory responses?

24      A.   This one?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 126

1    Q.   Yes.  I think if said 12.75.  I thought it said

2    12.75 when you calculated time.

3    A.   That's -- I was promised a raise at my review.

4    So that was based on the calculation.

5    Q.   So you didn't actually earn 12.75?

6    A.   No.

7    Q.   When was your review?

8    A.   That was October, November.

9    Q.   That would have been an annual review?

10   A.   Yes.

11   Q.   So for concluding the November to November

12   year, anniversary year --

13   A.   Yes.

14   Q.   -- and you were promised a raise?

15   A.   Based on what everybody else gets and based on

16   the excellent review, yes.

17   Q.   Did anyone ever promise it to you?

18   A.   Jeanne discussed it.

19   Q.   And what was discussed?

20   A.   She said she'll discuss it when she bets back.

21   Q.   So the 12.75 figure, then, isn't, in fact, what

22   you were earning?

23   A.   No.

24   Q.   Then the health insurance was through what

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 127

1    organization?  What was the insurance carrier?

2        A.    With Lawns Unlimited.

3        Q.    We are just on Lawns right now.

4        A.    MAMSI or Optimum Choice, whatever they go by.

5        Q.    And it's MAMSI, I think?

6        A.    I think so.

7        Q.    Was that a PPO, HMO?

8        A.    I'm not sure how it was set up.

9        Q.    When you said before PPO and POS, PSO, I don't

10   really know what that means.

11       A.    I don't either.  I just know the abbreviations.

12       Q.    So it doesn't matter, then, at this point.  I

13   just, don't actually know what that is.

14             Do you remember what your co-pays were,

15   deductibles were?  I know we talked a little bit about

16   that before.

17       A.    I can remember one of my co-pays being ten, but

18   I'm not sure the specifics.

19       Q.    Dental insurance, did they carry that?

20       A.    I don't remember.

21       Q.    Life insurance?

22       A.    I believe that -- yes.

23       Q.    Was that paid for by Lawns?

24       A.    Yes.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 128

1    Q.   Do you have life insurance now?

2    A.   Yes, I do.

3    Q.   Is that paid for as well?

4    A.   No.

5    Q.   You pay for that?

6    A.   Yes.

7    Q.   Disability insurance?

8    A.   I don't recall.

9    Q.   Pension?

10   A.   There was an IRA offered.

11          MS. DiBIANCA:  Let's go to Butz 1 again.

12   I just have to find that.

13          What is that the DI number?

14          MS. YUEN:  47.

15          MS. DiBIANCA:  That makes it easier.

16   Okay.

17   BY MS. DiBIANCA:

18   Q.   So we are going to go to your response to

19   interrogatory number 6, which is on page 4.

20          Now, Lawns Unlimited, the insurance

21   coverage that you received there, was that what I call

22   employee only coverage?  Do you know what I mean when

23   I say employee only coverage?

24   A.   I understand.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 129

1    Q.    Is that what Lawns offered?

2    A.    Yes.

3    Q.    So you were the only insured under that policy,

4    is that correct?

5    A.    Yes.

6    Q.    When, as a new employee, were you entitled to

7    insurance coverage at Lawns?

8    A.    Effective immediately.

9    Q.    There was no waiting period?

10    A.    No.

11    Q.    For any employee?

12    A.    I don't know.

13    Q.    What I'd like to do now is go through the

14    medical expenses that you list here on your response?

15    A.    And go through the corresponding documents as

16    well.  These are documents that you've already

17    provided.  I just want to make sure I understand

18    what's being asserted.

19          MS. DiBIANCA:  Let's make the whole pack

20    as one exhibit.  So this is going to be Butz 8.

21          (Butz Deposition Exhibit 8 was marked for

22    identification.)

23    BY MS. DiBIANCA:

24    Q.    You'll see that the P numbers, the plaintiff's

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 151

1    on there?

2    A.    Yes, it is.

3    Q.    That reflects what?

4    A.    How much I paid on that specific a date and

5    what check number.

6    Q.    So other than the ones that have an actual

7    credit card receipt, I don't actually have proof of

8    payment in here.  All I have is invoices, is that

9    correct?

10   A.    Correct.

11   Q.    So when you said you were getting together

12   other documents?

13   A.    I just received some more documents from the

14   doctor.

15   Q.    Do they include proof of payment or just

16   invoices?

17   A.    It was a summary with payment.

18   Q.    Okay.  So that would be a proof of payment,

19   sure.

20   A.    Yeah.

21   Q.    So if you go towards the end of the packet, I

22   believe it's the fourth from the end.  It's a Bayside

23   Health Association invoice.  The P number is P67.

24   A.    Okay.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 152

1    Q.   It says on the right-hand, sort of bottom side,

2    previous balance, insurance and patient.  If you're

3    not able to remember or understand, please, you know,

4    don't guess.  I'm just wondering if you can provide me

5    with more information than what this is.

6              I believe -- let me see.  Let's take a

7    look.

8    A.   I'm not sure what that bottom stuff is, but I

9    know what the form is.

10   Q.   Okay.  The form is what?

11   A.   It's when you go for a check-up.  This is the

12   form that the ob/gyn used to fill out, and you would

13   have to give to the women for billing.

14   Q.   So on your list, DI 107, it says you submitted

15   February 11, 2/11/04, Bayside Health, ob/gyn,

16   postpartum visit, $15, paid?

17   A.   Correct.

18   Q.   And then that is one of the amounts that's

19   blank.  So where on this does it say, "paid 15"?

20   A.   It just says P, pay, next to it.

21   Q.   What does that mean?

22   A.   I'm not sure.  But when I walked in there, I

23   had to pay at least that amount.

24   Q.   So that this doesn't reflect payment, is that

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 153

1    correct?

2    A.    Correct.

3    Q.    So if you put $15, does that mean that your

4    co-pay was at least $15?  Is that what you are saying?

5            I mean, we don't have any basis whatsoever

6    right now to correct the $15 on your chart to this

7    record at this time.  Is that right?

8    A.    I would have to guess, yeah, that $15 would

9    have been some type of co-pay.

10    Q.    But we don't know; you don't know, is that

11    right?

12            Do you have any documents for it at this

13    time?

14    A.    For this specific one?

15    Q.    Yes.

16    A.    No.  I don't have any documents on me.

17    Q.    And any documents that you've already

18    submitted?

19    A.    Not for Bayside.

20    Q.    And then the previous page in that same exhibit

21    is another Bayside bill, and that's dated January

22    14th.  And that looks like exactly the same type of

23    thing, and you have on DI 107, for 1/14, you list

24    Bayside again and again list paid as $15.  But that

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 159

1    Q.    Even on your chart there's no description on

2    the table, right?

3    A.    I don't see it there.

4    Q.    So we have -- and this is not signed, this

5    receipt, correct?

6    A.    Doesn't look like it.

7    Q.    And it looks like it's your husband's credit

8    card, is that correct?

9    A.    Yes.

10   Q.    So we do have a payment for Dr. Funk in the

11   amount of $65, but we do not know for what patient or

12   for what services rendered, is that correct?

13   A.    Correct.

14   Q.    Did the insurance reject your prescription

15   medicines?

16   A.    Yes.

17   Q.    Tell me about that.

18   A.    When I went to go get birth control on February

19   1st, it was declined.

20   Q.    It would have been declined as of February 1st.

21   I'm with you.  What about before February 1st?

22   A.    I don't recall.

23   Q.    Well --

24   A.    I don't think I had prescription before that.

Electronically signed by ann calligan (501-267-394-7784)          bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 160

1    Q.   Well, you do.  You have them listed here.

2    January 1st, January 1st, January 4, January 4.  And

3    you only paid a few dollars for each of them.  So I

4    assume that the medicine actually cost more than that,

5    more than four or five dollars per prescription, but

6    it was submitted at that time to the insurance.  And

7    has the insurance since then come back and said,

8    "Actually, you weren't covered"?  Like you are now

9    saying or doing with Dr. Funk or any other doctor?

10   A.   No.

11   Q.   Do you think that's because you were actually

12   covered?

13   A.   It depends on when Mr. Fleming actually

14   cancelled my insurance.

