IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
RENEE M. BUTZ,                   :
                                 :
          Plaintiff,             :
                                 :
     v.                          : Civ. Action No. 05-495-JJF
                                 :
LAWNS UNLIMITED LTD. and         :
EDWARD FLEMING,                  :
                                 :
          Defendants.            :
```

Renee M. Butz, North East, Maryland.  <u>Pro</u> <u>se</u> Plaintiff.

Margaret M. DiBianca and Teresa A. Cheek, Young, Conaway,
Stargatt & Taylor, Wilmington, Delaware.  Attorneys for
Defendants Lawns Unlimited Ltd. and Edward Fleming.

**<u>MEMORANDUM OPINION</u>**

July 30, 2008
Wilmington, Delaware

**Farnan, District Judge**

Plaintiff Renee M. Butz ("Plaintiff") filed her Complaint on July 15, 2005, alleging sex discrimination on the basis of her pregnancy. (D.I. 2.) Presently before the Court is Plaintiff's Motion To Amend/Correct The Amended Complaint and Motion For An Extension Of Time To Complete Discovery and Defendants' Motion For Summary Judgment, and responses thereto. (D.I. 106, 115, 124.)

For the reasons set forth below, the Court will grant Plaintiff's Motion To Amend/Correct, deny as moot Plaintiff's Motion For Extension Of Time To Complete Discovery, and grant Defendants' Motion For Summary Judgment as to the claims against Edward Fleming and deny the Motion For Summary Judgment in all other respects.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On July 15, 2005, Plaintiff filed this discrimination action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 and § 20003-5(g). A Second Amended Complaint was filed on August 15, 2007. (D.I. 105.) Plaintiff alleges employment discrimination occurred from September 1, 2003 to January 7, 2004, while she was employed by Defendant Lawns Unlimited Ltd. ("Lawns Unlimited"). More specifically, she alleges she was terminated while on maternity leave; her insurance was cancelled without notice and she was not offered COBRA; she did not receive

vacation, sick or personal time owed her; overtime hours were deleted; and, she did not receive a bonus.  Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and with the State of Delaware Department of Labor.  The EEOC issued a Notice of Right to Sue letter on June 9, 2006.

Lawns Unlimited, a small lawn care business, was founded in 1987 by Edward Fleming ("Mr. Fleming") and Jeanne Fleming ("Mrs. Fleming"), his wife.  (D.I. 123.)  Mr. Fleming is the president of Lawns Unlimited.  (Id.)  He works in the field and also shares office responsibilities with Mrs. Fleming.  (Id.)

Defendants hired Plaintiff on September 4, 2002 to replace the previous office manager.  (D.I. 123.)  She began as a temporary employee, and became a full-time employee on October 16, 2002.  (Id.)  Plaintiff held the position of office manager the entire time she was employed by Lawns Unlimited.  (Id.)

Several office assistants were employed by Lawns Unlimited during Plaintiff's tenure.  Laurie Schatz ("Schatz") was hired first, followed by Dina Alderucci ("Alderucci") in June 2003.  (D.I. 123.)  Alderucci was trained by Plaintiff to relieve Plaintiff during her maternity leave.  (D.I. 128, B70.)  However, Alderucci resigned from her position prior to the time that Plaintiff's maternity leave began.  (Id.)  In November 2003, Debbie Watson ("Watson") replaced Alderucci (Id.)

-3-

There is no written leave policy.  (D.I. 126, A8.)
Apparently, however, there is an unwritten leave policy as Mr.
Fleming testified that employees who take medical leave, either
paid or unpaid, are required to fill out a form and receive an
authorization from either Mr. Fleming or Mrs. Fleming.  (D.I.
126, A8-9.)  Plaintiff testified that use of the forms was never
really enforced, but that an employee needed to seek verbal
approval.  (<u>Id</u>. at A86.)