15   Q.   Well, based on the prescription drugs, would

16   you say it's fair to assume that you were still

17   covered as of January 4 of 2004?

18   A.   If he made the phone call after January 4th --

19   Q.   That's not what I'm asking.  I'm saying, based

20   on the fact that you only had to pay less than $5 per

21   prescription, is it fair to assume you were covered by

22   insurance?

23   A.   Assume, yes.

24   Q.   Is there any reason to not believe that?

Page 161

1    A.    Don't know.

2    Q.    I mean, it's not a trick question.  I mean,

3    honestly, have you ever heard of any prescription

4    medicine that cost less than $5 without any insurance

5    coverage?

6    A.    Some of my medicines can cost under $5.

7    Q.    With no insurance coverage?

8    A.    Yes.  Because I picked up a prenatal that was

9    pretty inexpensive.

10   Q.    Okay.

11   A.    But I would have to guess probably it was

12   covered.  I don't know.

13   Q.    Probably it was.

14         How would we find out whether or not it

15   was?  You're saying it wasn't.  I assume you're saying

16   it wasn't based on the fact that you're assessing

17   damages for it?

18   A.    Yes.

19   Q.    How do we find out that it wasn't?

20   A.    I guess you have to call insurance company.

21   Q.    Didn't I ask that in the interrogatory

22   question?

23         Didn't I ask in number 8 on page 4 of 10

24   pages in document 107 marked as Butz 1, "Identify and

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 166

1    Q.    Did you give me Dr. Funk's statement?

2    A.    I just got that recently.

3    Q.    When did you get Bayside Health?

4    A.    I'm sorry?

5    Q.    When did you get the statement from Bayside

6    Health?

7    A.    Several months ago.  Maybe longer than that.  I

8    attached it to the back-up that I gave you.

9    Q.    That would have been your initial disclosures,

10   then.  So Bayside Health has not notified you that you

11   owe them, is that correct?

12   A.    That's correct.

13   Q.    Why do you think that is?

14   A.    Well, I owe them a huge balance, so they could

15   have wrapped it in with that balance.

16   Q.    What was the balance for, the huge balance?

17   A.    A tubal pregnancy.

18   Q.    That was prior to on January '04?

19   A.    Correct.

20   Q.    So that's a -- that's why I'm asking.  So prior

21   to January '04 you already had moneys owed with

22   Bayside Health?

23   A.    Correct.

24   Q.    So then they haven't come back and said the

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 176

1    A.    Yes.  Which, again, I got that statement, so I

2    can submit that to you.

3    Q.    And then the next one is Bayside Health for

4    January 14th, $15.  And we don't have a proof of

5    payment for that at this time.

6    A.    No.

7    Q.    Birth control from Happy Harry's on 2/1, I

8    believe we did have a receipt for that?

9    A.    Yes.  P6.

10   Q.    And P6 indicates that it was a pharmaceutical

11   in the amount of 30.75 and in the page, P20, put that

12   together and you can see it's for you from Happy

13   Harry's.  Yes?

14   A.    Yes.

15   Q.    Then the last one is Bayside Health, $15, and

16   that we don't have a proof of payment for at this

17   time.

18   A.    Correct.

19   Q.    And then we stop there because the next one is

20   into April, and as we discussed earlier, you're no

21   longer requesting April damages, correct?

22   A.    Correct.

23   Q.    So, Ms. Butz, I just want to -- without doing

24   horrific math, as of today you have submitted proof of

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 177

1    payment for approximately $40.  Is that how you

2    understand it?

3        A.    Yes.

4        Q.    Do you have any other reason to believe such as

5    any document from MAMSI or Optimum Choice that makes

6    you think you didn't have insurance coverage?  And the

7    letter -- I'm sorry.  I'll clarify.  And the letter

8    that you received from Lawns Unlimited saying they

9    were going to cancel your insurance.  Anything else

10   that makes you think you were not covered?

11       A.    A letter from -- just the three letters that

12   all together I got from the insurance company, and

13   then one from Mr. Fleming.

14       Q.    And the three letters, that was one that we

15   moved in as the exhibit that you were referring to,

16   Butz 9, I think?

17       A.    There was two like that plus another letter the

18   same way my insurance was cancelled.

19       Q.    Would they have been before that or after that

20   letter we just reviewed?

21       A.    I'm sorry?

22       Q.    Would they have been before or after the letter

23   we just reviewed?

24              Here's why I'm asking.  It's not a trick

Electronically signed by ann calligan (501-267-394-7784)                    bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 178

1  question by any means.  I have a letter that looks

2  very much, I think, like the one we just looked at,

3  dated in February, but I don't have any bills that

4  were attached to it.  So it's actually one of my

5  questions to ask you is, what the heck does this mean?

6  I give this to you, and if it's relevant we can move

7  it in.

8     A.   I would have to look at what it's attached

9  to -- on my records, but these were things that were

10  paid in the December of '03 stuff.

11     Q.   And just because I want to make the record

12  really clear, could you tell us the little numbers,

13  the Bates numbers at the bottom of the page, like a P

14  or D?

15     A.   Oh, P91 or P92.

16     Q.   And they are, just for the record, if you could

17  explain --

18     A.   Explanation codes for MAMSI.  And it just

19  indicates -- this one indicates the claim has been

20  reviewed by the union.  Claim was paid in accordance

21  to your contract.  These expenses were applied to

22  member's plan deductible.

23          And then this one, P92, co-payments

24  greater than or equal to requested allowable amount.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 179

1    No payment is forthcoming from the health plan.

2    Member may be billed the co-payment only.  This claim

3    is paid in accordance with your contract.  Our

4    discount has been taken.  Member may not be billed for

5    discount or contractual allowance.

6        Q.   Are those the ones that you're referring to?

7    You said you had other letters that made you think

8    insurance was cancelled?

9        A.   No.  There was two letters like this one.

10       Q.   Like B or Butz --

11       A.   Butz 9, page 1.

12       Q.   2?

13       A.   2?

14       Q.   Yeah.

15       A.   And then there was another one that indicated

16   my actual insurance was cancelled.

17              MS. DiBIANCA:  Let me see here.

18              This is the one that we just looked at, so

19   I'm going to turn that.  I have two more letters.  So

20   I am going to remove these altogether.  Well, we'll

21   move those two.  So this as Butz 10.

22              (Butz Deposition Exhibit 10 was marked for

23   identification.)

24

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 182

1    we take them and we scan them in as they come to us.

2    We don't sort or put them in chronological order.

3    That's what we do with my documents.  But because

4    they're yours, we don't change the order.  We preserve

5    them.  So in other words, 94 and 95, came to me

6    together.  And they were pages before and pages after

7    and they perhaps were in there but they weren't

8    attached to these.  So you know for your reference.

9    Okay.

10                So the other letter we don't have at this

11   time, but you actually think it's in --

12        A.    It should be -- it looks typed.

13        Q.    I'm with you.  And we'll look for that.  You

14   think that was submitted?

15        A.    Yes.

16        Q.    What about bills from Beebe Medical Center,

17   have you been contacted to pay any of those?

18        A.    No.

19        Q.    I should put in context, Beebe is where you had

20   your daughter.

21        A.    Correct.

22        Q.    And did you actually tender payment for the

23   services related to her birth?

24        A.    I'm sorry?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 183

1    Q.    Did they charge you money for when you checked

2    out?

3    A.    I never got anything from them.

4    Q.    So if you weren't covered, you believe your

5    coverage ended on --

6    A.    The 31st.

7    Q.    Of December and you gave birth --

8    A.    December 30th.

9    Q.    Okay.  So you would have had coverage for less

10   than, I suppose, 24 hours after the birth?  Is that

11   what you believe at this time?

12   A.    Yes.

13   Q.    And then when did you check out of the

14   hospital?

15   A.    January 1st.

16   Q.    So you believe there was, at least, I guess a

17   day.  Was there one or two days of you being in the

18   hospital after you lost coverage?

19   A.    I left January 1st.

20   Q.    So there would have been no services rendered

21   on the 1st?

22   A.    Not that I recall.

23   Q.    Well, knowing the hospital, knowing that they

24   charge you like $30 an aspirin, I mean, I would assume

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 184

1    there was some costs relating to the 1st even if all

2    they did was push you in a wheelchair out the door?