The leave policy Mr. Fleming testified to is not included in
the employee policy manual, but the manual provides for sick
pay/time off as follows: "It is understood that from time to
time, time off will be necessary - following approval from the
owners, this time will be allowed. . . .  A maximum number of
paid days off will be 3 days/year.  Any days off over the allowed
amount will be deducted from employees salary.  Likewise any
personal time off (or unapproved time - not in writing by owners
of Lawns Unlimited) will be automatically deducted from employees
salary.  Being off work for any other reasons other than those
listed above are considered unexcusable and will not be
compensated for. . . .  Hourly employees are paid only for actual
hours worked and therefore not paid for sick days, or any
personal or medical time off."  (<u>Id</u>. at A8-9, A254, ¶ 24.)
Plaintiff's health care coverage through Lawns Unlimited provided
for "employee-only" coverage.  (D.I. 123.)

-4-

The record reflects that Watson was absent from work on a number of occasions. (D.I. 128, B10-21.) Most of her absences were for short durations and with prior approval, but on one occasion it appears she was absent without prior approval for over a week due to medical reasons. (<u>Id</u>. at B10, B21.) Another worker, Schatz also took a short leave of absence for medical reasons. (<u>Id</u>. at B70.)

Plaintiff announced her pregnancy in approximately April 2003. (<u>Id</u>.) The pregnancy was high risk. (D.I. 128, B108.) Plaintiff discussed maternity leave with Mr. Fleming and she trained employees to perform her duties while she was on maternity leave. (D.I. 126, A12.) Mrs. and Mrs. Fleming knew Plaintiff's approximate due date. (D.I. 128, B70.) Defendants knew that Plaintiff intended to take maternity leave following the birth of her child. (D.I. 123.) The maternity leave was not a paid leave, except for the vacation time Plaintiff had accrued. (D.I. 126, A91.))

On December 23, 2003, Plaintiff called Mrs. Fleming and told her that she was going to the hospital and might not come in to work. (D.I. 128, B83.) Plaintiff was at the hospital less than an hour and was told that she was slightly dilated, that her mucus plug had come out, and to go home. (<u>Id</u>.) Plaintiff testified that instead of going home, she went to work because it was payroll week and she wanted to wrap things up before she was

out on maternity leave.  (Id.)  Upon her arrival at work
Plaintiff told Mrs. Fleming and Watson her medical situation.
(Id.)

 Mr. Fleming testified that on December 23, 2003, he handed
Plaintiff a vacation request form so that she could put down
"exactly" when she was going to be back.  (D.I. 126, A19.)  Mr.
Fleming left the office before Plaintiff, however, and when he
returned the form was blank.  (Id. at A20.)  Plaintiff did not
fill out the form and Lawns Unlimited did not receive a doctor's
notice when the maternity leave began.  (Id.)

 Plaintiff's husband, Scott Butz ("Scott") arrived at Lawns
Unlimited at approximately 2:00 P.M. to take Plaintiff home.
(D.I. 128, B108.)  At the time, Mr. Fleming was on the radio and
Plaintiff and Scott waived to him.  (Id.)  According to
Plaintiff, she grabbed her toothbrush and toothpaste and left.
(D.I. 128, B109.)  According to Mr. Fleming, Plaintiff removed
all her personal belongings from the office.  (Id. at A22.)  It
is undisputed that Plaintiff kept her office keys.  According to
Watson, Plaintiff kept her office keys and told Watson that if
she returned the keys the Flemings would know she was not
planning on returning to work, so she would later mail the keys
to Watson.  (Id. at A146.)

 After Plaintiff left the office, Watson told Mr. Fleming
that Plaintiff had no intention of returning to work at Lawns

Unlimited after giving birth and that she had another job waiting for her. (D.I. 126, A8, A145, A158, A205.)  Watson indicated that Plaintiff was worried about health care.  (<u>Id</u>. at A205.) Also according to Watson, Plaintiff planned to go on unpaid leave for four weeks, and then give two weeks' notice.  (<u>Id</u>.) According to Watson, Plaintiff gave Watson her cell phone number and told her not to share it with the Flemings because she was on maternity leave and they were not allowed to call her.  (<u>Id</u>.) Mr. Fleming testified Watson did not have Plaintiff's cell number, but another telephone number that only she could use. (D.I. 128, B88.)