3        A.    I've never gotten anything.

4        Q.    Nothing from them.    Okay.

5            MS. DiBIANCA:    I'm going to actually take

6    a break so we can go off.

7            (Discussion off the record.)

8            (Whereupon an adjournment was taken herein

9    until August 30, 2007, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Electronically signed by ann calligan (501-267-394-7784)                          bb0aa7d0-a2dc-4ae9-9321-1eb90fbdc196

A81

Butz v. Lawns Unlimited, Ltd. and Fleming

Page 189

1  ALSO PRESENT:

2        SHAINA CARL
         Young Conaway Stargatt & Taylor, LLP
3
         MICHAEL BUTZ
4

5                        -----

6                    RENEE M. BUTZ,

7      the witness herein, having first been

8      duly sworn on oath, was examined and

9      testified as follows:

10                     EXAMINATION

11          MS. DiBIANCA:  Welcome back.  We are on

12  day 2 of Plaintiff Renee Butz's deposition.

13          In the room today are myself, Margaret

14  DiBianca for defendant Lawns Unlimited and Edward

15  Fleming.  Here with me are Shaina Carl as well as

16  Edward Fleming, and our court reporter.  Renee Butz is

17  in attendance and so is Michael Butz with the

18  plaintiff.

19          Welcome back.  We are going to sort of

20  finish where we left off yesterday and then carry on

21  and hopefully wrap up as quickly as possible.

22  BY MS. DiBIANCA:

23     Q.  Do you remember all the instructions that we

24  discussed yesterday?  Would you prefer that I go over

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 198

1    Q.    And can you tell me how you came to reduce the

2    figures?

3    A.    Because I reduced it down to March of '04.

4    Q.    The time period?

5    A.    For the medical bills.

6    Q.    And can you tell me why you did that?

7    A.    Because that's when I didn't have insurance.

8    Q.    So initially you had claimed medical expenses

9    up through, it looks like, 2006?

10   A.    Correct.

11   Q.    And then subsequently you eliminated any

12   medical expenses after March of 2004, is that correct?

13   A.    Correct.

14   Q.    And you did that because the medical expenses

15   could be charged to your current insurance, is that

16   right?

17   A.    Correct.

18   Q.    And the items listed in the right column here

19   under total amount on page 4, it says medical bills

20   with insurance, and then you list, starting in April

21   of 2004, and then in the total amount there's figures

22   there.  Are those moneys that you had paid or are

23   those moneys of the total bill?

24   A.    It says without insurance, but it was just a

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 199

1  total amount of the bill.  It doesn't indicate how

2  much I paid out of pocket.  It just was a total

3  amount.

4     Q.   And then that's the same for the medical bills

5  without insurance and the medical bills with

6  insurance?

7     A.   Correct.

8     Q.   Now, under the second entry on the list is

9  12/30/2003, Bayside Health, C-section, $3,500.  Then

10  underneath that is two entries for Beebe Medical

11  Center for hospital expenses, I suppose relating to

12  your delivery, roughly 6500 and 1700 dollars.  Are

13  those related to the birth of your daughter?

14     A.   Yes, it is.

15     Q.   And what happened to those?  You're no longer

16  requesting those bills, that amount, right?

17     A.   Beebe was completely paid for.

18     Q.   By?

19     A.   By the insurance.  Insurance wasn't cancelled

20  until December 31.

21     Q.   So the insurance has since paid for all those

22  expenses on 12/30/03?

23     A.   Correct.

24     Q.   I'm back on page 3.  There is also a list of

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 201

1    mouth.  So would it be fair for me to say that you're
2    no longer seeking damages, these wages for the time
3    that you were employed, when you became employed with
4    Cecil County Government, and that's why?
5        A.    The 2003 is basically my difference of when I
6    was employed with Lawns Unlimited to Cecil County
7    Government.  From 2004 on, they are more or less
8    comparable.  They are a wash.
9        Q.    They are a wash to what?  The two employments,
10   you mean what you would have earned?
11       A.    Correct.  As far as the wages are concerned.
12       Q.    What do you earn at Cecil County Government?
13   Are you a salary or hourly?
14       A.    I'm an hourly employee.
15       Q.    What do you earn there?
16       A.    Now or --
17       Q.    Now.
18       A.    Now, I -- oh, my gosh.
19       Q.    Are you having a hard time recalling?
20       A.    I do.
21       Q.    How about when you started in 2004, 2003?
22       A.    2003, I believe I started at 12.75.
23       Q.    So, because you earned actually more at Cecil
24   County Government than you did at Lawns Unlimited and

Electronically signed by ann calligan (501-267-394-7784)                    b296ea47-b05f-4b5f-a491-e5666b527145

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 205

1    Q.    Did you ever get like a handbook or some kind
2    of employment policies?
3    A.    No.
4    Q.    Did you ever see one of those?
5    A.    No.
6    Q.    If someone had a question about that, about the
7    use of vacation time or personal time, who would they
8    go to to ask?
9    A.    Jeanne or Ed.
10   Q.    And did you have to seek approval before you
11   used personal time?
12   A.    Verbally, unless you called out sick.
13   Q.    Mm-hmm.  And you would get approval from who?
14   A.    Jeanne or Ed.
15   Q.    And vacation time, was that the same?  How did
16   you get approval for that?
17   A.    It could be done verbally.
18   Q.    Were you going to say or?  You said you can do
19   it verbally.  Can you do something else?
20   A.    The guys out in the field were -- had to use
21   some type of form, but that was never really enforced.
22   Q.    What type of form?
23   A.    Some type of vacation request form.
24   Q.    Are you saying some type because you're just

Wilcox and Fetzer, Ltd.   Registered Professional Reporters        302-655-0477
Electronically signed by ann calligan (501-267-394-7784)                    b296ea47-b05f-4b5f-a491-e5666b527145

A86

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 211

1    A.   First there was one girl, and I can't honestly

2    remember her name.   She didn't stay very long.

3    Q.   Okay?

4    A.   Then there was Laurie Schaltz.   Then there was

5    Dina Alderucci.   And then Debby Watson.

6          MS. DiBIANCA:   Let's do Butz 13.

7          (Butz Deposition Exhibit 13 was marked for

8    identification.)

9    BY MS. DiBIANCA:

10   Q.   I'm just going to have a look at that, if you

11   will.   Then let me know when you've familiarized

12   yourself with it.

13          All set?

14   A.   Mm-hmm.

15   Q.   Yes?   You said you've looked over Butz 13?

16   A.   Yes.

17   Q.   Can you tell us what it is for the record?

18   A.   It's called agenda for employee meeting.

19   Q.   Have you seen this before?

20   A.   Yes.

21   Q.   Where did you see it before?

22   A.   This was typed up probably by myself and

23   another lady.   It was typed up by me and Laurie.

24   Q.   Do you recall when?

Electronically signed by ann calligan (501-267-394-7784)          b296ea47-b05f-4b5f-a491-e5666b527145

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 239

1    Q.    Then after you received the letter?

2    A.    I didn't get the letter until the 14th.

3    Q.    So let's say January 14th you received the

4    letter, and how do you remember that date?

5    A.    Approximately.

6    Q.    Well, why do you say January 14th?

7    A.    Because I know I didn't get it anywhere during

8    that period of time.

9    Q.    Between January 7 and 14?  You said that period

10   of time.

11   A.    I know I didn't get it right after January 7th.

12   Q.    How do you know that?

13   A.    Because it's -- I had to sign for it.  So

14   Mr. Fleming would have records for it of when I

15   actually got it.

16   Q.    But I'm just saying you said January 14th, so

17   I'm trying to determine how that number comes to you.

18   Do you actually recall receiving it, or you do not?

19   A.    I remember signing for the letter.  And it's

20   approximately dated January 13th or 14th.  14th is

21   sticking at my head.

22   Q.    All right.  Fair enough.  That's all I'm

23   asking.