That evening Mr. Fleming telephoned Plaintiff.  (D.I. 128, B108.)  Plaintiff told Mr. Fleming that she would return to work after her maternity leave ended.  (<u>Id</u>.)  She was visibly upset, and according to Scott, needed to lie down after the telephone call ended.  (<u>Id</u>. at 109.)  When Mr. Fleming spoke to Plaintiff on the evening of December 23, 2004, he asked Plaintiff to come to the office the next day, December 24th, to discuss the matter, but she did not appear at the office.  (D.I. 126, A158.)

On December 24, 2003, Mr. Fleming called and left a message for Plaintiff.  (D.I. 128, B109.)  According to Scott, Plaintiff returned the call, he heard Mr. Fleming screaming, and Plaintiff began crying.  (<u>Id</u>.)  At that time Mr. Fleming asked Plaintiff why she was not at work and she replied that she could not drive.

(D.I. 126, A95.)  Plaintiff told Mr. Fleming that she intended to
return to work after her maternity leave.  (D.I. 123.)  It was
during this conversation that Mr. Fleming told Plaintiff that her
fellow co-workers had told him that she had no intention of
returning to work after her maternity leave and that she had
accepted another job.  (D.I. 126, A103-104.)

     Scott took the phone from Plaintiff and spoke to Mr.
Fleming.  He told Mr. Fleming that Plaintiff intended to return
to work after her maternity leave.  (D.I. 123.)  He also told Mr.
Fleming that the information he had been given by Watson could
not be further from the truth, that Plaintiff did not have a job
lined up, and that she had not interviewed with anyone.  (D.I.
128, B109.)  Mr. Fleming told Scott he would take their words on
the matter, and Scott thought the matter resolved.  (<u>Id</u>.)
According to Mr. Fleming, Scott told him that Plaintiff was
officially on maternity leave and did not want to talk to Mr.
Fleming or see him until the end of her leave.  (D.I. 126, A15.)
Mr. Fleming testified that he needed to know what was going on
and told Scott that he needed to figure out who was telling the
truth.  (<u>Id</u>.)  Defendants believed that Plaintiff had secured
other employment prior to December 23, 2003.  (D. I. 123.)
Plaintiff sent Defendants an e-mail dated December 24, 2003, at
1:00 P.M., as a follow-up to their December 23, 2003 conversation
that her maternity leave had begun effective December 23, 2003,

and that she intended to return to work six weeks after the birth of her child. (D.I. 123; D.I. 128, B9.)

According to Watson, Plaintiff telephoned her on December 23, 2003, and asked Watson why she had told Mr. Fleming of her plans. (D.I. 126, A146.) Watson responded that she was worried about her job with the company and that Plaintiff's actions were not fair to anyone. (Id. at A146.) According to Plaintiff, it was after the December 24th telephone call with Mr. Fleming when Plaintiff may have telephoned Watson and yelled at her. (D.I. 126, A105.) Plaintiff suspected Watson was the person who had advised Mr. Fleming that Plaintiff was allegedly planning on not returning to work. (D.I. 126, A120.)

According to Plaintiff, Mr. Fleming called on December 26, 2003 with a computer question, and there were two other subsequent business telephone calls. ((D.I. 128, B84, B85 at B85.) The calls were pleasant and about business. (Id. at B85.) Based upon those conversations, Plaintiff had some doubt, but did not believe that there was a problem with her maternity leave. (Id. at B85.) Mr. Fleming did not recall speaking to Plaintiff on December 26 or December 29, 2003 but knew that Watson had because of computer problems. (Id. at B88.) According to Mr Fleming, he was unable to speak to Plaintiff because she would not return telephone calls and gave Watson a telephone number that Mr. Fleming could not use. (D.I. 126, A15; D.I. 128, B87.)

-9-

He testified that Plaintiff never told him that she was not
returning to work, but she never returned his telephone calls.
(D.I. 126, A19.)

Plaintiff gave birth on December 30, 2003.  (D.I. 128,
A194.)  She called the Lawns Unlimited office on January 5, 2004
after the birth of her child, and left a message.  (D.I. 123.)