24         And then so January 14th, 15th, 16th, any

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 253

1    Q.    So it wasn't that you checked in with a
2  different name, but the insurance coverage, is that
3  sort of --
4    A.    Yeah.  You have to check in by the name that's
5  on your insurance policy.
6    Q.    Punitive damages, are you seeking punitive
7  damages?
8    A.    Yes.
9    Q.    In the amount of $50,000?
10   A.    Yes.
11   Q.    Can you give me some information about now you
12  came to conclude that amount?
13   A.    That was the maximum.
14   Q.    It is?  Interesting.
15          How did you find that out?
16   A.    I had an attorney that -- I've talked to
17  several different attorneys, and if it was a big
18  corporation, they would be lined up taking the case.
19  But because he's a small company, it's not enough
20  money for him.
21   Q.    For who?  I'm sorry.
22   A.    For the attorney.
23   Q.    For a specific attorney?
24   A.    For all the attorneys.  It's just not enough

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 264

1    the maximum punitive.

2    Q.   What's the behavior or the conduct that you're

3    claiming occurred to justify punitive damages, not

4    necessarily tied to an amount but just generally

5    speaking?

6    A.   I was wronged, you know.  There's small

7    companies across this country that break the laws

8    every day.  They need to be punished but because they

9    are not big corporations, people can't afford to fight

10   them.  Well, he needs to be stopped on the rest.

11   Q.   Mr. and Mrs. Fleming, you knew them personally

12   and professionally?

13   A.   I knew them professionally.  And I guess you --

14   I thought I knew them personally.

15   Q.   Did you go out with them, hang out with their

16   family, things like that?  This is what I'm looking

17   for, sort of the contact for --

18   A.   They were invited to my weeding.  They were

19   invited to my baby shower.  I slept in the same bed

20   with their children on a business trip.

21   Q.   You knew their children?

22   A.   I did know their children.

23   Q.   I don't mean sort of, you know, very, very

24   well, but you knew them, you've met them before

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 268

1    Mr. Ed Fleming is also a named defendant.  So

2    generally speaking, the Flemings.

3             They knew you were pregnant, correct?

4    A.    Oh, yes.

5    Q.    They knew when you were due, correct?

6    A.    Yes.

7    Q.    And when were you originally expected to be

8    due?

9    A.    Approximately January 5.

10   Q.    And they knew that you were going to take

11   maternity leave?

12   A.    Correct.

13   Q.    And they knew that your maternity leave you

14   expected to be out for six weeks?

15   A.    Yes.

16   Q.    And they knew that maternity leave was not a

17   paid leave, correct?

18   A.    Except for the vacation that I was holding,

19   waiting for.

20   Q.    Okay.  But it wasn't --

21   A.    The whole six weeks was not going to be paid.

22   Q.    There was no such thing as paid maternity

23   leave?

24   A.    Nothing that I know of, no.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 269

1    Q.   I just think, because we can probably get this

2    stuff on the record that's not in dispute and instead

3    of sort of haggling over it and all that nonsense.  So

4    we are all in agreement up to that point.

5              Then you leave work.  Tell me what

6    happens.  Sort of December 23.  My understanding is

7    December 23, but if that's incorrect, let me know.

8    A.   December 23 I woke up in the morning and I

9    thought my water broke.

10   Q.   And you're living in Wilmington or the greater

11   Wilmington area?

12   A.   Yes.

13             And it was like, oh, I don't know.  My

14   husband is like, go to the hospital.  So I was like,

15   well, I'm just going to go to Beebe.  That was where

16   my doctors are from.  I'm not contracting.  I don't

17   feel these types of things, but I just had a gush of

18   water.  Being the first child, don't know what the

19   heck is going on.  So I go down there.  They indicated

20   my mucus plug came out.  And don't ask me what a mucus

21   plug is.  I have no idea.  That's what I was told.

22   Q.   What time was this on the 23rd by the time you

23   got to Beebe?

24   A.   Around seven-ish.  And while I was going down

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 270

1    there, I called Jeanne and told her the situation.

2    Saying, "I'm going to the hospital.  I think my water

3    broke.  I might night not come in.  Don't know."

4        Q.    Stand by?

5        A.    So I went there.  That was when they told me my

6    mucus plug came out.  But I was only dilated slightly,

7    to go home.

8              So I went to work because I knew it was --

9    I think it was payroll week.  And so I was like, oh,

10   got I got to get stuff done.  So I wanted to wrap up a

11   whole bunch of other things before I went out on

12   maternity leave, you know, just my loose ends to make

13   sure everything was good and everybody understood.

14       Q.    What time did you get to work?

15       A.    I think it was around eight-ish, maybe a little

16   after.  I wasn't at the hospital very long.

17       Q.    How far is Beebe from Lawns?

18       A.    Five, ten minutes if that.

19       Q.    So you were at Beebe for less than an hour?

20       A.    Yeah.

21       Q.    So 8:00 o'clock.  You get to work.  Go ahead.

22       A.    I told everybody the situation.

23       Q.    Who's everybody?

24       A.    Mr. Fleming and Debby.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 271

1    Q.    And you told them in person?

2    A.    Yes.

3    Q.    At 8:00 o'clock?

4    A.    Yes.

5    Q.    Okay.

6    A.    And I called my husband, and you know, he's

7    like, you know what?  You really should come home.

8    You don't know when you are going to go into labor.  I

9    was, that's a good idea.  I don't want to be driving

10   and going into full-fledged labor and get in a car

11   accident.

12   Q.    Were you planning on giving birth?

13   A.    In Beebe.

14   Q.    Okay.  Go for it.  I'm sorry.

15   A.    That's okay.  So I didn't want to drive any

16   more.  So he came -- my mother and -- because I had my

17   car there.  My mother and my husband came to pick me

18   up around, I would say, 1:30, 2:00 o'clock I guess.

19   Q.    Okay.  1:30, 2:00 o'clock.

20   A.    And Mr. Fleming was actually leaving shortly

21   before that, and he was like, you know, if you need

22   anything just, you know, holler.

23   Q.    Right.  Right.

24   A.    And I said okay.  You know, my in-laws had --

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 279

1    work, right?

2        A.    He asked me why I wasn't there yet.

3        Q.    Okay.

4        A.    I once again told him I can't drive and once

5    again we went kind of into the same situation as the

6    23rd.

7        Q.    Okay.

8        A.    And that's when he said that, you know, well --

9    you're not coming back.  And I kept saying, "I give

10   you my word.  I give you my word."

11       Q.    Did he say why he felt that?

12       A.    I don't know if I can pinpoint.  I don't

13   remember him -- I don't remember if he said anything

14   like that.  I just remember him saying that, you know,

15   "you're not coming back."

16       Q.    And you just said, "Yes, I am."  Your husband

17   said, "Oh, yes, she is."  And then that also ended

18   pretty amicably I guess.

19       A.    Pretty peacefully, yes.

20       Q.    That's 7:00 a.m., and then what happens?

21       A.    Then the 26th, Mr. Fleming called for a

22   computer question.  I talked for about 15, 20 minutes.

23       Q.    That was peaceful also?

24       A.    That's very peaceful.  Nothing was said about

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 283

1   still a little nervous.

2      Q.    And two subsequent phone calls and everything

3   was fine, right?

4      A.    Yes.   There was no screaming, no yelling.   It

5   was all business talk and just --

6      Q.    Pleasant?

7      A.    -- pleasant.

8      Q.    So you were worried but not because anything

9   had happened subsequent to the 24th, is that right?   I

10  want to make sure sort of what your thoughts were as

11  far as uh-oh.   When did you say uh-oh, when you got

12  the letter?

13     A.    When I got the letter, I was devastated.   But

14  in back of my mind I was like, you know, I've seen

15  Mr. Fleming blow up, and I've seen him be very

16  manipulative to employees.   So I was hoping that I was

17  not going to be that type of person that he was going

18  to do that to.

19     Q.    That's exactly what I'm asking.   Did you have

20  any reason to think that, based on the way the

21  conversation ended the 24th and then your two

22  subsequent phone calls, did that give you any

23  indication that there was going to be major problems?

24     A.    There was a little doubt in my mind, but for

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 284

1    overall I really didn't think that this was going to

2    happen.

3        Q.    That's why you would have called and left a

4    message with the baby's measurements and, you know,

5    the baby was born?

6        A.    Yeah.  I mean, why else would I have called?  I

7    was being pleasant.  If I wasn't going to be pleasant,

8    I would have never called him back and give him help

9    with his computer question.  I would have been like F

10    you.