Plaintiff received a letter from Lawns Unlimited dated
January 7, 2004, advising her that she was terminated effective
December 23, 2003.  ( D.I. 123.)  The termination letter cited
several reasons for Plaintiff's termination, including that she:
1) had not received written authorization for her maternity leave
as required by company policy; 2) did not provide a written
doctor's notice indicating she needed time off; 3) told fellow
co-workers that she had no intention of returning to work[1]; and
4) sought and apparently accepted employment elsewhere.  (D.I.
126, A196.)  Mr. Fleming states in this letter that he determined
Plaintiff had terminated her employment with Lawns Unlimited
effective December 23, 2003, when she "left the premises cleaning
out [her] desk and taking all of [her] belongings." (D.I. 126,
A196.)  The letter goes on to state that Plaintiff's insurance
coverage disenrollment date as December 23, 2003, but that Lawns
Unlimited will extend the coverage to December 31, 2003, if
allowed by the insurance carrier so that the costs of delivery

---

[1]The letter states that Plaintiff's co-workers were willing
provide testimony on this issue.

-10-

would be covered.  (<u>Id</u>.)  Mr. Fleming testified that Lawns Unlimited did not want Plaintiff to be burdened with the medical expenses from the birth of her child.  (D.I. 126. A28.)  The letter states that Lawns Unlimited would incur a much higher insurance premium as a result of Plaintiff's working for one year, using its insurance to pay medical bills in excess of $23,000 and then leaving the company.  (D.I. 126, A196.) Finally, the letter states that Lawns Unlimited is disappointed that Plaintiff would take advantage of the benefits it offers and abuse those privileges.  (<u>Id</u>.)

A fax from the Flemings dated January 8, 2004, stated that the Flemings spoke to their insurance agent "who was all for us disenrolling" Plaintiff on December 23, 2003, until the agent was told that Plaintiff thought that "she was on maternity leave (unapproved, of course) then it gets into a gray area."  (D.I. 126, A194.)  On January 22, 2004, Mrs. Fleming requested that Lawns Unlimited's insurance carrier extend Plaintiff's insurance coverage through December 31, 2003.  (D.I. 126, A192.)

Plaintiff testified that getting the letter was a "slap in the face" because she had given Mr. Fleming her word she was returning to work, and her word meant nothing.  (D.I. 126, A106.) Plaintiff did not respond to the letter.  (<u>Id</u>. at A107.)  She believes that one of the reasons Defendants terminated her was because of increased health care premiums.  (D.I. 123.)

-11-

Plaintiff also believes she was discriminated against because she was pregnant. (D.I. 126, A112, A115.) She concluded, based upon the January 7, 2004 letter, that Mr. Fleming terminated her because she was pregnant, that he believed fellow co-workers who said Plaintiff was not returning to work, and that part of the reason he terminated Plaintiff was because she cost him too much money in his health insurance. (_Id_. at A115, A116.) She testified that Mr. and Mrs. Fleming made comments, but "it was mostly" Mr. Fleming. (_Id_. at A112) Plaintiff testified that Mr. Fleming believed that women should stay home to take care of their children; they should be homemakers. (_Id_. at A113.)

After Plaintiff received the termination letter, her father-in-law, Michael L. Butz ("Mr. Butz") telephoned Mr. Fleming. (_Id_.) Mr. Butz's version of the conversation is that he asked Mr. Fleming if he realized he was violating the Pregnancy Discrimination Act by firing Plaintiff and Mr. Fleming responded that it was his company and he could do whatever he wanted. (D.I. 128, B90.) Mr. Butz asked Mr. Fleming to reinstate Plaintiff's position. (_Id_.) Mr. Fleming agreed to reinstate Plaintiff, but under the condition that Plaintiff sign an employment contract for a certain number of years. (_Id_.) When asked if any of his other employees had ever signed an employment contract, Mr. Fleming responded, "no." (_Id_.) Mr. Fleming indicated that this was the only way the Plaintiff's employment

-12-

would be reinstated.  (Id.)

Conversely, Mr. Fleming testified that there are no labor contracts at Lawns Unlimited.  (D.I. 126, A15.)  He testified that he and Mr. Butz had a nice talk, Mr. Butz asked if Mr. Fleming would give Plaintiff back her job, and Mr. Fleming replied to have Plaintiff call him.  (D.I. 126, A15.)  Mr. Fleming waited for Plaintiff to call after speaking to Mr. Butz, but she did not.  (Id. at A17.)