11        Q.    That's exactly what I'm saying.  There was no

12    sort of hostility on your end in the sense what you

13    called them and let them know the good news,

14    et cetera, right?

15        A.    Yes.

16        Q.    That's all I'm trying to find out, sort of when

17    everything happened.  It seems like the letter, that

18    was the trigger, is that pretty fair?

19        A.    Yeah.

20        Q.    So you get the letter.  Then what happened?

21              And the letter we've already admitted.  So

22    we know what that is.

23        A.    I was devastated.  I cried and cried and cried.

24        Q.    Why did you cry, without stating the obvious

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 285

1    just because it's important we get it all on paper?

2        A.    Well, you know, they treated me like family,

3    and you know, you don't screw your family.

4        Q.    Prior to the letter you mean, they had treated

5    you like family?

6        A.    Yes.  I mean, like I told you I slept in the

7    same bed with their children on a business trip.

8    That -- you're not -- that's a big no-no.  You don't

9    do that.  So, you know, I was treated like family.

10   You know, I was treated like one of their children.

11       Q.    So that's why it's especially hurtful, correct?

12       A.    It was very hurtful.

13             And so, then, that's when Michael Butz

14   contacted him because I called him crying, going "I

15   don't know what to do."  And he called him up and, you

16   know, he was like "just give her her job back.  You

17   know, just give her her job back."

18       Q.    Were you on the phone with -- was this a

19   three-way phone call?

20       A.    No, it was not.

21       Q.    It was just Michael Butz, and was it

22   Mr. Fleming?

23       A.    Yes.

24       Q.    When was that, same day as you received the

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 286

1    letter.

2        A.    No.   Probably -- I'm assuming it would have

3    been the next day.

4        Q.    Did you ask your father-in-law to call and see

5    if he could work things out?

6        A.    Yes.   He's more calm and collected than I am.

7        Q.    Because did you think that it was a

8    misunderstanding?   I mean, what did you think?

9        A.    I didn't know what to think, to be honest with

10   you.

11       Q.    What was sort of the purpose of him calling?

12       A.    Because I would have exploded on Ed.

13       Q.    I understand that, but what was the objective?

14   Was it to --

15       A.    He's a businessman.

16       Q.    Right.

17       A.    So I figured a businessman, who's not

18   emotional, talking to another businessman could come

19   to real --

20       Q.    Realization?

21       A.    Yes.   Thank you.

22       Q.    So were you hoping he would be able to

23   straighten out the record or, you know, the

24   relationship or the facts as they understood it?   Were

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 287

1  you hoping that he would say, "Rip up the letter.  I'm
2  sorry.  We were wrong.  Of course, she's coming back"?
3  I just want to know what is the objective?
4      A.   To get my job back.  To get the insurance
5  reinstated.  And happy, merry could be.  I go back to
6  work.
7      Q.   So Mr. Michael Butz called.  Were you in the
8  house when he called?  Were you in the same location?
9      A.   No.
10     Q.   So you didn't hear the telephone call?
11     A.   No, I didn't.
12     Q.   Then, based on what he told you then, how did
13  the telephone call go?
14          Sorry.  When did he tell you about the
15  telephone call, right after it?
16     A.   I believe so, yes.
17     Q.   Sorry.  Go ahead.
18     A.   That's okay.  He, you know, he called me back.
19  He said that the only way that Mr. Fleming would give
20  me my job back is if I signed a labor contract and
21  that he was not going to reinstate my insurance or my
22  job unless I signed the labor contract.
23     Q.   What is a labor contract?  What did you
24  understand that to be?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 288

1    A.    I had no clue what a labor contract is.  I've

2    never -- the only thing I've ever heard of a labor

3    contract is if you're making six figures.

4    Q.    So he didn't say, "This is what it would say."

5    He just said "a labor contract"?

6    A.    He just indicated -- I don't think specifics.

7    I think it was something I had to work there for so

8    long or something of that nature.  But I did not agree

9    to those terms of me coming back.

10    Q.    Then what happens?

11    A.    That was the end of it.  That's when I decided

12    that there was no way that it was going to be possible

13    for me to go back to Lawns Unlimited and that was when

14    I did the unemployment, looked for a job, and went to

15    the DDOL with the letter.

16    Q.    After Michael Butz talked to Ed Fleming, did

17    you ever talk to Ed Fleming?

18    A.    No.

19    Q.    Did Michael Butz talk to Mr. Fleming after

20    that?

21    A.    I don't believe so.  I think it was just that

22    one conversation.

23    Q.    And then the next time you saw Mr. Fleming

24    would have been at the unemployment board?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 289

1    A.    No.  I actually -- I couldn't take off my brand

2    new job.  So they said I could teleconference.

3    Q.    When was the next time you saw him?

4    A.    I think today.

5    Q.    Yesterday?

6    A.    Or yesterday.

7    Q.    And let me see.  Anything that I missed in the

8    facts there as far as the timeline goes?  Any other --

9    like did your husband call him, did your mother call

10   him, anything like that?

11   A.    No.

12   Q.    So the only communications there were after the

13   letter was with Mr. Michael Butz?

14   A.    Correct.

15   Q.    Did you ever speak to Jeanne Fleming during

16   that time?

17   A.    Not the 23rd or 24th.  Seven in the morning on

18   the 23rd when I called, when I was going to the

19   hospital, but I don't believe I talked to her any

20   other time.

21   Q.    Did you consider reaching out to her when you

22   got the letter?

23   A.    No.

24   Q.    Why not?

Electronically signed by ann calligan (501-267-394-7784)                    b296ea47-b05f-4b5f-a491-e5666b527145

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 291

1    A.    You know, he indicates it was a sudden leave of

2    absence, which being pregnant is not really sudden.

3    Q.    Definitely not.

4    A.    You know, fellow co-workers told him that I

5    wasn't coming back.

6    Q.    Now, is this the first time you had heard about

7    this, that he states, "Our greater concern is you told

8    fellow co-workers that you never had any intentions of

9    returning at all from your maternity leave."  Is this

10   the first time you had gotten that information?

11   A.    Unless he might have said something on the

12   24th, this is when he actually came out and said

13   fellow co-workers.

14   Q.    Were you stunned by that?

15   A.    I was shocked.

16   Q.    Did you have any idea who he was referring to,

17   or did you conclude who you thought he was talking to

18   about?

19   A.    I concluded, but I wasn't really sure who he

20   was talking about.  I had an idea maybe.

21   Q.    You thought it was --

22   A.    Debby.

23   Q.    And it turned out that that was, in fact, who

24   it was?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 292

1    A.    Yes.

2    Q.    So you were correct.  Okay.

3          So he says your co-workers say you told

4    them that you never had any intensions.  Okay.

5    A.    And that I accepted another job.

6    Q.    Okay.

7    A.    He feels, you know, at this point "I feel I

8    must make a professional employment decision based on

9    the information, and I have determined to terminate

10   your employment with Lawns Unlimited effective on

11   December 23rd.  When you left the premises and

12   cleaning out your desk and taking all your belongings

13   and" --

14   Q.    Did you ever call Debby Watson, knowing or sort

15   of suspecting and then later finding you were --

16   A.    I might have called her and yelled at her.

17   Q.    Would you have called her at work or at home?

18   A.    I don't recall.

19   Q.    Did you ever call her at home?

20   A.    I might have.

21   Q.    Do you think you had her home telephone number?

22   A.    I might have had it programmed at one point in

23   my phone because I sometimes -- I think I had some

24   people programmed in my phone.  I'm sorry.

Wilcox and Fetzer, Ltd.   Registered Professional Reporters          302-655-0477
Electronically signed by ann calligan (501-267-394-7784)          b296ea47-b05f-4b5f-a491-e5666b527145

A104

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 293

1    Q.    Okay.  That's fine.

2          So you did or you may have, I suppose, is

3    that correct, called her?

4    A.    Yes.

5    Q.    And would that have been, I guess after

6    receiving the letter and seeing this and seeing that

7    he's saying here, you know, somebody's telling me in

8    your work that you, Renee, told them things that

9    weren't true?

10   A.    I don't remember exactly.

11   Q.    Would you have reason to have called and yelled

12   at her before that?