Plaintiff did not receive any information regarding what meant by a labor contract, but decided she would not return to work at Lawns Unlimited if she was required to sign a labor contract.  (Id. at A108.)  At that point, Plaintiff decided to seek unemployment benefits.  (Id. at A109.)

Plaintiff received unemployment compensation following her termination from Lawns Unlimited.  (D.I. 123.)  However, she could not collect unemployment benefits until her maternity leave time had expired (i.e., when a physician released her to return to work).  (D.I. 126, A109.)  Lawns Unlimited offered Plaintiff reinstatement during the unemployment insurance hearing, but by that time she had obtained another job.  (D.I. 126, A128, A179.)  Plaintiff had applied for a job with the Cecil County Government on February 6, 2004, was hired, and started in her new position on March 1, 2004.  (D.I. 123; (D.I. 126, A132.)

-13-

II.  **STANDARD OF REVIEW**

The Court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  When determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If the nonmoving party fails to make a sufficient showing on an

-14-

essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  To survive a motion for summary judgment, Plaintiff cannot rely merely on the unsupported allegations of the Complaint, and must present more than the "mere existence of a scintilla of evidence" in her favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff."  <u>Blozis v. Mellon Trust of Delaware Nat'l Ass'n</u>, 494 F. Supp. 2d 258, 267 (D. Del. 2007) (quoting <u>Hankins v. Temple Univ.</u>, 829 F.2d 437, 440 (3d Cir. 1987)).

## III. DISCUSSION

### A.  Individual Liability

Mr. Fleming moves for summary judgment on the basis that an individual defendant is not subject to suit under Title VII. Plaintiff did not address the issue in her response.

Title VII does not contemplate the liability of individual employees.  <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 184 (3d Cir. 1997).  Indeed, it is well-settled that Title VII does

-15-

not provide for individual liability.  <u>Sheridan v. E.I. DuPont de
Nemours & Co.</u>, 100 F.3d 1061, 1078 (3d Cir. 1996) (<u>en</u> <u>banc</u>).  <u>See
Hill v. Borough of Kutztown</u>, 455 F.3d 225 (3d Cir. 2006).
Plaintiff's claim against Mr. Fleming, individually, fails as a
matter of law.  Accordingly, the Court will grant his Motion For
Summary Judgment.

**B.  Pregnancy Discrimination**

The Civil Rights Act of 1964 prohibits discrimination on the
basis of sex.  The Pregnancy Discrimination Act ("PDA")
explicitly provides that, for the purposes of Title VII, "on the
basis of sex," includes discrimination "because of or on the
basis of pregnancy, childbirth, or related medical conditions."
42 U.S.C. § 2000e(k); <u>International Union, United Auto.,
Aerospace and Agr. Implement Workers of America, UAW v. Johnson
Controls, Inc.</u>, 499 U.S. 187, 198-99 (1991); <u>Villanueva v.
Christiana Care Health Services, Inc.</u>, Civ. No. 04-258-JJF, 2007
WL 188111, at *3 (D. Del. Jan. 23, 2007).  The prohibition of
employment discrimination based on an individual's sex is
breached "whenever an employee's pregnancy is a motivating factor
for the employer's adverse employment decision."  <u>Doe v. C.A.R.S.
Prot. Plus, Inc.</u>, –F.3d–, 2008 WL 2222689, at *3 (3d Cir. 2008)
(quoting <u>In re: Carnegie Ctr. Assoc.</u>, 129 F.3d 290, 294 (3d Cir.
1997).  The PDA does not require preferential treatment for
pregnant employees but, instead mandates that employers treat

-16-

pregnant employees the same as non-pregnant employees who are
similarly situated with respect to their ability to work.  (Id.)
(citations omitted)

     Disparate treatment discrimination is proven by either using
direct evidence of intent to discriminate or using indirect
evidence from which a court could infer intent to discriminate.