13   A.    It might have been on the 24th.

14   Q.    Well, I don't know.  Does that make sense?  I

15   mean, if he told you on the 24th that somebody, one of

16   your co-workers had told him you did not have any

17   intention to return.  In fact, you actually got other

18   employment.  Would you think it would have ended

19   peacefully on the phone?  Sort of makes me think that

20   wasn't on the 24th.

21   A.    You know, screaming and yelling and then making

22   amends, it could end peacefully --

23   Q.    Sure.

24   A.    -- because I gave him my word.  I sent him an

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 295

1    Q.   Yes.  Sure.  Sure.  You already said that.  I'm

2    sorry.  You said that because you said you had to give

3    your word, you were giving your word?

4    A.   I was giving him my word I was coming back.  I

5    was devastated.  I'm like, well -- and then, after we

6    got off phone peaceful, I'm like maybe this is the end

7    of it.  So getting this letter it was a real more slap

8    in the face because here my word didn't mean crap.

9    I've been there for over a year.  I trained three or

10   four employees that are all in the office.  And I was

11   not trusted.

12   Q.   So we call Debby Watson and let her have it.

13   Did she say she didn't tell him anything, or what was

14   her response?

15   A.   I don't remember her saying anything.  She just

16   let me vent and we kind of got off phone.

17   Q.   Did you sort of end on a friendly note with her

18   or not so much at that point?

19   A.   I think it was just me venting and her going,

20   "okay."

21   Q.   I mean she accused you of simply being a liar,

22   I think.  I mean, she said that you were not going to

23   come back and yet, you know, according to you, she

24   knew full well you were going to come back.  So she's

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 296

1    saying, no, she's a liar.  Would you really have been

2    friendly on the phone?

3        A.    I told you I yelled.

4        Q.    When you say venting to me, like I vent to my

5    friends.  But you weren't really like more venting to

6    her as much as you are venting at her?

7        A.    I was just yelling.  And I -- it was -- then I

8    realized that I'm being stupid and this is immature

9    and got off the phone because it wasn't going to make

10   a difference.

11       Q.    Okay.  I understand.

12             Then what happened?  Then that's it, the

13   department of labor, and what not, right?

14       A.    Then that's -- all that, and then department of

15   labor asked Mr. Fleming to come in for a mediation.

16       Q.    Right.  Okay.  I don't want to get too far of a

17   time block.

18             Did you respond to this letter, the

19   January 7 letter in writing at all?

20       A.    No.

21       Q.    Did Mr. Butz tell you that might be a good

22   idea, Mr. Michael Butz?

23       A.    I don't think he indicated it was good, bad,

24   or -- I didn't respond.  At that point I a made

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 297

1  decision I wasn't going to come back if I had to sign

2  a labor contract.

3      Q.   But you never got any real information about

4  what that actually meant?

5      A.   No.

6      Q.   And after Mr. Michael Butz called him, got

7  this information about some kind of labor contract,

8  came back to you, told you about it, what was sort of

9  his interpretation of the whole situation?

10     A.   As far as what Fleming said about the labor

11  contract.

12     Q.   Sort of what his thoughts were on it.  Like

13  this is nonsense or, well, I don't know what's going

14  on.

15     A.   He just said it's really up to you.  He

16  actually thought I should go look at the labor

17  contract.  But at that point I'm like, you know, I

18  didn't have a signed labor contract when I was first

19  hired.  I'm not signing one now, no.

20     Q.   Did Mr. Butz -- was he sort of a peacemaker in

21  that sense saying maybe we should move towards some

22  kind of peace making?

23     A.   No.  He just, you know, called Mr. Fleming for

24  me, and he goes, you know, "Here's your option.  Do

Wilcox and Fetzer, Ltd.   Registered Professional Reporters          302-655-0477

Electronically signed by ann calligan (501-267-394-7784)          b296ea47-b05f-4b5f-a491-e5666b527145

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 298

1  what you want."  And that's when I decided that, no,

2  it wasn't a good idea for me to go back and under

3  those pretenses and probably even hostility.  And

4  that's when I decided that, you know what, I'm just

5  going to go to unemployment, see if I can collect

6  that, and just check to see if I can get a job, you

7  know.  I have a kid.  I can't worry about that.  I

8  need to get a job.

9     Q.   But that was not in January, right, or that was

10  in January?

11    A.   What?

12    Q.   Worrying about getting a job, seeking

13  employment.

14    A.   After this letter, that's when I went, I

15  believe, to the unemployment.  I went to unemployment

16  pretty much with this letter.  But I couldn't collect

17  unemployment until that period of time because I was

18  on maternity leave.

19    Q.   The end of the six weeks?

20    A.   Yes.

21    Q.   Which makes sense to you?  When they said that

22  to you, you said okay.

23    A.   At first I didn't understand.  Then they

24  explained to me, with a doctor's note, I couldn't

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 299

1  work, so, therefore, I understood their point of view,

2  that I couldn't collect unemployment until I was

3  allowed to work.

4     Q.   The doctor's note, tell me about that.  That I

5  think you submitted with maybe your complaint or

6  something like that.  You submitted a photocopy to the

7  Court of a doctor's note saying you couldn't work.  If

8  you don't recall, that's --

9     A.   I remember submitting some doctor notes, but...

10     Q.   Just tell me about the doctor's note.  I don't

11  need to pull it out.

12     A.   Well, you know, they gave me one.  I think it

13  was like the 29th or 30th or something.

14     Q.   Who is they?  Would that have been --

15     A.   That would have been --

16     Q.   -- ob/gyn?

17     A.   Yes.

18         And just for my records, you know, if I

19  needed it, then I would have it.  And then I went back

20  to them saying I might need a doctor's note again.

21     Q.   Them being the ob/gyn?

22     A.   Ob/gyn.  So they gave me one for the whole six

23  to eight weeks.  The form was never asked for, so I

24  never sent it to them.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 305

1    Q.    Okay.

2    A.    But Jeanne did make the comment, "Oh, it's a

3    new baby."  You know, with C-sections, of course,

4    you're laid up.  So you can't drive, so...

5    Q.    Yeah.  Yeah.

6    A.    But she's like "but thank you for the offer."

7    Q.    All right.  Fair enough.  Excellent.

8          So at that time it was absolutely still

9    very cordial, pleasant, familial, no hostility?

10   A.    No.

11   Q.    Correct?

12   A.    Correct.  I'm sorry.

13   Q.    Now, we know -- hate to get to the law of it.

14   We know that you're bringing your claim under

15   Title VII, right?  That's Title VII of the Civil

16   Rights Act of 1964, which is referred to generally as

17   Title VII.  Is that your understanding?

18   A.    Yes.

19   Q.    And under Title VII you have to allege you're

20   in a protected class, and your protected class that

21   you're alleging is pregnancy, correct?

22   A.    Correct.

23   Q.    And do you feel or do you believe or do you

24   claim that you were discriminated against because you

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 306

1    were pregnant?

2        A.    I believe so, yes.

3        Q.    And who harbored some kind of bias towards

4    pregnant women, who would that have been?

5        A.    There was comments during pregnancy, you know,

6    even during a meeting, you know, Mr. Fleming indicated

7    that the man was not allowed to take off.  It was the

8    woman's job to take the kids to work.

9        Q.    I want to get to all that actually in great

10   detail, but first I just want to know who the person

11   or persons are that you believe harbored some kind of

12   discriminatory animus against pregnant women?

13       A.    Mr. Fleming.

14       Q.    Did Jeanne Fleming harbor any discriminatory

15   animus against women?

16       A.    She made comments, but it was mostly

17   Mr. Fleming.

18       Q.    And you felt that he -- I want to get further,

19   but I don't want to put words into your mouth.  Do you

20   know another way to say that instead of sort of the

21   legal terms of it?  Instead of harbors discriminatory

22   animus, can you say, did he not like pregnant women?