Doe v. C.A.R.S.,2008 WL 2222689, at *3.  When a claim is
supported with evidence from which discrimination may be inferred
the Court uses the McDonnell Douglas burden-shifting framework to
analyze the Title VII pregnancy discrimination claim.  Id.
(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
(1973)).  The analysis proceeds as follows:  1) The employee
must first establish a prima facie case; 2) If the employee is
able to present such a case, then the burden shifts to the
employer to provide a legitimate, nondiscriminatory reason for
its adverse employment decision; 3) If the employer is able to do
so, the burden shifts back to the employee, who, to defeat a
motion for summary judgment, must show that the employer's
articulated reason was a pretext for intentional discrimination.
Doe v. C.A.R.S., 2008 WL 2222689, at *3.

     A pregnancy discrimination case is unique and is not treated
as an ordinary case of gender discrimination.  Id. at *4.  "[T]he
elements of that prima facie case must not be applied woodenly,
but must rather be tailored flexibly to fit the circumstances of

-17-

each type of illegal discrimination." _Id_. (quoting _Geraci v._ _Moody-Tottrup, Int'l, Inc._, 82 F.3d 578, 581 (3d Cir. 1996). "Moreover, the Supreme Court has cautioned that the **prima** **facie** requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" _Id_. (quoting _Texas Dep't of Cmty._ _Affairs v. Burdine_, 450 U.S. 248, 253 (1981).

Establishing a **prima** **facie** case of pregnancy discrimination differs from establishing a **prima** **facie** case of gender discrimination. _Id_. at *4. In a case alleging pregnancy discrimination, to raise an inference of any unlawful discharge a plaintiff must adduce evidence that: 1) she was pregnant, and, that the employer knew it; 2) she was qualified for her job; 3) she suffered an adverse employment decision; and 4) there is some nexus between her pregnancy and the adverse employment action. _Id_. (citations omitted). The nexus between a plaintiff's pregnancy and an adverse employment action raises an inference of discrimination. _Id_.

### 1. **Prima** **Facie** Case

The parties do not dispute that Plaintiff has met her burden on the first three elements of a **prima** **facie** pregnancy discrimination case: 1) she was pregnant and that her employer knew she was pregnant; 2) she was qualified for her job; and, 3) she suffered an adverse employment decision. The parties dispute the fourth element, that is, whether there is some nexus between

-18-

Plaintiff's pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination.

"[T]he PDA does not require that employers treat pregnant employees better than other temporarily disabled employees", but it "does require that employers treat pregnant employees no worse." Id. (citations omitted). Hence, a plaintiff may present evidence to show that she was treated less favorably than similarly situated employees who are not in the plaintiff's protected class. Id. at *5. (citations omitted). In this regard, Plaintiff submitted evidence that two non-pregnant workers (i.e., Watson and Schatz) took sick leave, some with prior approval and some without prior approval, albeit for shorter periods of time, but they were not terminated.

Additionally, Plaintiff left work on December 23, 2003, and by letter dated January 7, 2004 was discharged retroactively to December 23, 2003. Temporal proximity is sufficient to create an inference of causality to defeat summary judgment. Leoben v. Lancaster Jewish Cty. Ctr. Ass'n, 503 F.3d 217, 232-233 (3d Cir. 2007). In assessing causation, the Court looks to the procedural posture of the case. See id. at 279 n.5 ("There is . . . a difference between a plaintiff relying upon temporal proximity to satisfy her prima facie case for the purpose of summary judgment, and to reverse a verdict.") (internal citation omitted). Here, Plaintiff was terminated two weeks after she began her maternity

-19-

leave and one week after giving birth, with the termination retroactive to her last working day.  The temporal proximity is sufficient here to meet Plaintiff's minimal <u>prima</u> <u>facie</u> case burden as to the causal connection element.  <u>See</u> e.g. <u>Fistulate v. Justice</u>, 409 F.3d 178, 189-90 (3d Cir. 2005) (discussing a period less than one month and noting that "a short period of time" may provide the evidentiary basis of an inference of retaliation).