23   Did he have something against pregnant women.  I'm

24   just trying to figure out --

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 307

1    A.   He believed that women should stay home to take
2    care of their children.  They should be homemakers.
3    Q.   Is his wife --
4    A.   His wife is a homemaker.  She works
5    occasionally, but for the most part, she is a
6    homemaker.
7    Q.   And they have five children?
8    A.   Five children.
9    Q.   And so your position is that Mr. Fleming thinks
10   that women should not work who have children?
11   A.   They should stay home.
12   Q.   And did any other women at Lawns Unlimited,
13   other than Jeanne Fleming, did any of them have
14   children?
15   A.   No.  Well, never -- there was only two women,
16   and -- well, three women, but I was the only one ever
17   pregnant.
18   Q.   Laurie.  Dina.  Debby.  Anyone else?
19   A.   Dina did not have children.
20   Q.   Debby, did she have children?
21   A.   They were old -- older.  They are --
22   Q.   Over 18?
23   A.   I believe so.
24   Q.   And Laurie you already said.  Dina?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 308

1    A.    Laurie had two.  Dina did not have any.

2    Q.    How old were Laurie's kids, out of the house?

3    A.    No.  They were still in the house.

4    Q.    Lived with her?

5    A.    At the time, yes.

6    Q.    And who was the person responsible for hiring

7    you?

8    A.    Jeanne and Ed.

9    Q.    Joint decision?

10   A.    Yes.

11   Q.    And who would have been responsible for hiring

12   Laurie?

13   A.    Jeanne, but I sat through the interview.

14   Q.    All right.  And would Mr. Fleming have had any

15   role in that?

16   A.    He did come and meet her because I think he was

17   ecstatic because she had -- no.  That was -- I'm

18   thinking of Dina.  I think Dina had a degree.  One of

19   them had a degree, so he was really ecstatic that she

20   had a background like he had.

21   Q.    And so would he have had yea or nay power to

22   decide?  Would he have had veto power, I mean, to

23   decide if someone was not going to get hired?

24   A.    Yes.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 309

1    Q.    So he could have vetoed your hiring?

2    A.    Yes.

3    Q.    And Laurie's and Debby's and Dina's?

4    A.    Yes.

5    Q.    So I guess it's your position -- I suppose it's

6    your position that Mr. Fleming -- and I want you to

7    correct me on my part of this if it's wrong -- that

8    Mr. Fleming in his capacity as an agent of Lawns

9    Unlimited discriminated against you because you were

10   pregnant?

11   A.    Yes.

12   Q.    And that is, in fact, why he terminated you,

13   because you were pregnant?

14   A.    I believe so.

15   Q.    And what about the fact that he had been told,

16   perhaps erroneously, but he had been told, that you

17   were not returning, how did that play a role?

18   A.    That's his decision on that, but as far as --

19   Q.    Do you believe that he believed that?

20   A.    I don't know what he thought.

21   Q.    Well, you know --

22   A.    I'm not in his brain.

23   Q.    You do conclude that he thought that?

24   A.    Based on this letter, yes.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 310

1    Q.   Yes what?

2    A.   Based on his letter, he believed that fellow

3 co-workers said I wasn't coming back.

4    Q.   You believe that that was part of the reason

5 that he terminated you?

6    A.   Well, that was part of the reason and because I

7 cost him too much money in his health insurance.

8    Q.   And that's stated in the letter?

9    A.   Yes, it is.

10    Q.   The letter states that you had your baby on

11 December 30th and they were asking for it to be

12 extended to cover the delivery, right?  Is that right,

13 your health insurance?

14    A.   December 31th.

15    Q.   Which would have covered the delivery, right?

16    A.   Yes.

17    Q.   The fact that he asked the health insurance

18 company to extend your coverage to cover you during

19 your delivery, does that comport with the fact that

20 you believe he had a discriminatory bias?

21    A.   Well, let's keep going.  It says, "Lawns

22 Unlimited has now incurred a much higher premium as a

23 result of your working for us for one year to pay

24 bills estimated in excess $23,000, and then leaving

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 314

1   bill, but for an employee who no longer works there.

2       A.   I guess it's interpreted -- interpretations and
3   you know...

4       Q.   I guess I understand if you think this was just
5   made up.

6       A.   I don't know how he got the figures unless he
7   called his insurance -- I don't know.  You know.  I'm
8   not Mr. Fleming, so...

9       Q.   I'm not asking you to speak on his behalf.  I
10  just want to know what you thought when you read it.

11      A.   That he discriminated against me.  He basically
12  fired me because I was out on maternity leave, that he
13  was like, hell with it, she's not coming back.  I'm
14  firing while she's out on maternity leave.  And
15  obviously the EEO -- the DDOL found him because I got
16  a right-to-sue letter.

17      Q.   Right.  Well, for the record, everyone gets a
18  right-to-sue letter.  It's part of the process.
19  That's why we have an administrative process.  So you
20  can get a cause or no cause findings and you still get
21  a right to sue letter.  It's the law, which there's a
22  reason for that.  I mean, the reason for that is
23  everyone has a constitutional right to a trial by
24  jury.  So we couldn't implement a system where an

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 315

1    administrative agency takes away that right for you to

2    take your lawsuit to court.

3            What the government can do is implement a

4    system where you have to take additional steps with an

5    administrative agency such as the department of labor

6    before you get to sue.  So you always have a right

7    to -- it's a constitutional right to go get a trial.

8    So the fact that they issue a right-to-sue letter

9    doesn't mean --

10    A.    They found cause of him discriminating.

11    Q.    Now, that may mean something.  Legally it

12    doesn't, but it might mean something factually.

13            But when you got the letter, did you think

14    that he thought -- he says, our greater concern is

15    that you told fellow co-workers, dot, dot, dot, that

16    you never had any intentions of returning at all from

17    that maternity leave.  Did you think that he was

18    concerned that fellow co-workers told him that you

19    never had any intentions of returning at all from your

20    maternity leave?  Do you think he was concerned?

21    A.    I believe the first or second paragraph of the

22    authorization and the last per -- the "per

23    conversation with our health insurance" is the biggest

24    thing because usually you write most important thing

Electronically signed by ann calligan (501-267-394-7784)                b296ea47-b05f-4b5f-a491-e5666b527145

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 316

1    up on top and then the next important thing at the

2    bottom.

3        Q.    Well, without implying too much into the

4    structural framework of letter drafting, do you think

5    that he was concerned that you told fellow co-workers,

6    or that he believed you had told fellow co-workers you

7    were not returning from maternity leave?  Do you

8    believe that that was the case?

9        A.    It's not relevant.

10       Q.    I'm just asking you a question.  Did you

11   believe that?  I mean, did you think he was lying or

12   did you think Debby Watson had told him that and that

13   she was lying?  Did you think he had completely made

14   that up?  I mean, that's all I'm asking.  I'm not

15   asking whether these other things don't exist.  I'm

16   just asking this one limited piece.

17       A.    You know, he could have believed that, but why

18   didn't he believe me over them?

19       Q.    I'm not asking if he could.  Anybody could

20   have, should have, would have.  I'm asking you, when

21   you got this letter, did you think that is what he

22   thought, in addition to other things?

23       A.    At first was pregnancy.

24       Q.    That's not -- I mean, we can go back and forth.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 317

1   I can continue to ask the same question.  You can

2   continue to avoid, but I'm going to continue to ask.

3       A.    That was part of it, yes.

4       Q.    So you did think -- I mean, which is, I would

5   assume, in line with why you would call Debby Watson

6   and say, "What are you doing?"  Right?

7       A.    Yes.

8       Q.    Because you believed when you read this that it

9   was Debby Watson probably who had made this up, right?

10  You said that you suspected it would have been Debby

11  Watson that told this falsity?

12      A.    I would assume it was her.

13      Q.    That's fine.  I mean, that's all I'm asking is

14  what you know, what your thoughts were when you

15  received the letter.

16          So when you got the letter you said, you

17  know, in addition to other things you said that Debby

18  Watson must have been the one who told him this

19  nonsense, right?

20      A.    Yes.

21      Q.    So you did believe at that time that he thought

22  that was fact, is that right?

23      A.    I believe there was a lot of facts, but that

24  was part -- part B of the facts.