For the above reasons, the Court finds that Plaintiff has provided sufficient evidence to satisfy the nexus element of the <u>prima</u> <u>facie</u> case, particularly in light of the fact that her burden at this stage is not particularly onerous.  Hence, she has thus raised an inference of discrimination sufficient to defeat summary judgment.

### 2. Legitimate, Nondiscriminatory Reason for Employment Action

Because Plaintiff has established a <u>prima</u> <u>facie</u> case, the burden of production shifts to Defendants to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  <u>Doe v. C.A.R.S.</u>, 2008 WL 2222689 at *9 (citations omitted).  When this burden is met, the Court's "factual inquiry then proceeds to a new level of specificity."  <u>Id</u>. (citing <u>Burdine</u>, 450 U.S. at 255).  The presumption of discrimination established by the <u>prima</u> <u>facie</u> showing "simply drops out of the picture."  <u>Id</u>. (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S.

-20-

502, 511 (1993)).  If Defendants meet this burden, Plaintiff must
then show that the legitimate reasons offered by Defendants are
merely a pretext for discrimination.  Id. (citations omitted).

To show pretext, Plaintiff must submit evidence which (1)
casts doubt upon the legitimate reason proffered by the employer
such that a fact-finder could reasonably conclude that the reason
was a fabrication; or (2) would allow the fact-finder to infer
that discrimination was more likely than not a motivating or
determinative cause of the employee's termination.  Id.
(citations omitted).  Accordingly, to avoid summary judgment,
Plaintiff's evidence rebutting the employer's proffered
legitimate reasons must allow a fact-finder reasonably to infer
that the employer's proffered non-discriminatory reasons was
either a post hoc fabrication or otherwise did not actually
motivate the employment action (that is, that the proffered
reason is a pretext).  Id. (citations omitted).  It is important
to remember that the prima facie case and pretext inquiries often
overlap.  Id.

Defendants maintain that Plaintiff was terminated because
she abandoned her job.  Defendants specifically argue that on
December 23, 2003, Plaintiff packed her personal belongings and
left without telling Mr. or Mrs. Fleming she was going to begin
her planned maternity leave.  They argue that Plaintiff did not
leave her office keys or any instructions for Watson during her

-21-

absence, or tell Defendants how long she expected to remain out.
Nor did Lawns Unlimited provide for any maternity leave, either
paid or unpaid.  Finally, Plaintiff was terminated for failure to
communicate her intentions regarding her employment status or to
dispute Watson's claims.

        An unexcused absence from work is a legitimate,
nondiscriminatory reason for terminating employment.  <u>Doe v.
C.A.R.S.</u>, 2008 WL 2222689 at *9.  Defendants' contention,
however, is not supported by the evidence which demonstrates
Defendants knew that Plaintiff intended to take maternity leave
and knew that she expected to be off work for six weeks.  On
December 23, 2003, Plaintiff thought she was going into labor and
sought medical attention.  She left the hospital and upon her
arrival at work advised everyone of her situation.  Plaintiff
orally, and later in written communication, advised Lawns
Unlimited that her maternity leave began on December 23, 2003,
that she intended to return to work, and that  she expected to be
off work for six weeks.  While Defendants argue there was no
leave policy, Mr. Fleming testified that  employees were expected
to fill out a leave form, and on Plaintiff's last day at work
left a form for her to complete.  Moreover, while the company
manual does not specifically refer to maternity leave, it
provides for unpaid sick leave for hourly employees.  The
evidence contradicts Defendants' position.  The facts before the

-22-

court permit an inference Defendants knew Plaintiff was beginning her maternity leave.

Defendants further argue that they believed Plaintiff was not returning to work despite the fact that both she and her husband reiterated to Mr. Fleming that Plaintiff would return. Moreover, prior to her termination, Plaintiff responded to business telephone calls and nothing seemed amiss.  Additionally, Plaintiff kept her office keys which suggests that she intended to return to work.  Defendants focus on the fact that Plaintiff remained on Lawns Unlimited's insurance until she gave birth, but the record reflects that Defendants sought to end Plaintiff's insurance coverage and only extended it upon the advice of their insurance company.