---

Electronically signed by ann calligan (501-267-394-7784)                b296ea47-b05f-4b5f-a491-e5666b527145

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 318

1    Q.   Agreed.  I'm not saying it was the most
2    important.  I'm not saying it was the least important
3    fact or where it was written in the letter.  I'm just
4    asking, was it a consideration?
5    A.   Yes.
6    Q.   And was it your desire to get it straightened
7    out, make the record clear?
8    A.   I tried.
9    Q.   Okay.  Tell me how you tried.
10   A.   We talked.  I sent him e-mails.  I mean, I
11   was his employee who was there a lot longer and
12   trained so many people, and I mean, it's not my job to
13   convince him.  It's him to believe me and understand
14   that I went out on maternity leave, and he chose to
15   make a bad and wrongful choice.
16   Q.   But after January 14th, when you received the
17   letter, did you do anything to clarify it?
18   A.   I had Mr. Butz, Michael Butz contact him.
19   Q.   And when Michael Butz contacted Mr. Fleming,
20   was part of what he said dealing with this?
21   A.   It was to try to get my job back.
22   Q.   How did he do that?
23   A.   He called him and said, "Mr. Fleming, give her
24   her job back.  Reinstate her insurance."  Mr. Fleming

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 319

1    said, "Absolutely not.  This is my business.  I can do

2    whatever the hell I want.  She wants to come back,

3    she's got to sign a labor contract."

4              I'm not signing a labor contract.  I'm not

5    doing it.

6    Q.   Well, you didn't know what the contract was

7    right?

8    A.   Exactly.  Just knew it was a labor contract.

9    Q.   Which you'd never seen except for in some -- I

10   forget -- one context, I think.

11   A.   But why would I be the only one?

12   Q.   I'm not saying -- I'm not saying you should

13   have signed it.

14   A.   Because I was the only one that was pregnant.

15   Q.   I'm not saying you should have signed it.  I'm

16   just making sure the record is clear.

17             And did Mr. Butz, Michael Butz say during

18   that conversation, "Look, this is not the case.

19   You're wrong.  You've got it all wrong, Mr. Fleming"?

20   A.   I would be speculating.  I'm not sure.  I was

21   not part of the conversation.

22   Q.   So as far as you know for certain, no one ever

23   contacted Mr. Fleming and said, "Mr. Fleming, you've

24   got it wrong; she didn't tell any co-worker that"?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 320

1    A.    I sent documentation.

2    Q.    To him?

3    A.    I sent Mr. Fleming an e-mail.  I've --

4    Q.    Wait.  Wait.  Wait.  One step at a time.

5    A.    I talked to him the 23rd, the 24th.

6    Q.    I'm talking about after January 14th, 2004, did

7    anybody that you're aware of contact Mr. Fleming and

8    say, "Mr. Fleming, you've got it wrong; she did not

9    tell co-workers that she not going to return, and she

10   didn't accept other employment," et cetera?

11   A.    The only conversation that I am aware of was

12   when Michael Butz talked with Mr. Fleming.

13   Q.    Fair enough.  And during that conversation that

14   you are aware of, he did not say, "Mr. Fleming, this

15   is not -- your letter isn't accurate"?

16   A.    With --

17   Q.    Without speculating.

18   A.    Yeah.  I don't know what exactly was said.  I

19   just know that part of it.

20        MS. DiBIANCA:  All right.  Let's take a

21   break.

22        (Luncheon recess taken.)

23        MS. DiBIANCA:  We will go back on the

24   record.  We are finishing up plaintiff's deposition in

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 321

1    Butz versus Lawns Unlimited.  And we are all back that
2    were present for the morning session.
3    BY MS. DiBIANCA:
4        Q.    While you had a break over lunch, did you have
5    anything that you want to supplement or amend for the
6    morning session?
7        A.    No.
8        Q.    When you were at Lawns Unlimited when you were
9    covered by their insurance, did you have co-pays for
10   doctor visits?
11       A.    Yes.
12       Q.    And you do or do not remember how much they
13   were?
14       A.    I don't remember.
15       Q.    I know we went over that yesterday and I
16   apologize for asking again.  And so the co-pay amount
17   is an amount that is your responsibility, correct?
18       A.    Correct.
19       Q.    So any amount of medical expenses that you
20   would have had -- let's say if you thought that
21   insurance coverage ended the 31st -- so if you went on
22   the 27th to the pharmacy and got a prescription and
23   you were still under Lawns health care at that point,
24   right?

Electronically signed by ann calligan (501-267-394-7784)                    b296ea47-b05f-4b5f-a491-e5666b527145

A124

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 327

1  first question at the top is -- actually, probably

2  should say, could you tell me what that is?  Does that

3  look familiar?

4      A.    It is the questionnaire form that was filled

5  out, I believe, at the DDOL.

6      Q.    And who filled it out.

7      A.    Myself.

8      Q.    And then the first question at the top of that

9  page, I think question 20, can you tell me what that

10 says?

11     A.    "Why do you believe that you and person cited

12 in 19 above are just disciplined more severely than

13 those persons cited in 18 above?"

14     Q.    And is that, your understanding of that

15 question is, not having read 18 and 19 above, but is

16 it that -- why do you feel you were discriminated

17 against?  Is that how you understand that?

18     A.    Yes.

19     Q.    And what did you respond?

20     A.    That I believe I was let go due to insurance

21 reasons, clearly mentioned in paragraph 4 of the

22 letter.

23     Q.    And is that your position today as well?

24     A.    Yes.

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 329

1    Q.    Actually I think I'm asking a different

2    question.  So you're referring to the evidence of

3    discrimination, is that right, what you see as

4    evidence of discrimination?

5    A.    Yes.

6    Q.    I was thinking, why would they have

7    discriminated?  That's sort of -- do you see the

8    difference?  Let me think of a better way to put it if

9    that's not clear.

10              In other words, what was their motivation?

11   I say they, and I just mean defendants.  What was

12   their motivation to act to treat you more severely?

13   A.    For the insurance.  I think it was for the

14   insurance reasons and that's why they let me go.  I

15   mean I still feel that way.

16   Q.    That's fine.  I just want to get it on the

17   record.

18              That's all I have for that one.

19              And is it your position that Jeanne

20   Fleming did not harbor a discriminatory animus based

21   on pregnancy?

22   A.    Harbor?

23   Q.    Have.

24   A.    Does she make any -- make any comments?

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 330

1    Q.   No.  I mean, did you have any reason to believe

2  that she disliked pregnant people, pregnant women?

3    A.   I don't know.  I mean after the letter and

4  comments being made, in my eyes, yes.  She didn't have

5  a problem with me being pregnant.

6    Q.   So it was Mr. and Mrs. Fleming then, is that

7  right?  You believe that Mrs. Fleming actually

8  discriminated against you?

9    A.   She wasn't in the office that often, so it was

10 Mr. Fleming, he's that one that terminated me.  But

11 Mrs. Fleming is his wife, so...

12   Q.   So she went along with it because she was his

13 wife or because she actually was acting out towards

14 pregnant people, had discriminatory bias towards

15 pregnant people?

16   A.   Shed make comments, you know, about homemaking,

17 but that's it.  I mean, as far as any actions are

18 concerned, it was all Mr. Fleming.

19   Q.   So he was the discriminatory actor?

20   A.   Yes.

21   Q.   And she had the authority to but chose not to

22 act on your behalf?

23   A.   I guess not.  She never called me.

24   Q.   So we agree that you definitely state that she

Butz v. Lawns Unlimited, Ltd. and Fleming
Renee M. Butz - DiBianca

Page 331

1    did not act on your behalf.  Did she have the

2    authority to act on your behalf?

3        A.   She is one of -- she's the secretary/treasurer.

4    She helped -- you know, she was part of hiring me,

5    so...

6        Q.   So you would assume that?

7        A.   Yes.

8        Q.   Okay.  That's fine.

9            Were you ever at any time offered

10   reinstatement at Lawns Unlimited?

11       A.   Was I ever offered reinstatement?  No.

12       Q.   Were you offered reinstatement at the

13   unemployment insurance board hearing?

14       A.   No.

15       Q.   Was reinstatement discussed at that time?

16       A.   I believe it was discussed, but at that point I

17   already had a job.

18       Q.   So you would not have accepted it if it had

19   been offered then?

20       A.   Correct.  A little late.

21       Q.   And they knew you were working then, right?

22       A.   Yes.

23       Q.   It's your testimony you did not seek medical

24   treatment for any kind of medical issue you were