Finally, Plaintiff presented evidence which casts doubt on whether Defendants had a good faith belief that she had abandoned her job.  Plaintiff was employed by Lawns Unlimited for over a year, yet Defendants chose to believe Watson, an employee of two months, over Plaintiff.  Plaintiff told Mr. Fleming she would return to work, a sentiment echoed by her husband.  Indeed, she was consistent in her statements to Mr. Fleming that she intended to return to work.  Defendants argue that Plaintiff did not call Mr. Fleming after receipt of the termination letter to discuss reinstatement, but the letter makes no mention that this was an option.

-23-

In the Court's view, the evidence presented creates a genuine issue of material fact as to whether Defendants' proffered reasons for terminating Plaintiff's employment were a pretext.  For the discussed reasons, the Court will deny Defendants' Motion For Summary Judgment.

### 3.  Damages

Lawns Unlimited argues that Plaintiff's failure to produce documents in support of her damages claim precludes her from any award.  Because Plaintiff is <u>pro</u> <u>se</u>, the Court will allow Plaintiff a limited time to address the damages issue within forty-five (45) days from this decision.  Therefore, the Court will, at this juncture, deny the Motion For Summary Judgment on the issue of damages.

## IV.  Miscellaneous Motions

### A.  Motion To Amend

Plaintiff moves to amend her Second Amended Complaint to add a claim for pain and suffering and for punitive damages.  (D.I. 106.)  Defendants object to the Motion.

"After amending once or after an answer has been filed, the plaintiff may amend only with leave of the court or the written consent of the opposing party, but 'leave shall be freely given when justice so requires.'"  <u>Shane v. Fauver</u>, 213 F.3d 113, 115 (3d Cir. 2000) (quoting Fed. R. Civ. P. 15(a)).  The Third Circuit has adopted a liberal approach to the amendment of

pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities." Dole v. Arco Chem. Co., 921 F.2d 484, 486-87 (3d Cir. 1990) (citations omitted). Amendment, however, is not automatic. See Dover Steel Co., Inc. v. Hartford Accident and Indem., 151 F.R.D. 570, 574 (E.D.Pa. 1993). Leave to amend should be granted absent a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962); See also Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000). Futility of amendment occurs when the complaint, as amended, does not state a claim upon which relief can be granted. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

Here, Plaintiff seeks to amend the damages claims of her Second Amended Complaint, rather than to add new facts or counts. The Court advised Plaintiff in its July 23, 2007 Memorandum Order that if she wished to add claims, parties, or essential facts not already alleged, she was required to request leave to amend her Amended Complaint by motion. (See D.I. 99.) She followed the Court's instructions in filing the instant motion.

In asking the Court to deny the Motion, Defendants are seeking a ruling on the issue of whether Plaintiff is able to

-25-

prove the damages she seeks.  Because the Court has granted
Plaintiff a limited extension to address the damages issue, the
Court will grant the Motion To Amend.  Plaintiff will be allowed
to amend the Second Amended Complaint only as to the ad damnum
clause adding a claim for pain and suffering and punitive
damages.

### B.  Motion To Extend Discovery

Plaintiff's Motion To Extend Discovery, filed September 13,
2007, seeks to extend the discovery deadline for thirty days.
Plaintiff contends that during her deposition, Defendants
introduced new evidence regarding their defense that had not been
previously been provided.

Defendants argue that Plaintiff does not indicate what that
defense might be and that she has had ample opportunity to
participate in discovery.  Defendants further advise that in an
attempt to resolve this matter they spoke to Plaintiff and she
indicated the extension of time was requested so that Defendants
could respond to her Third Request For Production.  Defendants
advise the court they have responded to this last discovery
request.  Based upon the foregoing, the Court will deny as moot
the Motion To Extend Discovery.  (D.I. 115.)

### V.  CONCLUSION

For the reasons above, the Court will grant Plaintiff's
Motion To Amend/Correct, deny as moot Plaintiff's Motion For

Extension Of Time To Complete Discovery, and grant Defendants'
Motion For Summary Judgment as to the claims against Edward
Fleming and deny the Motion For Summary Judgment in all other
respects.  An appropriate Order will be entered.